ROBERT E. OPERA -- State Bar No. 101182
ropera@winthropcouchot.com
PAYAM KHODADADI – State Bar No. 239906
pkhodadadi@winthropcouchot.com
**WINTHROP COUCHOT**
**PROFESSIONAL CORPORATION**
660 Newport Center Drive, Ste 400
Newport Beach, CA 92660

Telephone: (949) 720-4100
Facsimile: (949) 720-4111

General Insolvency Counsel for
Debtor and Debtor-in-Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>PERSIK PRODUCTIONS, INC.,<br>fka BOB YARI PRODUCTIONS,<br><br>               Debtor and<br>               Debtor-in-Possession. | Case No.: 2:10-bk-12122 BR<br><br>Chapter 11<br><br>**DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT ACCOMPANYING DEBTOR'S SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION**<br><br><u>Disclosure Statement Approval Hearing</u>:<br>Date:     March 1, 2011<br>Time:    10:00 a.m.<br>Place:   Courtroom 1668<br>           255 East Temple Street<br>           Los Angeles, CA 90012<br><br><u>Plan Confirmation Hearing</u>:<br>Date:     April 20, 2011<br>Time:    2:00 p.m.<br>Place:   Courtroom 1668<br>           255 East Temple Street<br>           Los Angeles, CA 90012 |

# TABLE OF CONTENTS

**PAGE**

I.      INTRODUCTION ................................................................................................    2

II.     DEFINITIONS AND RULES OF CONSTRUCTION .........................................    7
        A.      Definitions ...............................................................................................    7
        B.      Rules of Interpretation ...........................................................................    32
        C.      Exhibits ...................................................................................................    33

III.    OVERVIEW OF THE CHAPTER 11 PROCESS, THE PLAN AND
        VOTING ON THE PLAN ...................................................................................    33
        A.      The Chapter 11 Process ..........................................................................    33
        B.      Overview of the Debtor's Proposed Plan .................................................    34
        C.      Plan Confirmation and Voting and Objection to the Plan ............................    35
                1.      Voting on the Plan .......................................................................    35
                2.      Deadline for Voting for or Against the Plan ....................................    36
                3.      Deadline for Objecting to the Confirmation of the Plan....................    36
                4.      Time and Place of the Confirmation Hearing ...................................    37
                5.      Plan Confirmation ........................................................................    37
                6.      Identity of Person to Contact for More Information
                        Regarding this Disclosure Statement or the Plan..............................    38

IV.     NATURE AND HISTORY OF THE DEBTOR'S BUSINESS;
        CAUSES OF THE DEBTOR'S FINANCIAL DIFFICULTIES; THE
        DEBTOR'S CHAPTER 11 FILING; SIGNIFICANT EVENTS
        DURING THE DEBTOR'S CHAPTER 11 CASE; AND THE
        DEBTOR'S ASSETS AND LIABILITIES AND FINANCIAL
        CONDITION ......................................................................................................    39
        A.      The Debtor ...............................................................................................    39
        B.      The Debtor's Financial Difficulties .........................................................    40
                1.      Contraction of Financing Markets ..................................................    40
                        (a)     YFGR ...............................................................................    40
                        (b)     Pre-Petition Litigation.......................................................    42
                2.      Reduction in Value of Subsidiary Interests ....................................    43
        C.      The Filing of the Debtor's Chapter 11 Petition ..........................................    43
        D.      Significant Events During the Case ..........................................................    43
                1.      Bankruptcy Schedules...................................................................    43
                2.      Meeting of Creditors.....................................................................    43
                3.      Debtor's Application to Employ Winthrop Couchot
                        Professional Corporation  ..............................................................    43
                4.      The Committee and Its Professionals ..............................................    44
                5.      Motions for Relief from Stay.........................................................    44
                        (a)     Alliance Parties .................................................................    44
                        (b)     Schulman and Nunun.........................................................    44

## TABLE OF CONTENTS

### (Continued)

| | | | PAGE |
|---|---|---|---|
| | (c) | Haggis Parties | 44 |
| | (d) | Robb | 45 |
| 6. | | Plan and Disclosure Statement Filing Deadline | 45 |
| 7. | | The Debtor's Plan Exclusivity Rights | 45 |
| 8. | | One Train Later Financing Motion | 46 |
| 9. | | Davand Loan | 46 |
| 10. | | Committee's Employment of Expert Debtor's Position Regarding Value of Subsidiary Interests | 47 |
| E. | Summary of Debtor's Assets and Liabilities and Present Financial Condition | | 48 |
| | 1. | Debtor's Assets | 48 |
| | 2. | Debtor's Liabilities | 48 |
| | (a) | Secured Claims | 48 |
| | (b) | Administrative Claims | 48 |
| | (c) | Priority Non-Tax Claims | 49 |
| | (d) | Priority Tax Claims | 49 |
| | (e) | General Unsecured Claims | 49 |
| V. | LITIGATION AND OBJECTIONS TO CLAIMS | | 49 |
| A. | Litigation Commenced Prior to the Petition Date | | 49 |
| B. | Litigation Commenced After the Petition Date | | 50 |
| C. | Claims Objections | | 50 |
| D. | Subordination Actions | | 50 |
| E. | Notice Regarding Causes of Action and Claims Objections | | 51 |
| VI. | DESCRIPTION OF THE PLAN | | 51 |
| A. | Basic Structure of the Plan | | 51 |
| B. | Classification and Treatment of Claims | | 52 |
| C. | Unclassified Claims | | 53 |
| | 1. | Allowed Administrative Claims | 53 |
| | (a) | Payment | 53 |
| | (b) | Administrative Claims Bar Date | 54 |
| | (c) | Deadline for Objections | 54 |
| | (d) | United States Trustee Fees/Pre-Effective Date Professional Fee Claims | 55 |
| | 2. | Allowed Priority Tax Claims | 55 |
| D. | Classification of Claims and Interests | | 55 |
| | 1. | Overview | 55 |

MAINDOCS-#158405-v5-PersikFirstAmndDisclosureStatement.DOC

# TABLE OF CONTENTS

## (Continued)

|  |  |  |  | PAGE |
|---|---|---|---|---|
| | 2. | Designation of Classes | | 56 |
| | | (a) | Allowed Claims | 56 |
| | | | (i) Class 1 | 56 |
| | | | (ii) Class 2 | 56 |
| | | | (iii) Class 3 | 56 |
| | | | (iv) Class 4 | 56 |
| | | | (v) Class 5 | 56 |
| | | | (vi) Class 6 | 56 |
| | | (b) | Interests | 56 |
| | | | (i) Class 7 | 56 |
| | 3. | Summary of Classification | | 57 |
| VII. | TREATMENT OF CLASSES UNDER THE PLAN | | | 58 |
| | A. | Class 1 -- Allowed Secured Claim of Bank Leumi | | 58 |
| | | 1. | Claims Against Subsidiaries | 58 |
| | | 2. | Accommodation Security Agreement | 58 |
| | B. | Class 2 -- Allowed Guild Secured Claims | | 58 |
| | | 1. | Claims Against Subsidiaries | 59 |
| | | 2. | Guilds Forbearance Agreement | 59 |
| | | 3. | Amount of Allowed Guild Secured Claims | 60 |
| | | 4. | Interest on Allowed Guild Secured Claims | 60 |
| | | 5. | Distributions on Account of Allowed Guild Secured Claims | 60 |
| | | 6. | Final Distribution on Account of Allowed Guild Secured Claims | 61 |
| | | 7. | No Section 1111(b) Election | 61 |
| | | 8. | Guarantee of Allowed Guild Secured Claims | 61 |
| | | 9. | Reorganized Debtor's Pledge to Guilds of Subsidiary Interests | 62 |
| | | 10. | Davand's Pledge to Guilds of Interest in the Reorganized Debtor | 62 |
| | | 11. | Guilds' Option to Employ Plan Agent | 62 |
| | | | (a) Guilds' Right to Make Plan Agent Election | 63 |
| | | | (b) Powers of Guilds Plan Agent | 63 |
| | | | (i) Subsidiaries Financial Reporting to Guilds Plan Agent | 64 |
| | | | (ii) Additional Financial Reporting to Guilds Plan Agent | 64 |
| | | | (iii) Guilds Plan Agent's Access to Financial Books and Records | 64 |
| | | | (iv) Guilds Plan Agent's Right to Consult Regarding the Amount of Subsidiary Distributions | 64 |
| | | | (v) Guilds Plan Agent's Enforcement of Remedies | 65 |
| | | | (c) Obligation to Cooperate with Guilds Plan Agent | 65 |

MAINDOCS-#158405-v5-PersikFirstAmndDisclosureStatement.DOC

# TABLE OF CONTENTS

### (Continued)

| | | PAGE |
|---|---|---|
| (d) | Resolution of Disputes with Guilds Plan Agent | 66 |
| (e) | No Interest in Plan Fund | 66 |
| (f) | Cost of Guilds Plan Agent | 66 |
| (g) | Termination of Employment of Guilds Plan Agent | 66 |
| 12. | Release of Guilds' Liens | 67 |
| 13. | Guilds Allowed Unsecured Claims Distribution Cap | 67 |
| C. | Class 3 -- Any Allowed Secured Claims, Other than Class 1 and Class 2 Allowed Secured Claims | 67 |
| D. | Class 4-- Any Allowed Priority Non-Tax Claims | 68 |
| E. | Class 5-- Allowed General Unsecured Claims | 68 |
| 1. | Plan Fund | 68 |
| 2. | Distributions of Plan Fund Proceeds | 68 |
| 3. | Schedule of Distributions | 68 |
| (a) | Initial and Interim Class 5 Distributions | 68 |
| (b) | Final Distributions | 69 |
| 4. | No Post-Petition Interest | 69 |
| 5. | Conditions to Distributions on Account of Allowed Class 5 Claims | 69 |
| 6. | Satisfaction of Allowed Class 5 Claims | 70 |
| 7. | Termination of Reorganized Debtor's Obligation to Holders of Allowed Class 5 Claims | 70 |
| 8. | Yari Guaranty | 70 |
| 9. | Reorganized Debtor's Pledge of Subsidiary Interests | 70 |
| 10. | Davand's Pledge of Interest in the Reorganized Debtor | 71 |
| 11. | Waiver and Release of All Class 5 Claims of Yari Affiliates | 71 |
| 12. | Reorganized Debtor's Pledge of Security Interest in Net Recoveries | 71 |
| 13. | Release of Plan Agent's Liens | 71 |
| 14. | General Unsecured Claims Cap | 71 |
| F. | Class 6 – Any Allowed Subordinated Claims | 72 |
| G. | Class 7 – Interests | 72 |
| 1. | Retention of Interest | 72 |
| 2. | New Value | 73 |
| VIII. | PLAN IMPLEMENTATION | 73 |
| A. | Overview | 73 |
| B. | Plan Agent | 74 |
| 1. | Establishment and Administration of Plan Fund | 74 |
| 2. | Distributions on Account of Allowed Claims | 74 |
| C. | Review of Financial Reporting | 74 |
| 1. | Subsidiaries Financial Reporting/Post-Effective Date Net Cash Flow Reporting | 74 |

MAINDOCS-#158405-v5-PersikFirstAmndDisclosureStatement.DOC

# TABLE OF CONTENTS

## (Continued)

|  |  | PAGE |
|---|---|---|
| 2. | Additional Financial Reporting | 75 |
| 3. | Access to Financial Books and Records | 75 |
| 4. | Consultation Regarding the Amount of Subsidiary Distributions | 75 |
| 5. | Objections to Disputed Claims | 76 |
| 6. | Prosecution of Causes of Action | 76 |
| 7. | Enforcement of Remedies | 76 |
| 8. | Approval of Sale of Assets of Subsidiaries Out of the Ordinary Course of Business | 77 |
| 9. | Other Rights, Powers and Duties | 77 |
| D. | Plan Fund | 77 |
| 1. | Subsidiary Distributions | 77 |
| 2. | Effective Date Cash Balance | 78 |
| 3. | Post-Effective Date Net Cash Flow | 78 |
| 4. | Net Recoveries | 78 |
| (a) | Film Rights Net Recoveries | 78 |
| (b) | Non-Film Rights Net Recoveries | 79 |
| (c) | Axium Litigation Payment | 79 |
| E. | Distributions of Plan Fund Proceeds | 80 |
| F. | Representative of the Estate | 80 |
| G. | No Liability of the Post-Effective Date Committee or the Plan Agent | 80 |
| H. | Funding of Post-Effective Date Plan Expenses | 81 |
| I. | Termination of the Committee and Appointment of the Post-Effective Date Committee | 81 |
| J. | The Reorganized Debtor | 82 |
| 1. | Corporate Powers | 82 |
| 2. | Board of Directors | 82 |
| 3. | Officers of Reorganized Debtor | 82 |
| K. | Causes of Action | 82 |
| L. | Post-Effective Date Professional Fees | 83 |
| 1. | Reorganized Debtor's Employment of Professionals | 83 |
| 2. | Plan Agent's Employment of Professionals | 83 |
| 3. | Ordinary Course Payments to Professionals | 83 |
| M. | Approval for Disposition of Assets | 84 |
| 1. | Disposition of Plan Fund Assets | 84 |
| 2. | Disposition of Retained Assets | 84 |
| N. | Compromise of Claims Objections and Causes of Action | 85 |
| O. | Plan Completion Certification | 85 |
| P. | Final Decree | 86 |
| Q. | Subsidiaries Financial Reporting/Post-Effective Date Net Cash Flow Reporting | 86 |
| 1. | Subsidiaries' Financial Affairs | 86 |
| 2. | Reorganized Debtor's Net Cash Flow | 86 |

MAINDOCS-#158405-v5-PersikFirstAmndDisclosureStatement.DOC

## TABLE OF CONTENTS

### (Continued)

| | | |
|---|---|---|
| R. | Inter-Company Transactions | 87 |
| S. | Post-Effective Date Operations of Subsidiaries | 87 |
| T. | Reorganized Debtor's Operating Expenses | 87 |
| U. | Obligation to Cooperate with Plan Agent | 88 |
| V. | Resolution of Disputes | 88 |
| W. | Distributions | 88 |
| | 1.  Designation and Role of the Disbursing Agent | 88 |
| | 2.  Distribution of Property Under the Plan | 89 |
| | (a)  Cash Distributions | 89 |
| | (b)  Setoffs and Recoupment | 89 |
| | (c)  Timeliness of Distributions | 89 |
| | (d)  Limitation on Liability | 90 |
| | (e)  Delivery of Distributions | 90 |
| | (i)  Distributions Only to Holders of an Allowed Claim | 90 |
| | (ii)  Addresses to Which Distributions Will Be Sent | 90 |
| | (f)  Approval for Schedule of Proposed Distributions | 91 |
| | (g)  Compliance with Tax Requirements | 91 |
| | (h)  Further Assurances Regarding Distributions | 91 |
| | (i)  Creditor's Payment of Obligations or Turn Over of Property to the Plan Agent | 91 |
| | (j)  Miscellaneous | 92 |
| X. | Objections to Disputed Claims | 92 |
| | 1.  Right to Object to Disputed Claims | 92 |
| | 2.  Claims Objection Deadline | 93 |
| | 3.  Treatment of Disputed Claims | 93 |
| | (a)  No Distribution Pending Allowance | 93 |
| | (b)  Distribution After Allowance | 93 |
| | (c)  Reserve for Disputed Claims | 93 |
| | (d)  No Distribution Until Allowance of Disputed Claim | 94 |
| | 4.  Bar Date for Filing Avoidance Action Payment Claims | 95 |
| Y. | Litigation | 95 |
| | 1.  Authorization to Assert Causes of Action | 95 |
| | 2.  Preservation of Causes of Action | 95 |
| Z. | Executory Contracts and Unexpired Leases | 96 |
| | 1.  Executory Contracts and Unexpired Leases Being Assumed | 96 |
| | 2.  Executory Contracts and Unexpired Leases Being Rejected | 97 |
| | 3.  Guild Contracts | 97 |
| | 4.  Bar Date for Rejection Claims | 98 |
| | 5.  Cure Claims Schedule | 98 |

## TABLE OF CONTENTS

### (Continued)

**PAGE**

| | | |
|---|---|---|
| AA. | Post-Effective Date Notice | 99 |
| BB. | Disposition of Guarantees | 99 |
| CC. | Miscellaneous Plan Provisions | 99 |
| DD. | Valuation of Subsidiary Interests | 100 |
| | 1. Net Asset Valuation Report | 100 |
| | 2. Valuation Analysis Conducted by the Guilds | 101 |
| | 3. The Committee's Employment of The Salter Group | 101 |
| | 4. The Committee's and the Guilds' Evaluation of the Subsidiary Interests | 102 |
| | (a) Inclusion of Contingent Liabilities | 102 |
| | (b) Inclusion of Litigation Costs | 102 |
| | (c) Updating of Financing Affairs | 103 |
| | (d) More Accurate Estimate of Value of Film Rights | 103 |
| | (e) Guilds' Residuals on Reversionary Values | 103 |
| | 5. Marketing of Debtor's Business. | 103 |
| EE. | Yari Guarantee and Collateral for Securing Payment of Distributions Under the Plan | 105 |
| | 1. Subsidiary Interests Pledge Agreement | 105 |
| | 2. Davand Pledge Agreement | 106 |
| | 3. Reorganized Debtor's Pledge of Security Interest in Net Recoveries | 106 |
| | 4. Collateral for Yari Guarantee | 107 |
| FF. | Waiver of Reimbursement and Contribution Claims | 109 |
| | 1. Insolvent Subsidiaries | 110 |
| | 2. Value Provided to Settle Reimbursement/Contribution Claims | 110 |
| | (a) Payments to Creditors in Excess of Value of the Interest | 110 |
| | (b) Davand's Funding Is Essential to the Reorganized Debtor's Meeting Its Obligations to Creditors Under the Plan | 110 |
| | (c) Reimbursement/Contribution Claims Release Payment | 111 |
| IX. | EFFECT OF CONFIRMATION OF THE PLAN | 112 |
| | A. Discharge | 112 |
| | B. Injunction/Release | 112 |
| | C. Distribution of Property Free and Clear of Liens, Claims and Interests | 112 |
| | D. Binding Effect of Plan | 113 |
| | E. Revesting of Assets | 113 |

MAINDOCS-#158405-v5-PersikFirstAmndDisclosureStatement.DOC

## TABLE OF CONTENTS

### (Continued)

**PAGE**

X.    LIMITATION OF LIABILITY ............................................................................. 113
    A.    No Liability for Solicitation or Participation.............................. 113
    B.    Good Faith ................................................................................. 113
    C.    Limitation of Liability Regarding Plan....................................... 113

XI.   CERTAIN RISK FACTORS TO BE CONSIDERED ..................................... 114
    A.    Risk that the Debtor Will Have Insufficient Cash for the Plan
        to Become Effective.................................................................... 114
    B.    Risk Regarding the Distributions to Be Made to Holders of
        Allowed General Unsecured Claims........................................... 114
    C.    Bankruptcy Risks ....................................................................... 115

XII.  CONFIRMATION OF THE PLAN................................................................... 115
    A.    Introduction................................................................................ 115
    B.    Votes Necessary to Confirm the Plan ........................................ 115
    C.    Votes Necessary for a Class to Accept the Plan ........................ 116
    D.    Treatment of Non-Accepting Classes ........................................ 116
    E.    Request for Confirmation Despite Non-Acceptance by Impaired
        Class(es)...................................................................................... 116
    F.    Feasibility of the Plan ................................................................ 117
        1.    Feasibility Analysis......................................................... 118
            (a)    Effective Date of the Plan ..................................... 118
            (b)    Unpaid Administrative Claims ($685,876)........................... 118
                (i)    Professional Fees ($684,901)................................ 118
                (ii)   United States Trustee Fees ($975) ........................... 119
            (c)    Cure Claims ($0)............................................................. 119
            (d)    Allowed Priority Non-Tax Claims ($0) ................................. 119
            (e)    Debtor's Cash Resources as of the Effective Date ............... 119
                (i)    Accumulated Cash ($25,000).................................... 119
                (ii)   Subsidiary Distributions ($43,000)........................... 119
                (iii)  Reimbursement/Contribution Claims
                    Release Payment ...................................................... 119
                (iv)   Davand Effective Date Contribution ........................... 119
                (iv)   Expenses to Be Paid Through Effective Date ($0) .... 120
            (f)    Allowed Secured Claims ($2,350,000)................................ 120
             (g)    Allowed Priority Tax Claims ($0) ........................................ 120
             (h)    Allowed General Unsecured Claims ($70.0 Million)............ 120
            (i)    Net Recoveries ($0) .................................................. 121
             (j)    Costs of Administering the Plan ($100,000) ........................ 122

## TABLE OF CONTENTS

MAINDOCS-#158405-v5-PersikFirstAmndDisclosureStatement.DOC

**(Continued)**

**PAGE**

2.    Funding of Distributions Required by the Plan ................................... 122
    (a)    Distributions Payable on or Soon After the Effective
        Date ........................................................................................ 122
    (b)    Ongoing Distributions Under the Plan.................................... 123
        (i)    Allowed Guild Secured Claims .................................. 123
        (ii)    Allowed Priority Tax Claims ..................................... 124
        (iii)    Allowed General Unsecured Claims........................... 124
            (1)    The Amount of Allowed Administrative
                Claims, Cure Claims, Allowed Priority
                Tax Claims, Allowed Priority Non-Tax
                Claims, and Post-Effective Date Plan
                Expenses ...................................................... 124
            (2)    Recoveries from Causes of Action ................ 125
            (3)    Amount of Allowed General
                Unsecured Claims  ......................................... 125
G.    Liquidation Analysis.................................................................. 128
    1.    Potentially Reduced Value of Assets in Liquidation ........................ 130
        (a)    Cash........................................................................................ 130
        (b)    Causes of Action ................................................................... 130
        (c)    Subsidiary Interests............................................................... 130
        (i)    Premium to Be Paid for Subsidiary Interests
            Under the Plan ........................................................... 130
        (ii)    Decline in Value of Subsidiary Interests
            in Chapter 7............................................................... 131
    2.    Increased Amount of Claims in Liquidation...................................... 132

XIII.    CERTAIN FEDERAL TAX CONSEQUENCES OF THE PLAN .......................... 134
    A.    Introduction................................................................................. 134
    B.    Federal Income Tax Consequences to the Debtor ......................... 135
    C.    Tax Consequences to Creditors ................................................... 136

XIV.    ALTERNATIVES TO THE PLAN ........................................................................ 137

XV.    RECOMMENDATION ........................................................................................ 138

MAINDOCS-#158405-v5-PersikFirstAmndDisclosureStatement.DOC

# I.

## **<u>INTRODUCTION</u>**

Persik Productions, Inc. fka Bob Yari Productions, the Debtor in the Case, provides this Disclosure Statement to all of its Creditors.[1] This Disclosure Statement is furnished for the purpose of soliciting acceptances to the Debtor's Plan, which has been filed with the Bankruptcy Court. A copy of the Plan accompanies this Disclosure Statement.

Section 1125 of the Bankruptcy Code requires that, at the time when the Plan is delivered to Creditors, the Plan be accompanied by this Disclosure Statement.[2] The purpose of this Disclosure Statement is to provide adequate information of a kind, and in sufficient detail, so far as is reasonably practicable, in light of the nature and history of the Debtor and the condition of the Debtor's books and records, to enable a typical Creditor to make an informed judgment about the Plan and to enable such Creditor to determine whether it is in his best interest to vote for (accept) or against (reject) the Plan.

This Disclosure Statement contains a description of the Plan and other information relevant to the decision whether to vote to accept or to reject the Plan. The Debtor urges Creditors to read carefully this Disclosure Statement because it contains important information concerning the Debtor's history, business, assets and liabilities and sets forth a summary of the Plan.

This Disclosure Statement does not purport to be a complete description of the Plan, the financial data pertaining to the Debtor's business, the applicable provisions of the Bankruptcy Code, or any other matters that may be deemed significant by Creditors. Out of practical necessity, this Disclosure Statement represents an attempt to summarize extensive financial data, legal documents and legal principles, including provisions of the Bankruptcy Code, and set them forth

---

[1] The definitions of the capitalized terms used in this Disclosure Statement are contained in Article II of this Disclosure Statement.

[2] Section 1125(b) provides, in pertinent part, as follows:

An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information.

1  in understandable, readable form. Thus, although the Debtor has attempted to describe fairly and

2  accurately the matters set forth and discussed in this Disclosure Statement, the

3  Debtor desires to emphasize that the documents referred to or summarized in this Disclosure

4  Statement (including, without limitation, financial information for the Debtor's business) are

5  available for review by contacting in writing the Debtor's attorneys, Winthrop Couchot

6  Professional Corporation (Attn: Robert E. Opera), at the address set forth at the upper left-hand

7  corner of the first page of this Disclosure Statement.

8          If a Creditor does not fully understand this Disclosure Statement, or feels that the

9  information provided herein is insufficient to enable him to determine whether to accept or to

10  reject the Plan, he is invited to make written inquiry of the Debtor's attorneys, Winthrop Couchot

11  Professional Corporation (Attn:  Robert E. Opera), at the address set forth at the upper left-hand

12  corner of the first page of this Disclosure Statement.

13          While this Disclosure Statement provides a summary of the provisions of the Plan, if any

14  inconsistency exists between the Plan and this Disclosure Statement, the provisions of the Plan

15  are controlling.  Therefore, Creditors are urged to review carefully the provisions of the Plan.

16          Only holders of Claims allowed under section 502 of the Bankruptcy Code or Claims

17  temporarily allowed for voting purposes under Rule 3018(a) of the Federal Bankruptcy Rules, and

18  whose Claims are in those Classes of Claims that are "impaired" under the Plan, are entitled to

19  vote to accept or reject the Plan.[3]  Classes of Claims that are not impaired are conclusively

20  presumed to have voted to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code

21  and, therefore, are not entitled to vote on the Plan.

22          To vote to accept or reject the Plan, a Creditor must indicate his acceptance or rejection

23  thereof on the ballot that accompanies this Disclosure Statement and return it to Winthrop

24  Couchot Professional Corporation in the envelope provided or by telefacsimile, such that the

25  ballot is actually received by Winthrop Couchot Professional Corporation by 4:00 p.m. on **March

26  25, 2011**. The mailing address and the telefacsimile number for Winthrop Couchot Professional

27

28  [3] Under section 1124 of the Bankruptcy Code, a Class of Claims under the Plan is impaired by the Plan if the legal, equitable, or contractual rights of the Claims in the Class are altered by the Plan.

Corporation are listed in the upper left-hand corner of the front page of this Disclosure Statement.

Each Class of Creditors allowed to vote on the Plan will be deemed to have accepted the Plan if

the Plan is accepted by valid ballots cast by Creditors in that Class holding at least two-thirds (2/3)

in dollar amount and more than one half (1/2) in number of the Allowed Claims of Creditors in

that Class actually voting on the Plan.  **UNLESS OTHERWISE ALLOWED BY THE**

**BANKRUPTCY COURT, ONLY PROPERLY EXECUTED BALLOTS TIMELY**

**TENDERED TO COUNSEL FOR THE DEBTOR WILL BE COUNTED AS HAVING**

**VOTED ON THE PLAN.**

Since mail delays may occur, and because time is of the essence, it is important that ballots

be returned well in advance of the date specified hereinabove as the deadline for Winthrop

Couchot Professional Corporation to receive ballots. Unless otherwise allowed by the Bankruptcy

Court, any ballots received after such deadline will <u>not</u> be included in any calculation to determine

whether the Debtor's Creditors have accepted or rejected the Plan.

At the Confirmation Hearing, the Bankruptcy Court will determine, pursuant to

section 1129 of the Bankruptcy Code, whether the Plan has been accepted by the necessary

Classes of Claims created under the Plan, and, if not, whether the Bankruptcy Court should

nevertheless confirm the Plan. If at such hearing the Bankruptcy Court should determine that the

Plan meets all of the requirements for confirmation prescribed by the Bankruptcy Code, the

Bankruptcy Court will enter a Confirmation Order. Pursuant to section 1141 of the Bankruptcy

Code, the effect of the Confirmation Order will be to make the provisions of the Plan binding

upon the Debtor and each Creditor, regardless of whether the Creditor voted to accept the Plan.

Pursuant to section 1128 of the Bankruptcy Code, any party-in-interest may object to the

confirmation of the Plan. The Bankruptcy Court has fixed **March 25, 2011**, at 4:00 p.m., as the

deadline for filing an objection to the Plan and for serving a copy thereof upon the Debtor's

attorneys, Winthrop Couchot Professional Corporation, at the address set forth hereinabove, and

upon the United States Trustee. The branch office of the United States Trustee in which the

Bankruptcy Case is being administered is located at 725 South Figueroa St., Suite 2600, Los

Angeles, California 90017. Any objections or other written communications to the United States

1  Trustee respecting the Plan or the Bankruptcy Case should be mailed to the attention of Russell

2  Clementson, Esq., at that address.

3       **THIS IS A SOLICITATION BY THE DEBTOR. THE REPRESENTATIONS**

4  **CONTAINED HEREIN ARE THOSE OF THE DEBTOR AND NOT OF ITS ATTORNEYS**

5  **OR ACCOUNTANTS. NO REPRESENTATIONS CONCERNING THE DEBTOR,**

6  **INCLUDING, BUT NOT LIMITED TO, REPRESENTATIONS AS TO ITS FUTURE**

7  **BUSINESS OPERATIONS, CASH FLOW, THE VALUE OF ITS PROPERTY, THE**

8  **AMOUNT OF CLAIMS AGAINST THE ESTATE, OR ANY TAX EFFECT OF THE**

9  **TRANSACTIONS PROPOSED UNDER THE PLAN, ARE AUTHORIZED BY THE**

10  **DEBTOR, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.**

11       **THE INFORMATION CONTAINED OR REFERRED TO IN THIS DISCLOSURE**

12  **STATEMENT HAS NOT BEEN SUBJECT TO CERTIFIED AUDIT. RECORDS KEPT**

13  **BY THE DEBTOR RELY FOR THEIR ACCURACY ON BOOKKEEPING PERFORMED**

14  **INTERNALLY BY THE DEBTOR. THE DEBTOR BELIEVES THAT EVERY**

15  **REASONABLE EFFORT HAS BEEN MADE TO PRESENT FINANCIAL**

16  **INFORMATION AS ACCURATE AS IS REASONABLY PRACTICABLE GIVEN THE**

17  **NATURE AND HISTORY OF THE DEBTOR'S BUSINESS AND THE CONDITION OF**

18  **THE DEBTOR'S BOOKS AND RECORDS. HOWEVER, THE RECORDS KEPT BY THE**

19  **DEBTOR ARE NEITHER WARRANTED NOR REPRESENTED TO BE FREE OF**

20  **INACCURACY. NEITHER COUNSEL TO THE DEBTOR NOR ANY ACCOUNTANTS**

21  **TO THE DEBTOR HAVE INDEPENDENTLY VERIFIED THE INFORMATION**

22  **CONTAINED HEREIN, OR MAKE ANY REPRESENTATIONS OR WARRANTIES**

23  **WITH RESPECT TO THE ACCURACY THEREOF, EXCEPT AS REPRESENTED OR**

24  **WARRANTED EXPRESSLY IN SECTIONS 2.1.38, 2.1.139, .2.1.150 AND 6.29 OF THE**

25  **PLAN.**

26       **NOTWITHSTANDING THE FOREGOING, OR ANY OTHER STATEMENT**

27  **CONTAINED IN THIS DISCLOSURE STATEMENT, REPRESENTATIONS AND**

28

MAINDOCS-#158405-v5-PersikFirstAmndDisclosureStatement.DOC

1  WARRANTIES EXPRESSLY MADE BY THE DEBTOR, YARI OR BY ANY YARI

2  PARTY IN THE PLAN ARE ACCURATE AS STATED THEREIN.

3    NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR

4  DISPUTED CLAIM OR CAUSE OF ACTION IS NOT IDENTIFIED IN THIS

5  DISCLOSURE STATEMENT. IN ACCORDANCE WITH THE PROVISIONS OF THE

6  PLAN, THE DEBTOR OR THE PLAN AGENT MAY SEEK TO INVESTIGATE, FILE

7  AND PROSECUTE CAUSES OF ACTION OR OBJECTIONS TO CLAIMS, WHETHER

8  OR NOT SUCH OBJECTIONS OR CAUSES OF ACTION ARE IDENTIFIED IN THIS

9  DISCLOSURE STATEMENT.

10    ALL PARTIES ENTITLED TO VOTE ON THE PLAN ARE URGED TO REVIEW

11  CAREFULLY THE PLAN AND THIS DISCLOSURE STATEMENT PRIOR TO VOTING

12  ON THE PLAN. THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT

13  BE CONSTRUED IN ANY MANNER TO BE LEGAL, BUSINESS OR TAX ADVICE.

14  EACH CREDITOR AND OTHER PARTY-IN-INTEREST SHOULD CONSULT WITH

15  HIS OWN LEGAL COUNSEL, BUSINESS ADVISOR, CONSULTANT OR

16  ACCOUNTANT PRIOR TO VOTING ON THE PLAN IN ORDER TO ENSURE A

17  COMPLETE UNDERSTANDING OF THE TERMS OF THE PLAN. THIS DISCLOSURE

18  STATEMENT IS INTENDED FOR THE SOLE USE OF THE CREDITORS OF THE

19  DEBTOR TO ENABLE THEM TO MAKE AN INFORMED DECISION REGARDING

20  THE PLAN.

21    THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE

22  STATEMENT INDICATES ONLY THAT THE DISCLOSURE STATEMENT CONTAINS

23  ADEQUATE INFORMATION FOR THE PURPOSE OF SOLICITATION OF

24  ACCEPTANCES TO THE PLAN BY THE DEBTOR, AND NOT ANY

25  RECOMMENDATION REGARDING WHETHER A CREDITOR SHOULD VOTE TO

26  ACCEPT OR TO REJECT THE PLAN.

27    ANY DISCUSSION OF TAX MATTERS CONTAINED HEREIN IS NOT

28  INTENDED TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF

**AVOIDING ANY TAX OR TAX PENALTIES THAT MAY BE IMPOSED ON ANY PERSON.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED OR REFERRED TO IN PROMOTING, MARKETING OR RECOMMENDING A PARTNERSHIP OR OTHER ENTITY, INVESTMENT PLAN, OR OTHER ARRANGEMENT TO ANY PERSON.  ALL CREDITORS SHOULD CONSULT WITH THEIR OWN LEGAL COUNSEL AND/OR ACCOUNTANTS AS TO LEGAL, TAX, AND OTHER MATTERS CONCERNING THEIR CLAIMS.**

**II.**

**<u>DEFINITIONS AND RULES OF CONSTRUCTION</u>**

A.    **<u>Definitions</u>**.

The following defined terms are used in this Disclosure Statement.

1.    **"<u>Accommodation Security Agreement</u>"** means that Accommodation Security Agreement, dated September 13, 2007, entered into by and between the Debtor and ICB Entertainment Finance, predecessor-in-interest of Bank Leumi, as such agreement may have been amended and as it may be amended hereafter from time to time.

2.    **"<u>ADL</u>"** has the meaning set forth in paragraph VII(A)(1) of this Disclosure Statement.

3.    **"<u>Administrative Claim</u>"** means a Claim for costs or expenses that are allowable under sections 503(b) or 507(b) of the Bankruptcy Code or 28 U.S.C. § 1930. These costs or expenses may include: (a) actual, necessary costs and expenses of preserving the Estate after the Petition Date; (b) Ordinary Course Administrative Claims; (c) Pre-Effective Date Professional Fee Claims; (d) Administrative Tax Claims; and (e) United States Trustee Fees.

4.    **"<u>Administrative Claims Bar Date</u>"** has the meaning set forth in paragraph VI(C)(1)(b) of this Disclosure Statement.

5.    **"<u>Administrative Claims Objection Deadline</u>"** has the meaning set forth in paragraph VI(C)(1)(c) of this Disclosure Statement.

6.      **"Administrative Tax Claim"** means a Tax Claim, other than a Secured Claim, that a governmental unit asserts against the Debtor for any tax period that, in whole or in part, falls within the period commencing on the Petition Date and ending on the Effective Date.

7.      **"Affiliate"** will have the meaning set forth in Bankruptcy Code section 101(2).

8.      **"Allowed Administrative Claim"** means an Administrative Claim that is allowed as set forth in Section 3.1 of the Plan or otherwise by a Final Order.

9.      **"Allowed Avoidance Action Payment Claim"** means an Allowed Claim based upon or arising from an entity's payment to the Plan Fund of a claim asserted against the entity pursuant to an Avoidance Action.  Any Allowed Avoidance Action Payment Claim will be treated under the Plan as an Allowed Class 5 Claim.

10.      **"Allowed Claim"** means a Claim (a) that is listed in the Bankruptcy Schedules filed with the Bankruptcy Court by the Debtor and not listed as disputed, contingent, unliquidated or unknown as to amount and as to which no timely objection has been filed; (b) with respect to which a Proof of Claim has been filed by the Bar Date, and as to which no objection is filed within the time period fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or by order of the Bankruptcy Court, or as to which any such objection has been determined in whole or in part in favor of the holder of the Claim by a Final Order; or (c) that has been resolved pursuant to a settlement agreement approved by Final Order of the Court or otherwise authorized pursuant to the Plan.  Under the Plan, the amount of an Allowed Claim will be as follows:  (i) if the Creditor did not file a Proof of Claim with the Bankruptcy Court on or before the Bar Date, the amount of the Creditor's Claim as listed in the Bankruptcy Schedules as neither disputed, contingent, unliquidated or unknown; or (ii) if the Creditor filed a Proof of Claim with the Bankruptcy Court on or before the Bar Date, (1) the amount stated in such Proof of Claim if no objection to such Proof of Claim is filed within the time period fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or by order of the Bankruptcy Court,

1    (2) the amount thereof fixed by a Final Order of the Bankruptcy Court if an objection to

2    such Proof of Claim is filed within the time period fixed by the Bankruptcy Code, the

3    Bankruptcy Rules, the Plan or by order of the Bankruptcy Court; or (3) the amount fixed

4    pursuant to a settlement agreement approved by Final Order of the Bankruptcy Court or

5    otherwise authorized pursuant to the Plan.  Under the Plan, any Claim that is not filed by

6    the Bar Date and that is listed in the Bankruptcy Schedules as wholly disputed,

7    unliquidated, contingent or unknown, or that is not allowed under the terms of the Plan,

8    will be disallowed in full, and no Distribution will be made on account of such Claim.

9    Notwithstanding anything to the contrary contained in this paragraph II(A)(10) or in

10    Sections 8.3.3 or 8.3.4 of the Plan, a Claim which is disputed only in part will be deemed

11    to be a Disputed Claim only as to the amount of the Claim which is disputed and will be

12    deemed to be an Allowed Claim as to the amount of the Claim which is not disputed.

13    **11.**    **"Allowed Class '***' Claim"** means an Allowed Claim classified in the

14    specified Class.

15    **12.**    **"Allowed Deficiency Claim"** means that portion of an Allowed Claim that

16    is in excess of the value of any Debtor Collateral which is security for the repayment of

17    such Claim, calculated in accordance with the provisions of section 506 of the Bankruptcy

18    Code.

19    **13.**    **"Allowed General Unsecured Claim"** means a General Unsecured Claim

20    that is an Allowed Claim.

21    **14.**    **"Allowed Guild Secured Claim"** means the Allowed Secured Claim of a

22    Guild, in the amount set forth in Section 5.2.3 of the Plan.

23    As of the Petition Date, the Guilds had Secured Claims against the Debtor limited

24    to the Debtor's rights and interests in its Subsidiary, Illusionist Distribution LLC, in the

25    aggregate amount of approximately $134,453.  While the Guilds' secured Claims as of the

26    Petition Date were limited to such extent, the Guilds had as of the Petition Date, and

27    continue to have, security interests encumbering assets of Subsidiaries.  The Guilds assert

28    that Subsidiaries have breached obligations that they owe to the Guilds, and, accordingly,

MAINDOCS-#158405-v5-PersikFirstAmndDisclosureStatement.DOC

1    that the Guilds are entitled to assert secured remedies against such Subsidiaries.  The

2    Subsidiaries have not filed for bankruptcy relief in order to obtain a stay of the Guilds'

3    enforcement of their secured remedies against the Subsidiaries, and the Debtor desires to

4    avoid having Subsidiaries file for bankruptcy relief in light of the expense and disruption

5    associated therewith.  The Debtor instead has requested that the Guilds forbear from

6    exercising their secured remedies against the Subsidiaries in consideration of the Debtor's

7    providing to the Guilds financial accommodations pursuant to the Plan.

8          Pursuant to the Plan, the Debtor proposes to provide to the Guilds Allowed

9    secured claims in the aggregate amount of $2,350,000, which the Debtor believes is the

10   value of the Guilds' secured claims against the Subsidiaries, with the Guilds being

11   granted under the Plan security interests expanded to encumber all of the Debtor's

12   Subsidiary Interests.  Such Allowed Secured Claims are being granted to the Guilds on

13   account of the Guilds' Claims against all of the Subsidiaries and in consideration of each

14   Guild's signing the Guilds Forbearance Agreement.

15         The MPIPHP will have no Allowed Guild Secured Claim under the Plan.

16         **15.**      **<u>Allowed Penalty Claim</u>** means a Penalty Claim that is allowed by a

17   Final Order.  Any Allowed Penalty Claim will be treated under the Plan as an Allowed

18   Class 6 Claim.

19         **16.**      **<u>Allowed Priority Non-Tax Claim</u>** means an unsecured Allowed Claim

20   entitled to priority pursuant to sections 507(a)(4), 507(a)(5), or 507(a)(7) of the

21   Bankruptcy Code.

22         **17.**      **<u>Allowed Priority Tax Claim</u>** means an Allowed Claim entitled to

23   priority under section 507(a)(8) of the Bankruptcy Code.

24         **18.**      **<u>Allowed Rejection Claim</u>** means an Allowed General Unsecured Claim

25   based upon or arising from the rejection of an executory contract or unexpired lease

26   pursuant to a Final Order of the Bankruptcy Court or pursuant to the Plan.  Any Allowed

27   Rejection Claim will be treated under the Plan as an Allowed Class 5 Claim.

28

-10-

19.  **<u>Allowed Secured Claim</u>"** means an Allowed Claim secured by a valid and unavoidable Lien against property in which the Estate has an interest, or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value, determined in accordance with section 506(a) of the Bankruptcy Code, of the Secured Creditor's interest in the Estate's interest in the Debtor Collateral securing the Claim, or to the extent of the amount subject to setoff, whichever is applicable.  Under the Plan, unpaid principal and any accrued interest allowable under section 506 of the Bankruptcy Code with respect to an Allowed Secured Claim will be computed as of the Effective Date, and the Allowed Secured Claim will thereafter bear interest as provided in the Plan.

20.  **<u>Allowed Subordinated Claim</u>"** means any Allowed Claim that is subordinated to Allowed Class 5 Claims to the extent provided by the Bankruptcy Code or a Final Order.

21.  **<u>Asset Disposition</u>"** has the meaning set forth in paragraph (VIII)(M)(2) of this Disclosure Statement.

22.  **<u>Avoidance Action</u>"** means an adversary proceeding, lawsuit or other action or proceeding filed pursuant to sections 502(d), 506, 510, 542, 543, 544, 545, 547, 548, 549, 553 or other sections of the Bankruptcy Code, an adversary proceeding, lawsuit or other action or proceeding based on applicable non-bankruptcy law that may be incorporated or brought under the foregoing sections of the Bankruptcy Code, an adversary proceeding, lawsuit or other action or proceeding arising under, or relating to, any similar state law or federal law, and any other similar action or proceeding filed to recover property for or on behalf of the Estate, or to avoid a Lien or transfer, whether or not such adversary proceeding, lawsuit, action or proceeding is initiated on or before the Effective Date.

23.  **<u>Avoidance Action Payment Claim</u>"** means a Claim based upon or arising from an entity's payment to the Plan Fund of a claim asserted against the entity pursuant to an Avoidance Action.

24.    **"<u>Axium Litigation</u>"** means any Cause of Action against Axium International, Inc., Golden Tree Asset Management, LP, GTAM Special Realty, LLC, or any of their respective affiliates, subsidiaries, insiders or insurers.

25.    **"<u>Axium Litigation Net Recoveries</u>"** means any Net Recoveries in connection with or resulting from any assertion, litigation or settlement of the Axium Litigation.  Pursuant to the Plan, the Plan Agent will have liens encumbering the Axium Litigation and any Axium Litigation Net Recoveries in order to secure the payment of any Axium Litigation Payment in accordance with the provisions of that Security Agreement, a copy of which is attached as Exhibit "P" to the Plan ("Axium Litigation Security Agreement").

26.    **"<u>Axium Litigation Payment</u>"** means the payment due to the Plan Agent, pursuant to Section 6.7.4.3 of the Plan, equal to thirty percent (30%) of any Axium Litigation Net Recoveries.

27.    **"<u>Bank Leumi</u>"** means Bank Leumi USA.

28.    **"<u>Bank Leumi Loan Documents</u>"** means, collectively, the loan and security agreements security agreements among the Debtor, YFGR, Yari, ADL, SDL, and other Subsidiaries, on one hand, and ICB Entertainment Finance, a division of Imperial Credit Bank, on the other hand, and thereafter assigned to Bank Leumi, as such loan and security agreements may have been amended and as they may be amended hereafter from time to time.

29.    **"<u>Bankruptcy Code</u>"** means the United States Bankruptcy Code, as set forth in 11 U.S.C. §§ 101-1532, as now in effect and as may be hereafter amended.

30.    **"<u>Bankruptcy Court</u>"** means the United States Bankruptcy Court for the Central District of California, Los Angeles Division.

31.    **"<u>Bankruptcy Rules</u>"** means, collectively, the Federal Bankruptcy Rules and the Local Bankruptcy Rules.

32.    **<u>Bankruptcy Schedules</u>**" means the Schedules of Assets and Liabilities and Statement of Financial Affairs filed by the Debtor in the Case, as they may have been amended and as they may be amended hereafter from time to time.

33.    **<u>Bar Date</u>**" means the last date for Creditors whose Claims are not scheduled, or whose Claims are scheduled in the Bankruptcy Schedules as disputed, contingent, unliquidated or unknown as to amount, to file Proofs of Claim, as set forth in an order of the Bankruptcy Court entered on October 13, 2010.  The Bar Date for filing a Proof of Claim on account of a General Unsecured Claim was November 18, 2010.

34.    **<u>Business Day</u>**" means any day other than a Saturday, Sunday or a legal holiday (as defined in Rule 9006(a) of the Federal Bankruptcy Rules).

35.    **<u>Case</u>**" means the case under Chapter 11 of the Bankruptcy Code commenced by the Debtor on the Petition Date and bearing Case Number 2:10-bk-12122 BR.

36.    **<u>Case Closing Date</u>**" means the date on which the Bankruptcy Court enters a Final Decree closing the Case, in accordance with section 350 of the Bankruptcy Code.

37.    **<u>Cash</u>**" means cash or cash equivalents including, but not limited to, bank deposits, checks or other similar forms of payment or exchange.

38.    **<u>Causes of Action</u>**" means any and all claims, demands, rights, actions, causes of action and suits of the Debtor or the Estate, of any kind or character whatsoever, arising prior to the Effective Date, in contract or in tort, at law or in equity or under any other theory of law, that the Debtor or the Debtor's Estate has or asserts, or may have or assert, against third parties, whether or not the subject of litigation or otherwise asserted as of the Effective Date, and which have not been settled or otherwise resolved by Final Order as of the Effective Date, including but not limited to:  (a) Avoidance Actions; (b) claims for tax refunds; (c) claims to recover accounts receivable; and (d) any other claims or demands which may be asserted against third parties.  Pursuant to the Plan, the Debtor represents and warrants, and Yari represents and warrants that (a) to the best of his

1    knowledge after performing a diligent investigation, as of the date on which the Plan and

2    this Disclosure Statement are disseminated to parties-in-interest for voting on the Plan,

3    the Debtor and the Subsidiaries were parties to only those actions or proceedings set forth

4    in Exhibit "O" to the Plan, and (b) from and after the Effective Date, the Reorganized

5    Debtor will retain, control and, under the terms set forth in the Plan, prosecute, the Causes

6    of Action set forth solely in the Axium Litigation.

7        **39.**    **"Claim"** means a "claim" against the Debtor, as such term is defined in

8    section 101(5) of the Bankruptcy Code.

9        **40.**    **"Claims Objection Deadline"** means the <u>latest</u> of the following dates:

10   (a) the one hundred eightieth (180th) day after the Effective Date; (b) with respect to a

11   specific Claim, the ninetieth (90th) day after a Proof of Claim with respect to such Claim

12   is filed by a Creditor; or (c) with respect to a specific Claim, such greater period of

13   limitation as may be fixed or extended by the Bankruptcy Court or by agreement of the

14   Creditor asserting such Claim.

15       **41.**    **"Class"** means a grouping of Claims or the Interest, as classified in

16   Article IV of the Plan.

17       **42.**    "**Committee**" means the Official Committee of Unsecured Creditors

18   appointed in the Case by the United States Trustee.

19       **43.**    "**Confirmation**" means the entry of the Confirmation Order by the

20   Bankruptcy Court.

21       **44.**    **"Confirmation Date"** means the date on which the Bankruptcy Court

22   enters the Confirmation Order on its docket.

23       **45.**    **"Confirmation Hearing"** means the hearing before the Bankruptcy Court

24   to consider the confirmation of the Plan pursuant to section 1128(a) of the Bankruptcy

25   Code, as such hearing may be continued from time to time.

26       **46.**    **"Confirmation Hearing Date"** means the first date on which the

27   Bankruptcy Court holds the Confirmation Hearing.

28

**47.** **"Confirmation Order"** means the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code.

**48.** **"Covered Picture"** means all theatrical and motion pictures, produced or distributed by the Debtor or any Subsidiary, that was produced subject to collective bargaining agreements with or on behalf of one or more Guilds.

**49.** **"Creditor"** means the holder of a Claim against the Debtor.

**50.** **"Creditors' Share"** means a one-third (1/3) share of all Subsidiary Distributions, payable to the Plan Agent on behalf of holders of Allowed Class 5 Claims until the Reorganized Debtor Note has been paid in full.

**51.** **"Cure Claims"** has the meaning set forth in paragraph VIII(Z)(4) of this Disclosure Statement.

**52.** **"Cure Claims Schedule"** has the meaning set forth in paragraph VIII(Z)(4) of this Disclosure Statement.

**53.** **"Davand"** means Davand Holdings, LLC.

**54.** **"Davand Effective Date Contribution"** means funds in the minimum amount of $500,000 provided by Davand to the Estate after the date hereof and on or before the Effective Date in order to fund payment of Administrative Claims accruing in the Case or to enable the Plan to be Confirmed, in an amount sufficient to satisfy all Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Priority Non-Tax Claims, and to fund the Plan Fund Reserve. The Davand Effective Date Contribution will be applied as a credit against the amount of the Reorganized Debtor Note. The Davand Effective Date Contribution will not be repaid or reimbursed.

**55.** **"Davand Loan"** means a loan in the amount of $350,000 made to the Debtor by Davand in accordance with the provisions of that Order Granting Debtor's Motion for Order Authorizing the Debtor to Enter into Funding Agreement and to Grant Security Interest in Assets of the Estate.

**56.** [Intentionally omitted.]

-15-

57.    **"Davand Pledge Agreement"** means that Pledge Agreement to be executed by Davand in favor of the Plan Agent, acting on behalf of holders of Allowed Class 5 Claims and Allowed Class 6 Claims under the Plan, and relating to the Interest in the Reorganized Debtor, in the form that will be attached as Exhibit "A" to the Plan.

58.    **"Debtor"** means Persik Productions, Inc. fka Bob Yari Productions, the debtor and debtor-in-possession in the Case.  For the purpose of this Disclosure Statement, references to the "Debtor" will include the Reorganized Debtor.

59.    **"Debtor Collateral"** means any property or interest in property of the Estate subject to a Lien of a Secured Creditor that is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable federal or state law.

60.    **"Deficiency Claim"** means that portion of a Claim that is in excess of the value of the Debtor Collateral which is security for the repayment of such Claim, calculated in accordance with the provisions of section 506 of the Bankruptcy Code.

61.    **"DGA"** means the Directors Guild of America, Inc.

62.    **"Disbursing Agent"** has the meaning set forth in paragraph VIII(W)(1) of this Disclosure Statement.  The Plan Agent will serve as Disbursing Agent under the Plan, except that the Reorganized Debtor will be responsible for making Distributions under the Plan to holders of Allowed Secured Claims in accordance with the provisions of the Plan.

63.    **"Disclosure Statement"** means this Second Amended Disclosure Statement relating to the Plan, including, without limitation, all exhibits and schedules hereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, as may be amended, modified or supplemented from time to time in accordance with the provisions of the Bankruptcy Code and Bankruptcy Rules.

64.    **"Disclosure Statement Order"** means the order entered by the Bankruptcy Court approving this Disclosure Statement.

65.    **"Disputed Claim"** means (a) any Claim or portion of a Claim as to which an objection to the allowance thereof has been interposed by the deadline set herein or

1  such later date as may be fixed by the Bankruptcy Court, which objection has not been

2  withdrawn or determined by Final Order; (b) any Claim for which a Proof of Claim is

3  required to be filed and no such Proof of Claim is filed or, if filed, is filed after the

4  applicable Bar Date for such Claim; and (c) any contingent Claim or unliquidated Claim.

5  To the extent that an objection relates to the allowance of only a part of a Claim, such

6  Claim will be a Disputed Claim only to the extent of the objection and will be deemed an

7  Allowed Claim as to the portion for which no timely objection is made.

8        66.    "**Disputed Claims Reserve**" has the meaning set forth in

9  paragraph VIII(X)(3)(c) of this Disclosure Statement.

10        67.    "**Disputed Class '\*\*\*' Claim**" means a Disputed Claim classified in the

11  specified Class.

12        68.    "**Disputed Joint Obligor Claim**" means a Disputed Claim that has been

13  asserted against both the Debtor and one or more Yari Parties.

14        69.    "**Distribution**" means any transfer of Cash under the Plan to the holder of

15  an Allowed Claim.

16        70.    "**Distribution Schedule**" has the meaning set forth in

17  paragraph VIII(W)(2)(f) of this Disclosure Statement.

18        71.    "**Effective Date**" means the fourteenth (14th) day following the waiver or

19  satisfaction of the conditions set forth in Section 6.3 of the Plan.

20        72.    "**Effective Date Cash Balance**" means the Debtor's Cash on hand as of

21  the Effective Date, excluding the Effective Date Subsidiary Distribution.

22        73.    "**Effective Date Subsidiary Distribution**" means a Cash distribution

23  made by each Subsidiary, on or before and as a condition to the Effective Date, equal to

24  any and all amount of the Subsidiary's Cash as of the Effective Date less the amount

25  reasonably required to pay in full (a) all of such Subsidiary's obligations of any nature

26  (including, without limitation, any obligations to the Guilds), whether disputed or

27  undisputed, liquidated or unliquidated, contingent or non-contingent, and (b) all of the

28  reasonable expenses incurred, and projected reasonably to be incurred, in the ordinary

course of the operations of that Subsidiary.  The amount of any Effective Date Subsidiary Distribution will be determined reasonably by each Subsidiary and by the Reorganized Debtor, after consultation with the Plan Agent and the Guilds.  Any Effective Date Subsidiary Distribution will be paid to the Plan Agent in an amount equal to the Creditors' Share of any such Effective Date Subsidiary Distribution, and to the Guilds in an amount equal to the Guilds' Share of any such Effective Date Subsidiary Distribution.

74.    **"Estate"** means the estate created in the Case under section 541 of the Bankruptcy Code.

75.    **"Expenses"** has the meaning set forth in paragraph II(A)(115) of this Disclosure Statement.

76.    **"Federal Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure, as now in effect and as may be hereafter amended.

77.    **"Film Rights"** means, collectively, any film produced by a Subsidiary, any copyright relating to such film, and any properties, claims or causes of action, assets, rights and interests, tangible or intangible, of any nature which constitute property of a Subsidiary related to such film or to such copyright, and any accounts, profits, proceeds or products of any nature derived from or relating to any of the foregoing, including, without limitation, any account receivable that may be owed to a Subsidiary with respect thereto.

78.    **"Film Rights Net Recoveries"** means any Net Recoveries relating to or arising from any Film Rights.

79.    **"Final Decree"** has the meaning set forth in paragraph VIII(P) of this Disclosure Statement.

80.    **"Final Order"** means an order or judgment of the Bankruptcy Court or other applicable court, as entered on the applicable docket, that has not been reversed, stayed, modified or amended, and as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or to obtain a rehearing is then pending or as to which any right to appeal, petition for certiorari, reargue, or obtain a rehearing is

waived in writing in form and substance satisfactory to the Debtor or to the Reorganized

Debtor and the Committee or to the Plan Agent, or to the Guilds, as the case may be, or,

in the event that an appeal, writ of certiorari, or proceeding for reargument or rehearing of

such order or judgment has been sought, such order or judgment is affirmed by the highest

court to which such order or judgment was appealed, or certiorari has been denied, or

from which reargument or rehearing was sought, and the time to take any further appeal,

petition for certiorari or move for reargument or rehearing has expired.

81.    "**General Unsecured Claim**" means any Claim that is not an

Administrative Claim, a Priority Tax Claim, a Priority Non-Tax Claim, a Secured Claim

or a Subordinated Claim, including, without limitation, a Rejection Claim, a Deficiency

Claim or an Avoidance Action Payment Claim.

82.    "**Guild Assumption Agreement**" means an assumption agreement, in the

form prescribed by each Guild collective bargaining agreement in connection with each

Covered Picture existing as of the Effective Date that is produced or distributed by the

Reorganized Debtor or by a Subsidiary; provided, however, that each such Guild

Assumption Agreement will provide that the obligations of the Reorganized Debtor under

each such Guild Assumption Agreement commence with residuals or plan contributions

that accrue on or after the Effective Date.  An exemplar of a Guild Assumption

Agreement is attached as Exhibit "W" to the Plan.

83.    "**Guild Pre-Petition Agreements**" means, collectively, all agreements

among a Guild, on one hand, and a Subsidiary or the Debtor, on the other hand, including,

without limitation, all collective bargaining agreements, assumption agreements, letters of

adherence, guaranty agreements and security agreements, as more specifically described

in the Guilds Forbearance Agreement (Exhibit "B" to the Plan), as such agreements may

have been amended or may be amended hereafter from time to time.

84.    "**Guilds**" means, collectively, or as otherwise applicable, the DGA, SAG

and the WGA, and their respective pension and health plans, and the Motion Picture

Industry Pension & Health Plans ("MPIPHP").

85.    **"Guilds Forbearance Agreement"** means that Forbearance Agreement, entered into by and among the Guilds, on one hand, and the Subsidiaries and the Debtor, on the other hand, a copy of which is attached as Exhibit "B" to the Plan.

86.    **"Guilds' Share"** means a two-thirds (2/3) share of all Subsidiary Distributions, payable to the Guilds on account of the Guilds' Allowed Guild Secured Claims, until the Reorganized Debtor Note has been paid in full, after which the Guilds' Share will be one hundred percent (100%) of all Subsidiary Distributions until the Allowed Guild Secured Claims have been paid in full.

87.    **"Inter-Company Transactions"** has the meaning set forth in paragraph VIII(R) of this Disclosure Statement.

88.    **"Interest"** means an "equity security" in the Debtor, as such term is defined in section 101(16) of the Bankruptcy Code.

89.    **"Interest Holder"** means Davand, the holder of the Interest.

90.    **"Internal Revenue Code"** means the Internal Revenue Code of 1986, now in effect and as may be hereafter amended.

91.    **"Late-Filed Claim"** means any General Unsecured Claim described in sections 726(a)(2)(C) or 726(a)(3) of the Bankruptcy Code.

92.    **"Lien"** means any lien, security interest, mortgage, deed of trust, encumbrance, pledge or other charge against assets or properties of the Debtor.

93.    **"Local Bankruptcy Rules"** means the Local Bankruptcy Rules applicable to cases pending before the Bankruptcy Court, as now in effect and as may be hereafter amended.

94.    **"Net Recoveries"** means all Cash proceeds received after the Effective Date in connection with or as a result of the assertion, litigation or settlement of any Cause of Action, <u>less</u> any reasonable attorneys' fees and costs, other reasonable Professional fees and costs, and any other reasonable fees, costs and expenses incurred by the Debtor, the Reorganized Debtor or by the Plan Agent in connection therewith.  The determination of the reasonableness of any such fees and costs will be made reasonably

1   by the Plan Agent, and, in the event that a dispute should arise regarding the

2   reasonableness of any such fees and costs, the merits of such dispute will be determined

3   by the Bankruptcy Court.

4        95.    **"New Production Payments"** has the meaning set forth in

5   paragraph VIII(D)(3) of this Disclosure Statement.

6        96.    **"Non-Film Rights Net Recoveries"** means any Net Recoveries not

7   relating to or arising from any Film Rights, including, without limitation, any Axium

8   Litigation Net Recoveries and any Yari Net Recoveries.

9        97.    **"Ordinary Course Administrative Claim"** means an Administrative

10  Claim allowable under section 503(b) of the Bankruptcy Code that is incurred in the

11  ordinary course of the Debtor's operations, exclusive of any Pre-Effective Date

12  Professional Fee Claims, Administrative Tax Claims and United States Trustee Fees.

13       98.    **"Out Parcels"** means those certain real estate parcels, the legal

14  descriptions of which are set forth in Exhibit "I" to the Plan, owned by various Affiliates

15  of Yari and adjacent to the San Jacinto Mall.

16       99.    **"Out Parcels Deed of Trust"** means a first priority mortgage or deed of

17  trust, to be executed by Memorial Northwest Pavilion, Ltd. in favor of the Plan Agent,

18  acting on behalf of the holders of Allowed Class 5 Claims under the Plan, and

19  encumbering the Out Parcels.  A true and complete copy of the Out Parcels Deed of Trust

20  is attached as Exhibit "E" to the Plan.

21       100.    **"Penalty Claim"** means any Claim for any fine, penalty, or forfeiture, or

22  for multiple, exemplary, or punitive damages, arising before the Petition Date, to the

23  extent that such fine, penalty, forfeiture, or damages are not compensation for actual

24  pecuniary loss suffered by the holder of such Claim, as set forth in section 726(a)(4) of

25  the Bankruptcy Code.

26       101.    **"Petition Date"** means January 20, 2010, the date on which the Debtor

27  filed its voluntary petition commencing the Case.

28

-21-

102. **"Plan"** means the Debtor's First Amended Chapter 11 Plan of Reorganization, including, without limitation, all exhibits, supplements, appendices, and schedules hereto, either in its present form or as it may be altered, amended, or modified from time to time.

103. **"Plan Agent"** means the entity appointed pursuant to the provisions of Section 6.6 of the Plan.

104. **"Plan Completion Certification"** has the meaning set forth in paragraph VIII(O) of this Disclosure Statement.

105. **"Plan Completion Date"** means the date upon which the Reorganized Debtor Note is fully, finally and indefeasibly paid.

106. **"Plan Documents"** means all documents necessary to carry out the purpose and intent of the Plan including, without limitation, the Davand Pledge Agreement, the Yari Guarantee, the Out Parcels Deed of Trust, the SJM Realty Pledge Agreement, the Reorganized Debtor Note, the Subsidiary Interests Pledge Agreement, the Guilds Security Agreements, the Guild Assumption Agreements and the Guilds Forbearance Agreement.

107. **"Plan Fund"** means a segregated, interest-bearing account established at a financial institution which is an authorized depository under United States Trustee Guidelines, into which the Reorganized Debtor will deposit all cash on hand in the Estate on the Effective Date and the Plan Agent will deposit all Cash received by it for the purpose of funding Distributions to holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed General Unsecured Claims and any Allowed Subordinated Claims and paying the Post-Effective Date Plan Expenses.

108. **"Plan Fund Assets"** means all of the rights, assets, properties and interests of the Debtor, excluding only the Retained Assets, and will include, without limitation, the following rights, assets, properties and interests transferred or granted to, and administered by, the Plan Agent pursuant to the Plan and/or the Plan Documents for the

MAINDOCS-#158405-v5-PersikFirstAmndDisclosureStatement.DOC

1    purpose of funding Distributions to holders of Allowed Administrative Claims, Allowed

2    Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed General Unsecured

3    Claims, and any Allowed Subordinated Claims, and paying the Post-Effective Date Plan

4    Expenses:  (a) the Creditors' Share of the Effective Date Subsidiary Distribution; (b) the

5    Effective Date Cash Balance; (c) any Axium Litigation Payment; (d) the Reorganized

6    Debtor Note and related guarantees and security agreements (including, without

7    limitation, the Davand Pledge Agreement, the Yari Guarantee, the Out Parcels Deed of

8    Trust, the SJM Realty Pledge Agreement and the Subsidiary Interests Pledge Agreement);

9    (e) the New Production Payments; (f) any Yari Cause of Action and all other Causes of

10   Action (including, without limitation, Avoidance Actions, excluding any Axium

11   Litigation Net Recoveries other than any Axium Litigation Payment, and all claims,

12   interests, defenses, counterclaims, setoffs, recoupments and other rights relating to (i) the

13   Debtor's current or former insiders, directors, officers, employees, professionals, agents

14   and representatives; and (ii) any Administrative Claims or scheduled or filed Priority Tax

15   Claims, Priority Non-Tax Claims or General Unsecured Claims against the Estate); (g)

16   one-third (1/3) of any and all amounts paid by, on account or for the benefit of Alliance

17   Films, Inc., fka Motion Picture Distribution, LP, Aurum Producciones, S.A., Alliance

18   Films (UK) Limited, fka Alliance Atlantis Releasing Limited dba Momentum Pictures, or

19   any affiliate, subsidiary, parent company or other entity related to any of the foregoing

20   (collectively, "Alliance Parties"), to, on account or for the benefit of the Debtor, the

21   Reorganized Debtor, Yari, Davand or any Yari Party, in satisfaction or resolution of or in

22   connection with any claim (as such term is defined in the Bankruptcy Code) asserted by

23   or against one or more Alliance Parties (an "Alliance Payment"); and (h) any and all other

24   rights, claims, assets, properties or interests of the Debtor that are not expressly retained

25   by, transferred or granted to, or administered by, the Reorganized Debtor, as Retained

26   Assets, pursuant to the Plan and/or the Plan Documents.  The Plan Fund Assets do not

27   include any Retained Assets.

28

109.    **"Plan Fund Proceeds"** means the Cash available in the Plan Fund for the Plan Agent's making Distributions under the Plan, after establishment of Reserves, including, without limitation, any Reserve for Post-Effective Date Plan Expenses.

110.    **"Plan Fund Reserve"** means an initial Cash fund of $100,000, payable from the Plan Fund, available to fund the initial Post-Effective Date Plan Expenses.

111.    **"Post-Effective Date Committee"** means the Committee, as it is reconstituted and function after the Effective Date, pursuant to the provisions of the Plan.

112.    **[Intentionally omitted]**

113.    **"Post-Effective Date Net Cash Flow"** means the amount of the Reorganized Debtor's Cash receipts relating to or arising solely from any film for which production is commenced after the Effective Date by any Yari Party less the Reorganized Debtor's Cash disbursements, calculated for each full calendar quarter commencing after the Effective Date and continuing through the Plan Completion Date.

114.    **"Post-Effective Date Net Cash Flow Reporting"** has the meaning set forth in paragraph VIII(Q)(2) of this Disclosure Statement.

115.    **"Post-Effective Date Notice Parties"** has the meaning set forth in paragraph VIII(O) of this Disclosure Statement.

116.    **"Post-Effective Date Plan Expenses"** means all voluntary and involuntary costs, expenses, charges, obligations, or liabilities of any kind or nature, whether matured, unmatured, non-contingent, contingent, liquidated, or unliquidated (collectively, "Expenses") incurred by the Post-Effective Date Committee or by the Plan Agent related to its performing its duties on behalf of holders of Allowed Class 5 Claims under the Plan, including, but not limited to the following Expenses:  (a) the Expenses associated with administering the Plan Fund, including any taxes assessed against the Plan Fund; (b) the Expenses associated with the Plan Agent's making the Distributions required by the Plan; (c) any reasonable Expenses incurred by a member of the Post-Effective Date Committee, including, without limitation, any attorneys' fees or other professional fees incurred by it and for which it is entitled to be indemnified; (d) the

Expenses of independent contractors and Professionals providing services to the Plan Agent or the Post-Effective Date Committee; (e) the Expenses, if any, associated with the Plan Agent's indemnity obligations, the purchase of errors and omissions insurance and/or other forms of indemnification; and (f) the fees of the Plan Agent, and the reimbursement of expenses, to which the Plan Agent is entitled under the Plan.

117.   **"Post-Petition Interest"** means any interest accrual, from and after the Petition Date, on an Allowed General Unsecured Claim or any Allowed Subordinated Claim, in accordance with, respectively, the provisions of Sections 5.5.4 and 5.6.4 of the Plan.  Any Post-Petition Interest under the Plan will accrue at the federal judgment rate, as set forth in 28 U.S.C. § 1961(a), in effect as of the Petition Date.

118.   **<u>Pre-Effective Date Professional</u>"** means a person employed in the Case prior to the Effective Date pursuant to an order of the Bankruptcy Court in accordance with sections 327 or 1103 of the Bankruptcy Code.

119.   **<u>Pre-Effective Date Professional Fee Claim</u>"** means:

(a)   A Claim of a Pre-Effective Date Professional under sections 327, 328, 330, 331 or 1103 of the Bankruptcy Code for compensation for services rendered or expenses incurred prior to the Effective Date on behalf of the Estate; or

(b)   A Claim, arising prior to the Effective Date, either under section 503(b)(4) of the Bankruptcy Code or under section 503(b)(3)(D) of the Bankruptcy Code.

120.   **<u>Pre-Payment Discount</u>"** means a discount for early payment in full of the Reorganized Debtor Note equal to the <u>lesser</u> of the following:  (a) the original principal balance of the Reorganized Debtor Note multiplied by .096; or (b) the original principal balance of the Reorganized Debtor Note multiplied by a number equal to the product of 0.096 and the number of full months outstanding between the date of such full prepayment of the Reorganized Debtor Note and January 20, 2012, multiplied by .09091.

121.    **<u>"Pre-Petition Guild Liens"</u>** means any and all security interests in favor of any Guild in connection with each Covered Picture, that were valid and perfected as of the Petition Date.

122.    "**<u>Priority Non-Tax Claim"</u>** means a Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

123.    **<u>"Priority Tax Claim"</u>** means a Claim entitled to priority under section 507(a)(8) of the Bankruptcy Code.

124.    **<u>"Professional"</u>** means any attorney, accountant, appraiser, auctioneer, broker, financial consultant, expert or other professional person.

125.    **<u>"Proof of Claim"</u>** means a statement under oath filed in the Case by a Creditor in which the Creditor sets forth the amount claimed to be owed to it and detail sufficient to identify the basis for the Claim, in accordance with Rule 3001 of the Federal Bankruptcy Rules.

126.    **<u>"Pro Rata"</u>** means proportionately so that the ratio under the Plan of (a) the amount of consideration distributed on account of an Allowed Claim to (b) the amount of the Allowed Claim is the same as the ratio of (x) the amount of consideration available for distribution on account of all Claims in the Class in which that Allowed Claim is included to (y) the amount of all Claims in that Class.

The Pro Rata formula is illustrated as follows:

| (a) | Amount of consideration distributed to a holder of an Allowed Claim | | (x) | Total consideration available for distribution to holders of Claims of that Class |
|---|---|---|---|---|
| (b) | Amount of such Allowed Claim | = | (y) | Amount of all Claims in that Class |

For the purpose of the application of this definition, in calculating the Distributions to be made under the Plan, the Plan Agent will establish Reserves, on account of Disputed Class 5 Claims, in accordance with the provisions of Section 8.4.3 of the Plan.

MAINDOCS-#158405-v5-PersikFirstAmndDisclosureStatement.DOC

127. **<u>"Rejection Claim"</u>** means any General Unsecured Claim based upon or arising from the rejection of an executory contract or unexpired lease pursuant to a Final Order of the Bankruptcy Court or pursuant to the Plan.

128. **<u>"Reorganized Debtor"</u>** means the Debtor, as its financial affairs are reorganized from and after the Effective Date. For the purpose hereof, a reference to the "Reorganized Debtor" will include the Debtor.

129. **<u>"Reorganized Debtor Note"</u>** means that certain promissory note in the original principal amount of $3,660,000 made by the Reorganized Debtor in favor of the Plan Agent, or its assignee, in the form attached as Exhibit "C" to the Plan. The maturity date of the Reorganized Debtor Note will be January 20, 2012, provided that the Reorganized Debtor will have the option to extend the maturity date of the Reorganized Debtor Note, on a monthly basis, for not more than an additional six-month period (i.e., through and including July 19, 2012) ("Note Extension Option"). The Reorganized Debtor Note will not bear interest, except only that, in the event that the Reorganized Debtor elects a Note Extension Option, the Reorganized Debtor Note will accrue interest, for each month extended after the original maturity date of the Reorganized Debtor Note, at the rate of 9.6% per annum, and the Reorganized Debtor will pay to the Plan Fund such accruing monthly interest payment as a condition to exercising each such Note Extension Option. The Reorganized Debtor Note will be payable quarterly from the Creditors' Share of the Subsidiary Distributions and will incorporate the Prepayment Discount. The Reorganized Debtor Note will become immediately due and payable upon the refinancing or partial or complete pre-payment of the Out Parcels Deed of Trust. The principal balance of the Reorganized Debtor Note will be adjusted in accordance with Section 5.5.14 of the Plan. As of the Effective Date, only the following amounts will be applied as a credit against the original principal balance of the Reorganized Debtor Note: the Davand Effective Date Contribution; the Creditors' Share of any Effective Date Subsidiary Distribution; the amount of $530,000, which represents the Debtor's receipt of a distribution made to it by a Subsidiary, PHR Releasing, LLC; and the amount (if any) of

any funds actually received by the Debtor from and after the date hereof and on or before the Effective Date from any Subsidiary (including any payments made by or on behalf of the Alliance Parties).  That portion of any and all Alliance Payments received by the Plan Agent after the Effective Date will be credited against the outstanding principal balance of the Reorganized Debtor Note.  Subsequent to the Effective Date, any and all Distributions made pursuant to the Plan by or for the benefit of the Reorganized Debtor, on account of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and Allowed General Unsecured Claims, will be credited against the outstanding principal balance of the Reorganized Debtor Note, except only for the following:  (a) any Yari Net Recoveries and any other Non-Film Rights Net Recoveries; (b) any Axium Litigation Payment; and (c) fifty percent (50%) of New Production Payments.

130.    **"Representatives"** has the meaning set forth in paragraph VIII(G) of this Disclosure Statement.

131.    **"Reserves"** means, collectively, the Disputed Claims Reserve, the Unclaimed Property Reserve, and any other reserves required to be established pursuant to the Plan.

132.    **"Retained Assets"** means the following rights, assets, properties and interests of the Debtor that will revest in the Reorganized Debtor subject to the terms and conditions of the Plan and/or the Plan Documents:  (a) the Subsidiary Interests (subject to the Subsidiary Interests Pledge Agreement, the Guilds Subsidiary Interests Pledge Agreement and all of the obligations of the Reorganized Debtor under the Plan); (b) all Causes of Action arising from or relating to Film Rights; (c) the Axium Litigation and seventy percent (70%) of any Axium Litigation Net Recoveries; and (d) any and all assets, properties, rights, interests, or claims of any nature of the Debtor relating to scripts for possible motion pictures, "Taxman" and "Governess," and any rights to recoup development costs with respect to scripts ("Motion Picture Development Rights").  By the Plan, the Debtor and Yari represent and warrant that the Motion Picture Development Rights currently have no material value and that there currently are no acts being taken in

furtherance of the development of a motion picture based upon such scripts, but do not represent or warrant whether the Motion Picture Development Rights will have any value in the future.

133.    **"SAG"** means the Screen Actors Guild, Inc.

134.    **"San Jacinto Mall"** means that certain real property, the legal description of which is contained in Exhibit "H" to the Plan, a portion of a larger regional shopping center commonly known as the San Jacinto Mall, Baytown, Harris County, Texas.

135.    **"SDL"** has the meaning set forth in paragraph VII(A)(1) of this Disclosure Statement.

136.    **"Secured Claim"** means a Claim that is secured by a Lien against property in which the Estate has an interest, or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value, determined under section 506(a) of the Bankruptcy Code, of the Secured Creditor's interest in the Estate's interest in the Debtor Collateral securing the Claim, or to the extent of the amount subject to setoff, whichever is applicable.

137.    **"Secured Creditor"** means the holder of a Secured Claim.

138.    **"SJM Realty"** means SJM Realty, Ltd., a Texas limited partnership, the sole owner of a fee interest in the San Jacinto Mall.

139.    **"SJM Realty Pledge Agreement"** means that certain Pledge Agreement to be executed by the pledgors identified therein in favor of the Plan Agent, pursuant to which forty-nine percent (49%) of the membership interests in SJM Realty, and any and all distributions associated with the remaining fifty-one percent (51%) of the membership interests in SJM are pledged to the Plan Agent to secure performance of the Yari Guarantee, in the form attached as Exhibit "F" to the Plan.

140.    **"Subordinated Claim"** means any Claim that is subordinated to Allowed Class 5 Claims to the extent provided by the Bankruptcy Code or a Final Order.

141.    **"Subsidiaries Financial Reporting"** has the meaning set forth in paragraph VIII(Q)(1) of this Disclosure Statement.

MAINDOCS-#158405-v5-PersikFirstAmndDisclosureStatement.DOC

142.   **"<u>Subsidiary</u>"** means a corporation in which not less than fifty percent (50%) of the voting stock is owned or controlled by the Debtor as of the Effective Date, or a limited liability company in which not less than fifty percent (50%) of the membership interests is owned or controlled by the Debtor as of the Effective Date, and is limited to the entities set forth in Exhibit "K" to the Plan.  Pursuant to the Plan, the Debtor represents and warrants, and Yari represents and warrants to the best of his knowledge after performing a diligent investigation, that the Debtor has no Subsidiaries other than those that are listed on Exhibit "K" to the Plan.  Pursuant to the Plan, the Debtor represents and warrants further, and Yari represents and warrants further, that only those Subsidiaries listed on that Net Asset Valuation, dated February 15, 2011, attached as Exhibit "2" to this Disclosure Statement, own, possess, control or have any rights in any assets of any material value.

143.   **"<u>Subsidiary Distribution</u>"** means a Cash distribution made by each Subsidiary within twenty (20) days after the end of each calendar quarter after the Effective Date, equal to any and all amount of the Subsidiary's Cash as of the end of such calendar quarter less the amount reasonably required to pay in full (a) all of such Subsidiary's obligations of any nature (including, without limitation, any obligations to the Guilds), whether disputed or undisputed, liquidated or unliquidated, contingent or non-contingent, and (b) all of the reasonable expenses incurred, and projected reasonably to be incurred, in the ordinary course of the operations of that Subsidiary. The amount of each Subsidiary Distribution will be determined reasonably by each Subsidiary and by the Reorganized Debtor, after consultation with the Plan Agent and the Guilds.  Any Subsidiary Distribution will be paid to the Plan Agent in an amount equal to the Creditors' Share of any such Subsidiary Distribution, and to the Guilds in an amount equal to the Guilds' Share of any such Subsidiary Distribution.

144.   **"<u>Subsidiary Interest</u>"** means the Reorganized Debtor's ownership interest in a Subsidiary.

145. **"Subsidiary Interests Pledge Agreement"** means that certain Pledge Agreement, pursuant to which the Reorganized Debtor pledges to the Plan Agent all of the Subsidiary Interests, subject only to valid, enforceable and unavoidable liens existing therein as of the Petition Date, to secure performance of all of the Reorganized Debtor's obligations on account of Allowed Class 5 Claims pursuant to the Plan (including pursuant to the Reorganized Debtor Note), in a form that will be attached as Exhibit "D" to the Plan.

146. **"Tax"** means any tax, charge, fee, levy, or other assessment by any federal, state, local or foreign taxing authority, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem, estimated, severance, stamp, occupation and withholding tax. "Tax" will include any interest, penalties or additions attributable to, or imposed on or with respect to, such assessments.

147. **"Tax Claim"** means any Claim, pre-petition or post-petition, relating to a Tax.

148. **"United States Trustee"** means the Office of the United States Trustee for the Central District of California.

149. **"United States Trustee Fees"** means all fees and charges assessed against the Debtor or the Reorganized Debtor by the United States Trustee and due pursuant to section 1930 of title 28 of the United States Code.

150. **"WGA"** means the Writers Guild of America West, Inc., for itself and on behalf of its affiliate, Writers Guild of America, East, Inc.

151. **"Yari"** means Bob Yari, in his individual capacity.

152. **"Yari Cause of Action"** means a Cause of Action asserted against a Yari Party.

153. **"Yari Guarantee"** means that Guarantee Agreement to be executed by Yari in favor of the Plan Agent, acting on behalf of the holders of Allowed Class 5 Claims

MAINDOCS-#158405-v5-PersikFirstAmndDisclosureStatement.DOC

under the Plan.  A true and complete copy of the Yari Guarantee is attached as Exhibit "G" to the Plan.

154.    **<u>Yari Net Recoveries</u>** means any Net Recoveries that may be received from any Yari Party.

155.    **<u>Yari Party</u>** means Yari and any Affiliate of Yari and any insider of any such Affiliate, including, without limitation, those persons and entities listed on Exhibit "J" to the Plan.

156.    **<u>YFGR</u>** has the meaning set forth in paragraph IV(B)(1)(a) of this Disclosure Statement.

157.    **<u>YFG Services</u>** means YFG Services, Inc., a California corporation.

B.    **<u>Rules of Interpretation.</u>**

For the purpose of this Disclosure Statement, unless otherwise provided in this Disclosure Statement, (1) the rules of construction set forth in section 102 of the Bankruptcy Code apply to this Disclosure Statement; (2) Rule 9006(a) of the Federal Bankruptcy Rules applies when computing any time period under this Disclosure Statement; (3) a term that is used in this Disclosure Statement and that is not defined in this Disclosure Statement has the meaning attributed to that term, if any, in the Bankruptcy Code or in the Bankruptcy Rules; (4) the definition given to any term or provision in this Disclosure Statement is superseded by any different meaning that may be given to that term or provision in the Plan; (5) whenever it is appropriate from the context, each term, whether stated in the singular or the plural, includes both the singular and the plural; (6) each pronoun stated in the masculine, feminine or neuter includes each of the masculine, feminine and neuter; (7) any reference to an exhibit, schedule, instrument, Plan Document or other document means such exhibit, schedule, instrument, Plan Document or other document as it has been, or may be, amended, modified, restated or supplemented as of the Confirmation Date, and any such exhibit, schedule, instrument or other document will be deemed to be included in the Plan or in this Disclosure Statement, as the case may be, regardless of when it is filed; (8) the phrases "under this Disclosure Statement," "hereof," "hereto," "hereunder," and similar words or phrases, refer to this Disclosure Statement in its entirety rather than to only a

-32-

1  portion of this Disclosure Statement; (9) unless otherwise indicated, all references in this

2  Disclosure Statement to sections, articles or exhibits are references to sections, articles or exhibits

3  in this Disclosure Statement; (10) section captions and headings are used for convenience only

4  and do not affect the meaning of this Disclosure Statement; and (11) any reference to the holder

5  of a Claim or Interest includes that entity's successor and assigns.

6       **C.     Exhibits.**

7       All exhibits to this Disclosure Statement are incorporated into and are a part of this

8  Disclosure Statement as if set forth in full herein.

9                                **III.**

10               **OVERVIEW OF THE CHAPTER 11 PROCESS,**

11               **THE PLAN AND VOTING ON THE PLAN**

12      **A.     The Chapter 11 Process.**

13      Chapter 11 of the Bankruptcy Code provides debtors with a "breathing spell" within which

14  to propose a restructuring of their obligations to third parties.  The filing of a Chapter 11

15  bankruptcy petition creates a bankruptcy "estate" comprising all of the property interests of the

16  debtor.  Unless a trustee is appointed by the bankruptcy court for cause (no trustee has been

17  appointed in the Case), a debtor remains in possession and control of all its assets as a "debtor-in-

18  possession."  The debtor generally may continue to operate its business in the ordinary course on a

19  day-to-day basis without bankruptcy court approval.  Bankruptcy court approval generally is

20  required only for various kinds of transactions as to which the Bankruptcy Code requires approval

21  (such as certain financing transactions) and transactions out of the ordinary course of a debtor's

22  business.  The filing of the bankruptcy petition gives rise to what is known as the "automatic stay"

23  which, generally, enjoins creditors from taking any action to collect or recover obligations owed

24  by a debtor prior to the commencement of a Chapter 11 case.  The bankruptcy court can, however,

25  grant relief from the automatic stay, under certain specified conditions or for cause.

26      A Chapter 11 debtor may propose a plan providing for the reorganization of the debtor or

27  for the orderly liquidation of the assets of the debtor's estate.  A plan provides, among other

28

things, for the treatment of the claims of the debtor's creditors and the interests of the debtor's shareholders.

**B.      Overview of the Debtor's Proposed Plan.**

The following is a brief overview of the material provisions of the Plan and is qualified in its entirety by reference to the full text of the Plan.  For a more detailed description of the terms and provisions of the Plan, see Articles VI and VII below.

The primary objectives of the Plan are to implement a reorganization of the Debtor by restructuring the Debtor's obligations to the Creditors.  Pursuant to the Plan, the Debtor will satisfy the Allowed Claims of Creditors in accordance with the terms and conditions of the Plan. The Debtor's obligations under the Plan to the holders of Allowed General Unsecured Claims will be guaranteed by Yari and will be secured by collateral pledged by the Debtor's parent company, Davand, and by other Affiliates of Yari in accordance with the terms and conditions of the Plan Documents.  Pursuant to the Plan, Davand will retain its Interest in the Debtor.

The Plan designates six Classes of Claims and one Class of Interests, which include all Claims against, and Interests in, the Debtor.  These Classes take into account the differing nature and priority under the Bankruptcy Code of the various Classes and Interests.

The following table summarizes the treatment of Claims and Interests under the Plan.

**SUMMARY OF CLAIMS AND INTERESTS UNDER THE PLAN**

| Class | Claim/Interest | Summary of Treatment[4] |
|---|---|---|
| N/A | Allowed Administrative Claims | Payment in full, in Cash, on or about the Effective Date or as an Administrative Claim is allowed by the Bankruptcy Court. |
| N/A | Allowed Priority Tax Claims | Payment in full, in Cash, in quarterly installments through January 2012, plus interest thereon. |
| 1 | Allowed Secured Claim of Bank Leumi | Bank Leumi will retain all of Bank Leumi's rights and remedies, except as set forth to the contrary in Section 5.1 of the Plan. |
| 2 | Allowed Guild Secured Claims of the Guilds | Guilds' Allowed Secured Claims will be paid in full over time as set forth in Section 5.2 of the Plan. |

---

[4] This is only a summary of the treatment of Claims and Interests under the Plan.  Creditors should refer to Articles VI and VII of this Disclosure Statement for a more complete discussion of the treatment of Allowed Claims and Allowed Interests under the Plan.

| Class | Claim/Interest | Summary of Treatment[4] |
|---|---|---|
| 3 | Allowed Secured Claims Other than Class 1 and Class 2 Secured Claims | Entitled to receive one of the payment options, elected by the Reorganized Debtor, set forth in Section 5.3 of the Plan. |
| 4 | Allowed Priority Non-Tax Claims | Payment in full, in Cash, on or about the Effective Date, or as a Priority Non-Tax Claim is allowed by the Bankruptcy Court. |
| 5 | Allowed General Unsecured Claims | Payment of Distributions from Plan Fund over the course of the Plan, as set forth in Section 5.5 of the Plan. |
| 6 | Allowed Subordinated Claims | Payment only if all other Allowed Claims are paid in full. |
| 7 | Allowed Interest | Unimpaired by Plan. |

Set forth in paragraph XII(F) hereof is a discussion of the projected recoveries by Creditors in the Case.

**C.     Plan Confirmation and Voting and Objections to the Plan.**

The Bankruptcy Court has not yet confirmed the Plan described in this Disclosure Statement. In other words, the terms of the Plan are not yet binding on the Debtor, Creditors and the Interest Holder.  However, if the Bankruptcy Court confirms the Plan, the Plan will be binding on the Debtor and on all Creditors and the Interest Holder in the Case.

**1.     Voting on the Plan.**

A Creditor may vote to accept or to reject the Plan by filling out and mailing or telefaxing to the Debtor's counsel the ballot that has been provided herewith.  Ballots should be mailed or telefaxed to Winthrop Couchot Professional Corporation, located at 660 Newport Center Drive, Suite 400, Newport Beach, California 92660 (the telefacsimile number is (949) 720-4111).  Ballots should be sent to the attention of P.J. Marksbury.

Any Creditor holding Claims in more than one impaired Class must submit one ballot for each such Class.  If a Creditor has received an incorrect ballot, or believes that he is entitled to vote in more than one Class, additional ballots may be obtained upon written request made to Winthrop Couchot Professional Corporation (Attn:  P.J. Marksbury).

In order to vote for or against the Plan, a Creditor must have filed a Proof of Claim on or before the Bar Date, unless his Claim is listed in the Bankruptcy Schedules filed in the Case by the Debtor as not being disputed, unliquidated or contingent.  Any such Creditor is, to the extent listed in the Bankruptcy Schedules, deemed to have filed a Claim,

and, absent a timely objection to the Claim, such Claim is deemed allowed. In order to determine whether a Creditor is entitled to vote on the Plan notwithstanding any failure to timely file a Proof of Claim, the Creditor should review the Debtor's Bankruptcy Schedules on file with the Bankruptcy Court. If a Creditor's Claim is not scheduled, or, if it is scheduled as contingent, disputed, or unliquidated and the Creditor did not file a Proof of Claim prior to the Bar Date, the Creditor may not be entitled to vote on the Plan.

The following types of Claims are not entitled to vote on the Plan: (a) Claims that have been disallowed; (b) Claims in an unimpaired Class; and (c) Administrative Claims and Priority Tax Claims. Claims in unimpaired Classes are not entitled to vote because such Classes are deemed to have accepted the Plan. Administrative Claims and Priority Tax Claims are not entitled to vote because such Claims are not placed in Classes and they are required to receive certain treatment specified by the Bankruptcy Code. **EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU STILL MAY HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.**

### 2.    Deadline for Voting for or Against the Plan.

The Bankruptcy Court has fixed **March 25, 2011**, at 4:00 p.m. Pacific Time, as the last date by which ballots must be received by Winthrop Couchot Professional Corporation, the Debtor's counsel. Subject to review and determination by the Bankruptcy Court, votes received by Winthrop Couchot Professional Corporation after that date may not be counted. Whether or not a Creditor votes on the Plan, he will be bound by the terms of the Plan and the treatment of his Claim set forth in the Plan if the Plan is confirmed by the Bankruptcy Court. Allowance of a Claim for voting purposes does not necessarily mean that all or a portion of the Claim will be allowed for distribution purposes.

Since, subject only to any order of the Bankruptcy Court to the contrary, only the votes of those Creditors whose ballots are timely received may be counted in determining whether a Class has accepted the Plan, Creditors are urged to fill in, date, sign and promptly mail the enclosed ballot.

### 3.    Deadline For Objecting to the Confirmation of the Plan.

1    Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may

2    object to the confirmation of the Plan.  Objections to the confirmation of the Plan must be

3    in writing and conform to the requirements of the Bankruptcy Rules and must be filed with

4    the Bankruptcy Court and served upon counsel to the Debtor, Winthrop Couchot

5    Professional Corporation, Attn: Robert E. Opera, 660 Newport Center Drive, Suite 400,

6    Newport Beach, CA 92660, and upon the United States Trustee, Attn:  Russell Clementson,

7    Esq., 725 S. Figueroa, Suite 2600, Los Angeles, CA 90017, so as to be received by

8    4:00 p.m. (Pacific Time) on **March 25, 2011**.  Objections to confirmation of the Plan are

9    governed by Rule 9014 of the Federal Bankruptcy Rules.  **UNLESS AN OBJECTION**

10    **TO CONFIRMATION IS TIMELY AND PROPERLY SERVED AND FILED, IT**

11    **MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

12    **4.    Time and Place of the Confirmation Hearing.**

13    Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after

14    notice, to hold a hearing on the confirmation of the Plan.  The hearing at which the

15    Bankruptcy Court will determine whether to confirm the Plan will take place on

16    **April 20, 2011**, at 2:00 p.m. in Courtroom 1668, 255 East Temple Street, Los Angeles,

17    California, 90012.  The Confirmation Hearing may be adjourned from time to time by the

18    Bankruptcy Court without further notice except for an announcement made at the

19    Confirmation Hearing.

20    **5.    Plan Confirmation.**

21    The Bankruptcy Court will confirm the Plan if the requirements of section 1129 of

22    the Bankruptcy Code are satisfied.  Section 1129 requires, among other things, that:

23    (a) with respect to each Class of Claims, each holder of a Claim in that Class has accepted

24    the Plan, or will receive or retain under the Plan on account of such Claim, property of a

25    value that is not less than the amount that such holder would receive if the Debtor were to

26    liquidate its assets under Chapter 7 of the Bankruptcy Code; (b) confirmation of the Plan is

27    not likely to be followed by a liquidation of the Debtor or the need for further

28    reorganization of the Debtor; and (c) the Plan be accepted by each Class of Claims that is

1  impaired by the Plan, or the Plan does not discriminate unfairly and is fair and equitable to

2  any impaired Class that has not accepted the Plan.

3        To confirm the Plan, the Bankruptcy Court must determine whether each

4  "impaired" Class entitled to vote on the Plan has accepted the Plan.  Pursuant to

5  section 1124 of the Bankruptcy Code, Classes "impaired" by the Plan are those Classes

6  whose legal, equitable or contractual rights are altered pursuant to the Plan.  Under

7  section 1126(c) of the Bankruptcy Code, an impaired Class of Claims is deemed to have

8  accepted the Plan if the Plan is accepted by Creditors in that Class holding at least two-

9  thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed

10  Claims of Creditors in that Class actually voting on the Plan.

11        In the event that an impaired Class of Claims does not accept the Plan, the Debtor

12  intends to request that the Bankruptcy Court confirm the Plan pursuant to the provisions of

13  section 1129(b) of the Bankruptcy Code.  Pursuant to section 1129(b), the Plan may be

14  confirmed despite the failure of a Class of Claims to accept the Plan if the Bankruptcy

15  Court determines that the Plan does not discriminate unfairly and is fair and equitable with

16  respect to such Class of Claims, and determines that the Plan otherwise complies with the

17  requirements of section 1129(b) of the Bankruptcy Code.  The condition that the Plan be

18  fair and equitable with respect to a nonaccepting Class of Claims includes certain legal

19  requirements more fully set forth in section 1129(b).

20        **6.**    **Identity of Person to Contact for More Information Regarding this**

21              **Disclosure Statement or the Plan.**

22        Any interested party desiring further information about this Disclosure Statement or

23  the Plan should contact counsel for the Debtor, Winthrop Couchot Professional

24  Corporation, Attn:  Robert E. Opera, 660 Newport Center Drive, Suite 400, Newport

25  Beach, California 92660; telephone no. (949) 720-4100.

26  / / /

27

28

# IV.

## NATURE AND HISTORY OF THE DEBTOR'S BUSINESS; CAUSES OF THE DEBTOR'S FINANCIAL DIFFICULTIES; THE DEBTOR'S CHAPTER 11 FILING; SIGNIFICANT EVENTS DURING THE DEBTOR'S CHAPTER 11 CASE; AND THE DEBTOR'S ASSETS AND LIABILITIES AND FINANCIAL CONDITION

The following is a description of the nature and the history of the Debtor's business, the causes of the Debtor's financial difficulties, the Debtor's Chapter 11 filing, significant events which have occurred during the Debtor's Case, and the Debtor's assets and financial condition.

### A.    The Debtor.

The Debtor was incorporated in February 1987.  The Debtor is a privately-owned California corporation, which was formerly known as Bob Yari Productions.  The Debtor is a holding company and its primary assets are the Subsidiary Interests.  Each of the Subsidiaries is a single-purpose entity formed by the Debtor primarily for the purpose of producing a theatrical motion picture.

The Subsidiaries generally hold the copyrights to the motion pictures produced by the Subsidiaries.  The Subsidiaries develop the motion pictures, pay the costs associated with the development of the motion pictures and collect any revenues to which they are entitled in connection with the exploitation of the motion pictures.

The Subsidiaries generally have debt and operating expenses that must be satisfied before any material Subsidiary Distributions can be made to the Debtor on account of the Debtor's Subsidiary Interests in the Subsidiaries.  The Subsidiaries generally incur secured debt in connection with funding the cost of developing a motion picture.  The Subsidiaries also incur liability to the Guilds for residuals that relate to certain licensing rights of a motion picture.  In some instances, a Subsidiary may owe profit participation obligations to creditors in connection with the production of a motion picture by a Subsidiary.  Each of the Subsidiaries also incurs various operating expenses, the administration of which generally is managed by YFG Services.[5]

---

[5] YFG Services, the sole shareholder of which is Yari, was formed for the purpose of providing management services needed by the Debtor and by the Subsidiaries in connection with the Subsidiaries' production of motion pictures (e.g., servicing debt and Guild obligations, accounting for profit participations, licensing rights in the motion pictures).

1    The sole shareholder of the Debtor is Davand, the sole member of which is Yari.

2    The Debtor's current officers are:  Yari (President) and Dennis Brown (Vice President and

3    Secretary).  Yari is currently the only member of the Debtor's Board of Directors.

4    **B.    The Debtor's Financial Difficulties.**

5    In or about 2007, the Debtor commenced experiencing financial difficulties.  The Debtor's

6    financial difficulties arose primarily as a result of the contraction in the financing markets

7    available for funding motion pictures, caused by the worldwide recession, and by a reduction in

8    the value of the Subsidiary Interests.

9    **1.    Contraction of Financing Markets.**

10    In or about the end of 2007, the debt and equity markets contracted severely as the

11    worldwide economy slipped into the worst economic recession since the Great Depression.

12    As a result, the primary sources of production and distribution financing for independent

13    motion picture producers such as the Debtor virtually disappeared.   The loss of such

14    financing sources caused substantial financial damage to the Debtor.

15    **(a)    YFGR.**  The Debtor's Affiliate, Yari Film Group Releasing, LLC

16    ("YFGR"), and certain Subsidiaries were parties to domestic distribution

17    agreements pursuant to which such Subsidiaries granted to YFGR, among other

18    things, a limited right to distribute certain motion pictures ("YFGR Motion

19    Pictures") throughout the United States.  YFGR entered into separate home

20    entertainment sub-distribution agreements with Worldwide Sony Pictures

21    Entertainment ("WSPE") for each of the YFGR Motion Pictures, pursuant to which

22    YFGR granted to WSPE the limited right to exploit video rights (and, under certain

23    circumstances, pay television rights) in the YFGR Motion Pictures, after the YFGR

24    _____

25    *[Footnote Cont'd]*
YFG Services has provided to the Debtor and to the Subsidiaries staffing, legal, accounting and other management services needed by the Debtor and by the Subsidiaries in the operation of their businesses.  For example, YFG

26    Services provides to each Subsidiary the services needed by each Subsidiary to exploit, in a number of media (theatres, video, pay per view, etc.), and in territories, both domestic and international, the value inherent in the

27    copyright to the motion picture produced by such Subsidiary, and YFG Services collects for such Subsidiary the revenues generated by the exploitation of such motion picture.  The management services rendered to the Subsidiaries

28    by YFG Services provide to the Subsidiaries the means to operate, and preserves the value of the assets of the Subsidiaries, and, hence, the value of the Debtor's Subsidiary Interests.

-40-

1    Motion Pictures had been theatrically released in the United States.  As a result of

2    the contraction of the financing markets, YFGR was unable to obtain funding

3    sufficient to distribute the YFGR Motion Pictures.  As a consequence thereof,

4    WSPE alleged that YFGR had breached its sub-distribution agreements with

5    WSPE, and asserted against YFGR certain damage claims and the right to exploit

6    the home video rights in the YFGR Motion Pictures before the theatrical release of

7    the YFGR Motion Pictures.  Faced with such disputes and other financial

8    difficulties, on December 19, 2008, YFGR filed a Chapter 11 petition for relief in

9    the Bankruptcy Court, as Case No. 2:08-32208 BR.

10         After the filing of YFGR's bankruptcy petition, WSPE and the official

11    committee of unsecured creditors appointed in the YFGR case ("YFGR

12    Committee") entered into a settlement agreement which provided, among other

13    things, for a sale to WSPE of YFGR's distribution rights in the YFGR Motion

14    Pictures and for a dismissal of YFGR's then pending motion to assume YFGR's

15    executory sub-distribution agreements with WSPE.  The YFGR Committee filed a

16    motion, pursuant to Rule 9019 of the Federal Bankruptcy Rules, to obtain approval

17    of such settlement agreement, and the Bankruptcy Court entered an order granting

18    such motion over YFGR's objection.  The Bankruptcy Court denied YFGR's

19    motion for reconsideration of such order and YFGR's request for a stay of such

20    order pending YFGR's appeal of such order.  WSPE thereafter distributed the

21    YFGR Motion Pictures on DVD, thereby destroying YFGR's ability to distribute

22    theatrically the YFGR Motion Pictures.

23         In connection with certain foreign distribution agreements between a

24    number of the Subsidiaries and certain foreign distributors, the Debtor entered into

25    agreements with foreign distributors ("Distribution Guarantee Agreements"),

26    pursuant to which the Debtor guaranteed theatrical releases of the YFGR Motion

27    Pictures.  As a consequence of YFGR's failure to release the YFGR Motion

28    Pictures theatrically, the foreign distributors asserted very substantial damage

1    claims against the Subsidiaries, their sales agent and/or the Debtor and offset

2    claims against obligations owed by these foreign distributors to the Subsidiaries,

3    their sales agent and/or the Debtor.

4        The failure of YFGR to release theatrically the YFGR Motion Pictures

5    resulted, then, in the creation of substantial claims against the Debtor.  Moreover,

6    the failure of YFGR to release theatrically the YFGR Motion Pictures impaired

7    substantially the value of the YFGR Motion Pictures for the Subsidiaries that

8    produced the YFGR Motion Pictures, and, hence, impaired substantially the value

9    of the Debtor's Subsidiary Interests in such Subsidiaries.  The Debtor believes that,

10   had the YFGR Motion Pictures been distributed theatrically, most, if not all, of

11   them would have been profitable, and would have generated value to the

12   Subsidiaries which had produced the YFGR Motion Pictures and, accordingly,

13   potential value for the Debtor on account of its Subsidiary Interests in such

14   Subsidiaries.

15       **(b)**    **Pre-Petition Litigation.**  As of the Petition Date, the Debtor was

16   named as a defendant in about twelve actions or arbitration proceedings filed

17   against it or against Subsidiaries and/or Affiliates and it, several of which relate to

18   the Debtor's guarantee of the theatrical releases of the YFGR Motion Pictures

19   under the Distribution Guarantee Agreements.  The Debtor was required to spend

20   substantial funds litigating such actions and proceedings and to devote substantial

21   management attention to such litigation, rather than to managing the Debtor's

22   business.  The expense and disruption associated with such litigation impaired

23   substantially the Debtor's business.

24       The financial difficulties associated with the litigation filed against the

25   Debtor created cash flow problems for the Debtor which impaired the Debtor's

26   ability to pay its ongoing obligations to its creditors, leading to further litigation

27   filed against the Debtor.

28

2. **Reduction in Value of Subsidiary Interests**.

Commencing in or about 2007, with the onset of the severe worldwide economic recession, the value of material assets of the Subsidiaries, such as foreign licensing rights for motion pictures produced by Subsidiaries, began to erode. The erosion in value of assets of the Subsidiaries resulted in a reduction of distributions that the Subsidiaries were able to make to the Debtor and, accordingly, caused cash flow difficulties for the Debtor.

C. **The Filing of the Debtor's Chapter 11 Petition**.

Faced with the financial difficulties referenced hereinabove, on January 20, 2010, the Debtor filed a voluntary Chapter 11 petition in order to preserve the viability of its business and to implement a debt restructuring plan for the benefit of the Debtor's Creditors. The Debtor acts as debtor-in-possession in the Case pursuant to sections 1107 and 1108 of the Bankruptcy Code.

D. **Significant Events During the Case**.

The following is a summary of certain significant events which have occurred during the Case:

1. **Bankruptcy Schedules**.

On or about February 19, 2010, the Debtor filed its Bankruptcy Schedules.

2. **Meeting of Creditors**.

On February 25, 2010, the Debtor attended in the Case a first meeting of creditors conducted pursuant to section 341(a) of the Bankruptcy Code, and thereafter attended a continued meeting of creditors.

3. **Debtor's Application to Employ Winthrop Couchot Professional Corporation**.

On February 19, 2010, the Debtor applied to the Bankruptcy Court for authority to employ Winthrop Couchot Professional Corporation as its general insolvency counsel in the Case ("Employment Application) [Docket. No. 29]. The Debtor resolved, by stipulation, objections asserted to the Employment Application by the United States Trustee and by the Committee. The YFGR Committee also filed objections to the Employment Application. Such objections were overruled by the Bankruptcy Court, and,

-43-

1   on May 26, 2010, the Bankruptcy Court entered an order granting the Employment

2   Application.

3       **4.**     **The Committee and Its Professionals**.

4       The United States Trustee appointed the Committee on March 17, 2010.  The

5   Committee employed the law firm of Pachulski Stang Ziehl & Jones LLP as its proposed

6   counsel on or about March 24, 2010.  On May 21, 2010, the Bankruptcy Court entered an

7   order authorizing the Committee to employ Pachulski Stang Ziehl & Jones, LLP.

8       **5.**     **Motions for Relief from Stay**.

9       Motions for relief from stay have been filed by the following parties in order to

10  obtain relief from stay to continue to pursue pre-petition litigation against the Debtor:

11      **(a)**     **Alliance Partie**s.  On March 8, 2010, the Bankruptcy Court

12      approved a stipulation among the Debtor, on one hand, and Alliance Atlantis

13      Releasing Limited dba Momentum Pictures, Alliance Films, Inc., and Aurum

14      Producciones S.A. (collectively, "Alliance Parties"), granting to the Alliance

15      Parties relief from stay solely to allow the United States District Court for the

16      Central District of California (Case No. 09-cv-01618) to hear and rule on the

17      motion for summary judgment that was filed by the Alliance Parties in such pre-

18      petition litigation.

19      **(b)**     **Schulman and Nunun.**  On March 8, 2010, the Bankruptcy Court

20      granted to  David Hahn, Chapter 7 trustee for Cathy Schulman and Tom Nunun,

21      relief from stay to continue to pursue pre-petition litigation (Case No. BC345581,

22      consolidated with BC248144) against the Debtor.

23      **(c)**     **Haggis Parties.**  On March 29, 2010, the Bankruptcy Court entered

24      an order approving a stipulation among the Debtor, on one hand, and Paul Haggis,

25      Inc., Mambo, Inc., Resarf, Inc. and Bobby Moresco (collectively, "Haggis

26      Parties"), granting to the Haggis Parties relief from stay to continue to pursue the

27      first phase of their pre-petition litigation against the Debtor (Case No. BC381582).

28

On August 6, 2010, the Bankruptcy Court entered an order granting to the Haggis Parties relief from stay to pursue the second phase of their pre-petition litigation against the Debtor.

**(d)    Robb.**  On April 15, 2010, the Bankruptcy Court entered an order approving a stipulation between the Debtor and James Robb ("Robb"), granting to Robb relief from stay for the sole and limited purpose of allowing Robb to petition the Superior Court for the State of California to confirm his pre-petition final order against the Debtor (JAMS Arbitration Case Reference No. 1220039179).

**6.    Plan and Disclosure Statement Filing Deadline.**

On February 1, 2010, the Bankruptcy Court entered its Order For Filing Chapter 11 Plan of Reorganization and Disclosure Statement and Order Setting Hearing for Approval of Disclosure Statement (the "Plan Filing Deadline Order") [Docket No. 11].  By the Plan Filing Deadline Order, the Debtor was required to have filed a Chapter 11 plan and accompanying disclosure statement on or before April 20, 2010 (the "Plan Filing Deadline").  Based upon stipulations entered into by and between the Debtor and the Committee, approved by orders of the Bankruptcy Court, the Plan Filing Deadline was extended through and including October 15, 2010.  On October 15, 2010, the Debtor filed its motion to extend the Plan Filing Deadline through and including November 24, 2010 and, by stipulation entered into among the Debtor, the Committee and the Guilds, the Plan Filing Deadline was extended to December 22, 2010.  The Debtor filed a Chapter 11 plan and accompanying disclosure statement by the Plan Filing Deadline.

**7.    The Debtor's Plan Exclusivity Rights.**

The Debtor's exclusive rights to propose a Chapter 11 plan, and to solicit acceptances to such a plan, have been extended, by stipulations entered into by and between the Debtor and the Committee and approved by orders of the Bankruptcy Court.  On October 15, 2010, the Debtor filed a motion to extend the Debtor's exclusive right to propose a Chapter 11 plan through and including November 24, 2010 and the Debtor's exclusive right to solicit acceptances to such a plan through and including  January 23,

MAINDOCS-#158405-v5-PersikFirstAmndDisclosureStatement.DOC

1   2011, and, by stipulation entered into among the Debtor, the Committee and the Guilds,

2   the Debtor's exclusive period to propose a plan was extended through December 22, 2010,

3   in accordance with the terms and conditions of such stipulation.  The Debtor filed a

4   Chapter 11 plan and accompanying disclosure statement on December 22, 2010.

5          The Committee asserts that the Debtor's Plan exclusivity  rights have terminated.

6          **8.      One Train Later Financing Motion.**

7          On or about April 13, 2010, the Debtor filed its Motion for Order Authorizing

8   Non-Debtor Subsidiary of the Debtor to Enter into Financing Agreement and to Grant

9   Security Interest in Certain Assets of the Non-Debtor Subsidiary pursuant to which the

10  Debtor requested that the Bankruptcy Court authorize the Debtor's Subsidiary, OTL

11  Distribution, LLC ("OTL"), to enter into and to perform its obligations under a financing

12  agreement with Cannon Commercial, Inc. ("Cannon").  OTL needed financing in order to

13  complete final post-production finishing services on its theatrical motion picture, One

14  Train Later ("OTL Film"), so that the OTL Film could be released.  In connection with

15  such transaction, the Debtor entered into no agreement with Cannon, and undertook no

16  commitment or obligation of any nature to Cannon.  Rather, OTL granted to Cannon a

17  security interest in the copyright of the OTL Film and in other personal property associated

18  with the OTL Film, in order to secured the repayment of the financing that Cannon agreed

19  to provide to OTL.  On May 21, 2010, the Bankruptcy Court entered its order authorizing

20  the Debtor to cause OTL to enter into, and to perform its obligations under, its financing

21  agreement with Cannon.

22         **9.      Davand Loan.**

23         As of the Petition Date, the Debtor had virtually no cash, and had no financing

24  arrangement to which it could resort, to fund the accruing costs of administration of the

25  Debtor's Case.  The Committee raised concerns that the Debtor's Case would not be

26  adequately funded.  The Committee indicated to the Debtor that the Committee would be

27  willing to discuss with the Debtor the terms of a consensual plan in the Case only if the

28  Debtor were to obtain funding to pay its accruing pre-confirmation obligations in the Case.

To address the Committee's concerns, the Debtor arranged to have Davand extend to the Debtor the $350,000 Davand Loan in order to fund the pre-confirmation administration of the Case.  On May 7, 2010, the Debtor filed in this Court that Motion for Order Authorizing the Debtor to Enter into Funding Agreement and to Grant Security Interest in Assets of the Estate ("Davand Loan Motion") pursuant to which the Debtor requested that the Bankruptcy Court authorize the Debtor to obtain from Davand the Davand Loan, and to secure the repayment of the Davand Loan by granting to Davand a security interest encumbering all of the Debtor's assets, junior in priority to all existing, duly-perfected and unavoidable liens encumbering the Debtor's assets, with the Davand Loan to be repaid immediately as and when the Debtor receives unencumbered Subsidiary Distributions.  At a hearing held on June 9, 2010, the Bankruptcy Court granted the Davand Loan Motion, and Davand thereafter advanced to the Debtor the Davand Loan. Proceeds of the Davand Loan were used to fund the payment of Pre-Effective Date Professional Fee Claims and a $15,000 payment to The Salter Group, as described in the immediately succeeding paragraph.  In accordance with the provisions of the Bankruptcy Court order approving the Davand Loan, the Debtor has repaid the amount of the Davand Loan.

**10.** **Committee's Employment of Expert to Evaluate Debtor's Position Regarding Value of Subsidiary Interests.**

In or about May 2010, the Debtor and the Committee entered into a stipulation pursuant to which the Debtor and the Committee agreed that the Committee could employ The Salter Group to evaluate the Debtor's position, taken in plan negotiations with the Committee, regarding the aggregate value of the Subsidiary Interests and the Debtor agreed to pay the costs incurred by The Salter Group with respect to its performing such evaluation ($15,000).  The Salter Group is an independent financial and strategic advisory firm which specializes in providing financial opinions, valuations, financial and strategic analysis and transaction support and has extensive knowledge and experience of the entertainment and media industry.  The Salter Group performed such evaluation for the

1    Committee, and the Committee took into account such evaluation in connection with its

2    plan negotiations with the Debtor.

3    **E.    Summary of Debtor's Assets and Liabilities and Present Financial Condition.**

4        **1.    Debtor's Assets.**

5        The Debtor's assets consist primarily of the Subsidiary Interests (a list of the

6    Subsidiaries is attached as Exhibit "K" to the Plan).  While it is difficult for the Debtor to

7    attribute any exact value to the Subsidiary Interests, the Debtor estimates that the

8    aggregate value of the Subsidiary Interests is approximately $1,388,725 million.

9        As of February 1, 2011, the Debtor had approximately $25,000 in Cash.  The

10    Debtor projects that, by about the Effective Date, it will receive additional Subsidiary

11    Distributions in an aggregate amount of approximately $43,000.

12        Apart from Causes of Action (the value of which is difficult to determine), the only

13    other material assets of the Estate are the Motion Picture Development Rights.  The Debtor

14    attributes no material value to the Motion Picture Development Rights.

15        **2.    Debtor's Liabilities.**

16        The Debtor estimates that the following Claims will be asserted against the Debtor:

17        **(a)    Secured Claims.**  The Debtor believes that Bank Leumi's Secured

18    Claim will be paid in full, in the ordinary course, by Subsidiaries and that the

19    Debtor will not be required to pay any funds to Bank Leumi.  The Guilds will have,

20    pursuant to the Plan, Allowed Guild Secured Claims in the aggregate amount of

21    $2,350,000.  The Debtor believes that there are no other Secured Claims in the

22    Case (i.e., that there are no Class 3 Secured Claims in the Case).

23        **(b)    Administrative Claims.**  Based upon information provided to the

24    Debtor by the Pre-Effective Date Professionals employed in the Case, the Debtor

25    estimates that approximately $458,901 in unpaid Pre-Effective Date Professional

26    Fee Claims were asserted against the Debtor as of January 31, 2011.[6]  The Debtor

27

28

---

[6] As of February 1, 2011, the Debtor had paid approximately $483,957 in Pre-Effective Date Professional Fee Claims, exclusive of the amount of the Retainer Balance.

1    projects that, from February 1, 2011 through the Effective Date, approximately

2    $225,975 in additional Pre-Effective Date Professional Fee Claims and United

3    States Trustee Fees Claims will be asserted against the Debtor.

4        **(c)    Priority Non-Tax Claims.**  The Debtor believes that there are no

5    Priority Non-Tax Claims in the Case.

6        **(d)    Priority Tax Claims.**  As of January 31, 2011, an aggregate amount

7    of approximately $71,573 in Priority Tax Claims was asserted against the Debtor.

8    The Debtor disputes such Priority Tax Claims.

9        **(e)    General Unsecured Claims.**  Based upon the Debtor's preliminary

10    review of the Proofs of Claim filed in the Case and the information contained in the

11    Debtor's Bankruptcy Schedules, the Debtor estimates that in excess of $70.0

12    million in General Unsecured Claims have been asserted against the Debtor

13    including a disputed claim in the amount of $20,088,000 filed by the Chapter 7

14    trustee in the YFGR bankruptcy case.

15                            **V.**

16              **LITIGATION AND OBJECTIONS TO CLAIMS**

17    **A.    Litigation Commenced Prior to the Petition Date.**

18        As of the Petition Date, the Debtor was involved in certain litigation, a schedule of which

19    litigation ("Litigation Schedule") is attached as Exhibit "O" to the Plan.

20        The Bankruptcy Court has granted relief from stay authorizing the prosecution of certain

21    actions against the Debtor and the Debtor is in the process of addressing such litigation.  Other

22    actions continue to be stayed in the Case.  The resolution of the actions filed against the Debtor

23    will affect the amount of General Unsecured Claims that will be allowed in the Case, and,

24    accordingly, will impact the amount of recovery that holders of Allowed General Unsecured

25    Claims will obtain in the Case.  However, since the Plan essentially is a "pot" plan, one in which

26    holders of Allowed General Unsecured Claims obtain their Pro Rata recovery of the Plan Fund,

27

28

1    rather than any fixed or guaranteed Distributions on account of their Claims, the resolution of such

2    litigation should not have a material impact on the confirmability or implementation of the Plan.[7]

3    **B.    Litigation Commenced After the Petition Date.**

4    The Debtor has not commenced, after the Petition Date, any litigation.  As set forth

5    hereinabove, after the Petition Date, the Bankruptcy Court has granted motions for relief from stay

6    to allow certain pre-petition actions to be continued against the Debtor, but no new actions have

7    been commenced against the Debtor.

8    After the Petition Date, Subsidiaries of the Debtor and other parties have filed an appeal of

9    a judgment adverse to them entered in the Axium Litigation.  The Debtor has been advised that

10    such appeal has substantial merit and is hopeful that it will be successful.

11    **C.    Claims Objections.**

12    Pursuant to Section 8.1 of the Plan, the Plan Agent is granted the exclusive right to file,

13    litigate, settle, adjust, enforce or abandon objections to any and all Disputed Claims, except only

14    that the Reorganized Debtor will have the right to object to a disputed Secured Claim, a Disputed

15    Joint Obligor Claim and the Claim asserted by YFGR, in accordance with the terms and

16    conditions of the Plan.

17    The Debtor has not completed its review, analysis and investigation of the Proofs of Claim

18    that have been filed in the Case.  The Debtor has not filed any objections to Disputed Claims.  The

19    Debtor believes, however, that a number of Claims filed in the Case should be disputed, and

20    anticipates that objections will be filed to a number of Disputed Claims.

21    **D.    Subordination Actions.**

22    The Debtor has not completed its review, analysis and investigation of the Proofs of Claim

23    with regard to determining whether any potential Cause of Action exists to subordinate any Claim

24    pursuant to section 510 of the Bankruptcy Code or otherwise.  The Debtor had not filed any action

25    to subordinate any Claim in the Case.  Pursuant to the Plan, the Plan Agent is granted the

26    exclusive right to seek to subordinate a Claim, except only that the Reorganized Debtor will have

27

28    [7] Note, however, that the Plan provides for the General Unsecured Claims Cap described in paragraph VII(E)(14) hereof.

-50-

1  the right to seek to subordinate a Disputed Joint Obligor Claim.  Any right to assert Causes of

2  Action to subordinate any Claims in the Case are reserved pursuant to the Plan.

3          **E.**      **Notice Regarding Causes of Action and Claims Objections.**

4          Any failure to list in this Disclosure Statement any Cause of Action, or potential Cause of

5  Action, will in no manner waive, eliminate, modify, release, impair or alter the Debtor's or the

6  Plan Agent's right to commence, prosecute, defend against, settle, and realize upon any Cause of

7  Action that the Debtor or the Estate has or may have as of the Effective Date.  Unless otherwise

8  provided in the Plan or in the Confirmation Order, to the extent that any filed or to be filed Cause

9  of Action is not resolved as of the Effective Date, the Reorganized Debtor or the Plan Agent will

10  have the right to prosecute, settle, or otherwise resolve or dispose of such Cause of Action, in

11  accordance with the terms and conditions of the Plan.

12          The discussion regarding Causes of Action and objections to Disputed Claims contained in

13  this Disclosure Statement is for informational purposes only.  Nothing contained herein is

14  intended, nor should be construed, to be any admission or acknowledgement by the Debtor of any

15  matter pertaining to any Cause of Action or to any objection to a Disputed Claim in the Case.

16  Pursuant to the Plan, the Reorganized Debtor and the Plan Agent to be employed pursuant to the

17  Plan reserve all of their respective rights and remedies with respect to Causes of Action, or

18  objection to any Disputed Claim, that have been asserted or that may be asserted in the Case.

19                                **VI.**

20                    **DESCRIPTION OF THE PLAN**

21          The following is a summary of the Plan and is qualified in its entirety by the full text of the

22  Plan.  The terms of the Plan will be controlling on Creditors in the event that the Plan is

23  confirmed.  In the event of any inconsistency between the provisions of the Plan and this

24  Disclosure Statement, the provisions of the Plan will control.  Therefore, all Creditors are urged to

25  read the Plan carefully in its entirety rather than relying on this summary.

26          **A.**      **Basic Structure of the Plan.**

27          The Plan proposes to pay the Claims of six (6) Classes of Creditors in accordance with the

28  provisions of the Plan.  The Plan provides for the establishment of one (1) Class of Interests.

**B.    Classification and Treatment of Claims.**

Section 1123 of the Bankruptcy Code requires that the Debtor, with certain exceptions, classify separately in the Plan all Claims.  Pursuant to section 1122 of the Bankruptcy Code, the Debtor may place all Claims that are substantially the same in the same Class in the Plan. Section 1123(a)(4) of the Bankruptcy Code requires that the Plan provide the same treatment for all Claims in the same Class, unless the holder of a particular Claim agrees to a less favorable treatment of that Claim.

Section 1123(a) of the Bankruptcy Code requires that the Debtor specify in the Plan any Class that is not "impaired" by the Plan and specify the treatment of any Class that is impaired by the Plan.  Pursuant to section 1124 of the Bankruptcy Code, a Class of Claims is "impaired" by the Plan, unless the Plan (1) leaves unaltered the legal, equitable and contractual rights of holders of the Claims, or (2) cures any defaults with respect to the Claims which occurred before the Petition Date, reinstates the maturity of the Claims, and compensates the holders of the Claims for any damages incurred by them as a result of any reasonable reliance by them on contractual provisions or applicable law entitling them to receive accelerated payment after the occurrence of such defaults, or (3) provides that, on the Effective Date, the holders of such Claims will receive Cash equal to the amount of their Allowed Claims.  Pursuant to section 1126(f) of the Bankruptcy Code, a Class of Claims that is not impaired by the Plan is conclusively presumed to have accepted the Plan, and is not entitled to vote on the Plan.  Pursuant to section 1126(g) of the Bankruptcy Code, a Class is deemed not to have accepted the Plan if the Plan provides that the Claims of such Class do not receive or retain any property under the Plan on account of such Claims.

Classes 3 (Allowed Secured Claims other than Class 1 and Class 2 Secured Claims), 4 (Allowed Priority Non-Tax Claims) and 7 (Interests) are not "impaired" under the Plan and, therefore, are not entitled to vote on the Plan.  Classes 1 (Allowed Secured Claim of Bank Leumi), 2 (Allowed Guild Secured Claims), 5 (Allowed General Unsecured Claims), and 6 (Allowed Subordinated Claims) are "impaired" under the Plan.  Classes 1, 2, 5 and 6 are entitled to vote on the Plan.  Note that, at this time, no Claims have been subordinated in the Case, and, therefore, there may be no Class 6 Claims.

**C.    Unclassified Claims.**

In accordance with the provisions of section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified under the Plan.  These Claims are not considered impaired, and they do not vote on the Plan, because they automatically are entitled to specific treatment provided for them in the Bankruptcy Code.  Accordingly, the Debtor has not placed Administrative Claims and Priority Tax Claims in a Class.  The treatment of these unclassified Claims is as provided below.

**1.    Allowed Administrative Claims.**

Administrative Claims generally are Claims for the expenses of administering the Debtor's Case that are allowed under section 503(b) of the Bankruptcy Code.  Administrative Claims also include Claims provided for by section 503(b)(9) of the Bankruptcy Code.  The Bankruptcy Code requires that all Administrative Claims be paid on the Effective Date of the Plan, unless a particular Creditor agrees to a different treatment of its Claim.  All Allowed Administrative Claims will be paid by the Plan Agent from Plan Fund Assets.  The Debtor projects that approximately $685,875 in unpaid Administrative Claims will be asserted against the Debtor as of the Effective Date.  The Guilds will have no Allowed Administrative Claim.  The treatment of Administrative Claims under the Plan is as described below.

**(a)    Payment.**  Except to the extent that the holder of an Allowed Administrative Claim agrees to a less favorable treatment of its Allowed Administrative Claim, and, subject to the Administrative Claims Bar Date set forth in Section 3.1.2 of the Plan, each holder of an Allowed Administrative Claim will receive, in full satisfaction, discharge, exchange and release of its Allowed Administrative Claim, Cash in an amount equal to such Allowed Administrative Claim, on the latest of (i) the Effective Date, (ii) the fifteenth (15th) Business Day after the date upon which such Administrative Claim becomes an Allowed Administrative Claim, or (iii) the date upon which such Allowed Administrative Claim becomes due according to its terms; provided, however, that an Ordinary

Course Administrative Claim will be paid in full in accordance with the terms and conditions of the agreements giving rise to such Ordinary Course Administrative Claim.  Any Allowed Administrative Claim of YFG Services and any other Affiliate of Yari will be paid by Davand on the Effective Date in accordance with the provisions of Section 5.7.2 of the Plan.

**(b)**    **Administrative Claims Bar Date.**  Except for Pre-Effective Date Professional Fee Claims, United States Trustee Fees and Ordinary Course Administrative Claims, and, except as set forth in section 503(b)(1)(D) of the Bankruptcy Code, all requests for payment of Administrative Claims must be filed with the Bankruptcy Court and served no later than thirty (30) days after the Effective Date (the "Administrative Claims Bar Date").  Any holder of an Administrative Claim that is required to file a request for payment of its Administrative Claim by the Administrative Claims Bar Date and that does not file by the Administrative Claims Bar Date such a request for payment of its Administrative Claim will be forever barred from asserting such Administrative Claim against the Debtor, the Reorganized Debtor, the Estate or any of the property or assets of the Debtor or the Reorganized Debtor.

**(c)**    **Deadline for Objections.**  All objections to allowance of Administrative Claims that are subject to the Administrative Claims Bar Date must be filed by no later than forty-five (45) days after the Administrative Claims Bar Date with respect to such Administrative Claim (the "Administrative Claims Objection Deadline").  The Administrative Claims Objection Deadline may be extended for a one-time thirty (30) day period by the Reorganized Debtor or by the Plan Agent by filing a notice of the extended Administrative Claims Objection Deadline with the Bankruptcy Court.  Thereafter, the Administrative Claims Objection Deadline may be further extended only by an order of the Bankruptcy Court.  If the Reorganized Debtor or the Plan Agent fails to file, by the Administrative Claims Objection Deadline, an objection to an Administrative

Claim that must be filed, and is filed, by the Administrative Claims Bar Date, such Administrative Claim will be deemed allowed as of the Administrative Claims Objection Deadline.

> **(d)** **United States Trustee Fees/Pre-Effective Date Professional Fee Claims.** The treatment under the Plan of United States Trustee Fees and Pre-Effective Date Professional Fee Claims is set forth, respectively, in Sections 3.14 and 3.15 of the Plan.

> **2.** **Allowed Priority Tax Claims.**

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment of its Allowed Priority Tax Claim, each holder of an Allowed Priority Tax Claim will receive, in full satisfaction, discharge, exchange and release of its Allowed Priority Tax Claim, equal quarterly Cash payments, commencing on the first Business Day of the first full calendar quarter commencing on the Effective Date and continuing on the first Business Day of each full calendar quarter thereafter through January 2012, in an aggregate amount equivalent to such Allowed Priority Tax Claim, plus simple interest thereon calculated at the interest rate available on ninety (90) day United States Treasuries on the Effective Date. All Allowed Priority Tax Claims will be paid by the Plan Agent from the Plan Fund Assets. The Debtor projects that approximately $71,573 in Priority Tax Claims will be asserted against the Debtor as of the Effective Date; the Debtor disputes such Priority Tax Claims.

> **D.** **Classification of Claims and Interests**

> **1.** **Overview.**

As required by the Bankruptcy Code, the Plan places Claims and Interests into Classes according to their respective legal rights and interests, including their respective rights to priority. In Section 4.2 of the Plan, the Debtor lists each Class established under the Plan and states whether each Class is impaired or is unimpaired by the Plan. A Class is "unimpaired" by the Plan if the Plan leaves unaltered the legal, equitable and contractual rights to which the holders of Claims in the Class are entitled or the holder of

1    the Interest is entitled, as provided in section 1124 of the Bankruptcy Code.  Article V of

2    the Plan sets forth the treatment that each Class will receive under the Plan.

3        Pursuant to the Plan, a Claim will be deemed classified in a particular Class only

4    to the extent that the Claim qualifies within the description of that Class and will be

5    deemed classified in another Class or Classes to the extent that any remainder of the

6    Claim qualifies within the description of such other Class or Classes.  A Claim is

7    classified in a particular Class only to the extent that the Claim is an Allowed Claim in

8    that Class and has not been paid, released or otherwise satisfied prior to the Effective

9    Date.

10        **2.    <u>Designation of Classes</u>.**

11    The Plan designates the following Classes of Claims and Interests:

12        **(a)    <u>Allowed Claims</u>.**

13            (i)    <u>Class 1</u>:  The Allowed Secured Claim of Bank Leumi.

14    This Class is impaired by the Plan.

15            (ii)    <u>Class 2</u>:  The Allowed Guild Secured Claim of each of the

16    Guilds.  This Class is impaired by the Plan.

17            (iii)    <u>Class 3</u>:  Any Allowed Secured Claims, other than Class 1

18    and Class 2 Allowed Secured Claims.  This Class is unimpaired by the

19    Plan.

20            (iv)    <u>Class 4</u>:  Any Allowed Priority Non-Tax Claims.  This

21    Class is unimpaired by the Plan.

22            (v)    <u>Class 5</u>:  Allowed General Unsecured Claims.  This Class

23    is impaired by the Plan.

24            (vi)    <u>Class 6</u>:  Any Allowed Subordinated Claims.  This Class is

25    impaired by the Plan.

26        **(b)    <u>Interests</u>.**

27        <u>Class 7</u>:  The Interest of the Interest Holder.  This Class is unimpaired by

28    the Plan.

-56-

3.    **Summary of Classification**.

The following table summarizes the Classes of Claims and Interests established by the Plan:

| CLASS | DESCRIPTION | IMPAIRED/ UNIMPAIRED | VOTING STATUS |
|-------|-------------|----------------------|---------------|
| Class 1 | Allowed Secured Claim of Bank Leumi | Impaired | Entitled to Vote on Plan |
| Class 2 | Allowed Guild Secured Claims of the Guilds | Impaired | Entitled to Vote on Plan |
| Class 3 | Any Allowed Secured Claims Other than Class 1 and Class 2 Allowed Secured Claims | Unimpaired | Deemed to Accept Plan |
| Class 4 | Any Allowed Priority Non-Tax Claims | Unimpaired | Deemed to Accept Plan |
| Class 5 | Allowed General Unsecured Claims | Impaired | Entitled to Vote on Plan |
| Class 6 | Any Allowed Subordinated Claims | Impaired | Entitled to Vote on Plan |
| Class 7 | Interests | Unimpaired | Deemed to Accept Plan |

As set forth above, Classes 3 and 4 are unimpaired by the Plan; any holders of Claims in these Classes are conclusively presumed to have accepted the Plan and, hence, are not entitled to vote with respect to the Plan.  Classes 1, 2, 5 and 6 are impaired by the Plan, and holders of Claims in these Classes are entitled to vote to accept or reject the Plan.  The Interest in Class 7 is unimpaired, and, hence, is not entitled to vote with respect to the Plan.

The treatment of Claims and Interests under the Plan is in full and complete satisfaction of the legal, contractual, and equitable rights that each Creditor or the Interest Holder may have in or against the Debtor or its property.  This treatment supersedes and replaces any agreements or rights which those entities have in or against the Debtor or its property.  **NO DISTRIBUTIONS WILL BE MADE, AND NO RIGHTS WILL BE RETAINED, ON ACCOUNT OF ANY CLAIM THAT IS NOT AN ALLOWED CLAIM.**

# VII.

## TREATMENT OF CLASSES UNDER THE PLAN

The following sets forth the treatment of Classes established by the Plan.

**A.      Class 1 -- Allowed Secured Claim of Bank Leumi.**

Class 1 consists of the Allowed Secured Claim of Bank Leumi.  Class 1 is impaired by the Plan.  The treatment of Bank Leumi's Allowed Secured Claim is as follows:

**1.      Claims Against Subsidiaries.**

Bank Leumi will retain, without modification or alteration, all of Bank Leumi's claims, rights and remedies against the Debtor's Subsidiaries, Sophomore Distribution, LLC ("SDL") and Addicted Distributions, LLC ("ADL"), pursuant to the Bank Leumi Loan Documents with SDL and ADL.

**2.      Accommodation Security Agreement.**

Bank Leumi will retain, without modification or alteration, all of Bank Leumi's claims, rights and remedies pursuant to the Accommodation Security Agreement until such time as Bank Leumi's Allowed Secured Claim is paid in full, except only that the Reorganized Debtor will be entitled to retain for its own account, and will not be required to pay to Bank Leumi, twenty percent (20%) of the amount of any Subsidiary Distribution to which it is entitled that it may receive on account of its Subsidiary Interest in SDL. Bank Leumi will have no rights, remedies or claims of any kind (whether a Secured Claim, Administrative Claim, Priority Claim or General Unsecured Claim, or otherwise) against the Plan Fund Assets and/or the Plan Fund.

**B.      Class 2 -- Allowed Guild Secured Claims.**

Class 2 consists of the Allowed Guild Secured Claims of the Guilds.  Class 2 is impaired by the Plan.  The Allowed Guild Secured Claim of each Guild will be deemed to be classified in a separate subclass of Class 2, and each such subclass of Class 2 will be deemed to be a separate Class under the Plan, but will receive the same treatment under the Plan.  The treatment of the Allowed Guild Secured Claims of the Guilds under the Plan is as follows:

1.    **Claims Against Subsidiaries.**

Except as set forth expressly to the contrary in Section 5.2.2 of the Plan, each Guild will retain, without modification or alteration, its claims, both secured and unsecured, and its rights and remedies against each Subsidiary pursuant to the Guild Pre-Petition Agreements between such Guild and such Subsidiary.  Any payments made on account of a Guild's Allowed Guild Secured Claim will reduce, on a dollar-for-dollar basis, such Guild's secured claims against Subsidiaries, with such payment allocated among the Subsidiaries on terms mutually acceptable to the Guilds, the Subsidiaries and the Reorganized Debtor.  Any payments that a Subsidiary pays to a Guild, on account of such Guild's secured claim against such Subsidiary, will reduce, on a dollar-for-dollar basis, such Guild's Allowed Guild Secured Claim against the Reorganized Debtor.  The Guilds will have no pre-petition unsecured claim against any Subsidiary.  Any payment that Bank of Ireland pays to a Guild, on account of such Guild's secured or unsecured claim against such Subsidiary or such Guild's Claims against the Reorganized Debtor (except only for any Class 5 Claim of a Guild paid from the Plan Fund), will reduce, on a dollar-for-dollar basis, such Guild's Allowed Guild Secured Claim against the Reorganized Debtor and such Guild's secured claim against such Subsidiary.  Any payment that any entity, other than Bank of Ireland, the Reorganized Debtor, a Subsidiary or any Yari Party, pays to a Guild will be applied on account of the claim of the Guild paid by such entity.

2.    **Guilds Forbearance Agreement.**

The Guilds Forbearance Agreement will become effective and enforceable on the Effective Date of the Plan.  In accordance with the provisions of the Guilds Forbearance Agreement, each Guild will take no act to exercise any right or remedy that such Guild may have to collect amounts that a Subsidiary may owe to such Guild in connection with Guild claims which will have accrued prior to the Effective Date of the Plan, including, without limitation, by enforcing any security interest that such Guild may have in the assets of such Subsidiary so long as, from and after the Effective Date of the Plan, the

1   Reorganized Debtor pays timely its obligations to such Guild pursuant to the Plan and

2   such Subsidiary, or the Reorganized Debtor pursuant to the Guild Assumption

3   Agreements, pays timely to such Guild all obligations accruing to such Guild on or after

4   the Effective Date in accordance with the provisions of the Guilds Forbearance

5   Agreement.

6       **3.**    **Amount of Allowed Guild Secured Claims.**

7       Each Guild's Allowed Guild Secured Claim against the Debtor will be fixed, for

8   the purpose of the Plan, in the following amount:

9       **(a)**    DGA -- $456,370

10      **(b)**    WGA -- $535,095

11      **(c)**    SAG -- $1,358,535

12      **(d)**    MPIPHP -- $0

13  The aggregate amount of the Allowed Guild Secured Claims, then, is $2,350,000.

14      **4.**    **Interest on Allowed Guild Secured Claims.**

15      From the Effective Date, through and including the date upon which an Allowed

16  Guild Secured Claim is paid in full, interest will accrue on account of such Allowed Guild

17  Secured Claim at a rate equal to the one-month LIBOR rate in effect as of the Effective

18  Date, as such rate may be adjusted annually on the anniversary date of the Effective Date,

19  plus 2.5% per annum.

20      **5.**    **Distributions on Account of Allowed Guild Secured Claims.**

21      Subject to the provisions of Section 5.2.6 of the Plan, the Reorganized Debtor will

22  pay to each of the Guilds, on account of such Guild's Allowed Guild Secured Claim, plus

23  all interest accrued thereon, an amount equal to such Guild's pro rata share (measured

24  among the Guilds) of (a) the Guilds' Share of the Subsidiary Distributions as soon as

25  reasonably practicable after the Reorganized Debtor's receipt of such Subsidiary

26  Distributions from the Subsidiaries, and (b) two-thirds (2/3) of the amount of any Alliance

27  Payments; and commencing on the twentieth (20th) day of the first full calendar quarter

28  after the Reorganized Debtor Note is fully, finally and indefeasibly paid to the Plan Fund

1  and continuing on the twentieth (20th) day of each full calendar quarter thereafter, the

2  Reorganized Debtor will pay to each Guild, on account of such Guild's Allowed Guild

3  Secured Claim, an amount equal to such Guild's pro rata share (measured among the

4  Guilds) of one hundred percent (100%) of all Subsidiary Distributions received by the

5  Reorganized Debtor during the prior full calendar quarter, until such time as such Guild's

6  Allowed Guild Secured Claim, plus all interest accrued thereon, is paid in full.

7        **6.**       **<u>Final Distributions on Account of Allowed Guild Secured Claims</u>**.

8        Any unpaid and outstanding amounts of an Allowed Guild Secured Claim, plus

9  any interest accrued thereon, will be paid in full by the Reorganized Debtor on the

10  twenty-fourth (24th) month anniversary of the Effective Date.

11        **7.**       **<u>No Section 1111(b) Election</u>**.

12        Each Guild will not make an election under section 1111(b) of the Bankruptcy

13  Code. The Guilds' General Unsecured Claims will be treated as Class 5 Claims under the

14  Plan.

15        **8.**       **<u>Guarantee of Allowed Guild Secured Claims</u>**.

16        Yari will guarantee to each Guild that such Guild will receive payment in the

17  amount of such Guild's Allowed Guild Secured Claim in accordance with the terms and

18  conditions set forth in the Plan, pursuant to the terms of that Guarantee Agreement with

19  such Guild, copies of which Guarantee Agreement for each Guild are attached,

20  collectively, as Exhibit "N" to the Plan (collectively, "Guilds Guarantee Agreements").

21  Yari's obligations pursuant to the Guilds Guarantee Agreements will be secured by that

22  Deed of Trust, a copy of which is attached as Exhibit "Q" to the Plan ("Guilds Deed of

23  Trust"), and by that Pledge Agreement, a copy of which is attached as Exhibit "R" to the

24  Plan ("Guilds Membership Interest Pledge Agreement"). The security interests to be

25  granted to the Guilds pursuant to the Guilds Deed of Trust and the Guilds Pledge

26  Agreement will be junior to the security interests to be granted to the Plan Agent, for the

27  benefit of holders of Allowed Class 5 Claims, pursuant to, respectively, the Out Parcels

28  Deed of Trust and the SJM Realty Pledge Agreement and will be subject to an

Intercreditor Agreement among the Plan Agent and the Guilds in a form and substance mutually acceptable to the Guilds and to the Committee.

**9.    Reorganized Debtor's Pledge to Guilds of Subsidiary Interests.**

Subject to the terms and conditions of that Pledge Agreement, a copy of which is attached as Exhibit "S" to the Plan ("Guilds Subsidiary Interests Pledge Agreement"), the Reorganized Debtor will grant to the Guilds a security interest in the Subsidiary Interests in order to secure timely performance of all of the Reorganized Debtor's obligations on account of the Allowed Guild Secured Claims under the Plan.  The security interest to be granted to the Guilds pursuant to the Guilds Subsidiary Interests Pledge Agreement will be junior to the security interest to be granted to the Plan Agent, for the benefit of holders of Allowed Class 5 Claims, pursuant to the Subsidiary Interests Pledge Agreement, and will be subject to an Intercreditor Agreement among the Plan Agent and the Guilds in a form and substance mutually acceptable to the Guilds and to the Committee.

**10.    Davand's Pledge to Guilds of Interest in the Reorganized Debtor.**

Subject to the terms and conditions of that Pledge Agreement, a copy of which is attached as Exhibit "T" to the Plan ("Guilds Stock Interest Pledge Agreement"), Davand will grant to the Guilds a security interest in the Interest in the Reorganized Debtor in order to secure timely performance of all of the Reorganized Debtor's obligations on account of the Allowed Guild Secured Claims under the Plan.  The security interest to be granted to the Guilds pursuant to the Guilds Stock Interest Pledge Agreement will be junior to the security interest to be granted to the Plan Agent, for the benefit of holders of Allowed Class 5 Claims, pursuant to the Davand Pledge Agreement, and will be subject to an Intercreditor Agreement among the Plan Agent and the Guilds in a form and substance mutually acceptable to the Guilds and to the Committee.

**11.    Guilds' Option to Employ Plan Agent.**

From and after the full, final and indefeasible payment of the Reorganized Debtor Note, the Guilds will have the option, exercisable in their sole and absolute discretion, to employ the Plan Agent to act on behalf of the Guilds under the Plan ("Guilds Plan

MAINDOCS-#158405-v5-PersikFirstAmndDisclosureStatement.DOC

Agent"). The Guilds may employ the Plan Agent jointly with the holders of Allowed

Class 5 Claims until the Plan Agent's employment by the holders of Allowed Class 5

Claims terminates pursuant to the provisions of Section 6.28 of the Plan) ("Guilds Plan

Agent Election"). In the event that, after any termination of the employment of the Plan

Agent in accordance with the provisions of Section 6.28 of the Plan, the Guilds determine

to appoint a replacement Guilds Plan Agent or to designate the Plan Agent as the Guilds

Plan Agent, the identity of any such replacement Guilds Plan Agent will be subject to the

written consent of the Reorganized Debtor, which consent will not be unreasonably

withheld by the Reorganized Debtor. The time by which the Guilds may make the Guilds

Plan Agent Election, the terms and conditions of the Guilds' employment of the Plan

Agent to act on behalf of the Guilds under the Plan, and the rights, powers and remedies

granted to the Guilds Plan Agent under the Plan are set forth in Section 5.2.11 of the Plan.

> (a)   **Guilds' Right to Make Plan Agent Election.** The Reorganized
Debtor will give to the Guilds written notice of any full, final and indefeasible
payment of the Reorganized Debtor Note ("Reorganized Debtor Note Payment
Notice"). The Guilds will have the right to make the Guilds Plan Agent Election
within thirty (30) days after the giving of the Reorganized Debtor Note Payment
Notice. In the event that the Guilds fail to make a Guilds Plan Agent Election
within such 30-day period, the Guilds' option to make the Guilds Plan Agent
Election will terminate.

> (b)   **Powers of Guilds Plan Agent.** The following rights, powers and
remedies granted to the Plan Agent under the Plan, and no other such rights,
powers and remedies, will transfer to, and may be exercised by, the Guilds Plan
Agent under the Plan; provided, however, that, subject to the provisions of the
Plan and the Guilds Forbearance Agreement, (i) each Guild will retain all existing
rights under its Guild Pre-Petition Agreements as applicable to Post-Effective
Date Guild obligations, and (ii) with respect to Pre-Effective Date Guild
obligations, each Guild may exercise any and all Guilds Plan Agent powers on its

own behalf to the extent a Guilds Plan Agent has not been appointed or a Guild provides written notice of its election not to act through the Guilds Plan Agent.

(i) <u>Subsidiaries Financial Reporting to Guilds Plan Agent</u>. The Guilds Plan Agent will have the right to review the Subsidiaries Financial Reporting in order to evaluate whether the Subsidiaries are making all Subsidiary Distributions to which the Guilds are entitled from the Subsidiaries under the Plan.

(ii) <u>Additional Financial Reporting to Guilds Plan Agent</u>. Upon reasonable written request made to the Reorganized Debtor by the Guilds Plan Agent, the Reorganized Debtor will provide promptly to the Guilds Plan Agent any financial reporting regarding the Subsidiaries' business, operations and assets and liabilities, including, without limitation, any Inter-Company Transactions, that may be reasonably requested by the Guilds Plan Agent in order for him to evaluate the accuracy and fairness of the Subsidiaries Financial Reporting.

(iii) <u>Guilds Plan Agent's Access to Financial Books and Records</u>. Upon reasonable written request made to the Reorganized Debtor by the Guilds Plan Agent, the Reorganized Debtor will provide promptly to the Guilds Plan Agent and to the Guilds Plan Agent's agents reasonable access to the Reorganized Debtor's and to the Subsidiaries' financial and accounting books and records and other documents for the purpose of permitting the Guilds Plan Agent to audit the accuracy and fairness of the Subsidiaries Financial Reporting. The Guilds Plan Agent's right to conduct any such audit, and the payment of the cost of any such audit, will be as set forth in Section 6.6.3.3 of the Plan.

(iv) <u>Guilds Plan Agent's Right to Consult Regarding the Amount of Subsidiary Distributions</u>. The Guilds Plan Agent will have the right to consult with the Reorganized Debtor and the Subsidiaries, and the

MAINDOCS-#158405-v5-PersikFirstAmndDisclosureStatement.DOC

1    Reorganized Debtor and the Subsidiaries will have an obligation to consult

2    with and to cooperate with the Guilds Plan Agent, regarding the amount of

3    the Subsidiary Distributions to be made to the Guilds, in accordance with

4    the terms and conditions of Section 6.6.3.4 of the Plan.

5         (v)    <u>Guilds Plan Agent's Enforcement of Remedies</u>.  The Guilds

6    Plan Agent will have the right to enforce, on behalf of the Guilds, any and

7    all remedies that the Guilds may have under the Guilds Guarantee

8    Agreements, Guilds Deed of Trust, Guilds Membership Interest Pledge

9    Agreement, Guilds Subsidiary Interests Pledge Agreement, and the Guilds

10    Stock Interest Pledge Agreement (collectively, "Guilds Security

11    Agreements"), the Plan, the Bankruptcy Code or under applicable law in

12    the event of a default by the Reorganized Debtor under the Plan.  Subject

13    only to any right of a Guild, exercisable in accordance with any applicable

14    provisions of a Guild Pre-Petition Agreement, to elect a different venue,

15    pursuant to the Guilds Security Agreements, the parties thereto will submit

16    expressly to the exclusive jurisdiction of the Bankruptcy Court with

17    respect to any disputes or the exercise of any rights and remedies

18    thereunder.  The Guilds Plan Agent will provide to the Reorganized Debtor

19    written notice of any default under the Plan and/or under any Guilds

20    Security Agreement ("Guilds Default Notice").  In the event that any

21    payment default is not cured within ten (10) days after the giving of such

22    Guilds Default Notice, or in the event that any non-payment default is not

23    cured within  fifteen (15) days after the giving of such Guilds Default

24    Notice, the Guilds Plan Agent will be entitled to enforce any and all rights

25    and remedies as it deems appropriate in the exercise of its sole and

26    absolute discretion.

27    **(c)**    **Obligation to Cooperate with Guilds Plan Agent.**  The

28    Reorganized Debtor, the Subsidiaries, Yari and any and all Affiliates of Yari will

1  have a duty and obligation, enforceable pursuant to the Plan, to reasonably

2  cooperate with the Guilds Plan Agent in the exercise of all of its rights, duties and

3  responsibilities pursuant to the Plan.

4         **(d)**    **Resolution of Disputes with Guilds Plan Agent.**  In the event that

5  any dispute should arise between the Guilds Plan Agent, on one hand, and the

6  Reorganized Debtor, a Subsidiary or a Yari Affiliate, on the other hand, regarding

7  any of their respective rights, obligations and remedies pursuant to the Plan or any

8  of the Guilds Security Agreements, they will act diligently and in good faith to try

9  to resolve such dispute, but, if such dispute cannot be resolved by them, any of

10  them will be entitled to request, pursuant to the provisions of the Bankruptcy

11  Rules, that the Bankruptcy Court resolve the merits of such dispute, subject only

12  to any right of a Guild, exercisable in accordance with any applicable provisions

13  of a Guild Pre-Petition Agreement, to have such dispute resolved in any other

14  appropriate venue.

15         **(e)**    **No Interest in Plan Fund.**  Neither the Guilds, nor the Guilds Plan

16  Agent, will have any interest in, right to, or claim against the Plan Fund or any

17  Plan Fund Proceeds, except only to the extent that the Guilds hold Allowed Class

18  5 Claims under the Plan.

19         **(f)**    **Cost of Guilds Plan Agent.**  Any cost associated with the Guilds'

20  retaining the Guilds Plan Agent, and the Guilds Plan Agent's performing any of

21  the rights, powers and remedies granted to it under the Plan, will be paid solely by

22  the Guilds.  Neither the Reorganized Debtor, nor the Plan Fund will have any

23  liability to pay any such cost.

24         **(g)**    **Termination of Employment of Guilds Plan Agent.**  Upon the

25  earlier of the full, final and indefeasible payment of the Allowed Class 2 Claims or

26  written election by the Guilds, the employment of the Guilds Plan Agent under the

27  Plan, and all rights, powers, duties and remedies granted to the Guilds Plan Agent

28  under the Plan, will terminate, and the Guilds Plan Agent will be discharged.

12.    **Release of Guilds' Liens.**

Upon the full, final and indefeasible payment of the Allowed Class 2 Claims, the Guilds will, as soon as is reasonably practicable, take all acts, and execute all documents, appropriate to evidence the payment of the Allowed Class 2 Claims and to release and extinguish all Liens granted by the Guilds Security Agreements pursuant to the Plan; provided, however, that nothing contained in the Plan will impair or affect in any manner any valid claims, security interests or other liens, or rights or remedies that the Guilds may retain against any of the Subsidiaries.  Upon payment in full of the Allowed Class 2 Claims, all pre-Effective Date Secured Claims of any nature that the Guilds may assert against the Debtor will be deemed to be fully and completely extinguished and discharged.

13.    **Guilds Allowed Unsecured Claims Distribution Cap.**  The Guilds will have Allowed Class 5 Claims in the aggregate amount of $8.0 million.  The Plan Fund will have no liability for any Allowed Class 5 Claims of the Guilds in excess of Distributions payable on account of the Guilds' Class 5 Claims in the aggregate amount of $8.0 million.

C.    **Class 3 -- Any Allowed Secured Claims, Other than Class 1 and Class 2 Allowed Secured Claims.**

Class 3 consists of any Allowed Secured Claims, other than Class 1 and Class 2 Allowed Secured Claims.  Class 3 is unimpaired by the Plan.  In the event that there is more than one holder of an Allowed Class 3 Claim, the Allowed Secured Claim of each such Secured Creditor will be deemed to be classified in a separate sub-class of Class 3, and each such sub-class of Class 3 will be deemed to be a separate Class under the Plan.

The Debtor believes that no Class 3 Claims exist in the Case.  In the event that it is determined that there are Allowed Class 3 Claims in the Case, pursuant to Section 5.3 of the Plan, the Reorganized Debtor is required to elect to provide to each holder of an Allowed Class 3 Claim one of the treatment options provided by Section 5.3 of the Plan, in full satisfaction, discharge, exchange and release of such Allowed Class 3 Claim.

**D.**    **Class 4 -- Any Allowed Priority Non-Tax Claims.**

Class 4 consists of any Allowed Priority Non-Tax Claims.  Class 4 is unimpaired by the Plan.  The Debtor believes that no Class 4 Claims exist in the Case.  In the event that it is determined that there are Allowed Class 4 Claims in the Case, each holder of an Allowed Class 4 Claim will receive the treatment of Allowed Class 4 Claims provided by Section 5.4 of the Plan.

**E.**    **Class 5 -- Allowed General Unsecured Claims.**

Class 5 consists of all Allowed General Unsecured Claims.  Class 5 is impaired by the Plan.  The Debtor estimates that in excess of $70.0 million in Class 5 Claims have been asserted against the Debtor, and that approximately $30.0 million to $40.0 million of such Claims will be allowed in the Case.  The treatment of Allowed Class 5 Claims under the Plan is as follows:

**1.**    **Plan Fund.**

All payments to holders of Allowed Class 5 Claims will be paid from the Plan Fund.  The provisions of the Plan relating to the establishment of the Plan Fund, and the Reorganized Debtor's funding of the Plan Fund, are set forth in Section 6.7 of the Plan.

**2.**    **Distributions of Plan Fund Proceeds.**

Subject to the provisions of Sections 5.5.4, 5.5.5, 5.5.6 and 5.5.7 of the Plan, except to the extent that the holder of an Allowed General Unsecured Claim agrees to a less favorable treatment of its Allowed General Unsecured Claim, the holder of an Allowed General Unsecured Claim will receive, in full and complete satisfaction, discharge, exchange and release of its Allowed General Unsecured Claim, Pro Rata Distributions of Plan Fund Proceeds available for distribution to holders of Allowed Class 5 Claims.

**3.**    **Schedule of Distributions.**

Pursuant to the Plan, the Plan Agent will make Distributions to the holders of Allowed Class 5 Claims, from Plan Fund Proceeds, in accordance with the following schedule:

**(a)**    **Initial and Interim Class 5 Distributions.**  The Plan Agent will make Distributions to the holders of Allowed Class 5 Claims as quickly as

reasonably, practicably and economically feasible in accordance with the terms of the Plan and will consult with any Post-Effective Date Committee formed under the Plan regarding the timing and amount of the initial and all interim Distributions.

        **(b)**    <u>**Final Distributions.**</u>  Holders of Allowed Class 5 Claims will receive a final Distribution of their Pro Rata share of Plan Fund Proceeds as soon as reasonably practicable and before entry of the Final Decree.

    **4.**    <u>**No Post-Petition Interest.**</u>

In accordance with section 726(a)(5) of the Bankruptcy Code, an Allowed General Unsecured Claim will not include Post-Petition Interest on account of such Allowed General Unsecured Claim, except to the extent that all of the following are satisfied and paid in full:  (a) all Allowed Administrative Claims; (b) all Allowed Priority Tax Claims; (c) all Allowed Priority Non-Tax Claims; (d) all Allowed Guild Secured Claims (e)  all Allowed General Unsecured Claims; (f) all Late-Filed Claims; and (g)  all Allowed Penalty Claims.  Any Post-Petition Interest that may be payable on an Allowed General Unsecured Claim will be calculated from the Petition Date through the date on which such Allowed General Unsecured Claim is paid in full.

    **5.**    <u>**Conditions to Distributions on Account of Allowed Class 5 Claims.**</u>

Notwithstanding any provision to the contrary contained in the Plan, no Distribution will be made on account of any Allowed General Unsecured Claim until <u>each</u> of the following events occurs:  (a) the Plan Agent has paid, or established adequate reserves for the payment in full of, Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Non-Priority Tax Claims; (b) the Disputed Claims Reserve is adequately funded for Disputed Class 5 Claims; (c) all outstanding Post-Effective Date Plan Expenses have been paid; and (d) the Plan Fund Reserve is established and an adequate Reserve is otherwise established by the Plan Agent for payment of the estimated amount of accruing Post-Effective Date Plan Expenses, in an amount to be determined by the Plan Agent in the exercise of its sole and absolute discretion.

6.      **Satisfaction of Allowed Class 5 Claims**.

Notwithstanding anything to the contrary contained in Section 5.5 of the Plan, no holder of an Allowed General Unsecured Claim will be entitled to receive more than one hundred percent (100%) of the amount of its Allowed General Unsecured Claim, plus any Post-Petition Interest thereon payable pursuant to Section 5.5.4 of the Plan.

7.      **Termination of Reorganized Debtor's Obligations to Holders of Allowed Class 5 Claims**.

The Reorganized Debtor's obligations to the Plan Agent on account of Allowed Class 5 Claims and to the holders of Allowed Class 5 Claims will terminate, and Allowed Class 5 Claims will be deemed to be fully and completely satisfied, discharged and released, upon the Reorganized Debtor's payment to the Plan Fund, in accordance with the terms and conditions of the Plan, of all of the following amounts:  (a) the Reorganized Debtor Note; (b)  any Axium Litigation Payment; and (c) the New Production Payments, fifty percent (50%) of which will be applied as a credit against the amount of the Reorganized Debtor Note and fifty percent (50%) of which will not be applied as a credit against the amount of the Reorganized Debtor Note.

8.      **Yari Guaranty**.

Subject to the terms and conditions of the Yari Guarantee, Yari will personally guarantee to the Plan Agent the Reorganized Debtor's obligations under the Reorganized Debtor Note.  Yari's obligations pursuant to the Yari Guarantee will be secured by the Out Parcels Deed of Trust and by the SJM Realty Pledge Agreement.

9.      **Reorganized Debtor's Pledge of Subsidiary Interests**.

Subject to the terms and conditions of the Subsidiary Interests Pledge Agreement, the Reorganized Debtor will grant to the Plan Agent, for the benefit of holders of Allowed Class 5 Claims, a security interest in the Subsidiary Interests in order to secure timely performance of all of the Reorganized Debtor's obligations to holders of Allowed Class 5 Claims under the Plan, including under the Reorganized Debtor Note.

1       **10.    Davand's Pledge of Interest in the Reorganized Debtor.**

2       Subject to the terms and conditions of the Davand Pledge Agreement, Davand will

3   grant to the Plan Agent, for the benefit of holders of Allowed Class 5 Claims, a security

4   interest in the Interest in the Reorganized Debtor in order to secure timely performance of

5   all of the Reorganized Debtor's obligations to holders of Allowed Class 5 Claims under

6   the Plan, including under the Reorganized Debtor Note.

7       **11.    Waiver and Release of All Class 5 Claims of Yari Affiliates.**

8       Upon the Effective Date of the Plan, all Class 5 Claims of Yari and any and all

9   Affiliates of Yari, except only for any Claim of YFGR, will be waived, released and

10  deemed finally disallowed in full.

11      **12.    Reorganized Debtor's Pledge of Security Interest in Net Recoveries.**

12      Subject to the terms and conditions of Section 6.7.4 of the Plan and the terms and

13  conditions of the Litigation Security Agreement (Exhibit "P" attached to the Plan), the

14  Reorganized Debtor will grant to the Plan Agent, for the benefit of holders of Allowed

15  Class 5 Claims, a security interest in any Axium Litigation Net Recoveries and any other

16  Net Recoveries to which holders of Allowed Class 5 Claims are entitled under the Plan in

17  order to secure timely payment to the Plan Agent of any such Net Recoveries.

18      **13.    Release of Plan Agent's Liens.**

19      Upon the full, final and indefeasible payment of the Reorganized Debtor Note, the

20  Plan Agent will, as soon as is reasonably practicable, take all acts, and execute all

21  documents, appropriate to evidence the payment of the Reorganized Debtor Note

22  (including without limitation by marking the Reorganized Debtor Note canceled and by

23  returning the Reorganized Debtor Note to the Reorganized Debtor) and to release and

24  extinguish all Liens granted to the Plan Agent pursuant to the Plan Documents.

25      **14.    General Unsecured Claims Cap.**

26      In accordance with the provisions of Section 5.5.14 of the Plan, the Debtor agrees

27  to increase the amount of the Reorganized Debtor Note if General Unsecured Claims are

28  allowed in the Case in an aggregate amount in excess of the sum of the following:  (a)

$39.0 million; (b) fifty percent (50%) of the amount of any Allowed General Unsecured Claims of Paul Haggis, Paul Haggis, Inc., Mambo, Inc., Bobby Moresco and any and all other entities affiliated therewith or related thereto (as reflected, in part, in Proofs of Claim Nos. 4, 7, 19, 20, 40 and 41 and any amendments or modifications thereto); and (c) one hundred percent (100%) of any Allowed General Unsecured Claim of any Creditor who filed a Proof of Claim after the Bar Date and whose claim is not deemed valid under Rule 3003(b)(1) of the Federal Bankruptcy Rules ("General Unsecured Claims Cap").  In the event that the aggregate amount of Allowed General Unsecured Claims in the Case exceeds the General Unsecured Claims Cap, the amount of the Reorganized Debtor Note will be increased by an amount equivalent to the difference in the Pro Rata Distributions that would have been made to Class 5 Creditors if the aggregate amount of Allowed General Unsecured Claims had been equal to the General Unsecured Claims Cap; provided, however, that in no event will the amount of the Reorganized Debtor Note be increased by more than $200,000 pursuant to Section 5.5.14.

**F.**     **Class 6 -- Any Allowed Subordinated Claims.**

Class 6 consists of any Allowed Subordinated Claims.  Class 6 is impaired under the Plan. The Debtor believes that no Class 6 Claims exist in the Case.  In the event that it is determined that there are Allowed Class 6 Claims in the Case, each holder of an Allowed Class 6 Claim will receive the treatment of Allowed Class 6 Claims provided by Section 5.6 of the Plan.

**G.**     **Class 7 -- Interests.**

Class 7 consists of the Interest of the Interest Holder.  Class 7 is unimpaired under the Plan.  The treatment of the Interest of the Interest Holder under the Plan is as follows:

**1.**     **Retention of Interest.**

The Interest Holder will retain, without modification or alteration, all of its rights, remedies and interests pursuant to the Interest, except that such Interest will be subject to the Davand Pledge Agreement.

2.    **New Value**.

The Interest Holder will provide, and with respect to Section 5.7.2(c) of the Plan will be deemed to have provided, to the Reorganized Debtor, as of the Effective Date, as and for a contribution of "new value" in order to retain its Interest, the following:  (a) the Davand Effective Date Contribution; (b) a payment in an amount equal to any Allowed Administrative Claim of Davand on account of any payment or satisfaction by Davand of any Allowed Administrative Claim of YFG Services or any Affiliate of Yari; and (c) the estimated present value of the payments projected to be made to the Reorganized Debtor by Davand, or by Yari pursuant to the Yari Guarantee and the collateral provided in support thereof, in order to enable the Reorganized Debtor to pay all of its obligations from and after the Effective Date.

**VIII.**

**PLAN IMPLEMENTATION**

A.    **Overview**.

The Plan provides for a reorganization of the Debtor's financial affairs in accordance with the terms and conditions of the Plan.  The Debtor's obligations to the Creditors will be restructured in accordance with the terms and conditions of the Plan.  Pursuant to the Plan, a Plan Fund will be established from which Distributions will be made to holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed General Unsecured Claims and any Allowed Subordinated Claims.  On the Effective Date, all of the Plan Fund Assets will be transferred to, and will vest in the Plan Fund, which Plan Fund will be controlled by the Plan Agent in accordance with the terms and conditions of the Plan.  On the Effective Date, the Retained Assets will revest in the Reorganized Debtor, free and clear of all liens, claims and encumbrances except as set forth in the Plan.

Article VI of the Plan describes the means by which the Debtor intends to effectuate the reorganization provided for by the Plan and to fund the obligations to Creditors undertaken in the Plan.  Article VI provides information regarding the conditions precedent to Confirmation and the effectiveness of the Plan, the appointment of the Plan Agent and the rights and powers of the

Plan Agent under the Plan, the establishment of the Plan Fund, the funding for the Plan Fund and required amounts of such funding, the appointment of any Post-Effective Date Committee, corporate governance of the Reorganized Debtor, implementation of the Plan and other material issues bearing upon the performance of the Plan.

The following summarizes the provisions of Article VI of the Plan. The following summarizes also the provisions of the Plan regarding the making of Distributions under the Plan (Article VII of the Plan), the treatment of Disputed Claims under the Plan (Article VIII of the Plan), the filing of post-Effective Date Litigation (Article IX of the Plan) and the treatment of executory contracts and unexpired leases under the Plan (Article X of the Plan).

**B.     Plan Agent.**

On the Effective Date, a Plan Agent selected jointly by the Committee will be appointed in accordance with the provisions of Section 6.6 of the Plan. The Plan Agent will have, <u>inter alia</u>, the following rights, powers, remedies and duties under the Plan (in addition to any and all rights, powers, remedies and duties reasonably necessary or appropriate to carry out the purpose and intent of the Plan which are not inconsistent with the provisions of the Plan):

**1.     Establishment and Administration of Plan Fund.**

The Plan Agent will establish, and will be responsible for administering, the Plan Fund. The Plan Agent may invest the Plan Fund Proceeds as permitted by the guidelines of the United States Trustee.

**2.     Distributions on Account of Allowed Claims**.

The Plan Agent will be responsible for making all Distributions to the holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed Class 5 Claims and any Allowed Class 6 Claims under the Plan.

**C.     Review of Financial Reporting**.

**1.     Subsidiaries Financial Reporting/Post-Effective Date Net Cash Flow Reporting.**

The Plan Agent will have the right to review the Subsidiaries Financial Reporting in order to evaluate whether the Subsidiaries are making all Subsidiary Distributions to

1    which the Plan Agent is entitled from the Subsidiaries under the Plan, and to review the

2    Post-Effective Date Net Cash Flow Reporting in order to evaluate whether the

3    Reorganized Debtor is complying with its obligations under the Plan with respect to the

4    payment of New Production Payments to the Plan Fund.

5           **2.**      **Additional Financial Reporting.**

6          Upon reasonable written request made to the Reorganized Debtor by the Plan

7    Agent, the Reorganized Debtor is required to provide promptly to the Plan Agent any

8    additional financial reporting regarding the Subsidiaries' businesses, operations and assets

9    and liabilities (including, without limitation, any Inter-Company Transactions) that may

10    be reasonably requested by the Plan Agent in order for him to evaluate the accuracy and

11    fairness of the Subsidiaries Financial Reporting, and is required to provide promptly to

12    the Plan Agent any additional financial reporting regarding the Reorganized Debtor's

13    business, operations and assets and liabilities that may be reasonably requested by the

14    Plan Agent in order for him to evaluate the validity of the Post-Effective Date Net Cash

15    Flow Reporting.

16           **3.**      **Access to Financial Books and Records.**

17          In accordance with the terms and conditions of Section 6.6.3.3 of the Plan, upon

18    reasonable written request made to the Reorganized Debtor by the Plan Agent, the

19    Reorganized Debtor is required to provide promptly to the Plan Agent and to the Plan

20    Agent's agents reasonable access to the Reorganized Debtor's and to the Subsidiaries'

21    financial and accounting books and records and other documents for the purpose of

22    permitting the Plan Agent to audit the accuracy and fairness of the Subsidiaries Financial

23    Reporting and the Post-Effective Date Net Cash Flow Reporting.

24           **4.**      **Consultation Regarding the Amount of Subsidiary Distributions.**

25          Pursuant to Section 6.6.3.4 of the Plan, until the Reorganized Debtor Note has

26    been fully, finally and indefeasibly paid, the Plan Agent will have the right to consult with

27    the Reorganized Debtor and the Subsidiaries regarding the amount of the Subsidiary

28    Distributions to be made at the end of each calendar quarter in accordance with the Plan,

and the Reorganized Debtor and the Subsidiaries will have an obligation to consult with and to cooperate with the Plan Agent regarding the Reorganized Debtor's determination of the amount of the Subsidiary Distribution to be made by each Subsidiary, in time sufficient to permit fair and accurate Subsidiary Distributions to be made timely in accordance with the provisions of the Plan.  Upon full, final and indefeasible payment of the Reorganized Debtor Note, the rights, powers and remedies of the Plan Agent under Section 6.6.3.4 of the Plan will terminate and will transfer to the Guilds until such time as the amount of the Allowed Class 2 Claims has been fully, finally and indefeasibly paid, at which time the rights, powers and remedies of the Guilds under this Section 6.6.3.4 will terminate.

**5.  Objections to Disputed Claims.**

The Plan Agent will have the right to object to Disputed Claims in accordance with the terms and conditions of Section 8.1 of the Plan.

**6.  Prosecution of Causes of Action.**

The Plan Agent will have the right to prosecute Causes of Action vested in the Plan Fund in accordance with the terms and conditions of Section 6.15 of the Plan (including, without limitation, any and all Yari Causes of Action).

**7.  Enforcement of Remedies.**

In accordance with the provisions of Section 6.6.6 of the Plan, the Plan Agent will have the right to enforce, on behalf of the holders of Allowed Class 5 Claims and any Allowed Class 6 Claims, any and all remedies that the holders of Allowed Class 5 Claims and Allowed Class 6 Claims may have under the Plan, the Plan Documents, the Bankruptcy Code, or under other applicable law in the event of a default by the Reorganized Debtor, a Subsidiary, or by a Yari Party in the performance of its obligations to holders of Allowed Class 5 Claims or Allowed Class 6 Claims under the Plan and/or the Plan Documents.  Without limiting the generality of the foregoing, the Plan Agent will have the right to enforce any and all rights and remedies provided to it pursuant to the Reorganized Debtor Note, the Subsidiary Interests Pledge Agreement, the Yari Guarantee,

1    the SJM Realty Pledge Agreement, the Out Parcels Deed of Trust and the Davand Pledge

2    Agreement.

3    **8.    Approval of Sale of Assets of Subsidiaries Out of the Ordinary Course**

4    **of Business.**

5    Subject to the provisions of Section 6.17.2 of the Plan, the Plan Agent will have

6    the right to approve, in writing and in advance, of the sale by the Reorganized Debtor or

7    by any of the Subsidiaries of any of their assets out of the ordinary course of business,

8    which approval will not be unreasonably withheld by the Plan Agent.

9    **9.    Other Rights, Powers and Duties.**

10    In addition to the rights, powers and duties granted to the Plan Agent pursuant to

11    Sections 6.6.1 through 6.6.7 of the Plan, the Plan Agent will have such other rights,

12    powers and duties that are appropriate to implement and to carry out the provisions of the

13    Plan for the benefit of holders of Allowed Class 5 Claims and any Allowed Class 6

14    Claims which are not inconsistent with the provisions of the Plan.

15    **D.    Plan Fund.**

16    On or as soon as practicable after the Effective Date, the Plan Agent will establish the

17    Plan Fund.  The Plan Fund will be administered solely by the Plan Agent for the benefit of

18    holders of Allowed Class 5 Claims and any Allowed Class 6 Claims.  The Plan Fund will be

19    comprised of the Plan Fund Assets, which will include the following:

20    **1.    Subsidiary Distributions.**

21    Pursuant to the Plan, the Subsidiaries are required to pay directly to the Plan Fund,

22    within twenty (20) days after the end of each calendar quarter, the Creditors' Share of the

23    Subsidiary Distributions.  The Creditors' Share of Subsidiary Distributions will comprise

24    a part of the Plan Fund Assets and the Plan Fund and will be administered by the Plan

25    Agent in accordance with the provisions of the Plan.  The amount of the Subsidiary

26    Distributions paid on account of Allowed Class 5 Claims will be credited against the

27    outstanding balance of the Reorganized Debtor Note.  Upon full, final and indefeasible

28    payment of the Reorganized Debtor Note, the Subsidiaries' obligation to pay to the Plan

MAINDOCS-#158405-v5-PersikFirstAmndDisclosureStatement.DOC

Fund any Subsidiary Distributions will terminate, and one hundred percent (100%) of the

Subsidiary Distributions will be paid to the Guilds until the amount of the Allowed Class

2 Claims is fully, finally and indefeasibly paid, at which time the Subsidiaries' obligation

to pay any Subsidiary Distributions to the Guilds will terminate.

   **2.**    **Effective Date Cash Balance.**

On the Effective Date, the Debtor will transfer to the Plan Fund the Effective Date

Cash Balance, which amount will include the Effective Date Subsidiary Distribution.

The amount of the Effective Date Cash Balance transferred to the Plan Agent, will be

credited against the outstanding balance of the Reorganized Debtor Note.

   **3.**    **Post-Effective Date Net Cash Flow**.

Commencing on or before the twentieth (20th) day of the first full calendar quarter

following the Effective Date, and continuing on or before the twentieth (20th) day of each

full calendar quarter thereafter, until the Reorganized Debtor Note is fully, finally and

indefeasibly paid, the Reorganized Debtor is required to pay to the Plan Fund the <u>greater</u>

of the following amounts:  $25,000; or twenty percent (20%) of the Post-Effective Date

Net Cash Flow generated during the prior full calendar quarter, the foregoing payments

being referred to herein individually as a "New Production Payment," and, collectively, as

the "New Production Payments."  Fifty percent (50%) of the amount of the New

Production Payments will be credited against the outstanding balance of the Reorganized

Debtor Note, and fifty percent (50%) of the amount of the New Production Payments will

not be credited against the outstanding balance of the Reorganized Debtor Note.  Upon

full, final and indefeasible payment of the Reorganized Debtor Note, the Reorganized

Debtor's obligation to pay to the Plan Fund any New Production Payments will terminate.

   **4.**    **Net Recoveries.**

The Reorganized Debtor is required to pay to the Plan Fund any Net Recoveries as

follows:

   **(a)**    **Film Rights Net Recoveries**.  The Reorganized Debtor is required

to pay to the Plan Fund one hundred percent (100%) of any Film Rights Net

Recoveries until such time as the amount of the Reorganized Debtor Note is fully, finally and indefeasibly paid, at which time the Reorganized Debtor's obligation to pay to the Plan Fund the amount of any Film Rights Net Recoveries will terminate and the Reorganized Debtor may retain for its own account the amount of any Film Rights Net Recoveries free and clear of any Claims, rights or interests of the holders of Allowed Class 5 Claims and any other Creditors.  Any payment to the Plan Fund of Film Rights Net Recoveries will be credited against the outstanding balance of the Reorganized Debtor Note.

        **(b)**       **<u>Non-Film Rights Net Recoveries</u>.**  Subject to the provisions of Section 6.7.4.3 of the Plan, the Reorganized Debtor will pay to the Plan Fund one hundred percent (100%) of any Non-Film Rights Net Recoveries which are received at any time by the Reorganized Debtor.  Payment of any Non-Film Rights Net Recoveries to the Plan Fund will not be credited against the outstanding balance of the Reorganized Debtor Note.

        **(c)**       **<u>Axium Litigation Payment</u>.**  Pursuant to the Plan, the Reorganized Debtor is required to pay to the Plan Fund thirty percent (30%) of any Axium Litigation Net Recoveries.  Payment of any Axium Litigation Payment to the Plan Fund will not be credited against the outstanding balance of the Reorganized Debtor Note.

The Reorganized Debtor is required to pay to the Plan Fund any Net Recoveries received by the Debtor or by the Reorganized Debtor upon the <u>later</u> to occur of the following dates:  the fifth (5th) Business Day after the Effective Date of the Plan; or the fifth (5th) Business Day after the Reorganized Debtor receives such Net Recoveries.  The Plan Agent will have a lien encumbering any Net Recoveries in order to secure timely payment to the Plan Fund of any Net Recoveries, in accordance with the provisions of that Litigation Security Agreement (Exhibit "P" to the Plan).

MAINDOCS-#158405-v5-PersikFirstAmndDisclosureStatement.DOC

**E.    Distributions of Plan Fund Proceeds.**

After paying or fully satisfying all Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Priority Non-Tax Claims, Distributions of Plan Fund Proceeds will be made solely to the holders of Allowed General Unsecured Claims, and, in accordance with the provisions of Section 5.6 of the Plan, in the event that Allowed General Unsecured Claims are paid in full, to holders of Allowed Subordinated Claims.  The holders of Allowed General Unsecured Claims and Allowed Subordinated Claims will receive Distributions from the Plan Fund solely as provided by the Plan.

**F.    Representative of the Estate.**

Pursuant to the Plan, the Reorganized Debtor is appointed as the representative of the Estate pursuant to section 1123(b)(3)(B) of the Bankruptcy Code for the purpose of performing the duties and exercising the rights and remedies granted expressly to the Reorganized Debtor under the Plan; provided, however, that the Plan Agent also will be deemed to be a representative of the Estate pursuant to section 1123(b)(3)(B) for the purpose of performing the duties and exercising the rights and remedies granted expressly to the Plan Agent under the Plan.  Subject only to the provisions of the Plan granting expressly to the Plan Agent rights, powers and authorities under the Plan, pursuant to the Plan, the Reorganized Debtor is vested exclusively with the rights, authorities and powers to carry out and to implement the Plan.  On the Effective Date, the Plan Fund Assets will be transferred to and will vest in the Plan Fund to be administered, liquidated, adjusted, settled, enforced, collected or abandoned by the Plan Agent in accordance with the terms and conditions of the Plan.

**G.    No Liability of the Post-Effective Date Committee or the Plan Agent.**

Pursuant to Section 6.11 of the Plan, to the maximum extent permitted by law, the Post-Effective Date Committee, the Plan Agent, and their respective employees, officers, directors, shareholders, agents, members, representatives, and Professionals (collectively, "Representatives") will not have or incur liability to any Creditor, the Interest Holder, any party-in-interest or to any other entity for an act taken or omission made in good faith in connection with or related to the administration of the Plan Fund Assets under the Plan, the implementation

MAINDOCS-#158405-v5-PersikFirstAmndDisclosureStatement.DOC

of the Plan and the making of Distributions under the Plan. The Post-Effective Date Committee, the Plan Agent and their respective Representatives will be entitled to reasonably rely on the advice of counsel with respect to their respective duties and responsibilities under the Plan. Entry of the Confirmation Order will constitute a judicial determination that the exculpation provisions contained in Section 6.11 of the Plan are necessary to, inter alia, facilitate Confirmation and to minimize potential claims arising after the Effective Date for indemnity, reimbursement or contribution from the Plan Fund Assets. The approval of the Plan by the Confirmation Order will constitute a res judicata determination of the matters included in the exculpation provisions of the Plan. Notwithstanding the foregoing, nothing in Section 6.11 of the Plan will absolve the Post-Effective Date Committee or the Plan Agent of any potential liability that either of them may have to any Creditor or to the Interest Holder on account of any acts or omissions by them constituting willful misconduct or gross negligence.

### H.    Funding of Post-Effective Date Plan Expenses.

All Post-Effective Date Plan Expenses will be expenses solely of the Plan Fund (including, without limitation, any Post-Effective Date Plan Expenses that may be paid from the Plan Fund Reserve), and not of the Reorganized Debtor, and will not increase the Reorganized Debtor's obligations under the Plan.

### I.    Termination of the Committee and Appointment of the Post-Effective Date Committee.

In accordance with the provisions of Section 6.13 of the Plan, as of the Effective Date, the Committee will terminate and disband, and the Committee will be released from and discharged of all further authority, duties, responsibilities and obligations related to the Case. As of the Effective Date, at the election of the Committee, the Committee will be replaced by the Post-Effective Date Committee, which will be comprised of members of the Committee. Any Post-Effective Date Committee will have the right to supervise the Plan Agent and will have other powers, rights, responsibilities and functions, identified in the Plan and determined by the Committee which are not inconsistent with the provisions of the Plan.

**J.      The Reorganized Debtor.**

    **1.      Corporate Powers.**

The Debtor, as the Reorganized Debtor, will continue to exist and to operate after the Effective Date of the Plan.  The Reorganized Debtor will have all of the powers and rights of a corporation under the laws of the State of California, and, except as set forth in the Plan expressly to the contrary, will continue to have all corporate powers and rights accorded to it under its Articles of Incorporation, Bylaws and other corporate governance agreements.

    **2.      Board of Directors.**

On the Effective Date, the sole member of the Board of Directors of the Reorganized Debtor will be Yari.

    **3.      Officers of Reorganized Debtor.**

On the Effective Date, the officers of the Reorganized Debtor will be the following persons:  Yari (President), and Dennis Brown (Vice President and Secretary).  The Board of Directors of the Reorganized Debtor may replace such officers, or appoint other officers, as it deems appropriate in the exercise of its sound business judgment.

**K.      Causes of Action.**

The treatment under the Plan of any Causes of Action is set forth in Section 6.15 of the Plan.  The right to file, litigate, prosecute, settle, adjust, enforce, collect or abandon on behalf of the Debtor and the Estate any and all Causes of Action is deemed automatically transferred on the Effective Date from the Debtor to the Plan Agent, and, from and after the Effective Date, the Plan Agent will have the sole and exclusive right to file, litigate, prosecute, settle, adjust, enforce, collect or abandon any Yari Cause of Action and any other Cause of Action.  Notwithstanding the foregoing, in accordance with the provisions of Sections 6.15.2, 6.15.3 and 6.18.2 of the Plan, the right to file, litigate, prosecute, settle, adjust, enforce, collect or abandon the following Causes of Action is deemed automatically transferred on the Effective Date from the Debtor to the Reorganized Debtor:  (1) any Axium Litigation; and (2) any Cause of Action arising from or relating to any Film Rights.

**THE DEBTOR HAS NOT COMPLETED ITS INVESTIGATION REGARDING THE EXISTENCE OF CAUSES OF ACTION.  THE INVESTIGATION IN THIS REGARD IS ONGOING.  AS A RESULT, ALL PARTIES-IN-INTEREST ARE HEREBY ADVISED THAT, NOTWITHSTANDING THE FACT THAT THE EXISTENCE OF ANY PARTICULAR CAUSE OF ACTION MAY NOT BE LISTED, DISCLOSED OR SET FORTH IN THIS DISCLOSURE STATEMENT OR IN THE PLAN, A CAUSE OF ACTION MAY BE FILED AGAINST ANY CREDITOR OR OTHER PARTY AS THE REORGANIZED DEBTOR OR THE PLAN AGENT, AS THE CASE MAY BE, MAY DETERMINE, IN THE EXERCISE OF ITS SOLE AND ABSOLUTE DISCRETION.**

**L.**     **Post-Effective Date Professional Fees.**

**1.**     **Reorganized Debtor's Employment of Professionals.**

The Reorganized Debtor may employ, without any need to give notice to Creditors or to other parties-in-interest or to obtain any approval of the Bankruptcy Court, Professionals to assist the Reorganized Debtor to perform its duties under the Plan, as the Reorganized Debtor deems appropriate in the exercise of its sole and absolute discretion, and any fees and costs incurred by such Professionals will be borne solely by the Reorganized Debtor.

**2.**     **Plan Agent's Employment of Professionals.**

The Plan Agent may employ, without any need to give notice to Creditors or to other parties-in-interest or to obtain any approval of the Bankruptcy Court, Professionals to assist the Plan Agent to perform its duties under the Plan, as the Plan Agent deems appropriate in the exercise of its sole and absolute discretion, and any fees and costs incurred by such Professionals will be Post-Effective Date Plan Expenses borne solely by the Plan Fund, and not by the Reorganized Debtor.

**3.**     **Ordinary Course Payments to Professionals.**

Any Professional employed after the Effective Date will be entitled to obtain payment of the Professional's fees and costs, in the ordinary course, without any need to give notice to Creditors or other parties-in-interest or to obtain any approval of the

1  Bankruptcy Court.  Notwithstanding the foregoing, if the Professional does not obtain

2  payment of its post-Effective Date fees and costs within thirty (30) days after the

3  Professional's rendering of its billing statement therefor, the Professional will be entitled

4  to seek, by application filed in accordance with the Bankruptcy Rules, an order of the

5  Bankruptcy Court requiring prompt payment to the Professional of its fees and costs.

6  **M.**     **Approval for Disposition of Assets.**

7          **1.**     **Disposition of Plan Fund Assets.**

8          The Plan Agent will be entitled to sell, transfer, assign, encumber or otherwise

9  dispose of any Plan Fund Assets without any need to give any notice to the Reorganized

10  Debtor or to any Creditors or to obtain any approval of the Bankruptcy Court, but will be

11  required to consult with any Post-Effective Date Committee regarding any such disposition

12  of Plan Fund Assets.

13          **2.**     **Disposition of Retained Assets.**

14          The Reorganized Debtor will be entitled to sell, transfer, assign, encumber or

15  otherwise dispose of any interest in any of the Retained Assets ("Asset Disposition"), in

16  the ordinary course of its business, without the need to obtain any approval of the

17  Bankruptcy Court, the Plan Agent or any Creditor or other party-in-interest.  The

18  Reorganized Debtor will be entitled to effectuate an Asset Disposition, outside of the

19  ordinary course of its business, without the need to obtain any approval of the Bankruptcy

20  Court, provided that no Post-Effective Date Notice Party objects to any such Asset

21  Disposition.  In order to effectuate such an Asset Disposition, the Reorganized Debtor is

22  required to give to the Post-Effective Date Notice Parties not less than ten (10) days'

23  written notice of the Reorganized Debtor's intention to effectuate such Asset Disposition.

24  If no Post-Effective Date Notice Party files and serves a written objection to such Asset

25  Disposition within such 10-day period, the Post-Effective Date Notice Parties will be

26  deemed to have given their consent to such Asset Disposition, and such Asset Disposition

27  will be deemed to have been approved with no need for any further act by the Reorganized

28  Debtor, including without limitation, any need to obtain Bankruptcy Court approval

1    therefor.  On the other hand, if a Post-Effective Date Notice Party files and serves a written

2    objection to such Asset Disposition within such 10-day period, the Reorganized Debtor is

3    required to set the matter for hearing before the Bankruptcy Court, and the merits of such

4    Asset Disposition will be determined by the Bankruptcy Court pursuant to the provisions

5    of the Bankruptcy Code and the Bankruptcy Rules.  Neither the Plan Agent nor any other

6    Post-Effective Date Notice Party will unreasonably withhold its approval to any such Asset

7    Disposition.  No Asset Disposition, free and clear of the Plan Agent's liens, will be made

8    without the written consent of the Plan Agent, which consent will not be unreasonably

9    withheld by the Plan Agent.  No Asset Disposition, free and clear of the Guilds Plan

10   Agent's liens, will be made without the written consent of the Guilds Plan Agent, which

11   consent will not be unreasonably withheld by the Guilds Plan Agent.

12   **N.      Compromise of Claims Objections and Causes of Action.**

13       The treatment under the Plan of any compromises of objections to Disputed Claims and

14   any compromises of Causes of Action by the Plan Agent or by the Reorganized Debtor is set forth

15   in Section 6.18 of the Plan.

16   **O.      Plan Completion Certification.**

17       On or as soon as practicable after the date upon which the Reorganized Debtor determines,

18   after consultation with the Plan Agent, that the Reorganized Debtor Note has been fully, finally

19   and indefeasibly paid, and that all Distributions required to be made under the Plan to holders of

20   Allowed Class 5 Claims have been made or that final Distributions to holders of Allowed Class 5

21   Claims are being made or promptly will be made, the Reorganized Debtor is required to file with

22   the Bankruptcy Court and serve upon the Plan Agent, the United States Trustee, the Guilds, the

23   Post-Effective Date Committee, and any Creditor that files after the Effective Date a request for

24   notice of any proceedings in the Case (such parties, together with the Reorganized Debtor, are

25   referred to herein, collectively, as the "Post-Effective Date Notice Parties") a certification

26   attesting to such determination ("Plan Completion Certification").

27

28

MAINDOCS-#158405-v5-PersikFirstAmndDisclosureStatement.DOC

**P.      Final Decree.**

Pursuant to Section 6.21 of the Plan, unless earlier filed by the Reorganized Debtor, by the thirtieth (30th) day after the filing of the Plan Completion Certification, the Reorganized Debtor is required to file, in accordance with Rule 3022 of the Federal Bankruptcy Rules, an application with the Bankruptcy Court to obtain a final decree to close the Case ("Final Decree").  The Reorganized Debtor may file an application to obtain a Final Decree as and when it deems appropriate in the Case, but may not file any such application before the Reorganized Debtor Note is fully, finally and indefeasibly paid, without the prior written consent of the Plan Agent.  The Post-Effective Date Committee has the right under Section 6.21 of the Plan to seek, for good cause, an order of the Bankruptcy Court extending the time for entry of the Final Decree.

**Q.      Subsidiaries Financial Reporting/Post-Effective Date Net Cash Flow Reporting.**

**1.      Subsidiaries' Financial Affairs.**

Pursuant to Section 6.22.1 of the Plan, commencing on or before the twentieth (20th) day of the first full calendar quarter after the Effective Date and continuing on or before the twentieth (20th) day of each full quarter thereafter through the Plan Completion Date, the Reorganized Debtor is required to provide to the Plan Agent a balance sheet for each Subsidiary as of the last day of such calendar quarter, an income statement for the full calendar quarter, a cash flow report for the prior full calendar quarter, and a statement regarding the amount of Subsidiary Distributions proposed to be paid by the Subsidiaries on account of the prior full calendar quarter ("Subsidiaries Financial Reporting").

**2.      Reorganized Debtor's Net Cash Flow.**

Pursuant to Section 6.22.2 of the Plan, commencing on or before the twentieth (20th) day of the first full calendar quarter after the Effective Date and continuing on or before the twentieth (20th) day of each full quarter thereafter through the Plan Completion Date, the Reorganized Debtor is required to provide to the Plan Agent a report setting forth the Post-Effective Date Net Cash Flow generated by the Reorganized Debtor during the prior full calendar quarter ("Post-Effective Date Net Cash Flow Reporting").

1    **R.     Inter-Company Transactions.**

2          Pursuant to Section 6.23 of the Plan, the Reorganized Debtor will be entitled to enter into,

3    and to perform its obligations under, a transaction with a Yari Party, and a Subsidiary will be

4    entitled to enter into, and to perform its obligations under, a transaction with a Yari Party

5    (collectively, "Inter-Company Transactions"), subject to the terms and conditions set forth in

6    Section 6.23 of the Plan.

7    **S.     Post-Effective Date Operations of Subsidiaries.**

8          After the Effective Date, each Subsidiary is entitled to operate its business and to

9    administer and dispose of its assets free and clear of any limitations and restrictions that may be

10   imposed by the Bankruptcy Code, and without any need for any approval of the Bankruptcy Court,

11   the Plan Agent or the Post-Effective Date Committee, except only that, until the Reorganized

12   Debtor Note is fully, finally and indefeasibly paid, the following restrictions will apply:  (1) each

13   Subsidiary will be entitled to engage in an Inter-Company Transaction, including, without

14   limitation, a transaction to retain the services of YFG Services and any other Yari Party in order to

15   obtain the administrative services that it will need in the operation of its business, but only in

16   accordance with the provisions of Section 6.23 of the Plan; and (2) any sale of any of the assets of

17   the Subsidiaries other than in the ordinary course of business will require the prior written

18   approval of the Plan Agent, which approval will not be unreasonably withheld by the Plan Agent.

19   **T.     Reorganized Debtor's Operating Expenses.**

20         The Creditors' Share of all Subsidiary Distributions and all Plan Fund Assets will be

21   transferred or granted to the Plan Fund in accordance with the terms and conditions of the Plan

22   and will be segregated for the benefit of, and used solely to fund payments to, the holders of

23   Allowed Class 5 Claims, any Allowed Class 6 Claims, Allowed Administrative Claims, Allowed

24   Priority Tax Claims, and Allowed Priority Non-Tax Claims.  The Reorganized Debtor will have

25   no access to such funds in order to fund its post-Effective Date operations.  The Reorganized

26   Debtor will be solely responsible for paying all costs of its post-Effective Date operations.

27

28

MAINDOCS-#158405-v5-PersikFirstAmndDisclosureStatement.DOC

U. **Obligation to Cooperate with Plan Agent**.

The Reorganized Debtor, the Subsidiaries, Yari and any and all Affiliates of Yari will have a duty and obligation under the Plan, enforceable pursuant to the Plan, to reasonably cooperate with the Plan Agent in the exercise of all of its rights, duties and responsibilities pursuant to the Plan, including, without limitation, the exercise by the Plan Agent of its rights, duties and responsibilities pursuant to Section 6.6 of the Plan and in the investigation and evaluation of any Yari Causes of Action.

V. **Resolution of Disputes.**

Pursuant to the Plan, in the event that a dispute should arise between the Plan Agent, on one hand, and the Reorganized Debtor, a Subsidiary or a Yari Affiliate, on the other hand, regarding any of their respective rights, obligations and remedies under the Plan or any of the Plan Documents, they are required to act diligently and in good faith to try to resolve such dispute, but, if such dispute cannot be resolved by them, any of them will be entitled to request, pursuant to the provisions of the Bankruptcy Rules, that the Bankruptcy Court resolve the merits of such dispute.

W. **Distributions.**

1. **Designation and Role of the Disbursing Agent**.

The Reorganized Debtor will be responsible for making all Distributions to Davand and to the holders of Allowed Secured Claims under the Plan; the Plan Agent will be responsible for making all other Distributions under the Plan, including, without limitation, Distributions on account of Allowed Class 5 Claims, any Allowed Class 6 Claims, Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims under the Plan (the Reorganized Debtor, in its role as the entity responsible for making Distributions to Davand and to the holders of Allowed Secured Claims under the Plan, or the Plan Agent, in its role as the entity responsible for making all other Distributions under the Plan, as the case may be, is referred to herein as a "Disbursing Agent"). The terms of the employment of the Disbursing Agent under the Plan are set forth in Section 7.1 of the Plan. The Reorganized Debtor will charge no fee, and will not be entitled to any reimbursement of its expenses, in connection with its serving as a

1  Disbursing Agent under the Plan.  The terms of compensation of the Plan Agent for

2  serving as a Disbursing Agent under the Plan will be determined by the Committee, and

3  will be disclosed in the Plan Agent Disclosure (as defined in Section 6.10 of the Plan)in

4  connection with the Confirmation of the Plan.  The fees, expenses and any bond premiums

5  incurred by the Plan Agent in connection with the performance of its duties as Disbursing

6  Agent under the Plan will be paid as Post-Effective Date Plan Expenses and will be borne

7  solely by the Plan Fund, and not by the Reorganized Debtor.

8  **2.**  **Distribution of Property Under the Plan.**

9  **(a)**  **Cash Distributions.**  All Distributions under the Plan will be in

10  Cash.  Cash Distributions made pursuant to the Plan will be in United States funds,

11  by checks drawn on a domestic bank or, if the applicable Disbursing Agent so

12  elects, in the exercise of its sole and absolute discretion, by wire transfers from a

13  domestic bank.

14  **(b)**  **Setoffs and Recoupment.**  Pursuant to section 553 of the

15  Bankruptcy Code or applicable non-bankruptcy law, the applicable Disbursing

16  Agent may set off, recoup or withhold against any Allowed Claim and Distribution

17  to be made pursuant to the Plan on account of such Allowed Claim any pre-Petition

18  Date or post-Petition Date account stated, claim, right, or cause of action that the

19  Debtor, the Estate or the Reorganized Debtor may possess against the holder of

20  such Allowed Claim.  Neither the failure to effect such a setoff or recoupment nor

21  the allowance of any Claim will constitute a waiver or release by the Debtor, the

22  Estate, the Reorganized Debtor or the Plan Agent of any such account, claim, right,

23  or cause of action against the holder of such Allowed Claim.

24  **(c)**  **Timeliness of Distributions.**  Any Distribution required to be made

25  on the Effective Date will be deemed timely if made as soon as practicable after

26  such date but, in any event, within fourteen (14) days after such date.  Any

27  Distribution required to be made upon a Disputed Claim becoming an Allowed

28

1    Claim and no longer being a Disputed Claim will be deemed timely if made as soon

2    as practicable thereafter but, in any event, within fourteen (14) days thereafter.

3        **(d)**    __Limitation on Liability.__    Neither the Debtor, the Reorganized

4    Debtor, the Board of Directors of the Reorganized Debtor, the Committee, the Post-

5    Effective Date Committee, the Plan Agent, the Guilds Plan Agent, nor any of their

6    respective Representatives will be liable for (i) any acts or omissions (except for

7    acts or omissions constituting gross negligence or willful misconduct) in

8    connection with implementing the Distribution provisions of the Plan and the

9    making or withholding of Distributions pursuant to the Plan, or (ii) any change in

10    the value of Distributions made pursuant to the Plan resulting from any delays in

11    making such Distributions in accordance with the terms of the Plan (including, but

12    not limited to, any delays caused by the resolution of Disputed Claims).

13    Notwithstanding the foregoing, nothing will absolve the Reorganized Debtor of its

14    liability to make the Distributions required by the Plan.

15        **(e)**    __Delivery of Distributions.__

16            **(i)**    __Distributions Only to Holders of an Allowed Claim__.  Each

17    Distribution under the Plan will be tendered only to the holder of the

18    Allowed Claim entitled to such Distribution, in the manner set forth in

19    Section 7.2.6.2 of the Plan.

20            **(ii)**    __Addresses to Which Distributions Will Be Sent__.  Except as

21    provided in Section 7.2.8 of the Plan, Distributions to holders of Allowed

22    Claims and Allowed Administrative Claims will be distributed by mail as

23    follows:  (1) with respect to each holder of an Allowed Claim that has filed

24    a Proof of Claim, at the address for such Creditor reflected in such Proof of

25    Claim; (2) with respect to each holder of an Allowed Claim that has not

26    filed a Proof of Claim, at the address reflected in the Bankruptcy Schedules

27    filed by the Debtor; provided, however, that, if the applicable Disbursing

28    Agent receives a written notice of a change of address for such Creditor, the

1    address set forth in such notice will be used; or (3) with respect to each

2    holder of an Allowed Administrative Claim, at such address as the holder

3    thereof may specify in writing.

4    **(f)** **Approval for Schedule of Proposed Distributions.**  In the

5    discretion of the applicable Disbursing Agent, such Disbursing Agent will be

6    entitled to prepare a preliminary schedule of proposed Distributions to Creditors

7    ("Distribution Schedule"), and to apply, on an expedited basis, for an order of the

8    Bankruptcy Court approving the making of such Distributions pursuant to the

9    Distribution Schedule.  Notice of any such application must be served on the Post-

10    Effective Date Notice Parties or as otherwise determined by the Bankruptcy Court.

11    **(g)** **Compliance with Tax Requirements.**  The applicable Disbursing

12    Agent under the Plan is required to comply with all tax withholding and reporting

13    requirements imposed upon it by any governmental unit, and all Distributions

14    pursuant to the Plan will be subject to such tax withholding and reporting

15    requirements.

16    **(h)** **Further Assurances Regarding Distributions.**  In accordance with

17    the provisions of Section 13.22 of the Plan, as a condition to obtaining

18    Distributions under the Plan, each Creditor must execute and deliver to the

19    applicable Disbursing Agent, or join in the execution and delivery of, any

20    agreement or instrument appropriate for the consummation of the Plan.

21    **(i)** **Creditor's Payment of Obligations or Turn Over of Property to**

22    **the Plan Agent.**  As a condition to obtaining Distributions under the Plan, any

23    Creditor from which property is recoverable pursuant to a Final Order of the

24    Bankruptcy Court under sections 542, 543, 550 or 553 of the Bankruptcy Code, or

25    otherwise, or that is a transferee of a transfer avoidable pursuant to a Final Order of

26    the Bankruptcy Court under sections 522, 544, 545, 547, 548 or 549 of the

27    Bankruptcy Code or otherwise, must pay to the Plan Agent the amount, or turn over

28    to the Plan Agent any such property, for which such Creditor is liable to the

Debtor.  The disposition and application of such payment will be determined in accordance with the terms and conditions of the Plan.

(j)    **Miscellaneous.**  The treatment of De Minimis Distributions (as defined in Section 7.2.3 of the Plan), Unclaimed Property (as defined in Section 7.2.7 of the Plan), Distributions on account of the Guilds' Claims, and other issues pertaining to Distributions under the Plan are set forth in Article VII of the Plan.

## X.    Objections To Disputed Claims.

### 1.    Right to Object to Disputed Claims.

The Plan Agent will have the exclusive right to file, litigate, settle, adjust, enforce or abandon objections to any and all Disputed Claims, including any objection seeking to subordinate a Disputed Claim pursuant to section 510 of the Bankruptcy Code. Notwithstanding the foregoing, in accordance with the provisions of Sections 6.18.2, 8.1.2 and 8.1.3 of the Plan, an objection to a disputed Secured Claim, the Claim of YFGR or a Disputed Joint Obligor Claim may be filed, litigated, prosecuted, settled, adjusted, enforced or abandoned only by the Reorganized Debtor.  None of the fees and expenses incurred by or on behalf of the Reorganized Debtor in objecting to a Disputed Claim will be paid by, or reimbursed from, the Plan Fund.

**THE DEBTOR HAS NOT COMPLETED ITS INVESTIGATION REGARDING THE EXISTENCE OF DISPUTED CLAIMS.  THE INVESTIGATION IN THIS REGARD IS ONGOING.  AS A RESULT, ALL PARTIES-IN-INTEREST ARE HEREBY ADVISED THAT, NOTWITHSTANDING THE FACT THAT THE EXISTENCE OF ANY PARTICULAR DISPUTED CLAIM MAY NOT BE LISTED, DISCLOSED OR SET FORTH IN THE PLAN OR IN THIS DISCLOSURE STATEMENT, SUBJECT ONLY TO THE CLAIMS OBJECTION DEADLINE, AN OBJECTION MAY BE FILED TO ANY DISPUTED CLAIM AS THE REORGANIZED DEBTOR OR THE PLAN AGENT, AS THE CASE MAY BE, MAY DETERMINE,**

1    IN THE EXERCISE OF ITS SOLE AND ABSOLUTE DISCRETION.  THE

2    REORGANIZED DEBTOR OR THE PLAN AGENT WILL HAVE THE RIGHT

3    TO OBJECT TO AMOUNTS THAT HAVE BEEN SCHEDULED BY THE

4    DEBTOR AND WHICH ARE FOUND TO BE OBJECTIONABLE IN ANY

5    RESPECT.

6    **2.**    **Claims Objection Deadline.**

7    Unless another date is established by order of the Bankruptcy Court, an objection to

8    a Claim must be filed with the Bankruptcy Court and served on the Creditor holding such

9    Claim on or before the Claims Objection Deadline.  The Bankruptcy Court may extend the

10    Claims Objection Deadline for cause shown.

11    **3.**    **Treatment of Disputed Claims.**

12    **(a)**    **No Distribution Pending Allowance.**  All Distributions under the

13    Plan will be made only on account of Allowed Claims.  If any portion of a Claim is

14    a Disputed Claim, no Distribution provided for under the Plan will be made on

15    account of such Claim unless and until such Claim becomes an Allowed Claim and

16    is no longer a Disputed Claim.

17    **(b)**    **Distribution After Allowance.**  Within fourteen (14) days

18    following the date on which a Disputed Claim becomes an Allowed Claim and is

19    no longer a Disputed Claim, the applicable Disbursing Agent under the Plan is

20    required to distribute to the Creditor holding such Allowed Claim any Cash that

21    would have been distributable to such Creditor as if, at the time of the making of

22    any Distribution to the Class of which such Creditor is a member, such Claim had

23    been an Allowed Claim and not a Disputed Claim.  No interest will be paid on such

24    Claim, except as provided in Section 8.3.3 of the Plan.

25    **(c)**    **Reserve for Disputed Claims.**  On or as soon as practicable after

26    the Effective Date, the applicable Disbursing Agent under the Plan will establish, in

27    a segregated, interest-bearing account, a reserve for any Disputed Claim ("Disputed

28    Claims Reserve") in an amount equal to 100% of the Distribution to which the

holder of the Disputed Claim would be entitled under the Plan based upon the liquidated, face amount of its non-duplicative Disputed Claim unless such Claim is estimated by Final Order of the Bankruptcy Court; provided, however, that the applicable Disbursing Agent under the Plan will have the right to seek from the Bankruptcy Court an order reducing the amount of such Reserve pending the resolution of the Disputed Claim.  If the Disputed Claim does not set forth a liquidated amount of such Claim, then the amount of the Reserve to be established on account of such Disputed Claim will be the amount fixed mutually by the Creditor and by the applicable Disbursing Agent or the amount estimated by the Bankruptcy Court for the purpose of Section 8.3.3 of the Plan.  If the Disputed Claim is estimated, the amount of the Reserve to be established on account of such Disputed Claim will be the amount of the Distribution payable with respect to the estimated amount of such Disputed Claim as determined by Final Order of the Bankruptcy Court or agreed to in writing by the Creditor, and such estimated amount will set forth the maximum amount of the Distribution on account of such Disputed Claim.  In the case of any disputed Avoidance Action Payment Claim, the amount of the Reserve established on account of such Disputed Claim will be equal to the amount of the payment that the holder of such Disputed Claim has paid or will pay to the Debtor or to the Reorganized Debtor on account of the Avoidance Action asserted against the holder of such Disputed Claim.

> **(d)** **No Distribution Until Allowance of Disputed Claim.**  No disbursement of funds from a Disputed Claims Reserve will be made on account of a Disputed Claim unless and until such Disputed Claim becomes an Allowed Claim.  Any amount of a Claim which has been disallowed pursuant to an order of the Bankruptcy Court will be deemed to be extinguished and no Distribution of any amount will be paid on account thereof.  The amount reserved for any Disputed Claim (plus any interest thereon) which has been disallowed by the Bankruptcy

Court will be released to the applicable Disbursing Agent for the purpose of further

disposition in accordance with the provisions of the Plan.

### 4. Bar Date for Filing Avoidance Action Payment Claims.

Any Avoidance Action Payment Claim will be forever barred, will not be

enforceable against the Debtor or the Reorganized Debtor or the Plan Fund and will not be

entitled to any Distribution under the Plan, unless a Proof of Claim for such Avoidance

Action Payment Claim is filed and served on the Plan Agent and the Reorganized Debtor

within thirty (30) days after the later of (a) the date of entry of the order of the Bankruptcy

Court adjudging the Creditor's liability to the Debtor or to the Plan Fund on account of

such Avoidance Action, or (b) the date of service of notice of the Bar Date upon the

Creditor asserting the Avoidance Action Payment Claim.

### Y. Litigation.

#### 1. Authorization to Assert Causes of Action.

From and after the Effective Date, the Reorganized Debtor and the Plan Agent

will have the right to file, litigate, prosecute, settle, adjust, enforce, collect and abandon

Causes of Action, without the consent or approval of any third party, and without any

further order of the Bankruptcy Court, in accordance with the provisions of Sections 6.15

and 6.18 of the Plan.  The provisions of the Plan addressing the evaluation of Causes of

Action and the retention of Professionals to prosecute Causes of Action are set forth in

Sections 9.2 and 9.3 of the Plan.

#### 2. Preservation of Causes of Action.

Unless a Cause of Action is expressly waived, relinquished, released,

compromised, or settled in the Plan or in any Final Order, each Cause of Action is

reserved for later adjudication by the Reorganized Debtor or the Plan Agent pursuant to

the provisions of Section 6.15 of the Plan (including, without limitation, Causes of Action

of which the Debtor presently may be unaware, or which may arise or exist by reason of

facts or circumstances unknown to the Debtor at this time, or facts or circumstances

which may change or be different from those which the Debtor now believes to exist) and,

1   therefore, no preclusion doctrine, including, without limitation, the doctrines of res

2   judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial,

3   equitable, or otherwise), or laches will apply, based on this Disclosure Statement, the

4   Plan, or the Confirmation Order, to the prosecution of Causes of Action.  Without limiting

5   the generality of the foregoing, any entity with respect to which the Debtor has incurred

6   an obligation, or which has received services from the Debtor or a transfer of money or

7   property of the Debtor, or which has transacted business with the Debtor, should assume

8   that such obligation, transfer, or transaction may be evaluated subsequent to the Effective

9   Date and may be the subject of an Avoidance Action or other action or proceeding filed

10   after the Effective Date.

11   **Z.    Executory Contracts And Unexpired Leases.**

12   The treatment of executory contracts and unexpired leases under the Plan is set forth in

13   Article X of the Plan.

14   **1.    Executory Contracts and Unexpired Leases Being Assumed.**

15   Pursuant to the provisions of Section 10.1 of the Plan, effective as of, and

16   conditioned on, the occurrence of the Effective Date, the Debtor will assume under the

17   Plan all of the executory contracts and unexpired leases of the Debtor listed on Exhibit "L"

18   attached to the Plan.  The Debtor may amend, through and including the Confirmation

19   Hearing Date, Exhibit "L" to add thereto any executory contract or unexpired lease, or to

20   delete therefrom any executory contract or unexpired lease.  However, if any amendments

21   are made to Exhibit "L" less than thirty (30) days before the Confirmation Hearing Date,

22   the affected contract or lease parties will have fifteen (15) days from the date of service of

23   notice of such amendments within which to serve on the Debtor a written objection to the

24   same.  Upon receipt of any such objection, the Debtor will promptly set a hearing on the

25   same, and the assumption or rejection of the affected contract or lease will be delayed until

26   the Bankruptcy Court makes a determination on such issue (such determination may be

27   made after the Confirmation Date, without delaying the confirmation of the Plan).  Any

28   and all payments associated with the assumption of any such executory contract or lease,

including, without limitation, any and all payments on account of Cure Claims and any and all Post-Effective Date payments will be made by the Reorganized Debtor and will not be a liability of the Plan Fund and will not be deducted or paid from any Plan Fund Proceeds or credited against the Reorganized Debtor Note.

**2.    Executory Contracts and Unexpired Leases Being Rejected.**

Pursuant to the provisions of Section 10.2 of the Plan, effective as of, and conditioned on, the occurrence of the Effective Date, the Debtor will reject all of the executory contracts and unexpired leases of the Debtor not listed on Exhibit "L" attached to the Plan, including, without limitation, those executory contracts and unexpired leases listed on Exhibit "M" attached to the Plan.  The Debtor reserves the right to amend, through and including the Confirmation Hearing Date, Exhibit "M" to add thereto any executory contract or unexpired lease, or to delete therefrom any executory contract or unexpired lease.  However, if any amendments are made to Exhibit "M," the affected contract or lease parties and any other party-in-interest will have fifteen (15) days from the date of service of notice of such amendments within which to serve on the Debtor a written objection to the same.  Upon receipt of any such objection, the Debtor will promptly set a hearing on the same, and the rejection of the affected contract or unexpired lease will be delayed until the Bankruptcy Court makes a determination on such issue (such determination may be made after the Confirmation Date, without delaying the confirmation of the Plan).  Any executory contract or unexpired lease not listed in Exhibit "L" or in Exhibit "M" will be deemed to be rejected by the Debtor on the Effective Date.

**3.    Guild Contracts**.  All Guild Pre-Petition Agreements with Subsidiaries will not be affected by the Plan, except as Pre-Petition Guild obligations are modified in accordance with the Guilds Forbearance Agreement or the Plan.   Upon the Effective Date, the Reorganized Debtor will execute Guild Assumption Agreements in the form prescribed by each Guild collective bargaining agreement in connection with each Covered Picture existing as of the Effective Date that is produced or distributed by the Reorganized Debtor

or each Subsidiary; provided, however, that each such  Guild Assumption Agreement will provide that the obligations of the Reorganized Debtor under each such Guild Assumption Agreement commence with residuals or plan contributions that accrue on or after the Effective Date and that such obligations are subject to the provisions of the Plan and the Guilds Forbearance Agreement.

**4.**      **Bar Date for Rejection Claims.**

Any Rejection Claim will be forever barred, will not be enforceable against the Debtor or the Reorganized Debtor, and will not be entitled to any Distribution under the Plan, unless a Proof of Claim for such Rejection Claim is filed and served on the Reorganized Debtor within thirty (30) days after the <u>later</u> of (a) the date of entry of the order of the Bankruptcy Court approving the rejection of the executory contract or unexpired lease, or (b) the date of service of notice of the Bar Date upon the Creditor asserting the Rejection Claim.

**5.**      **Cure Claims Schedule.**

A schedule of the amounts necessary to cure any defaults under any executory contracts and unexpired leases assumed under the Plan ("Cure Claims") will be set forth in a schedule ("Cure Claims Schedule") to be filed with the Bankruptcy Court, and served on the non-debtor parties to such executory contracts and unexpired leases, on or before the thirtieth (30th) day prior to the Confirmation Hearing Date.  Any objection to the amount of any Cure Claim set forth in the Cure Claims Schedule must be filed and served upon the Debtor and counsel for the Debtor on or before the fifteenth (15th) day prior to the Confirmation Hearing Date.  In the event that any such objection to the amount stated for a Cure Claim in the Cure Claims Schedule is not filed and served as set forth herein, the amount of the Creditor's Cure Claim will be deemed forever to be the amount set forth in the Cure Claims Schedule, and any Cure Claim in excess of the amount set forth in the Cure Claims Schedule will be waived and will be forever barred in the Case, without further notice.  If the Debtor cannot resolve any such objection with the Creditor, the Debtor may either (a) elect to reject the executory contract or unexpired lease at the

MAINDOCS-#158405-v5-PersikFirstAmndDisclosureStatement.DOC

1    Confirmation Hearing, or (b) have the Bankruptcy Court determine the merits of the

2    objection on or after the Confirmation Hearing (without delaying the confirmation of the

3    Plan).  Any amount of a Cure Claim payable upon the assumption of an executory contract

4    or unexpired lease will be due and payable on or before the later of the fourteenth

5    (14th) day after the entry of a Final Order fixing the amount of the Cure Claim and then

6    only in the amount fixed by such Final Order, or the Effective Date.

7    **AA.    Post-Effective Date Notice.**

8        From and after the Effective Date, any entity that desires to obtain notice of any pleading

9    or document filed in the Case, or of any hearing in the Bankruptcy Court, or of any matter as to

10   which notice is to be provided under the Plan, must file a request for post-Effective Date notice

11   and serve such request on the Reorganized Debtor and the Plan Agent and any of their respective

12   counsel provided, however, that the United States Trustee, the Post-Effective Date Committee, the

13   Reorganized Debtor, the Guilds, the Plan Agent, and the Guilds Plan Agent each will be deemed

14   to have requested such post-Effective Date notice.

15   **BB.    Disposition of Guarantees.**

16       Except as set forth to the contrary in the Guild Assumption Agreements, in accordance

17   with the provisions of section 101(5) of the Bankruptcy Code, any Claim arising out of or related

18   to any pre-petition guarantee provided by the Debtor will be and will be deemed to be solely a

19   General Unsecured Claim, and no Administrative Claim or post-Effective Date claim or other

20   obligation or liability for the Debtor or the Reorganized Debtor will arise with respect thereto.  In

21   the event that agreement cannot be reached regarding the allowed amount of such Claim, the

22   Debtor or the Plan Agent will have the right to have the Bankruptcy Court estimate the amount of

23   such Claim for the purpose of allowance in accordance with the provisions of section 502(c) of the

24   Bankruptcy Code.

25   **CC.    Miscellaneous Plan Provisions.**

26       Other provisions of the Plan, including provisions pertaining to the Reorganized Debtor's

27   duty to file after the Effective Date reports regarding the status of implementation of the Plan, the

28   Debtor's right to revoke the Plan prior to the Confirmation Date, the governing law relating to the

1   Plan, the Bankruptcy Court's retention of jurisdiction over the Case and the Plan after the

2   Effective Date, and the Debtor's right to seek to modify the Plan are set forth in Article XIII of the

3   Plan.

4      **DD.    Valuation of Subsidiary Interests.**

5      The most valuable assets of the Estate are the Subsidiary Interests.  A list of the

6   Subsidiaries is attached as Exhibit "K" to the Plan.

7      The Debtor has worked extensively throughout the Case with the Guilds and the

8   Committee to address the valuation of the Subsidiary Interests.  In this regard, the following

9   efforts, among others, have been made to address the valuation of the Subsidiary Interests:

10      **1.    Net Asset Valuation Report.**

11      A Subsidiary Interest is the Debtor's equity interest in a Subsidiary and,

12   accordingly, the Debtor may not be entitled to obtain any material distribution on account

13   of such interest unless and until the obligations and operating expenses of the Subsidiary

14   are satisfied.  The Subsidiaries generally owe the following liabilities: secured debt in

15   connection with funding the cost of developing a motion picture; secured debt to the

16   Guilds for residuals owed to the Guilds pursuant to the Subsidiaries' collective bargaining

17   agreements with the Guilds; unsecured debt owed to the Guilds for residuals owed to the

18   Guilds pursuant to the Subsidiaries' collective bargaining agreements with the Guilds;

19   unsecured accounts payable incurred in the ordinary course by the Subsidiaries;

20   participation obligations to creditors in connection with the production of a motion picture

21   by a Subsidiary; and various operating expenses the administration of which generally is

22   managed by YFG Services.  The assets of the Subsidiaries generally consist of the

23   following:  the copyright in the motion picture produced by the Subsidiary (although, in a

24   number of instances, a Subsidiary has assigned its interest in the copyright and no longer

25   owns the copyright); accounts receivable owed to the Subsidiary by distributors of the

26   Subsidiary's motion picture; the rights of the Subsidiary to license the motion picture for

27   distribution in unsold foreign territories; royalties receivable; and any value attributable to

28   "second cycle" (i.e., reversionary value) distribution of the motion picture owned by the

1    Subsidiary.  Certain of the Subsidiary Interests have little or no value because the debts of

2    the subject Subsidiary exceed the value of the assets of such Subsidiary.  Certain of the

3    Subsidiary Interests are projected to have value because the debts of the Subsidiary are

4    believed to be less than the estimated value of the assets of such Subsidiary.

5         The Debtor has devoted considerable time and effort to preparing an analysis of

6    each Subsidiary Interest.  The Debtor has prepared and provided to the Guilds and to the

7    Committee, for their evaluation, a Net Asset Valuation report, indicating the Debtor's best

8    estimates of the value of the Subsidiary Interests ("NAV"), and amended versions thereof.

9         **2.    Valuation Analysis Conducted by the Guilds.**

10        Over a period of many months during the Case, the Debtor and the Guilds worked

11   extensively together to evaluate data concerning the value of the film rights held by the

12   Subsidiaries in order to address the Claims of the Guilds against the Debtor and the

13   Subsidiaries.  The Guilds' representatives, including the Guilds' auditors, worked with the

14   Debtor to evaluate the film rights of the Subsidiaries and related revenues and values, as

15   reflected in the NAV and amendments thereof provided to the Guilds by the Debtor.  In

16   connection with such evaluation, the Debtor provided to the Guilds full and complete

17   access to the books and records of the Subsidiaries in order to facilitate the Guilds'

18   evaluating data pertaining to the Subsidiary Interests.

19        **3.    The Committee's Employment of The Salter Group.**

20        As stated hereinabove, in or about May 2010, the Debtor and the Committee

21   entered into a stipulation pursuant to which the Debtor and the Committee agreed that the

22   Committee could employ The Salter Group to evaluate the Debtor's position, taken in plan

23   negotiations with the Committee, regarding the aggregate value of the Subsidiary Interests.

24   In connection with The Salter Group's analysis of the value of the Subsidiary Interests, in

25   or about May 2010, the Debtor provided to The Salter Group, for its consideration, a NAV,

26   a true and complete copy of which attached hereto as Exhibit "1" and is incorporated

27   herein by this reference ("May 2010 NAV").  The Salter Group performed an analysis of

28   the value of the Debtor's Subsidiary Interests (although no written report was prepared by

The Salter Group) and the Committee took into account The Salter Group's analysis in addressing the value of the Subsidiary Interests.

**4.    The Committee's and the Guilds' Evaluation of the Subsidiary Interests.**

Throughout the course of the Case, the Debtor, the Committee and the Guilds have had numerous communications regarding the value of the Subsidiary Interests. The Debtor has cooperated with the Committee and the Guilds to provide to them information requested by them regarding the assets and liabilities of each Subsidiary and the film rights maintained by each Subsidiary. There have been extensive discussions among the Debtor, the Committee and the Guilds regarding the valuation of the Subsidiary Interests, as reflected in the May 2010 NAV, and amendments thereof, provided to the Committee and to the Guilds by the Debtor. The NAV has been subject to extensive scrutiny, and has been refined by the Debtor from time to time during the Case to reflect, as accurately as possible, the estimated value of the assets of each Subsidiary and the liabilities of each Subsidiary.

Attached hereto as Exhibit "2" and incorporated herein by this reference is a current version of the NAV, dated February 15, 2011 ("February 2011 NAV"). This NAV indicates that the aggregate value of the Subsidiary Interests is approximately $1,388,725. The difference in valuation of the Subsidiary Interests between the February 2011 NAV and the May 2010 NAV is attributable, in part, to the following:

(a)    **Inclusion of Contingent Liabilities.** The February 2011 NAV takes into account certain contingent liabilities of the Subsidiaries which were not included in the May 2010 NAV (but which expressly were referenced in the May 2010 NAV as being excluded from the valuation of the Subsidiary Interests in the May 2010 NAV).

(b)    **Inclusion of Litigation Costs.** The February 2011 NAV takes into account attorneys' fees and costs incurred by the Subsidiaries in

1  connection with litigation involving the Subsidiaries, which were not

2  included in the May 2010 NAV.

3      **(c)**      **Updating of Financial Affairs.**  The February 2011 NAV

4  adjusts asset values and liabilities for each Subsidiary to take into account

5  events which have transpired since the preparation of the May 2010 NAV

6  (e.g. a write-off by Subsidiaries of an approximately $400,000 receivable

7  owed to them which was projected to have been collectible by such

8  Subsidiaries, and a Subsidiary Distribution in the amount of

9  approximately $530,000 made to the Debtor by PHR Releasing, LLC

10  (Perfect Holiday)).

11      **(d)**      **More Accurate Estimate of Value of Film Rights.**  The

12  February 2011 NAV adjusts asset values to take into account the Debtor's

13  current estimate of the realizable value of the assets of the Subsidiaries.

14      **(e)**      **Guilds' Residuals on Reversionary Values.**  The Guilds

15  will be entitled to payment of residuals on any "second cycle" (i.e.,

16  reversionary value) collections by the Subsidiaries.  These obligations are

17  reflected in the February 2011 NAV.

18      **5.**      **Marketing of Debtor's Business.**

19  In or about January 2011, the Committee and the Guilds requested that they be

20  authorized to solicit potential buyers for the Debtor's assets (i.e. the Subsidiary Interests)

21  and/or the assets of the Subsidiaries.  The Debtor agreed to such request, and has provided

22  to the Committee and to the Guilds diligence materials to facilitate a potential buyer's

23  evaluation of the assets of the Debtor and/or the assets of the Subsidiaries.  It is the

24  Debtor's understanding that the Committee and the Guilds, working with The Salter Group

25  and perhaps others, have evaluated potential buyers for assets of the Debtor and/or assets

26  of the Subsidiaries, and have contacted, or intend to contact, potential buyers to solicit

27  their interest in acquiring such assets.  The Debtor has cooperated, and will cooperate, with

28  the Committee and the Guilds with respect to such marketing process.

MAINDOCS-#158405-v5-PersikFirstAmndDisclosureStatement.DOC

In effect, the Debtor has authorized the Committee and the Guilds to attempt to locate a buyer who will provide, pursuant to a purchase of the assets of the Debtor and/or the assets of the Subsidiaries, more value for Creditors than the value that will be provided to Creditors pursuant to the Plan.  The Debtor believes that, by the Plan, the Debtor will provide to Creditors the most favorable recovery realistically possible under the circumstances of this case.  Nevertheless, this marketing process provides to Creditors as much assurance as reasonably can be obtained under the circumstances that the Debtor is providing fair value to Creditors pursuant to the Plan.  This marketing process provides to Creditors protection that, if a buyer is located who will offer to pay more value to Creditors than the value provided by the Plan, and the Debtor is unwilling to amend the Plan to meet or exceed the value provided by such buyer, ultimately that buyer will acquire the assets of the Debtor and/or the assets of the Subsidiaries and the Plan will not be confirmed by the Bankruptcy Court.

**Any Creditor or party-in-interest that desires to receive diligence materials regarding a possible acquisition of the assets of the Debtor and/or the assets of Subsidiaries may obtain a copy of such materials upon written request made to the Committee's counsel, Pachulski, Stang, Ziehl & Jones, LLP, 10100 Santa Monica Boulevard, 11th Floor, Los Angeles, California 90067-4100, Attention:  Jeremy V. Richards (jrichards@pszjlaw.com).**

**Copies of the Debtor's most recent reports, filed pursuant to Rule 2015.3 of the Federal Bankruptcy Rules, disclosing the income statements and cash flows of each of the Subsidiaries from the period covered by the last filed report [Docket Nos. 54-57] through December 31, 2010 and balance sheets for each of the Subsidiaries as of December 31, 2010, may be accessed from the Court docket or from the website of the Committee's counsel (www.pszjlaw.com).**

**A chart listing each film title of the Subsidiaries, and the licenses for each such film in foreign territories and the expiration date of such licenses, is attached hereto as Exhibit "3" and incorporated herein by this reference.**

MAINDOCS-#158405-v5-PersikFirstAmndDisclosureStatement.DOC

**EE.** **Yari Guarantee and Collateral for Securing Payment of Distributions Under the Plan.**

Pursuant to the Plan, Yari will provide the Yari Guarantee (Exhibit "G" to the Plan) in favor of the Plan Agent, acting on behalf of the holders of Allowed Class 5 Claims, by which he guarantees payment of the Reorganized Debtor's obligations under the Reorganized Debtor Note. Pursuant to the Plan, Yari will execute the Guilds Guarantee Agreement (Exhibit "N" to the Plan) in favor of the Guilds, by which he guarantees that each Guild will receive payment of its Allowed Guild Secured Claim in accordance with the terms and conditions of the Plan.

Pursuant to the Plan, the Reorganized Debtor's payment to Creditors of the Distributions required by the Plan will be secured as set forth below.

**1.** **Subsidiary Interests Pledge Agreement.**

In accordance with the provisions of Section 5.5.9 of the Plan, pursuant to the provisions of the Subsidiary Interests Pledge Agreement (Exhibit "D" to the Plan), the Reorganized Debtor will grant to the Plan Agent, for the benefit of holders of Allowed Class 5 Claims, a security interest in the Subsidiary Interests in order to secure timely performance of all of the Reorganized Debtor's obligations to holders of Allowed Class 5 Claims under the Plan. Similarly, in accordance with the provisions of Section 5.2.9 of the Plan, pursuant to the Guilds Subsidiary Interests Pledge Agreement (Exhibit "S" to the Plan), the Reorganized Debtor will grant to the Guilds a security interest in the Subsidiary Interests in order to secure timely performance of all of the Reorganized Debtor's obligations on account of the Allowed Guild Secured Claims under the Plan. The security interest to be granted to the Guilds pursuant to the Guilds Subsidiary Interests Pledge Agreement will be junior to the security interest to be granted to the Plan Agent, for the benefit of the holders of Allowed Class 5 Claims, pursuant to the Subsidiary Interests Pledge Agreement. The Debtor's estimate of the value of the Subsidiary Interests is set forth in Paragraph VIII(DD) hereof and is reflected in the February 2011 NAV (Exhibit "2" hereto).

2.      **Davand Pledge Agreement.**

In accordance with the provisions of Section 5.5.10 of the Plan, pursuant to the Davand Pledge Agreement (Exhibit "I" to the Plan), Davand will grant to the Plan Agent, for the benefit of holders of Allowed Class 5 Claims, a security interest in the Interest in the Reorganized Debtor in order to secure timely performance of all of the Reorganized Debtor's obligations to holders of Allowed Class 5 Claims under the Plan.  Similarly, in accordance with the provisions of Section 5.2.10 of the Plan, pursuant to the provisions of the Guilds Stock Interest Pledge Agreement (Exhibit "T" to the Plan), Davand will grant to the Guilds a security interest in the Interest in the Reorganized Debtor in order to secure timely performance of all of the Reorganized Debtor's obligations on account of the Allowed Guild Secured Claims under the Plan.  The security interest to be granted to the Guilds pursuant to the Guilds Stock Interest Pledge Agreement will be junior to the security interest to be granted to the Plan Agent, for the benefit of the holders of Allowed Class 5 Claims, pursuant to the Davand Pledge Agreement.  The value of Davand's Interest is equivalent to the value of the Debtor's assets (almost entirely the Subsidiary Interests), less the Debtor's liabilities as compromised pursuant to the Plan.  Set forth in paragraph XI(F) hereof is the Debtor's estimate of the amount of its liabilities.  The Debtor believes that the value of its assets is less than the amount of its liabilities.

3.      **Reorganized Debtor's Pledge of Security Interest in Net Recoveries.**

In accordance with the provisions of Section 5.5.12 of the Plan, pursuant to the Litigation Security Agreement (Exhibit "P" to the Plan), the Reorganized Debtor will grant to the Plan Agent, for the benefit of holders of Allowed Class 5 Claims, a security interest in any Axium Litigation Net Recoveries and any other Net Recoveries to which holders of Allowed Class 5 Claims are entitled under the Plan in order to secure timely payment to the Plan Fund of any such Net Recoveries.  It is uncertain whether the Reorganized Debtor will obtain any Net Recoveries, and, if so, the amount of any such Net Recoveries.  For the purpose of the Feasibility Analysis provided in paragraph XI(F) of this Disclosure Statement, the Debtor assumes, conservatively, that there will be no Net Recoveries.

MAINDOCS-#158405-v5-PersikFirstAmndDisclosureStatement.DOC

4. **Collateral For Yari Guarantee.**

In accordance with the provisions of Section 5.5.8 of the Plan, Yari's obligations pursuant to the Yari Guarantee will be secured by the Out Parcels Deed of Trust (Exhibit "E" to the Plan) and by the SJM Realty Pledge Agreement (Exhibit "F" to the Plan). Similarly, in accordance with the provisions of Section 5.2.8 of the Plan, Yari's obligations pursuant to the Guilds Guarantee Agreements will be secured by the Guilds Deed of Trust (Exhibit "Q" to the Plan), and by the Guilds Membership Interest Pledge Agreement (Exhibit "R" to the Plan). The security interest to be granted to the Guilds pursuant to the Guilds Deed of Trust and the Guilds Membership Interests Pledge Agreement will be junior to the security interest to be granted to the Plan Agent, for the benefit of holders of Allowed Class 5 Claims, pursuant to, respectively, the Out Parcels Deed of Trust and the SJM Realty Pledge Agreement.

The Out Parcels Deed of Trust and the Guilds Deed of Trust are, respectively, first-priority and second-priority deeds of trust, to be executed by Memorial Northwest Pavilion Ltd. ("Memorial Northwest"), encumbering the Out Parcels. Memorial Northwest asserts that the value of the Out Parcels is approximately $2,230,000. The Out Parcels are approximately three acres. There are two ground leases occupying two acres of the three-acre parcel. The ground leases are with Chili's and Johnny Carino's, both national restaurant chains, and the annual base rents are approximately $135,000 plus reimbursement of property taxes. A reasonable valuation would be based upon an 8% capitalization rate. Therefore, those two acres should have a value of approximately $1,680,000. Offers have been received for the other acre parcel in the amount of approximately $850,000. Therefore, the total value for the three acres should be approximately $2,230,000. This three-acre parcel is owned free and clear of any mortgages or other material liens.[8]

---

[8] Memorial Northwest is a solvent entity, as reflected in the financial statements maintained in the ordinary course by Memorial Northwest.

1    The SJM Realty Pledge Agreement and the Guilds Membership Interest Pledge

2    Agreement are, respectively, first-priority and second-priority pledges by the pledgors

3    identified therein pursuant to which 49% of the membership interests in SJM Realty, and

4    any and all distributions associated with the remaining 51% of the membership interests in

5    SJM Realty, are pledged to secure performance of the Yari Guarantee.  SJM Realty asserts

6    that the aggregate value of the 49% membership interest in SJM Realty, and any and all

7    distributions associated with the remaining 51% of the membership interests in SJM

8    Realty, is not less than $5,600,000.  The San Jacinto Mall was appraised in July 2007 as

9    having a value of approximately $29.0 million.  The mortgage encumbering the San

10   Jacinto Mall is approximately $11,692,494, yielding net equity in the amount of

11   approximately $17.3 million.  Even discounting the value of the San Jacinto Mall by 20%

12   to take into account a reduction in value of the San Jacinto Mall as a result of any

13   deterioration in the commercial real estate market, the net equity still would be in excess of

14   $11.5 million.  By the SJM Realty Pledge Agreement, there will be a pledge of 49% of the

15   membership interests in SJM Realty and the distributions associated with the remaining

16   51% of the membership interests in SJM Realty.  Therefore, conservatively, the value of

17   this collateral should be approximately $5.6 million.[9]

18   It is estimated, therefore, that the aggregate value of the collateral pledged to

19   support the Yari Guarantee is approximately $7,830,000.  The Yari Guarantee is a

20   guarantee of the Reorganized Debtor's obligations under the Reorganized Debtor Note.

21   The Reorganized Debtor Note (Exhibit "C" to the Plan) is in the original principal amount

22   of $3,660,000, and will be reduced, in part, by the amount of the Pre-Effective Date

23   Professional Fee Claims (exclusive of the Retainer Balance) paid during the Case, the

24   $15,000 payment made to The Salter Group, Pre-Effective Date United States Trustee Fees

25   paid during the Case, the Plan Fund Reserve, Allowed Administrative Claims, Allowed

26   Priority Tax Claims, and the Allowed Priority Non-Tax Claims, which are projected to be

27

28   [9] The pledgors are solvent entities, as reflected in the financial statements maintained in the ordinary course by the
pledgors.

in the aggregate amount of approximately $1,290,683.  Accordingly, it is estimated that the aggregate value of the collateral pledged to secure Yari's performance under the Yari Guarantee exceeds substantially the amount of the obligations which are being guaranteed by Yari under the Yari Guarantee.

In the event that the Reorganized Debtor should default in performing its obligations to Class 5 Creditors under the Plan, the Plan Agent will be entitled to resort to the collateral pledged to support the Yari Guarantee.  Given the value of such collateral, any disposition of such collateral should produce proceeds sufficient to satisfy all outstanding obligations owed to Class 5 Creditors.  Accordingly, Yari's ability to respond pursuant to the Yari Guarantee may not be meaningful to Class 5 Creditors.  If the Bankruptcy Court requires any further financial disclosure regarding Yari's financial condition, he will provide such financial disclosure, under seal or under other protections to ensure the confidentiality of such financial disclosure satisfactory to him, in connection with the Confirmation Hearing.

**FF.    Waiver of Reimbursement and Contribution Claims.**

Pursuant to the Plan, the Reorganized Debtor will pay certain Allowed Claims which relate to or arose in connection with the Debtor's guarantee of the payment of obligations owed by a Subsidiary to its creditors, or in connection with an agreement with the Debtor to indemnify creditors of a Subsidiary with respect to any failure by the Subsidiary to comply with its obligations to such creditors.  As a result of the Reorganized Debtor's payment of such Allowed Claims, the Reorganized Debtor may have the right to assert claims for reimbursement or contribution, or claims based upon comparable or related causes of action or legal theories, against the Subsidiaries ("Reimbursement/Contribution Claims").  Pursuant to Section 6.31 of the Plan, effective as of the Effective Date, the Debtor, for itself and for the Estate, will waive and release the Reimbursement/Contribution Claims in accordance with the provisions of Section 6.31.  The Debtor believes that the waiver and release of the Reimbursement/Contribution Claims is appropriate, in part, for the following reasons:

1.    **Insolvent Subsidiaries.**

The Debtor has evaluated the Reimbursement/Contribution Claims and has determined that the Reimbursement/Contribution Claims can be asserted only against YFGR and other Subsidiaries that the Debtor believes are insolvent and have no ability, and likely will have in the foreseeable future no ability, to make any meaningful payment to the Reorganized Debtor on account of the Reimbursement/Contribution Claims.  The Debtor believes, therefore, that pursuing the Reimbursement/Contribution Claims would not result in any material recovery for Creditors and will serve only to cause the Debtor or the Reorganized Debtor to incur litigation expense that would reduce the amount available for distribution to Creditors under the Plan.

2.    **Value Provided to Settle Reimbursement/Contribution Claims**.

Davand will provide, on behalf of the Subsidiaries, in part, the following value in consideration of the Debtor's waiver and release of the Reimbursement/Contribution Claims:

(a)    **Payments to Creditors in Excess of Value of the Interest**.

Pursuant to the Plan, Davand is causing the Reorganized Debtor to pay to Creditors an amount substantially in excess of the value of the Interest being retained by Davand.  The Debtor's primary assets are the Subsidiary Interests.  As stated in paragraph VIII(DD) hereof and as reflected in the February 2011 NAV, the Debtor believes that the value of the Subsidiary Interests is approximately $1,388,000. Davand is causing the Reorganized Debtor to pay pursuant to the Plan $3,660,000 in order for Davand to retain the Interest (approximately 264% more than the value of the Subsidiary Interests).  In effect, as reflected in the February 2011 NAV, all of the value (and more) of the Subsidiaries is being paid to fund the Distributions to Creditors under the Plan.

(b)    **Davand's Funding Is Essential to the Reorganized Debtor's Meeting Its Obligations to Creditors Under the Plan.**  In addition to the cash infusion that Davand will provide to the Reorganized Debtor in order to enable the

1    Reorganized Debtor to make the Distributions required to be made on or about the

2    Effective Date (projected to be in the amount of approximately $617,876), Davand

3    will need to provide to the Reorganized Debtor funding in order to enable the

4    Reorganized Debtor to make the ongoing Distributions required to be made to

5    Creditors under the Plan.  As set forth in paragraph XII(F)(2)(b)(i) hereof, the

6    Debtor projects that Davand will need to advance to the Reorganized Debtor

7    approximately $553,784 in order to enable the Reorganized Debtor to pay timely

8    its obligations to the Guilds at the end of the term for paying the Allowed Guild

9    Secured Claims under the Plan.  Moreover, as set forth in paragraph

10   XII(F)(2)(b)(iii) hereof, the Debtor projects that Davand will need to advance to the

11   Reorganized Debtor approximately $2,369,317in order to enable the Reorganized

12   Debtor to pay timely its obligations to Class 5 Creditors at the maturity date of the

13   Reorganized Debtor Note.  Without such advances to be provided by Davand, the

14   Plan would not be feasible.

15        **(c)      Reimbursement/Contribution Claims Release Payment.**  In

16   addition to the value to be provided by Davand referenced hereinabove, in

17   accordance with the provisions of Section 6.31 of the Plan, Davand will pay to the

18   Plan Fund on the Effective Date, a payment in the amount of $100,000 in order to

19   obtain, for the benefit of the Subsidiaries, a waiver and release of the

20   Reimbursement/Contribution Claims ("Reimbursement/Contribution Claims

21   Release Payment").

22        The Debtor will file, and serve on Creditors, not later than the twenty-fourth (24th) day

23   prior to the Confirmation Hearing, a pleading in support of the Plan, providing additional

24   disclosure regarding the Reimbursement/Contribution Claims and the merits of the resolution of

25   such claims provided for by the Plan.

26        **APART FROM THE REIMBURSEMENT/CONTRIBUTION CLAIMS, NO**

27   **OTHER CLAIMS AGAINST SUBSIDIARIES, YARI OR ANY YARI AFFILIATE WILL**

28   **BE RELEASED UNDER THE PLAN.**

## IX.

## EFFECT OF CONFIRMATION OF THE PLAN

### A.    Discharge.

Confirmation of the Plan will have all of the effects provided by section 1141 of the Bankruptcy Code which are not inconsistent with the terms of the Plan.  Except as provided expressly to the contrary in the Plan or in the Confirmation Order, pursuant to section 1141(d) of the Bankruptcy Code, the Distributions and rights that are provided in the Plan will be in complete satisfaction, settlement, release and discharge, effective as of the Effective Date, of all known or unknown Claims and Administrative Claims against, rights against, liabilities of, obligations of, and any Liens encumbering the Debtor's assets and properties, including but not limited to, Claims of the kind specified in sections 502(g), 502(h) and 502(i) of the Bankruptcy Code, in each case whether or not (1) a Proof of Claim based upon such Claim is filed or deemed filed under section 501 of the Bankruptcy Code, (2) such Claim is allowed under section 502 of the Bankruptcy Code, or (3) the holder of such Claim accepted the Plan.  The Confirmation Order will constitute a determination of the discharge of all Claims and Administrative Claims against the Debtor, subject only to the occurrence of the Effective Date, to the fullest extent permitted by section 1141 of the Bankruptcy Code.  Any obligations of the Debtor to Creditors imposed by the Plan will be compensable only from Distributions made pursuant to the Plan, provided, however, that any obligations to the Plan Agent or the Guilds, acting on behalf of their respective constituencies, are enforceable by the Plan Agent or the Guilds Plan Agent, as the case may be..

### B.    Injunction/Release.

On the Effective Date, an injunction against Creditors' acts will be issued in accordance with the provisions of Section 11.2 of the Plan, and Claims will be forever waived and released in accordance with the provisions of Section 11.3 of the Plan.

### C.    Distribution of Property Free and Clear of Liens, Claims, and Interests.

Except as otherwise provided in the Plan or in the Confirmation Order, all property distributed under the Plan will be distributed free and clear of all Liens and other Claims of Creditors and the Interest of the Interest Holder.

1    **D.    Binding Effect of Plan.**

2         Upon the Effective Date, the provisions of the Plan will be binding upon the Debtor, the

3    Reorganized Debtor, the Plan Agent, each Creditor and the Interest Holder.

4    **E.    Revesting of Assets**.

5         Except only for the Retained Assets which will be vested in the Reorganized Debtor on the

6    Effective Date, all assets, properties and interests of the Estate will vest in, and will be property of,

7    the Plan Fund.

8                                                    **X.**

9                              **LIMITATION OF LIABILITY**

10   **A.    No Liability for Solicitation or Participation.**

11        As specified in section 1125(e) of the Bankruptcy Code, entities that solicit acceptances or

12   rejections of the Plan, in good faith and in compliance with the applicable provisions of the

13   Bankruptcy Code, will not be liable, on account of such solicitation or participation, for violation

14   of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of

15   the Plan or the offer, issuance, sale, or purchase of securities.

16   **B.    Good Faith.**

17        Confirmation of the Plan will constitute a finding that the Plan was proposed, and that

18   acceptances of the Plan were solicited, in good faith and in compliance with applicable provisions

19   of the Bankruptcy Code.

20   **C.    Limitation of Liability Regarding Plan.**

21        Effective as of the Effective Date, neither the Committee, the Post-Effective Date

22   Committee, the Guilds, the Debtor, the Reorganized Debtor, the Board of Directors of the

23   Reorganized Debtor, the Plan Agent, the Guilds Plan Agent nor any of their respective

24   Representatives will have or incur any liability to any Creditor or to the Interest Holder or to any

25   other party-in-interest for any act or omission in connection with or arising out of the negotiation,

26   preparation and pursuit of confirmation of the Plan, the approval of the Disclosure Statement, the

27   administration of the Plan or the consummation of the Plan (except for any act or omission

28   constituting gross negligence or willful misconduct), to the fullest extent permitted by applicable

1   statutory and case law, except only for the obligations of the Reorganized Debtor, Yari, the

2   Subsidiaries and any Yari Party provided for by the Plan.

3                                           **XI.**

4                        **CERTAIN RISK FACTORS TO BE CONSIDERED**

5            Holders of Claims entitled to vote on the Plan should read and consider carefully the

6   factors set forth below, as well as other information set forth in this Disclosure Statement and the

7   documents delivered together herewith and/or incorporated by reference herein, prior to voting to

8   accept or reject the Plan.

9        **A.      Risk that the Debtor Will Have Insufficient Cash for the Plan to Become**

10                **Effective.**

11           The Plan cannot be confirmed by the Bankruptcy Court unless the Debtor has Cash

12  sufficient by the Effective Date to pay, or to reserve for payment of, all Allowed Administrative

13  Claims and other Allowed Claims which must be paid on or about the Effective Date, unless

14  Creditors holding such Claims agree to a deferred payment of their Claims.  The Debtor believes

15  that, at the time of the Confirmation Hearing, on account of a cash infusion to be provided by

16  Davand, the Debtor will have Cash sufficient to satisfy or to reserve for all such Claims.  For a

17  further discussion of this issue, please refer to paragraph XII(F) of this Disclosure Statement.

18       **B.      Risk Regarding the Distributions to Be Made to Holders of Allowed General**

19                **Unsecured Claims.**

20           While the Debtor has endeavored to project, pursuant to paragraph XII(F) of this

21  Disclosure Statement, what it believes are likely to be the Distributions to be made to holders of

22  Allowed General Unsecured Claims, there can be no certainty that those projections will be

23  accurate and that holders of Allowed General Unsecured Claims will receive the Distributions

24  projected in this Disclosure Statement.  The projected recovery by holders of Allowed General

25  Unsecured Claims will be affected by, among other things: (1) the amount of any recoveries

26  generated from prosecuting Causes of Action; (2) the outcome of objections to Disputed Claims,

27  and, hence, the amount of Allowed General Unsecured Claims; (3) the amount of Allowed

28  Administrative Claims; and (4) the costs of administering the Plan.

**C.    Bankruptcy Risks.**

In the event that a Class of Claims that is entitled to vote with respect to the Plan does not vote to accept the Plan, the Debtor will need to "cram down" on such non-accepting Class pursuant to section 1129(b) of the Bankruptcy Code in order to obtain confirmation of the Plan. The cram down provisions of section 1129(b) of the Bankruptcy Code are fairly complex, and require, among other things, that the Plan and the Debtor comply with the provisions of sections 1129(a)(1)-(7), and (9)-(16) of the Bankruptcy Code as applicable, and that the Plan not discriminate unfairly and be fair and equitable with respect to each Class of Claims that is impaired under the Plan and that has not accepted the Plan.  While the Debtor believes that the Plan satisfies all of the requirements for confirmation of a plan under section 1129(b), there is no assurance that the Bankruptcy Court will make such a determination.

**XII.**

**CONFIRMATION OF THE PLAN**

**A.    Introduction.**

The following discussion is intended solely for the purpose of alerting Creditors about basic confirmation issues which they may desire to consider. The Debtor CANNOT and DOES NOT represent that the discussion contained below is a complete summary of the law on this topic and is not providing any legal opinions with respect thereto.  **CREDITORS SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW WITH RESPECT TO CONFIRMING A PLAN IS COMPLEX**.

Many requirements must be met before a bankruptcy court can confirm a Chapter 11 plan. Such requirements include that the plan must be accepted by at least one impaired class established by the plan, must be feasible and that the distributions to non-accepting creditors in impaired classes must be at least as much as such creditors would receive in a Chapter 7 liquidation.  These requirements are not the only requirements for confirmation.

**B.    Votes Necessary to Confirm the Plan.**

A bankruptcy court cannot confirm a Chapter 11 plan unless (1) all impaired classes under the Plan have voted to accept the plan, or (2) at least one impaired class has accepted the plan

1  without counting the votes of any insiders within that class and the plan is eligible to be confirmed

2  by "cram down" on non-accepting classes pursuant to section 1129(b) of the Bankruptcy Code.

3        **C.**      **Votes Necessary for a Class to Accept the Plan.**

4        A class of claims is deemed to have accepted a Chapter 11 plan where more than one-

5  half (1/2) in number, and at least two-thirds (2/3) in dollar amount, of the claims allowed in that

6  class that actually vote on the plan vote in favor of the plan.

7        **D.**      **Treatment of Non-Accepting Classes.**

8        As noted above, even if there are impaired classes that do not accept a Chapter 11 plan, a

9  bankruptcy court nonetheless may confirm the plan if the non-accepting classes are treated in the

10  manner required by the Bankruptcy Code and there is at least one impaired class that accepts the

11  plan.  The process by which a plan can be confirmed and become binding on non-accepting

12  classes notwithstanding rejection by one or more classes is commonly referred to as "cram down."

13  The Bankruptcy Code allows a plan to be "crammed down" on non-accepting classes of claims or

14  interests if the plan meets all of the requirements for confirmation, except the voting requirements

15  of section 1129(a)(8) of the Bankruptcy Code, and if the plan does not "discriminate unfairly" and

16  is "fair and equitable" with respect to each impaired class that has not voted to accept the plan, as

17  provided in section 1129(b) of the Bankruptcy Code and applicable case law.

18        **E.**      **Request for Confirmation Despite Non-Acceptance by Impaired Class(es).**

19        The Debtor will ask the Bankruptcy Court to confirm the Plan by cram down on any

20  impaired Class if such Class does not vote to accept the Plan.  In this regard, it is important to note

21  that the Debtor has established under the Plan a Class of Allowed Secured Claims (Class 3) and a

22  Class of Allowed Subordinated Claims (Class 6) which may not exist in the Case.  The Debtor has

23  done so in an abundance of caution.  The Debtor will seek confirmation of the Plan

24  notwithstanding (as is expected) a failure by such Classes to cast any affirmative vote with respect

25  to the Plan.

26  */ / /*

27

28

**F.      Feasibility of the Plan.**

       **1.      Feasibility Analysis.**

Section 1129(a)(11) of the Bankruptcy Code requires that, for the Plan to be confirmed, the Bankruptcy Court find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor.

The Plan provides for a reorganization of the Debtor.  Pursuant to the Plan, the Reorganized Debtor is required to satisfy the amount of the Reorganized Debtor Note and to make any other payments to the Plan Fund in order to satisfy Allowed General Unsecured Claims, and is required to satisfy Allowed Guild Secured Claims, in accordance with the terms and conditions of the Plan.  Pursuant to the Plan, the Debtor's obligations to the holders of Allowed General Unsecured Claims are guaranteed by Yari and such obligations are secured by collateral in accordance with the terms and conditions of Plan Documents.  Moreover, pursuant to the Plan, the Reorganized Debtor and the Plan Agent are authorized to investigate the viability of prosecuting Causes of Action, and, if appropriate, to prosecute Causes of Action for the benefit of Class 5 Creditors, with proceeds therefrom disbursed in accordance with the terms and conditions of the Plan.

The Debtor has prepared an analysis, set forth hereinbelow, of the feasibility of the Plan in order to demonstrate that the Plan satisfies the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code ("Feasibility Analysis").  The Feasibility Analysis sets forth, among other things, the Debtor's estimate of the resources available to fund the Distributions required by the Plan.

THE FEASIBILITY ANALYSIS REPRESENTS A PREDICTION OF FUTURE EVENTS BASED UPON CERTAIN ASSUMPTIONS MADE BY THE DEBTOR, AS SET FORTH HEREINBELOW.  WHILE THE DEBTOR IS CONFIDENT THAT IT WILL BE FEASIBLE TO MAKE THE DISTRIBUTIONS TO CREDITORS PROVIDED BY THE PLAN, THERE IS NO ABSOLUTE GUARANTY OR OTHER ASSURANCE THAT THE FEASIBILITY ANALYSIS WILL PROVE TO BE ACCURATE.  BY REASON OF THE UNCERTAINTIES INHERENT IN THE PREDICTION OF FUTURE

1    EVENTS, THE FINANCIAL RESULTS MAY WELL BE DIFFERENT FROM THOSE

2    PREDICTED, AND SUCH A DIFFERENCE MAY BE MATERIAL AND ADVERSE

3    TO THE INTERESTS OF CREDITORS.

4    Significant assumptions underlying the Feasibility Analysis include the following:

5    **(a)** **Effective Date of the Plan.**  For the purpose of the Feasibility

6    Analysis, the Debtor projects that the Confirmation Date will occur in or about

7    April 2011 and that the Effective Date will occur in or about April 2011.

8    **(b)** **Unpaid Administrative Claims ($685,876).**  Administrative

9    Claims in the Case consist primarily of fees of Professionals employed in the Case

10    ("Professional Fees") and United States Trustee Fees.[10]

11    (i) Professional Fees ($684,901).  The Debtor's projection of

12    the Professional Fees which will have to be paid on or about the Effective

13    Date derives, in large part, from information provided to the Debtor by such

14    Professionals.  The Debtor estimates that unpaid fees of Professionals will

15    be approximately $684,901 as of the Effective Date.[11]  The projection of

16    Administrative Claims of Professionals employed in the Case is only an

17    estimate, and is not to be construed as any agreement by the Debtor as to

18    the amount or reasonableness of such fees.  The actual fees of the

19    Professionals which may be allowed by the Bankruptcy Court and which

20    will have to be paid on or soon after the Effective Date may be higher or

21    lower than the amount estimated by the Debtor.

22

23

24    [10] This projection assumes that there will be no material Administrative Claims that will need to be paid on or about
25    the Effective Date, other than the unpaid Administrative Claims of Professionals and the United States Trustee Fees.
Since the Debtor is a holding company and conducts no material ongoing business operations, this assumption should
be valid.  YFG Services provides staffing and other administrative services to the Debtor, but, pursuant to
26    Section 3.1.1 of the Plan, any Administrative Claim of YFG Services will be satisfied by Davand.
27    [11] This projection is based upon the following:  the unpaid fees and costs of the Debtor's counsel, Winthrop Couchot
Professional Corporation, in the amount of approximately $258,901  as of January 31, 2011; the unpaid fees and costs
of the Committee's counsel, Pachulski, Stang, Ziehl & Jones, LLP, in the amount of approximately $201,000 as of
28    January 31, 2011; and the Debtor's estimate that approximately $225,000 in fees and costs of such Professionals will
be incurred from February 1, 2011 through the Effective Date.

(ii) <u>United States Trustee Fees ($975)</u>. The Debtor projects that the Debtor will have to pay, on or about the Effective Date, approximately $975 in United States Trustee Fees. This projection is based upon the Debtor's estimate of the disbursements that it will make through the Effective Date and is believed to be accurate.

(c) **<u>Cure Claims ($0)</u>.** The Debtor projects that the Debtor will owe no amount of Cure Claims. Such projection derives from the Debtor's analysis of the Debtor's contracts and unexpired leases and the Debtor's present determination that it will not assume any executory contract or unexpired lease under the Plan.

(d) **<u>Allowed Priority Non-Tax Claims ($0)</u>.** The Debtor is a holding company and has not employed, and does not employ now, any employees. Accordingly, the Debtor believes that there are no Priority Non-Tax Claims in the Case.

(e) **<u>Debtor's Cash Resources as of the Effective Date</u>.** The following is the Debtor's projection of the Cash resources that will be available to it to fund the Distributions required to be paid on or about the Effective Date.

(i) <u>Accumulated Cash ($25,000)</u>. As of February 1, 2011, the Debtor had approximately $25,000 in Cash.

(ii) <u>Subsidiary Distributions ($43,000)</u>. The Debtor projects that, from February 1, 2011 through the Effective Date, the Debtor will receive approximately $43,000 in Subsidiary Distributions.

(iii) <u>Reimbursement/Contribution Claims Release Payment</u>. As set forth in paragraph VIII(FF) hereof, Davand will pay, for the benefit of the Subsidiaries, the $100,000 Reimbursement/Contribution Claims Release Payment.

(iv) <u>Davand Effective Date Contribution</u>. Pursuant to Section 5.7.2 of the Plan, Davand has agreed to provide to the Reorganized Debtor, on or before the Effective Date, a cash infusion in an amount sufficient to

1    enable the Reorganized Debtor to pay all of its obligations as of the

2    Effective Date, but in no event less than $500,000.  The Debtor projects that

3    the amount of such cash infusion will be approximately $617,876 (i.e.,

4    $685,876 in Administrative Claims and United States Trustee Fees and

5    $100,000 to fund the Plan Fund Reserve, less the $68,000 in cash that the

6    Debtor is projected to have on hand as of the Effective Date and the

7    $100,000 Reimbursement/Contribution Claims Release Payment).

8       (v) <u>Expenses to Be Paid Through Effective Date ($0)</u>.  The

9    Debtor projects that, apart from United States Trustee Fees and fees and

10    costs of Professionals, the Debtor will not be required to pay any accruing

11    expenses from February 1, 2011 through the Effective Date.

12       **(f)** **<u>Allowed Secured Claims ($2,350,000)</u>.**  The Allowed Guild

13    Secured Claims are fixed in the aggregate amount of $2,350,000 under the Plan.

14    The Debtor projects that the Allowed Secured Claim of Bank Leumi will be paid in

15    full in the ordinary course of the Subsidiaries' business operations, and that the

16    Reorganized Debtor will not be required to make payments to Bank Leumi under

17    the Plan.  The Debtor projects that there will be no other Allowed Secured Claims.

18    The Debtor's projection of the Allowed Secured Claims derives from the Debtor's

19    financial books and records, from a review of the Proofs of Claim filed in the Case,

20    and from negotiations (not yet finalized) with the Guilds fixing the amount of the

21    Allowed Guild Secured Claims for the purpose of the Plan.

22       **(g)** **<u>Allowed Priority Tax Claims ($0)</u>.**  The Debtor's projection of the

23    amount of Priority Tax Claims derives from the Debtor's financial books and

24    records and the Debtor's review of Proofs of Claims filed in the Case.[12]

25       **(h)** **<u>Allowed General Unsecured Claims ($70.0 million)</u>.**  Based upon

26    the Debtor's preliminary analysis of the General Unsecured Claims asserted in the

27

28

---

[12] As of February 1, 2011, approximately $71,573 in Priority Tax Claims had been asserted against the Debtor.  The Debtor believes that such Priority Tax Claims have no merit, and believes that such Priority Tax Claims will be disallowed by the Bankruptcy Court.

Case, the Debtor believes that in excess of $70.0 million in General Unsecured Claims have been asserted against the Debtor, including a substantial amount of disputed General Unsecured Claims.  Significant disputed General Unsecured Claims include the following:[13]

|         | **Creditor**                            | **Claim**   |
|---------|-----------------------------------------|-------------|
| (i)     | Equity Pictures Medien                  | $7,625,640  |
| (ii)    | Haggis Parties                          | $6,500,000  |
| (iii)   | Paul Haggis, Inc.                       | $500,000    |
| (iv)    | Haggis Parties                          | $500,000    |
| (v)     | Resarf, Inc.                            | $250,000    |
| (vi)    | O'Melveny & Myers, LLP                  | $346,099    |
| (vii)   | Axium International, Inc.               | $165,724    |
| (viii)  | MHF Zweite Academy Film                 | $3,174,012  |
| (ix)    | Harvadania                             | $1,734,949  |
| (x)     | Robb                                    | $3,464,117  |
| (xi)    | YFGR trustee on behalf of YFGR estate   | $20,088,000 |

For the purpose of the Feasibility Analysis only, the Debtor will assume that General Unsecured Claims will be allowed in a range between approximately $30.0 million and $40.0 million.  Pursuant to the Plan, the Plan Agent generally has the right to object to Disputed Claims, and the Debtor assumes that the Plan Agent will evaluate the Claims asserted in the Case and will file objections, as appropriate, to Disputed Claims.  The Debtor intends to file, prior to the Confirmation Hearing, an objection to the Claim asserted by the YFGR trustee on behalf of YFGR.[14]

A chart listing the General Unsecured Claims in this Case is attached as Exhibit "4" hereto and is incorporated herein by this reference.

(i)    **Net Recoveries ($0).**  The Debtor has not conducted a thorough analysis of whether Avoidance Actions should be pursued in the Case, and, if so, the value of such actions.  For the purpose of the Feasibility Analysis only, to be

[13] The Debtor has reached a preliminary agreement with Contagious Entertainment to reduce its General Unsecured Claim from $9,014,788 to $2,500,000 and an agreement with Alliance Atlantis Releasing, Ltd., Alliance Films, Inc. and Aurum Producciones, S.A. to fix their General Unsecured Claims in the aggregate amount of approximately $8,001,414.  The Debtor intends to file, prior to the Confirmation Hearing, motions under Rule 9019 of the Federal Bankruptcy Rules, to obtain Bankruptcy Court approval of such agreements.

[14] No objections to Disputed Claims have been filed in the Case.  Therefore, the analysis contained herein regarding the amount of General Unsecured Claims that will be allowed by the Bankruptcy Court is necessarily a preliminary analysis.

conservative, the Debtor projects that there will be no Net Recoveries from Causes of Action.  Pursuant to the Plan, the Plan Agent generally has the right to prosecute Avoidance Actions and other Causes of Action (the Debtor has the right under the Plan to prosecute any Axium Litigation).  By prosecuting Causes of Action, there is a potential of recovering value for the benefit of Class 5 Creditors.

**(j)** **Costs of Administering the Plan ($100,000).**  The Plan Agent will incur costs with respect to administering the Plan.  The Debtor estimates that such costs will be in the amount of approximately $100,000.

The Reorganized Debtor will be responsible for paying accruing United States Trustee Fees, estimated to be in the amount of approximately $14,625 through the Plan Completion Date.

**2.** **Funding of Distributions Required by the Plan.**

The Feasibility Analysis indicates that the Reorganized Debtor will have Cash sufficient to pay the expenses which will be incurred in connection with the administration of the Plan and to make all Distributions required to be made pursuant to the Plan.

**(a)** **Distributions Payable on or Soon After the Effective Date.**  On or about the Effective Date, the Debtor must pay all of the Allowed Administrative Claims, any Allowed Priority Non-Tax Claims, United States Trustee Fees, and any Cure Claims.  The Debtor estimates that, with the cash infusion to be provided by Davand on or about the Effective Date, the Debtor will have Cash sufficient to pay such Claims.

The Debtor projects that the Debtor will have the following Cash available to it to pay Allowed Claims that must be paid on or soon after the Effective Date[15]:

|  |  |  |
|---|---|---|
| (i) | Accumulated Cash | $25,000 |
| (ii) | Collected Subsidiary Distributions | 43,000 |
| (iii) | Reimbursement/Contribution Claims Release Payment | 100,000 |
| (iv) | Davand Effective Date Contribution | 617,876 |

---

[15] The Debtor may pay, prior to the Effective Date, United States Trustee Fees and, pursuant to monthly payment procedures approved by the Bankruptcy Court, pre-Effective Date Professional Fees, as a credit against the amount of the Reorganized Debtor Note.

**TOTAL:**    <u>**$785,876**</u>

The Debtor projects that the Debtor will have to pay, on or about the Effective Date, the following obligations:

| | | |
|---|---|---:|
| (i) | Unpaid Administrative Claims | $684,901 |
| (ii) | United States Trustee Fees | 975 |
| (iii) | Cure Claims | 0 |
| (iv) | Allowed Priority Non-Tax Claims | 0 |
| (v) | Plan Fund Reserve | 100,000 |

**TOTAL:**    <u>**$785,876**</u>

On or before the Effective Date, by the Davand Effective Date Contribution (Section 5.7.2 of the Plan), Davand will advance to the Reorganized Debtor funds sufficient to enable the Reorganized Debtor to pay such Allowed Claims. The Reorganized Debtor's payment of such Allowed Claims will be applied as a credit against the amount of the Reorganized Debtor Note. Davand has available funds sufficient to provide such cash infusion to the Reorganized Debtor. The Debtor will submit to the Bankruptcy Court, prior to the Confirmation Hearing, evidence of Davand's ability to provide to the Reorganized Debtor funds sufficient for the Reorganized Debtor to pay such Allowed Claims.

**(b)    <u>Ongoing Distributions Under the Plan.</u>** After payment of Allowed Administrative Claims, any Cure Claims, United States Trustee Fees and any Allowed Priority Non-Tax Claims, the only remaining material Claims to be paid pursuant to the Plan are Allowed Guild Secured Claims (Class 2), Allowed Priority Tax Claims and Allowed General Unsecured Claims (Class 5).[16]

(i)    <u>Allowed Guild Secured Claims</u>. Pursuant to the Plan, the Guilds' Allowed Guild Secured Claims will be fixed in the aggregate amount of $2,350,000. The Guilds will retain their claims against Subsidiaries, and any payments that a Subsidiary pays to a Guild on account

---

[16] The Debtor projects that the Allowed Secured Claim of Bank Leumi will be paid in the ordinary course by Subsidiaries which are indebted to Bank Leumi and, accordingly, that the Reorganized Debtor will not be required to make any payment to Bank Leumi. Also, at present, no order has been entered subordinating any Claims, and, accordingly, for the purpose of the Feasibility Analysis only, the Debtor projects that there will be <u>no</u> Allowed Subordinated Claims (Class 6) in the Case.

-123-

of such Guild's secured claim against the Subsidiary will reduce, on a dollar-for-dollar basis, such Guild's Allowed Guild Secured Claim against the Reorganized Debtor.  The Debtor projects that, over the twenty-four months following the Effective Date, Subsidiaries will pay to the Guilds an aggregate amount of $771,120 on account of the Guilds' secured claims against the Subsidiaries, and that the Reorganized Debtor will pay to the Guilds an aggregate amount of $1,025,096 on account of the Guilds' Share of the Subsidiary Distributions.  The Debtor projects, then, that the Allowed Guild Secured Claims will be reduced to approximately $553,784 as of the end of the term for paying the Allowed Guild Secured Claims under the Plan.  This balance of the Allowed Guild Secured Claims will be satisfied by Davand.

All payments on account of Allowed Guild Secured Claims will be paid by the Reorganized Debtor and will not be paid from the Plan Fund.

(ii)     Allowed Priority Tax Claims.  While approximately $71,573 in Priority Tax Claims have been asserted in the Case, the Debtor disputes such Priority Tax Claims, and believes that such Priority Tax Claims will not be allowed in the Case.  Any Allowed Priority Tax Claims will be paid from the Plan Fund.

(iii)   Allowed General Unsecured Claims.  Recovery by Class 5 Creditors will depend, in part, on the following:

(1)     The Amount of Allowed Administrative Claims, Cure Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and Post-Effective Date Plan Expenses.  The Debtor projects that the aggregate amount of such Allowed Claims will be approximately $1,290,683, calculated as follows: $504,807 in

1   Administrative Claims paid prior to February 1, 2011[17]; and an

2   estimated  $685,876 in additional Administrative Claims which will

3   need to be paid from February 1, 2011 through the Effective Date;

4   and $100,000 to fund the Plan Fund Reserve.  The Debtor estimates

5   that, after paying such Allowed Claims there will be approximately

6   $2,519,317 remaining available in the Plan Fund to fund

7   Distributions for the benefit of Class 5 Creditors.[18]  If the amount of

8   such Allowed Claims is higher than projected, recoveries by the

9   Class 5 Creditors may be reduced.

10          (2)      Recoveries from Causes of Action.  For the purpose

11   of the Feasibility Analysis only, the Debtor projects that there will

12   be no Net Recoveries from the prosecution of Causes of Action.  If

13   there are any material Net Recoveries, recoveries by Class 5

14   Creditors may be increased.

15          (3)      Amount of Allowed General Unsecured Claims.  As

16   stated hereinabove, there remains in the Case a substantial amount

17   of disputed General Unsecured Claims to which objections likely

18   will be filed.  The Debtor estimates that between approximately

19   $30.0 million and $40.0 million in General Unsecured Claims will

20   be allowed by the Bankruptcy Court.

21

22   [17] From the Petition Date through January 31, 2011, the Debtor paid from either the Davand Loan or from Subsidiary
23   Distributions approximately the following Administrative Claims:  $366,145 (exclusive of the approximately $85,000
     Retainer Balance) to Winthrop Couchot Professional Corporation, the Debtor's general insolvency counsel; $117,812
24   to Pachulski, Stang, Ziehl & Jones LLP, the Committee's counsel; $15,000 to The Salter Group; and $5,850 in United
     States Trustee Fees.
25   [18] This amount is calculated as follows:  $3,660,000 in total funds paid to or for the benefit of the Plan Fund, plus fifty
     percent (50%) of the New Production Payments, estimated to be in the total amount of $100,000 (50% of which is
26   $50,000), and the $100,000 Reimbursement/Contribution Claims Release Payment, less:  $504,807 in Administrative
     Claims which were paid prior to February 1, 2011 (exclusive of the approximately $85,000 Retainer Balance);
27   $685,876 in projected Administrative Claims which will need to be paid from February 1, 2011 through the Effective
     Date; and $100,000 in projected Post-Effective Date Plan Expenses.  The Debtor projects that there will be no
28   Allowed Priority Non-Tax Claims, Cure Claims or Allowed Priority Tax Claims to be paid in the Case.  Note that
     post-Effective Date United States Trustee Fees, estimated to be in the amount of $14,625, will be paid by the
     Reorganized Debtor.

Based upon such assumptions, the Debtor projects the following potential recoveries by Class 5 Creditors:

| | | |
|---|---|---|
| Plan Fund | $3,660,000 | |
| Reimbursement/Contribution Claims Release Payment | 100,000 | |
| New Production Payments | 50,000 | |
| Net Recoveries | 0 | |
| Total Cash: | | $3,810,000 |
| Less Administrative Claims Paid Pre-February 1, 2011 (Exclusive of approximately $85,000 Retainer Balance) | | ($504,807) |
| Less Projected Administrative Claims (February 1, 2011 through Effective Date) | | ($685,876) |
| Less Allowed Priority Tax Claims | | ( 0 ) |
| Less Allowed Priority Non-Tax Claims | | ( 0 ) |
| Less Cure Claims | | ( 0 ) |
| Less Costs of Administering Plan | | ( 100,000) |
| Net Amount Available for Distribution to Class 5 Creditors | | **$2,519,317** |
| Est. Amount of Allowed General Unsecured Claims | $30.0 million | $40.0 million |
| Est. Percentage Recovery by holders of Allowed General Unsecured Claims | 8.40% | 6.29% |

The Debtor projects that, from the Effective Date through the maturity date of the Reorganized Debtor Note (unless the Reorganized Debtor Note is extended, January 20, 2012), the Subsidiaries will pay to the Plan Agent an aggregate amount of approximately $221,198 on account of the Creditors' Share of Subsidiary Distributions.  The Debtor projects that the Reorganized Debtor will pay to the Plan Agent $100,000 in New Production Payments, fifty percent (50%) of which (i.e., $50,000) will be applied as a credit against the amount of the Reorganized Debtor Note.  The Debtor projects, then, that the Reorganized Debtor will be required to pay to the Plan Agent the amount of $2,369,317 at or about the maturity date of the Reorganized Debtor Note in order to

1             satisfy the balance of the Reorganized Debtor Note[19].  Davand will

2             provide to the Reorganized Debtor funds sufficient for the

3             Reorganized Debtor to satisfy such balance of the Reorganized

4             Debtor Note.  In connection with the Confirmation Hearing, the

5             Debtor and Davand will provide to the Bankruptcy Court evidence

6             to demonstrate Davand's ability to make such payment.

7                 By the Feasibility Analysis, therefore, the Debtor projects,

8             conservatively, that the holders of Allowed General Unsecured

9             Claims will recover approximately 6.29%-8.40% on account of their

10            Allowed General Unsecured Claims.  If any of the assumptions

11            underlying the Feasibility Analysis proves to be overly conservative,

12            recoveries by holders of Allowed General Unsecured Claims may

13            prove to be more favorable than those projected.  On the other hand,

14            the Debtor cautions that, if any of the assumptions underlying the

15            Feasibility Analysis proves to be materially inaccurate and adverse

16            to the interests of holders of Allowed General Unsecured Claims,

17            recoveries by holders of Allowed General Unsecured Claims may

18            prove to be less favorable than those projected.

19       While the Debtor recognizes that these projections are subject to a variety of unpredictable

20 outside forces and circumstances which could affect adversely such projections, the Debtor

21 believes that the Feasibility Analysis has been prepared with sufficient care to allow the Debtor to

22 endorse it.

23 / / /

24

25

26     [19] This is calculated as follows:  the $3,660,000 original principal amount of the Reorganized Debtor Note, less the

27 following:  $1,290,683 in Allowed Administrative Claims ($504,807 in Administrative Claims paid as of January 31, 2011, exclusive of the Retainer Balance, and a projected amount of $685,876 for unpaid Administrative Claims from February 1, 2011 through the Effective Date); $100,000 to fund the Plan Fund Reserve; $0 in Allowed Priority Tax

28 Claims; $0 in Allowed Priority Non-Tax Claims; $0 in Cure Claims; $50,000 in the New Production Payments; and $221,198 in the Creditor's Share of Subsidiary Distributions.

1        **G.    Liquidation Analysis.**

2              Pursuant to section 1129(a)(7) of the Bankruptcy Code, a plan cannot be confirmed unless

3    the bankruptcy court determines that distributions under the plan to all holders of claims who have

4    not accepted the plan, and whose claims are classified in classes that are impaired under the plan,

5    are not less than those which they would receive in a liquidation case under Chapter 7 of the

6    Bankruptcy Code. This test must be satisfied even if a plan is accepted by each impaired class of

7    claims.   This test, which is often referred to as the "best interests of creditors" test, requires the

8    bankruptcy court to find either that (1) all holders of claims in an impaired class of claims have

9    accepted the plan, or (2) the plan will provide to each holder of a claim in an impaired class who

10   has not accepted the plan a recovery of property of a value, as of the effective date of the plan, that

11   is not less than the amount that such holder would receive if the debtor were liquidated under

12   Chapter 7 of the Bankruptcy Code.

13             To satisfy the "best interests of creditors" test, the bankruptcy court must reach a

14   conclusion regarding the probable distribution to the holders in each impaired class of claims if

15   the debtor were liquidated in a Chapter 7 case.  The first step in this process is to determine the

16   "liquidation value" that would be generated from a forced sale of the debtor's assets by a

17   Chapter 7 trustee. The second step requires the application of the projected liquidation proceeds in

18   accordance with the various rights of any creditors holding liens on the property.  If such proceeds

19   are sufficient to retire any such liens, then the excess would be made available to satisfy the claims

20   of unsecured creditors.

21             Once all of the claims secured by liens on assets of a debtor's estate are deducted from the

22   projected liquidation proceeds of the sale of the creditor's collateral, then the costs and expenses

23   associated with the liquidation of the estate incurred by the Chapter 7 trustee must be paid.  These

24   costs would include the compensation of the trustee, as well as compensation of counsel and other

25   professionals retained by the trustee, and asset disposition expenses.

26             After payment of the costs and expenses associated with the Chapter 7 liquidation are paid,

27   all unpaid administrative expenses incurred by the debtor in its Chapter 11 case (such as

28

1  compensation of attorneys for the debtor and any committee) and all unpaid claims arising from

2  the operations of the debtor during the pendency of the Chapter 11 case must be paid.

3  After the payment of Chapter 11 administrative expenses, the remaining liquidation

4  proceeds would be used to pay priority unsecured claims, such as tax and wage claims that are

5  entitled to priority under the Bankruptcy Code. Thereafter, the remaining liquidation proceeds

6  would be made available to pay general unsecured claims.  Finally, to the extent that any proceeds

7  remain after paying all allowed claims, such proceeds would be distributed to interest holders.

8  Attached hereto as Exhibit "5" is a liquidation analysis prepared by the Debtor that

9  estimates the probable liquidation value of the Debtor, and applies the foregoing liquidation

10  methodology to the estimated Claims against the Estate in a Chapter 7 liquidation in an effort to

11  quantify what each Class of Creditors would receive in a Chapter 7 liquidation ("Liquidation

12  Analysis").  Any Liquidation Analysis of this nature entails a significant degree of estimation and

13  projection regarding both probable asset value and probable Allowed Claim totals.  For example,

14  in preparing the Liquidation Analysis, the Debtor has been required to evaluate the very

15  substantial amount of Disputed Claims in the Case, and has necessarily quantified what it believes

16  will be the Allowed Claims within each Class.  Although this quantification was based upon a

17  careful assessment of the information contained in the Debtor's books and records and the

18  Debtor's review of the Disputed Claims asserted against the Debtor, as of the date of the

19  preparation of the Liquidation Analysis, it was not possible to quantify exactly the amount of

20  Allowed Claims given the substantial amount of Disputed Claims and the fact that no judicial

21  determinations had been made regarding the merits of the Disputed Claims.  These and other

22  factors may significantly increase or reduce the total amount of Allowed Claims within each

23  Class.

24  On the valuation side of the Liquidation Analysis, the Debtor has estimated the liquidation

25  value of the Debtor's assets utilizing its best estimate of the value of the Debtor's assets in a

26  Chapter 7 liquidation.

27  Material assumptions underlying the Liquidation Analysis include the following:

28

1      **1.      Potentially Reduced Value of Assets in Liquidation.**

2      Liquidation values for many types of assets are typically substantially lower than

3  going concern values for such assets.  In this case, the Debtor's primary assets are the

4  following:  Cash; Causes of Action; and Subsidiary Interests.

5      **(a)      Cash.**  Cash is fully recoverable either in a going concern scenario

6      or in a liquidation scenario.

7      **(b)      Causes of Action.**  Since the Debtor has not completed its

8      evaluation of Avoidance Actions and other Causes of Action, to be conservative,

9      the Debtor has attributed no value to Causes of Action.  The Debtor believes,

10     however, that any potential value of Causes of Action would be impaired if the

11     Case were converted to a Chapter 7 liquidation.  If the Debtor remains in

12     Chapter 11, pursuant to the Plan, the Plan Agent generally will prosecute the

13     Causes of Action for the benefit of Class 5 Creditors.  The Plan Agent will be

14     motivated to pursue any viable Causes of Action for the benefit of Class 5

15     Creditors and, pursuant to the Plan, will have funding sufficient to allow him to do

16     so.  If the Case were converted to a Chapter 7 liquidation, however, a trustee may

17     not have any funding to pursue any Causes of Action, and, therefore, may not be

18     inclined to prosecute aggressively the Causes of Action and even may abandon the

19     Causes of Action.  The Debtor believes that, as a result thereof, the potential value

20     of the Causes of Action in a liquidation would be less than the value thereof in a

21     Chapter 11 case.

22     **(c)      Subsidiary Interests.**  The Debtor believes that the value of the

23     Debtor's primary assets, the Subsidiary Interests, would be substantially higher if

24     the Debtor were reorganized pursuant to the Plan, than if the Case were converted

25     to a Chapter 7 liquidation.

26     (i)      Premium to Be Paid for Subsidiary Interests Under the Plan.

27     In connection with extensive negotiations conducted between the Debtor

28     and the Committee regarding the terms of the Plan, the Debtor has agreed to

-130-

1  pay to the Plan Fund the total amount of $3,660,000 (less Pre-Effective

2  Date Administrative Fee Claims exclusive of the Retainer Balance) in order

3  to fund the Plan for the primary benefit of Class 5 Creditors.  The Debtor

4  believes that such amount exceeds substantially the value of the Subsidiary

5  Interests.[20]  In effect, the Debtor believes that it is paying a substantial

6  premium in the Case in order to retain the Subsidiary Interests and to

7  facilitate the confirmation of the Plan.  The Debtor believes that, if the

8  Debtor's Case were converted to a Chapter 7 liquidation, the Chapter 7

9  trustee would not be in a position to sell or otherwise dispose of the

10  Subsidiary Interests for an amount approximating the amount of the Plan

11  Fund to be established under the Plan.

12          (ii)    Decline in Value of Subsidiary Interests In Chapter 7.  The

13  Debtor believes that, in a Chapter 7 liquidation, the value of the Subsidiary

14  Interests would decline significantly.  The value of the Subsidiary Interests

15  is dependent upon the Subsidiaries' ability to maximize the value of their

16  assets (primarily, the Subsidiaries' accounts receivable and ability to license

17  distribution rights in unsold foreign territories for motion pictures produced

18  by Subsidiaries), and to minimize the amount of their accruing obligations;

19  otherwise, Subsidiaries may not be in a position to make any equity

20  distributions to the Reorganized Debtor on account of the Subsidiary

21  Interests.  The businesses of the Subsidiaries are relatively complex and, to

22  be operated effectively, require management with extensive knowledge of

23  and expertise in such businesses and experience in motion picture

24  production and distribution.  The Debtor assumes that, in a Chapter 7

25  liquidation scenario, there would be little or no involvement by

26  management of the Subsidiaries, and believes that it is very likely that the

27  Chapter 7 trustee would have little or no knowledge of or expertise in the

28

---

[20] The Debtor estimates that the value of the Subsidiary Interests is only about $1,388,725.

1    businesses of the Subsidiaries or experience in motion picture production or

2    distribution.  The Debtor believes that, without the assistance of

3    management of the Subsidiaries, the Chapter 7 trustee would not be in a

4    position to preserve effectively the value of the Subsidiary Interests.[21]  The

5    Debtor projects, therefore, that the value of the Subsidiaries would decline

6    significantly in a Chapter 7 liquidation, and that it is likely that a substantial

7    amount of the value of the Subsidiary Interests would be lost in a Chapter 7

8    liquidation.

9    **2.    Increased Amount of Claims in Liquidation.**

10    As set forth hereinabove, a liquidation of the Debtor's assets may result in a

11    significant reduction of the value of the Debtor's assets.  In a Chapter 7 liquidation,

12    Creditors' interests also would be impaired by the creation of a substantial amount of

13    Claims, including substantial Administrative Claims, that otherwise would not be asserted

14    against the Debtor.

15    In a Chapter 7 case, the trustee would be entitled to seek a sliding scale fee based

16    upon the Cash that would be distributed by the trustee.  In addition, a Chapter 7 trustee

17    would employ Professionals and assistants that would add additional administrative

18    expense that would need to be paid prior to payment of Allowed General Unsecured

19    Claims.  The Debtor and the Committee already have legal counsel who are

20    knowledgeable about the Case and the legal issues concerning the disposition of the

21    Debtor's assets and the resolution of Claims asserted against the Estate; by reason of the

22    knowledge of the Professionals already employed in the Case, they likely can complete the

23    legal work necessary to resolve the Case much more efficiently and economically than a

24

25    [21] For example, without access to the administrative services and other services now provided to the Subsidiaries by
YFG Services and other Yari Affiliates, the Chapter 7 trustee would be required to obtain other sources for such

26    services.  The Debtor believes that the cost of such services from other sources may be significantly higher than the
cost of the services now provided by YFG Services and by other Yari Affiliates, and that it is likely that the

27    Subsidiaries' operations would suffer disruption from the loss of the existing services.  Moreover, the Debtor believes
that it is likely that the Chapter 7 trustee would not have the knowledge of the Subsidiaries' businesses necessary to

28    address the claims of the creditors of the Subsidiaries, including the Guilds, and, accordingly, that the claims asserted
against the Subsidiaries may increase significantly.

-132-

new set of Professionals who would be employed by a Chapter 7 trustee.  Moreover, the Debtor already has access to accounting and administrative personnel who are better qualified to resolve issues related to the maximizing of value of the Debtor's assets than would a Chapter 7 trustee who would have no knowledge or familiarity of such matters.  The costs of familiarizing the Chapter 7 trustee, the trustee's new Professionals, and the trustee's new staff with issues relating to the Case undoubtedly will increase the Administrative Claims that must be paid before payment of Allowed General Unsecured Claims.

In addition to a potentially significant increase in Administrative Claims in the Case associated with the fees and expenses of the Chapter 7 trustee and the Professionals and staff who would be employed by the Chapter 7 trustee, the amount of Claims that would be allowed in the Case may increase in a Chapter 7.  The Chapter 7 trustee would have no knowledge of the Claims asserted against the Debtor, and, without the assistance of the Debtor's management, may not be in a position to evaluate effectively and, if appropriate, to object to Claims.  Moreover, as set forth hereinabove, in any Chapter 7 liquidation, the trustee may not be inclined to prosecute aggressively Causes of Action.  As a result, not only could there be a potential loss in value of Causes of Action, but there could be an increase in Allowed Claims because, by not pursuing aggressively Causes of Action against the holders of Disputed Claims (e.g., setoff claims), Disputed Claims could be allowed in a Chapter 7 that otherwise would not be allowed in the Case.

Although there are difficulties inherent in quantifying, with any exactitude, the recoveries that Creditors would receive in a Chapter 7 liquidation, the Debtor believes that the Liquidation Analysis (Exhibit "5" hereto) provides a fair estimate of the results that would occur in a Chapter 7 liquidation.  The Liquidation Analysis indicates that, in a Chapter 7 liquidation, no Distributions would be paid on account of Allowed General Unsecured Claims.  The Debtor projects that, pursuant to the Plan, approximately $2,519,317 will be paid on account of Allowed General Unsecured Claims.  Moreover, under the Plan, Distributions on account of Allowed Claims are paid expeditiously.  Distributions to satisfy Allowed Administrative Claims will be

MAINDOCS-#158405-v5-PersikFirstAmndDisclosureStatement.DOC

1   paid on or about the Effective Date (projected to occur in or about April 2011) and Distributions

2   to holders of Allowed General Unsecured Claims will commence promptly after the Effective

3   Date, with the maturity date of the Reorganized Debtor Note (unless extended) being January 20,

4   2012.

5     Based on the foregoing, the Debtor believes that the confirmation of the Plan will produce

6   the highest available return to Creditors, and that it will be advantageous to Creditors to have the

7   Case resolved in Chapter 11, rather than in Chapter 7.

8     While the Debtor's conclusions regarding the results of a liquidation scenario are

9   unavoidably speculative and depend upon a number of variables, the Debtor believes that there is

10  a good basis for it to believe that, pursuant to the Plan, Creditors will be able to recover

11  significantly more on account of their Claims, on a much more expeditious basis, than they would

12  recover in a Chapter 7 liquidation.  Accordingly, the Debtor has concluded that the Plan is the best

13  alternative for Creditors, and will maximize recoveries by Creditors.

14  **XIII.**

15  **<u>CERTAIN FEDERAL TAX CONSEQUENCES OF THE PLAN</u>**

16    A.  **<u>Introduction</u>.**

17    The implementation of the Plan may have federal, state and local tax consequences to the

18  Debtor and to the Debtor's Creditors.  No tax opinion has been sought or will be obtained with

19  respect to any tax consequences of the Plan. This Disclosure Statement does not constitute, and is

20  not intended to constitute, either a tax opinion or tax advice to any person, and the summary

21  contained herein is provided for informational purposes only.

22    The discussion below summarizes only certain of the federal income tax consequences

23  associated with the implementation of the Plan.  This discussion does not attempt to comment on

24  all aspects of the federal income tax consequences associated with the Plan, nor does it attempt to

25  consider various facts or limitations applicable to any particular Creditor which may modify or

26  alter the consequences described herein. A Creditor may find that the tax consequences of the Plan

27  to such Creditor differ materially from the tax consequences discussed below because of such

28

1    Creditor's facts and circumstances. This discussion does not address state, local or foreign tax

2    consequences or the consequences of any federal tax other than the federal income tax.

3         The following discussion is based upon the provisions of the Internal Revenue Code, the

4    regulations promulgated thereunder, existing judicial decisions and administrative rulings. In light

5    of the rapidly-changing nature of tax law, no assurance can be given that legislative, judicial or

6    administrative changes will not be forthcoming that would affect the accuracy of the discussion

7    below.  Any such changes could be material and could be retroactive with respect to the

8    transactions entered into or completed prior to the enactment or promulgation thereof.  Moreover,

9    the tax consequences of certain aspects of the Plan are uncertain due to the lack of applicable legal

10   authority and may be subject to judicial or administrative interpretations that differ from the

11   discussion below.

12        CREDITORS ARE ADVISED TO CONSULT WITH THEIR OWN TAX ADVISORS

13   REGARDING THE TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS

14   CONTEMPLATED BY THE PLAN, INCLUDING FEDERAL, STATE, LOCAL AND

15   FOREIGN TAX CONSEQUENCES.

16        **B.**      **Federal Income Tax Consequences to the Debtor.**

17        For federal tax purposes, the Debtor has been treated as an S Corporation since February

18   1987.  S Corporations are corporations that elect to pass corporate income, losses, deductions and

19   credits through to their shareholders.  Since the corporate losses are passed through to the

20   corporation's shareholders, the corporation does not have to address the tax effects and limitations

21   of the carryover of net operating losses.  If a shareholder is allocated an S corporation loss or

22   deduction flow-through, the shareholder must have adequate stock and/or debt basis to claim such

23   loss and/or deduction.  Furthermore, the shareholder must also consider at-risk limitations and

24   therefore may not be able to claim the loss and/or deduction.

25        In this case, consummation of the Plan will substantially reduce the amount of the Debtor's

26   aggregate outstanding indebtedness (any amount of potential discharge of indebtedness for federal

27   income tax purposes will be referred to herein as a "Debt Discharge Amount"). In general, the

28   Internal Revenue Code provides that a taxpayer that realized a discharge of indebtedness must

-135-

include the Debt Discharge Amount in its gross income in the taxable year of discharge to the extent that the Debt Discharge Amount exceeds any consideration given for such discharge. No income from the discharge of indebtedness is realized to the extent that payment of the liability being discharged would have given rise to a deduction.

If a taxpayer is in a Chapter 11 case and the discharge of indebtedness occurs pursuant to a plan approved by the bankruptcy court, such discharge of indebtedness is specifically excluded from the gross income of the debtor.

Accordingly, it is the Debtor's view that the Debtor will not be required to include in income any Debt Discharge Amount as a result of a discharge of debt pursuant to the Plan. The Internal Revenue Code requires certain tax attributes of a debtor to be reduced by the Debt Discharge Amount excluded from income. Tax attributes are reduced in the following order of priority: net operating losses and net operating loss carryovers; general business credits; minimum tax credits; capital loss carryovers; basis of property including subsidiaries of the taxpayer; passive activity loss or credit carryovers; and foreign tax credit carryovers. Tax attributes are generally reduced by one dollar for each dollar excluded from gross income, except that general tax credits, minimum tax credits and foreign tax credits are reduced by approximately 36 cents for each dollar excluded from gross income. Since the Debtor is treated as an S Corporation, the Debtor's tax attributes do not include any carryovers.

Any Claim against the Debtor that is discharged by payment of a Distribution to a Creditor under the Plan will result in the creation of a Debt Discharge Amount, reducing tax attributes to the extent of the basis in such tax attributes.

C.    **Tax Consequences to Creditors.**

A Creditor who receives a Distribution on his or her Claim that is less than such Creditor's adjusted basis in such Claim may be entitled to claim a bad debt deduction for this difference. A bad debt deduction is allowed in the taxable year of the Creditor in which a debt becomes worthless. The Debtor expresses no opinion regarding the date or dates on which Claims discharged under the Plan became or may become worthless.

MAINDOCS-#158405-v5-PersikFirstAmndDisclosureStatement.DOC

1  **CREDITORS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX**

2  **LIABILITIES SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS,**

3  **ATTORNEYS AND/OR OTHER TAX ADVISORS.**  The Debtor CANNOT and DOES  NOT

4  represent that the tax consequences referenced herein are the only tax consequences of the Plan

5  because the Internal Revenue Code embodies many complicated rules which make it difficult to

6  state completely and accurately all of the tax implications of any action.

7  NO TAX ADVICE OF ANY NATURE IS BEING PROVIDED BY THIS DISCLOSURE

8  STATEMENT.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT WITH THEIR

9  OWN ACCOUNTANTS, ATTORNEYS AND/OR OTHER TAX ADVISORS CONCERNING

10  THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES OF THE PLAN.

11  **XIV.**

12  **ALTERNATIVES TO THE PLAN**

13  The Debtor believes that, pursuant to the Plan, the Debtor will make Distributions to

14  Creditors significantly in excess of the value of the Debtor's assets.  The Debtor believes,

15  therefore, that the terms of the Plan are favorable to Creditors and that it is unlikely that any

16  alternative plan or sale transaction can be sourced that will provide to Creditors value in excess of

17  the value that will be provided to them pursuant to the Plan.

18  Notwithstanding the foregoing, as stated in paragraph VIII(DD)(5) hereinabove, the

19  Debtor has authorized the Committee and the Guilds to pursue a process designed to solicit a

20  higher and better offer for the assets of the Debtor and/or the assets of the Subsidiaries.  This

21  process will be run by the Committee and by the Guilds, and not by the Debtor.  However, the

22  Debtor has provided to the Committee and to the Guilds a package of information designed to

23  facilitate a potential buyer's diligence with respect to a potential acquisition of the assets of the

24  Debtor and/or the assets of the Subsidiaries, and the Debtor has agreed to cooperate, and the

25  Debtor has cooperated and will continue to cooperate, with respect to the Debtor's facilitating any

26  and all reasonable diligence requests made by qualified buyers (as determined by the Committee

27  in consultation with the Guilds) who sign a reasonable confidentiality agreement.

28

1  E1 has not yet made any offer, or expressed its intention to make an offer, for the purchase of

2  some or all of the Debtor's assets.  The Debtor will continue to cooperate with E1, however, in any

3  reasonable diligence that E1 desires to perform with respect to the acquisition of assets of the

4  Debtor and/or assets of the Subsidiaries.

## XV.

## RECOMMENDATION

7       The Debtor recommends that all Creditors receiving a Ballot vote in favor of the Plan.  The

8  Debtor believes that the Plan maximizes recoveries to all Creditors and, thus, is in the best

9  interests of Creditors.  The Plan likely will produce Distributions to Creditors in excess of those

10  that would be available if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code, and

11  will minimize delays in recoveries by Creditors.

12  Dated: March //, 2011              **WINTHROP COUCHOT**
                                      **PROFESSIONAL CORPORATION**

                                      By:  _/s/ Robert E. Opera_
                                           Robert E. Opera
                                      Attorneys for Persik Productions, Inc., Debtor and
                                      Debtor-in-Possession

-138-

# EXHIBIT "1"

**Perisk Production, Inc.**
**Net Asset Valuation**
**As of January 20, 2010**

REVISED 4-14-2010

ASSETS
- Cash
- Collection Account - Assets
- Collection Account - IWP
- Accounts Receivable
- Accounts Receivable - Production Accounts
- Year of Account Balance
- Inventory
- Accounts Receivable - Tax Credit

TOTAL ASSETS

SECURED PRODUCTION LOANS
- Secured Production Loans
- Secured Tax Credit Financing

TOTAL SECURED PRODUCTION LOANS

NET VALUE AFTER SECURED DEBT

SECOND PRODUCTION RESIDUALS

NET VALUE AFTER SECURED RESIDUALS

TOTAL SECURED RESIDUALS

OTHER UNSECURED LIABILITIES

TOTAL UNSECURED LIABILITIES

NET EQUITY

PERISK OWNERSHIP INTERESTS

PERISK EQUITY

Perisk Equity plus irrevoceably value, if greater than zero

Revenue Value

NOTES
(1) Excludes contingent liabilities subject to ongoing litigation
(2) Variances of one Trust are contingent on court approval of financing

Cash Collateral
Secured
Unsecured

-140-

REVISED 6-30-2010

Perrin Production, Inc.
Net Asset Valuation
As of January 20, 2010

| | Perfect Entirety | Real Nos Cut | Remaining The Charg | Shortest Participancz | Superatue | Truckbecker | WTBFQ | Consolidated |
|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | |
| Cash | | | | | | | | 8,219 |
| Collection Account - Axsco | | | | | | | | 592,402 |
| Collection Account - EFT | 15,000 | | | | | | | 578,188 |
| Accounts Receivable | (10,000) | 183,094 | 180,900 | 306,906 | 2,453,333 | 121,532 | | (3,192,396) |
| Accounts Receivable - Related | 383,750 | | (180,000) | (30,000) | (375,000) | (170,157) | 9,887 | (2,181,264) |
| Value of Unsold Territories | 342,678 | 722,580 | 183,750 | 323,750 | 496,000 | 30,000 | 720,000 | 5,014,228 |
| Furniture and Fixtures | | | | | | | | 1,543,479 |
| Accounts Receivable - Tax Credit | | | | | | | | 1,162,407 |
| **TOTAL ASSETS** | 805,428 | 1,210,548 | 182,750 | 399,301 | 2,460,133 | 36,306 | 224,897 | 34,391,167 |

| **SECURED PRODUCTION LOANS** | | | | | | | | |
| Second Production Loan | 132,625 | | | | | | | 15,000,837 |
| Second Tax Credit Financing | | | | | | | | 1,350,000 |
| **TOTAL SECURED PRODUCTION DEBT** | 132,625 | | | | 3,250,268 | | | 11,601,837 |
| **NET VALUE AFTER SECURED PRODUCTION LOANS** | 152,625 | 1,210,548 | 182,750 | 399,301 | 3,221,268 | | | 13,776,316 |

| **SECURED RESIDUALS** | | | | | | | | |
| Residual Payable - CGA Union 500 | | | | | | 30,000 | | 492,786 |
| Residual Payable - SAG films 500 | 1,509 | 8,414 | 47,394 | 998,900 | | 1,377 | | 170,188 |
| Residual Payable - WGA 80% films | 502 | | 6,715 | | (519,935) | 18,819 | 1,381,264 | |
| Residual Payable - WGA % films | | 47,294 | | | 40,159 | 1,314 | 989,132,366 | |
| Residual Payable - AFM films (future residuals) | 486 | 29,047 | 24,743 | 98,384 | 147,384 | 2,523 | 3,165 | 28,453 |
| Residual Payable - SAG from 80% thru future residuals | 192 | 13,628 | 21,746 | | | 420 | 1,101 | 526,523 |
| Residual Payable - WGA from 80% thru future residuals | | 13,438 | 3,506 | | | | | 1,707,164 |
| Residual Payable - WGA % future residuals | 17,672 | 30,475 | 3,508 | | 6,508 | 446 | 252,471 | |
| Residual Payable - MPIPH 35% Exclusive weight | | | 7,472 | 221,837 | 8,392 | 3,054 | 44,118 | |
| Residual Payable - AFM from 80% thru future weight | 6,383 | | 341 | | | | | 2,238,680 |
| Residual Payable - SAG all residuals | | | 777 | | 2,205 | 44,281 | | 52,850 |
| Residual Payable - WGA on residuals | | | | | 2,167 | 249,525 | | 6,603 |
| Residual Payable - WGA on resida | | | | 21,653 | 28,428 | | | |
| **TOTAL SECURED RESIDUALS** | 26,328 | 84,161 | 56,154 | 87,450 | 226,697 | 27,181 | 18,853 | 4,901,151 |
| **NET VALUE AFTER SECURED RESIDUALS** | 24,328 | 1,155,249 | 56,154 | 515,253 | (606,416) | 2,443 | 207,012 | 9,965,139 |

| **UNSECURED RESIDUALS** | | | | | | | | |
| Residual Payable - SAG Union 500 | 121,121 | 107,121 | 141,791 | | | | 500 | 156,000 |
| Sales Commission to Current Receivables (net of Allowance) | 182,536 | 169,528 | | | | | 16,500 | 2,560,515 |
| Sales Commission on Unsold Receivables | | 27,561 | 83,110 | 773,375 | 15,627 | 17,500 | 1,431,541 | |
| Participations Payable | | | | 187,294 | (1,464,441) | (13,022) | 149,811 | 4,110,296 |
| Production Loans - Deferred Slate Funds | | 241,548 | 38,792 | | | 74,103 | | 7,411,130 |
| Other Current Liabilities | | | | | | | | |
| **TOTAL OTHER UNSECURED LIABILITIES** | 303,741 | 303,743 | 27,561 | 114,880 | 514,661 | 7,90 | 17,500 | 15,610,000 |
| **TOTAL UNSECURED LIABILITIES** | 303,741 | 761,909 | 218,732 | 164,054 | 773,375 | 16,657 | 17,500 | 20,410,000 |
| **NET EQUITY** | 546,907 | 426,423 | 187,294 | 187,294 | (1,464,441) | (13,022) | 149,811 | (11,159,875) |

| | 100% | 100% | 100% | 100% | 100% | 100% | 33% | |
| **PERRIN'S EQUITY** | 546,907 | 426,423 | (172,544) | 150,794 | (514,661) | 43,147 | | (12,146,129) |
| Beneficiary Value | 100,000 | 200,000 | 200,000 | 180,000 | 280,000 | 100,000 | 40,500 | 4,640,000 |
| Perrin's Equity plus contingency value, if greater than core | 546,907 | 420,423 | 26,214 | 507,294 | (908,810) | 14,675 | 103,547 | 2,433,814 |
| **Revised Value** | 646,000 | 620,000 | 200,000 | 500,000 | 280,000 | 13,000 | 100,000 | 3,790,000 |

**NOTES:**
(1) Certain contingent liabilities subject to separate litigation
(2) Valuation of One Trust Loan is contingent on court approval of

Perrin's Collateral
Secured
Unsecured    24,229    84,031    144,924    87,673    220,697    27,595    18,625    3,200,592
    0    398,061    34,742    34,164    (908,810)    2,344    0    3,200,700

# EXHIBIT "2"

**Perrix Productions, Inc.**
**Net Asset Valuation**
**As of February 15, 2011**

| | Accidental Husband | Addicted | Block Party | Churnscrubber | Crash | Employee of The Month, LLC | First Mr Guilty | First Snow | Gray Matters | Haven |
|---|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | | |
| Cash | 742 | 170 | 295 | 427 | 26 | 765 | 207 | 430 | 19 | 59 |
| Collection Account - Apollo | | | | | 270,263 | | | | | |
| Collection Account - BYP | | | | | 674,632 | | | | | |
| Accounts Receivable | 4,554,443 | 1,668,396 | 287,273 | 7,474 | 929,519 | 2,996 | 7,400 | 19,100 | 2,910 | 24,189 |
| Allowance for Doubtful Accounts | (330,512) | (76,896) | | 1,944 | | | 10,875 | 54,025 | 18,533 | 86,323 |
| Value of Unsold Territories | 77,500 | 192,500 | 15,000 | 375 | | 3,213 | 111,125 | 18,125 | 11,169 | 1,763 |
| Foreclosed Royalties | | | 2,158,604 | | 7,500,000 | 128,500 | | | | |
| Accounts Receivable - Tax Credit | 1,692,437 | | 100,000 | 23,505 | 400,000 | | 111,250 | 181,250 | 223,750 | 35,250 |
| **TOTAL ASSETS** | 5,992,610 | 1,912,170 | 160,235 | 2,327 | 1,874,534 | 132,261 | 111,417 | 228,680 | 223,769 | 1,022,839 |
| **SECURED PRODUCTION LOANS** | | | | | | | | | | |
| Secured Production Loans | 3,000,000 | | | | | | | | | |
| Secured Tax Credit Financing | 1,500,000 | | | | | | | | | |
| **TOTAL PRE-PETITION PRODUCTION LOANS** | 4,500,000 | | | | | | | | | |
| **NET VALUE AFTER SECURED PRODUCTION LOANS** | | | | | | | | | | |
| **TOTAL POST PETITION RESIDUALS ON RECEIVABLES AND UNSOLD** | 280,613 | 77,413 | 160,235 | 241 | 1,307 | 14,280 | 7,260 | 26,437 | 9,876 | 22,635 |
| **NET VALUE AFTER SECURED RESIDUALS** | | | | | | | | | | |
| **TOTAL PRE-PETITION SECURED DEBT** | | | | | | | | | | |
| **NET VALUE AFTER SECURED DEBT** | 842,307 | 1,344,747 | 160,235 | 2,446 | 1,673,127 | 116,916 | 104,232 | 200,243 | 213,894 | 1,059,395 |
| **TOTAL PRE-PETITION UNSECURED RESIDUALS** | 859,071 | 87,711 | 100,295 | 82,065 | 246,541 | 33,766 | 316,357 | 313,393 | 24,148 | — |
| **OTHER UNSECURED LIABILITIES** | | | | | | | | | | |
| Accounts Payable | 54,415 | 2,900 | 287,273 | 7,474 | 246,534 | 3,678 | 7,400 | 19,100 | 2,910 | 24,189 |
| Sales Commission Payable | 578,945 | 349,500 | | 1,944 | 738 | 385 | 10,875 | 54,025 | 18,533 | 86,323 |
| Sales Commission Unpaid and Forecasted Royalties | 11,825 | 38,500 | 15,000 | 375 | 10,000 | 3,213 | 111,125 | 18,125 | 11,169 | 1,763 |
| Participations Payable | | | 2,158,604 | 23,505 | 7,500,000 | | | | | |
| Residuals Payable AFM and Intra SSSB | | | | | | 44,506 | | | | |
| Residuals Payable - AFM from receivables | | | | 455 | | 5,160 | | | | |
| Production Loans - Inventory / German Funds | | | | | | | | | | |
| Residuals Payable - AFM from receivables | | | 1,146,125 | 1,485,000 | | | 1,469,002 | 1,614,352 | 276,319 | |
| Contingent Obligation - E1 | | | | | | | | | | |
| **TOTAL OTHER UNSECURED LIABILITIES** | 223,224 | 160,291 | 100,295 | 144,519 | 195,487 | 84,231 | (211,138) | 200,462 | 189,746 | 199,071 |
| **TOTAL UNSECURED LIABILITIES** | 844,885 | 410,900 | 3,584,202 | 1,616,751 | 7,765,272 | 3,678 | 111,417 | 1,107,202 | 309,649 | 114,975 |
| **TOTAL UNSECURED LIABILITIES** | 844,885 | 873,951 | 3,584,202 | 1,663,276 | 7,566,729 | 65,276 | 1,548,238 | 1,507,664 | 385,404 | 313,945 |
| **NET EQUITY** | (231,641) | 1,093,046 | (3,483,907) | (1,722,684) | (6,520,393) | 24,946 | (1,759,373) | (1,399,720) | (171,648) | 745,461 |
| **PERRIX'S OWNERSHIP INTERESTS** | 100% | 100% | 100% | 100% | 50% | 100% | 100% | 100% | 100% | 100% |
| **PERRIX'S EQUITY** | (231,641) | (3,483,907) | | (1,722,684) | (1,360,146) | 24,443 | (1,759,373) | (1,319,720) | (171,648) | 746,461 |
| Reversionary Value | 200,000 | 160,000 | 160,000 | 100,000 | 300,000 | 100,000 | 200,000 | 100,000 | 100,000 | 100,000 |
| Perrix's Equity plus reversionary value, if greater than zero | | | Copyright owned by German Fund | | Copyright owned by German Fund | | Copyright owned by German Fund | Copyright owned by German Fund | | |
| Less: Guild obligation on reversionary values | | | | | | | | | | |
| Less: Reserve for Litigation Loans | | | | | | | | | | |
| **NET ASSET VALUE** | 0 | 1,353,045 | 0 | 0 | 0 | 124,146 | 0 | 0 | 0 | 846,461 |

Perstix Productions, Inc.
Net Asset Valuation
As of February 15, 2011

Copyright owned by Gemini I

| | Henx | House of D. LLC | Blashelli | In the Shadows | Jumpaled Even Money | Makin' It Old Skool | Lonely Maiden | for Bobby Long | NBTF | One Train Later | Pained Vail | Perfect Holiday |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | | | | |
| Cash | 55 | 825 | 460 | | 1,356 | 20 | 244 | 21 | 2 | 1,463 | 20 | 861 |
| Collection Account - Apollo | | | | | | | | | | | | |
| Collection Account - BP2 | | | | | | | | | | | | |
| Accounts Receivable | 206,933 | 26,000 | 286 | | 120,004 | 76,000 | 225,000 | 3,022 | | 574,700 | | 4,400 |
| Allowance for Doubtful Accounts | | (25,000) | | | (66,004) | (25,000) | | | | | | 13,215 |
| Value of Unsold Territories | 68,750 | 60,000 | 35,000 | 25,100 | 207,500 | 507,500 | 748,290 | 83,750 | | 2,705,000 | 132,750 | 64,750 |
| Forecasted Royalties | | | 106,000 | | | | | | | | | |
| Accounts Receivable - Tax Credit | | | | | | | | | 1,250,705 | | | |
| **TOTAL ASSETS** | 195,738 | 66,625 | 135,778 | 125,500 | 263,559 | 316,520 | 971,494 | 83,771 | 7,234,307 | 3,281,163 | 122,770 | 349,651 |
| **SECURED PRODUCTION LOANS** | | | | | | | | | | | | |
| Secured Production Loans | | | | | | | | | 1,466,177 | | | |
| Secured Tax Credit Financing | | | | | | | | | | | | |
| **TOTAL SECURED PRODUCTION LOANS** | 15,978 | 7,524 | 1,328 | | | 16,073 | 1,496,177 | 9,286 | 2,313,689 | 77,661 | 4,380 | 14,276 |
| **NET VALUE AFTER SECURED RESIDUALS** | 195,718 | 66,625 | 133,776 | 125,500 | 263,559 | 316,520 | 971,494 | 83,771 | 2,313,689 | 3,281,163 | 122,770 | 349,651 |
| **TOTAL PRE-PETITION SECURED RESIDUALS** | 179,740 | 53,291 | 134,450 | 116,500 | 31,614 | 342,447 | (640,824) | 74,476 | 1,587,661 | 885,903 | 118,412 | 335,175 |
| **TOTAL PRE-PETITION RESIDUALS ON RECEIVABLES AND UNSOLDS** | 1,924,288 | 111,927 | 727,464 | | 296,287 | 61,783 | 81,783 | 73,422 | 128,266 | | 148,240 | 3,115 |
| **NET VALUE AFTER SECURED DEBT** | (744,535) | (58,636) | (591,014) | 116,500 | (251,173) | 343,447 | (722,007) | 130,214 | 1,464,795 | 885,903 | (28,828) | 332,560 |
| **NET VALUE AFTER SECURED RESIDUALS** | 772,199 | 190,931 | | 116,500 | 251,370 | 72,482 | 14,718 | 130,214 | 26,677 | 889,903 | 469,166 | |
| **TOTAL PRE-PETITION UNSECURED RESIDUALS** | | | | | | | | | | | | |
| **OTHER UNSECURED LIABILITIES** | | | | | | | | | | | | |
| Accounts Payable | 7,222 | | 15,781 | | 16,970 | 18,454 | 237,747 | 3,022 | 15,623 | | 6,600 | 4,400 |
| Sales Commission Payable | | 5,125 | | | 4,997 | | 184,520 | | 311,700 | | | 13,215 |
| Sales Commission Unsold and Forecasted Royalties | 1,375 | 3,000 | | 25,100 | 5,189 | 61,500 | 149,250 | 12,063 | 96,500 | 108,200 | 4,950 | 64,750 |
| Participations Payable | | 2,900,000 | | | | | | | | | | |
| Residuals Payable AFM thru 6/30/09 | | 15,726 | | | | | | | | | | |
| Residuals Payable AFM thru 7/02/10 | | 15,579 | | | 28,398 | | | | | | | |
| Residuals Loans - Investors / Gorham Funds | 93,406 | 1,200 | | | 4,555 | | | | | | | |
| Production Loans - AFM from receivables | 35,373 | | | | 11,500 | | | | | | | |
| Contingent Obligation - Z1 | 400 | | | | 901,840 | | | | | | | |
| **TOTAL OTHER UNSECURED LIABILITIES** | 137,776 | 40,659 | 2,821,151 | 981,190 | 1,185,770 | 1,395,625 | 825,108 | 16,585 | 627,441 | 108,200 | 10,669 | 87,465 |
| **TOTAL UNSECURED LIABILITIES** | 909,977 | 221,660 | 2,821,151 | 25,100 | 1,185,770 | 1,952,241 | 1,411,344 | 135,733 | 947,520 | 108,200 | 419,744 | 87,465 |
| **NET EQUITY** | (1,464,572) | (280,284) | (3,414,176) | 100,400 | (1,431,342) | (1,142,793) | (2,153,351) | (134,746) | 611,276 | 781,703 | (448,973) | 244,786 |
| **PERSTIX'S OWNERSHIP INTERESTS** | 100% | 50% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 30% | 100% | 100% |
| **PERSTIX'S EQUITY** | (1,464,572) | (140,141) | (3,414,176) | 100,400 | (1,431,342) | (1,142,793) | (2,153,351) | (134,746) | 611,276 | 234,511 | (448,973) | 244,786 |
| Reversionary Value | 200,000 | 50,000 | 400,000 | | 100,000 | 100,000 | 200,000 | 180,000 | 100,000 | 0 | 200,000 | 100,000 |
| Inventory Value | | | | 104,400 | | | | | | | | |
| Perstix's Equity plus reversionary value, if greater than zero | 0 | 0 | 0 | 104,400 | 0 | 0 | 0 | 0 | 711,276 | 234,511 | 0 | 344,786 |
| Less: Guild obligation on reversionary values | | | | | | | | | | | | |
| Less: Reserve for Litigation Costs | | | | | | | | | | | | |
| **NET ASSET VALUE** | | | | | | | | | | | | |

Perpis Production, Inc.
Net Asset Valuation
As of February 15, 2011

| | Real Mkt Div | Resurrecting The Champ | Shortcut To Happiness | Supheros | Sisario | Thumbsucker | WTRFG | Consolidated |
|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | |
| Cash | 36 | 64 | 762 | 64 | | | | 8,690 |
| Collection Account - Apollo | | | | | | | | 270,263 |
| Collection Account - BYP | | | | | | | | 974,532 |
| Accounts Receivable | 916,997 | 190,000 | 297,000 | 765,318 | | | 10,100 | 12,183,482 |
| Allowance for Doubtful Accounts | | (122,400) | (25,000) | (598,818) | | | | (1,678,625) |
| Value of Unsold Territories | 722,500 | 163,750 | 245,000 | 450,000 | | 30,000 | 217,500 | 8,100,500 |
| Forecasted Royalties | | | | | | | | 600,000 |
| Accounts Receivable - Tax Credit | | | | | | | | 1,502,437 |
| **TOTAL ASSETS** | 1,639,533 | 231,834 | 517,762 | 618,564 | - | 39,600 | 227,600 | 22,041,166 |
| **TOTAL POST PETITION RESIDUALS ON RECEIVABLES AND UNSOLDS** | 61,061 | 6,073 | 27,821 | 122,928 | - | 2,160 | 10,760 | 1,235,074 |
| **SECURED PRODUCTION LOANS** | | | | | | | | |
| Secured Production Loans | | | | 830,737 | | | | 7,646,603 |
| Secured Tax Credit Financing | | | | | | | | 1,500,000 |
| **TOTAL SECURED PRODUCTION LOANS** | | | | 830,737 | | | | 9,146,603 |
| **NET VALUE AFTER SECURED DEBT** | 1,578,472 | 243,761 | 489,941 | (204,173) | - | 27,440 | 216,840 | 11,677,471 |
| **SECURED PRE-PETITION LIENS** | | | | | | | | |
| Secured Commission Liens | 15,950 | 2,200 | 4,250 | 10,325 | - | 2,700 | 5,015 | 1,016,277 |
| Sales Commission Unpaid and Forecasted Royalties | 133,938 | 10,000 | 83,198 | 418,663 | | 760 | 16,313 | 22,522,618 |
| Participations Payable | 180,935 | 27,003 | 49,000 | 90,000 | | | | 1,027,694 |
| Residuals Payable-AFM thru SAG8 | | | | | | | | 12,451,599 |
| Residuals Payable-AFM thru IQ010 | | | | | | | | 206,729 |
| Residuals Payable - AFM non receivables | | | | | | | | 46,773 |
| Production Loans - Investors / Germain Funds | | | | | | | | 17,800 |
| | | | | | | | | 7,813,443 |
| Contingent Obligation - E1 | 255,554 | | | 494,619 | | | | 2,070,006 |
| **TOTAL PRE-PETITION SECURED RESIDUALS** | 3,418 | 174,435 | 11,752 | (443,287) | - | (31,666) | 209,761 | 5,110,151 |
| **NET VALUE AFTER SECURED RESIDUALS** | 1,643,393 | 57,991 | 466,338 | (443,287) | - | (31,666) | 209,761 | 7,047,084 |
| **OTHER UNSECURED LIABILITIES** | | | | | | | | |
| Accounts Payable | | | | | | | | |
| **TOTAL OTHER UNSECURED LIABILITIES** | 693,567 | 35,663 | 115,446 | 1,008,806 | - | 3,460 | 21,328 | 26,742,474 |
| **TOTAL UNSECURED LIABILITIES** | 693,165 | 214,799 | 128,338 | 1,008,806 | - | 113,863 | 21,328 | 28,852,661 |
| **NET EQUITY** | 851,598 | (157,206) | 228,190 | (1,489,088) | - | (161,619) | 188,424 | (22,745,641) |
| **PERKINS OWNERSHIP INTERESTS** | 100% | 100% | 100% | 100% | 100% | 100% | 33% | |
| **PERKINS EQUITY** | 833,594 | (157,206) | 228,610 | (1,489,088) | 0 | (161,619) | 62,741 | (20,016,129) |
| Reversionary Value | 200,000 | 200,000 | 160,000 | 200,000 | | 100,000 | 40,000 | 3,840,000 |
| Less: Guild obligation on reversionary values | | | | | | | | (851,000) |
| Less: Reserve for Litigation Costs | | | | | | | | (260,000) |
| **NET ASSET VALUE** | 1,013,598 | 42,794 | 478,610 | (1,269,088) | 0 | 0 | 102,741 | 1,318,757 |

Perisik Productions, Inc.
Net Asset Valuation
Detail of Residuals
As of February 15, 2011

| | Accidental Husband | Addicted | Block Party | Chumscrubber | Creash | Employee of The Month, LLC | Find Me Guilty | First Snow | Gray Matters | Haven | Hoax |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **POST-PETITION RESIDUALS ON RECEIVABLES AND UNSOLDS** | | | | | | | | | | | |
| Residuals Payable - DGA from receivables - SECURED | 41,225 | 19,845 | | 12,740 | 28,112 | | | | | | 130,488 |
| Residuals Payable - SAG from receivables - SECURED | 123,874 | | | 1,911 | 4,217 | | | | | | 26,098 |
| Residuals Payable - WGA from receivables - SECURED | 41,225 | | | 38,219 | 84,337 | | | | | | 391,463 |
| Interest calculated at 1% | | | | 3,733 | 12,651 | 26,281 | 150,776 | 117,166 | 55,122 | 110,801 | 78,553 |
| Residuals Payable - DGA on unsold - SECURED | 898 | 3,080 | | | 28,112 | 3,792 | 255,155 | 239,433 | 7,024 | 22,160 | 130,488 |
| Residuals Payable - SAG on unsold - SECURED | 2,393 | | | 33 | 4,217 | | 41,067 | 39,055 | | | 130,488 |
| Residuals Payable - WGA on unsold - SECURED | 699 | | | 99 | 28,112 | | 8,317 | 17,671 | 17,005 | | 44,712 |
| Interest calculated at 1% | | | | | 15,322 | | 648 | 3,574 | 1,192 | | 3,129 |
| Residuals Payable - DGA on unsold - SECURED | 109,740 | 55,593 | | 660 | 1,226 | 5,035 | 648 | 7,811 | | 4,793 | 132,336 |
| Residuals Payable - SAG from receivables - UNSECURED | 27,872 | 19,845 | | 53 | 45,907 | | 24,233 | 18,476 | 14,605 | | 10,287 |
| Residuals Payable - WGA from receivables - UNSECURED | 19,845 | | | 1,979 | 3,677 | 4,340 | 1,935 | 1,316 | 1,192 | | 44,112 |
| Residuals Payable - MPIPH from receivables - UNSECURED | | | | 158 | 15,322 | 347 | 8,078 | 5,482 | | | 3,129 |
| Residuals Payable - SAG on unsold - UNSECURED | | | n/a | | 1,226 | | 646 | 459 | 100 | | 125 |
| Residuals Payable - WGA on unsold - UNSECURED | | | | 132 | 602 | | 2,663 | 2,360 | | 260 | 1,976 |
| Residuals Payable - WGA on unsold - UNSECURED | | | | 20 | 60 | 30 | 646 | 724 | | 52 | 315 |
| Residuals Payable - MPIPH on unsold - UNSECURED | | | | 396 | 1,221 | 5 | 7,926 | 145 | 132 | | 528 |
| Interest calculated at 1% | | | | 59 | 160 | | 1,585 | 240 | | | 105 |
| | | | | | 452 | | 2,643 | | | | |
| | | | | | 60 | | 629 | | | | |
| **TOTAL POST-PETITION RESIDUALS ON RECEIVABLES AND UNSOLDS** | 209,613 | 77,423 | - | 261 | 1,207 | 14,386 | 7,281 | 26,427 | 9,275 | 12,933 | 14,176 |
| **PRE-PETITION SECURED RESIDUALS** | | | | | | | | | | | |
| Residuals Payable - DGA thru 909 | | | | | 246,891 | | | | | | |
| Interest calculated at 1% | | | | | | | | | | | |
| Residuals Payable - SAG thru 908 | | | 141,550 | 129,506 | | 37,822 | 175,749 | | | 273,694 | |
| Interest calculated at 1% | | | | | | 8,427 | | | | | |
| Residuals Payable - WGA thru 908 | | | | | | 1,564 | | | | | |
| Interest calculated at 1% | | | | | | | | | | | |
| Residuals Payable - SAG on unsold - DGA | 109,742 | 93,510 | | | | | | | | | |
| Interest calculated at 1% | 2,195 | 1,673 | | | | | | | | | |
| Additional adjustment per 909 audit - SAG | 339,219 | 60,355 | | | | | | | | | |
| Interest calculated at 1% | 6,564 | 1,328 | | | | | | | | | |
| Additional adjustment per 909 audit - WGA | 109,740 | | | | | | | | | | |
| Interest calculated at 1% | 2,195 | | | | | | | | | | |
| **TOTAL PRE-PETITION SECURED RESIDUALS** | 575,673 | 157,091 | | 62,060 | 246,891 | 33,783 | 316,387 | 212,299 | 24,148 | 198,071 | 1,024,785 |
| **PRE-PETITION UNSECURED RESIDUALS** | | | | | | | | | | | |
| Residuals Payable - SAG thru 908 | | | | | | | | | | | |
| Interest calculated at 1% | | | | | | | | | | | |
| Residuals Payable - MPIPH thru 908 | | | | | | | | | | | |
| Residuals Payable - WGA thru 908 | | | 2,869 | 66,951 | | 6,811 | 24,713 | 6,981 | | 2,313 | 108,605 |
| Interest calculated at 1% | | | | | | 1,447 | | | | | |
| Residuals Payable - MPIPH thru 1/20/10 | | | | | | 116 | | | | | |
| Additional adjustment per 909 audit - WGA | | | | | | | | | | | |
| Interest calculated at 1% | | | | | | | | | | | |
| Additional adjustment per 909 audit - DGA | | | | | | | | | | | |
| Interest calculated at 1% | | | | | | | | | | | |
| Residuals Payable - MPIPH thru 1/20/10 | | | | | | 10 | | | | 1,173 | |
| Interest calculated at 1% | | | | | | 2 | | | | 235 | |
| **TOTAL PRE-PETITION UNSECURED RESIDUALS** | 163,091 | | - | 144,519 | 135,417 | 66,698 | - | 200,462 | 99,559 | 198,071 | 772,798 |

1 of 3

Persik Productions, Inc.
Net Asset Valuation
Detail of Residuals
As of February 15, 2011

| | Haunts of D, LLC | Illusionist | In the Shadows | Jumpshot / Even Money | Kicki'n It Old School | Lonely Maiden | Love Song for Bobby Long | NBT | One Train Later | Painted Veil | Perfect Holiday | Real Men Cry |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **POST PETITION RESIDUALS ON RECEIVABLES AND UNSOLDS** | | | | | | | | | | | | |
| Residuals Payable - DGA on receivables - SECURED | | | | 21,020 | | 10,321 | | 18,040 | | | | 4,448 |
| Residuals Payable - SAG from receivables - SECURED | | 320 | | 63,000 | | 30,954 | | 54,101 | | | | 13,464 |
| Residuals Payable - WGA from receivables - SECURED | 792 | 600 | | 21,020 | | 10,321 | | 18,040 | | | | |
| Residuals Payable - DGA on unsolds - SECURED | 2,370 | 320 | | 3,931 | | 9,203 | 5,381 | 6,303 | 38,780 | 101,301 | 1,815 | 9,369 |
| Residuals Payable - SAG on unsolds - SECURED | | | | 16,359 | | 27,606 | | 18,609 | 38,780 | 20,260 | 355 | 28,187 |
| Residuals Payable - WGA on unsolds - SECURED | | | | 3,931 | | 9,203 | | 6,303 | | | 695 | |
| Residuals Payable - SAG from receivables - UNSECURED | | | | | 177 | | | | | | 121 | |
| Residuals Payable - WGA from receivables - UNSECURED | | | | | 144 | | | | | | | |
| Residuals Payable - MPIPH from receivables - UNSECURED | | | | 94,500 | 118 | 9,474 | | 14,400 | 1,159 | 43,044 | 1,815 | 10,707 |
| Residuals Payable - SAG on unsolds - UNSECURED | | | | | 7,665 | | | | | 3,444 | 355 | 3,559 |
| Residuals Payable - WGA on unsolds - UNSECURED | 702 | | | | 3,887 | | 1,094 | 2,040 | | 24,449 | 140 | 1,802 |
| Residuals Payable - MPIPH on unsolds - UNSECURED | 3,564 | | | 15,890 | 3,112 | 8,447 | 4,921 | 5,031 | | 1,556 | 12 | 3,791 |
| **TOTAL POST PETITION RESIDUALS ON RECEIVABLES AND UNSOLDS** | 7,514 | 1,235 | - | 233,943 | 15,975 | 115,541 | 9,396 | 141,146 | 77,561 | 4,155 | 14,276 | 61,061 |
| **PRE-PETITION SECURED RESIDUALS** | | | | | | | | | | | | |
| Residuals Payable - DGA thru 9/08 | 21,768 | 141,467 | | 41,098 | 15,381 | | | | | 178,347 | | |
| Interest calculated at 1% | 3,265 | 28,293 | | 8,218 | 3,076 | | | | | 35,669 | | |
| Residuals Payable - WGA thru 9/08 | 85,304 | 118,427 | | 123,254 | 12,543 | | 82,894 | | | 101,301 | | |
| Interest calculated at 1% | 9,706 | 24,653 | | 24,651 | 2,509 | | 8,449 | | | 20,260 | | |
| Residuals Payable - SAG thru 9/08 | | 141,467 | | 41,098 | 9,462 | | | | | 43,044 | | 8,475 |
| Interest calculated at 1% | | 28,293 | | 8,218 | 16,937 | | | | | 3,444 | | 170 |
| Residuals Payable - DGA thru 1/20/10 | 2,010 | 31,499 | | 7,328 | 1,350 | 18,095 | | 25,150 | | 24,449 | | 23,425 |
| Interest calculated at 1% | 161 | 2,520 | | 586 | 5,987 | 321 | 851 | 503 | | 1,957 | | 509 |
| Residuals Payable - SAG thru 1/20/10 | 5,031 | 160,313 | | 21,931 | 470 | 45,107 | | 74,451 | | | | |
| Interest calculated at 1% | 482 | 13,065 | | 1,738 | 4,333 | 962 | 126 | 1,509 | | | | |
| Additional adjustment per 908 audit - DGA | | 31,499 | | 7,327 | | 16,038 | | 24,550 | | | | |
| Interest calculated at 1% | | 2,520 | | 596 | | 321 | | 503 | | | | |
| Additional adjustment per 908 audit - SAG | 677 | 415 | | 32 | | | | | 219 | 385 | 4 | |
| Interest calculated at 1% | 162 | 415 | | 16 | | | | | 44 | 77 | 4 | |
| Additional adjustment per 908 audit - WGA | 2,027 | 70 | | 32 | | | | | | 219 | | |
| Interest calculated at 1% | 304 | 415 | | 0 | | | | | | 44 | | |
| **TOTAL PRE-PETITION SECURED RESIDUALS** | 111,527 | 727,464 | - | 246,207 | 72,442 | 81,743 | 73,422 | 124,266 | 144,240 | 3,116 | 34,079 | |
| **PRE-PETITION UNSECURED RESIDUALS** | | | | | | | | | | | | |
| Residuals Payable - SAG thru 9/08 | 61,747 | | | 171,397 | | | 20,889 | | | | | |
| Interest calculated at 1% | 9,282 | | | | | | 3,155 | | | | | |
| Residuals Payable - MPIPH thru 9/08 | 97,253 | | | | | | 31,467 | | | | | |
| Interest calculated at 1% | | | | | | | | | | | | |
| Residuals Payable - SAG thru 1/20/10 | 2,010 | | | | | | 384 | | | | | |
| Interest calculated at 1% | 161 | | | | | 14,719 | 31 | 20,077 | | | | 3,418 |
| Additional adjustment - MPIPH thru 1/20/10 | 9,647 | | | 22,973 | 4,333 | | 94,270 | | | | | |
| **TOTAL PRE-PETITION UNSECURED RESIDUALS** | 180,181 | - | - | 214,370 | 72,442 | 14,719 | 180,214 | 20,077 | - | - | - | 3,418 |

Persik Productions, Inc.
Net Asset Valuation
Detail of Residuals
As of February 15, 2011

| | Resurrecting The Champ | Shortcut To Happiness | Sophomore | (2) Dueno | Thunderstucker | WTRFG | Consolidated |
|---|---|---|---|---|---|---|---|
| **POST-PETITION RESIDUALS ON RECEIVABLES AND UNSOLDS** | | | | | | | |
| Residuals Payable - DGA from receivables - SECURED | - | 9,900 | 23,917 | | 9,425 | 50 | 139,276 |
| Residuals Payable - SAG from receivables - SECURED | | | 71,751 | | 1,414 | 240 | 370,315 |
| Residuals Payable - WGA from receivables - SECURED | | | | | 40,348 | | 91,640 |
| Interest calculated at 1 % | | | | | 6,052 | | |
| Residuals Payable - DGA on unsolds - SECURED | 2,079 | 11,655 | 6,588 | | 135 | 2,610 | 87,381 |
| Residuals Payable - SAG on unsolds - SECURED | 2,079 | | 19,764 | | 810 | 7,650 | 188,245 |
| Residuals Payable - WGA on unsolds - SECURED | | | | | | | 79,578 |
| Interest calculated at 1 % | | | | | | | |
| Residuals Payable - SAG from receivables - UNSECURED | | | | | | | 46,829 |
| Residuals Payable - WGA from receivables - UNSECURED | | | | | | | 20,389 |
| Residuals Payable - WPPH from receivables - UNSECURED | | 3,300 | 38,262 | | | | 123,035 |
| Residuals Payable - SAG on unsolds - UNSECURED | | | 765 | | | | 27,085 |
| Residuals Payable - WGA on unsolds - UNSECURED | 3,764 | 2,090 | 114,786 | | | | 14,677 |
| Residuals Payable - WPPH on unsolds - UNSECURED | 151 | | 2,298 | | | | 70,696 |
| **TOTAL POST-PETITION RESIDUALS ON RECEIVABLES AND UNSOLDS** | 8,073 | 27,841 | 112,235 | - | 2,140 | 10,760 | 1,233,078 |
| | | | | | | | |
| **PRE-PETITION SECURED RESIDUALS** | | | | | | | |
| Residuals Payable - DGA thru 9/29 | 58,913 | | | | | 433 | 586,232 |
| Interest calculated at 1 % | 11,723 | | | | | 87 | 113,544 |
| Residuals Payable - WGA thru 9/29 | | 9,784 | | | | 1,181 | 1,210,359 |
| Interest calculated at 1 % | | 1,997 | | | | 236 | 225,048 |
| Residuals Payable - WGA thru 9/09 | 58,813 | | | | | | 498,895 |
| Interest calculated at 1 % | 11,723 | | | | | | 98,302 |
| Residuals Payable - DGA thru 1/20/10 | 20,422 | | | | | 1,181 | 419,767 |
| Interest calculated at 1 % | 1,535 | | | | | 90 | 17,889 |
| Residuals Payable - SAG thru 1/20/10 | 20,432 | 19,559 | | | | 3,600 | 1,033,800 |
| Interest calculated at 1 % | 1,933 | 1,565 | | | | 288 | 47,194 |
| Interest calculated at 1 % | 735 | | na | | | | 286,617 |
| Residuals Payable - WGA thru 1/20/10 | 147 | | | | 2,315 | | 13,794 |
| Additional adjustment per 908 audit - DGA | | 141 | | | | | 8,096 |
| Interest calculated at 1 % | | 28 | | | | | 1,006 |
| Additional adjustment per 908 audit - SAG | 735 | | | | 6,942 | | 21,409 |
| Interest calculated at 1 % | 147 | | | | | | 2,711 |
| Additional adjustment per 908 audit - WGA | | | | | | | 5,125 |
| Interest calculated at 1 % | | | | | | | 931 |
| **TOTAL PRE-PETITION SECURED RESIDUALS** | 185,188 | 33,073 | 155,109 | - | 66,496 | 7,079 | 4,595,414 |
| | | | | | | | |
| **PRE-PETITION UNSECURED RESIDUALS** | | | | | | | |
| Residuals Payable - SAG thru 908 | 105,296 | | | | | | 444,947 |
| Interest calculated at 1 % | 21,299 | | 3,260 | | | | 208,179 |
| Residuals Payable - WGA thru 908 | | | 632 | | | | 37,082 |
| Interest calculated at 1 % | | | | | | | |
| Residuals Payable - WPPH thru 908 | 4,050 | | | | 108,413 | | 1,479,610 |
| Residuals Payable - SAG thru 1/20/10 | 36,803 | | | | | | 265,109 |
| Interest calculated at 1 % | 2,944 | | | | | | 15,599 |
| Residuals Payable - WGA thru 1/20/10 | | 6,521 | | | | | 107,191 |
| Residuals Payable - WPPH thru 1/20/10 | 1,486 | 1,304 | | | | | 461,974 |
| Interest calculated at 1 % | | | | | | | 5,374 |
| Additional adjustment per 908 audit - SAG | 1,330 | 46 | | | | | 3,146 |
| Interest calculated at 1 % | 205 | 9 | | | | | 630 |
| Additional adjustment per 908 audit - WGA | | | | | | | 862 |
| Interest calculated at 1 % | | | | | | | 166 |
| **TOTAL PRE-PETITION UNSECURED RESIDUALS** | 174,416 | 11,772 | - | - | 108,413 | - | 3,116,131 |

3 of 3

Persik Productions, Inc.
Footnotes to Net Asset Valuation
As of February 15, 2011

(1) Debtor has entered into a settlement agreement with Alliance Atlantis that includes minimum payments $850,000. This settlement agreement will also release certain subsidiaries from claims by Alliance Atlantis. This settlement agreement has been included in the Net Asset Valuation.

(2) Debtor has a preliminary agreement with the Guilds' pre-petition secured claims of $2,350,000. However, the conclusion of this settlement agreement is uncertain at this time. Therefore, such settlement has not included in this Net Asset Valuation.

(3) Entertainment 1 has filed claims against various subsidiaries along with the Debtor. These contingent claims have been included in the Net Asset Valuation.

(4) The values of unsold territories have deteriorated significantly over the past year. However, the decrease in such values have not been included in this Net Asset Valuation as the amount of such decrease is speculative at this time

(5) The Guilds will be entitled to residuals on the reversionary values. The Net Asset Valuation provided to the Salter Group did not account for this obligation. This obligation is estimated at $591,000 using a blended rate between home video and television of 15%. This reserve has been included in this Net Asset Valuation.

(6) Certain litigation will continue with the respective subsidiaries post confirmation. Therefore, a litigation reserve of $250,000 has been included in this Net Asset Valuation.

(7) The Secured Production Loan on Lonely Maiden is cross-collateralized with NBTT and Real Men Cry. Therefore, the Net Asset Valuation is impacted by the valuatoin of Lonely Maiden.

(8) The Secured Production Loan on Sophomore is cross-collateralized with Addicted. Therefore, the Net Asset Valuation is impacted by the valuation of Sophomore.

# EXHIBIT "3"

**Persik Productions, Inc**

**Contracted Sales - Expiration Dates**

| Licensee Name | Execution Date | Property/Title | License Territories | Start | | Exp | Expiration From |
|---|---|---|---|---|---|---|---|
| Magna Home Entertainment Pty Ltd. (former) | 7/27/2009 | ACCIDENTAL HUSBAND | Australia | Execution | Spec'd | 7/22/2019 | Def'd | 10 years from Notice of Initial Delivery |
| BELGA FILMS S.A. | 9/21/2006 | ACCIDENTAL HUSBAND | Benelux | Execution | Spec'd | 3/28/2020 | Def'd | 12 years from Notice of Initial Delivery |
| P.A. PICTURES WORLDWIDE C.V. | 7/9/2007 | ACCIDENTAL HUSBAND | Brazil | Execution | Spec'd | 3/28/2021 | Def'd | 14 years from Notice of Initial Delivery |
| MOTION PICTURE DISTRIBUTION LP | 12/20/2006 | ACCIDENTAL HUSBAND | Canada | Execution | Spec'd | 3/28/2028 | Def'd | 20 years from Complete Delivery |
| Blue Sky Media/Modus Vivendi | 10/30/2006 | ACCIDENTAL HUSBAND | Eastern Europe | Execution | Spec'd | 3/28/2023 | Def'd | 7 years from Notice of Initial Delivery |
| Buena Vista International | 11/19/2008 | ACCIDENTAL HUSBAND | Germany | Execution | Spec'd | 11/3/2023 | Outside | 15 years from First Theatrical Release |
| ProSiebenSat.1 Media AG | 12/28/2006 | ACCIDENTAL HUSBAND | Germany | 5/13/2010 | Outside | 4/13/2028 | Spec'd | |
| VILLAGE ROADSHOW FILMS DISTRIBUTO | 10/4/2006 | ACCIDENTAL HUSBAND | Greece | Execution | Spec'd | 3/28/2020 | Def'd | 12 years from Notice of Initial Delivery |
| PT PARKIT FILM | 12/13/2007 | ACCIDENTAL HUSBAND | India | Execution | Spec'd | 3/28/2018 | Def'd | 10 years from Notice of Initial Delivery |
| PT Amero Mitra JI. K.H. | 11/10/2006 | ACCIDENTAL HUSBAND | Indonesia | Execution | Spec'd | 3/28/2018 | Def'd | 8 years from Notice of Initial Delivery Availability |
| UNITED KING VIDEO LIMITED | 10/4/2006 | ACCIDENTAL HUSBAND | Israel | Execution | Spec'd | 3/28/2023 | Def'd | 15 years from Notice of Initial Delivery |
| EAGLE PICTURES SPA | 12/12/2006 | ACCIDENTAL HUSBAND | Italy | Execution | Spec'd | 9/26/2021 | Outside | the earlier of 23 years from First Theatrical Release or 6 months from Notice of Availability, to be rcv'd not prior to 4 wks before US Th. rel; addtl 6 month sell-off |
| Buena Vista International | 11/19/2008 | ACCIDENTAL HUSBAND | Latin America | Execution | Spec'd | 4/3/2024 | Outside | 15 years from First Theatrical Release |
| PHARS FILM CO., LLC | 10/31/2006 | ACCIDENTAL HUSBAND | Middle East | Execution | Spec'd | 3/28/2015 | Def'd | 7 years from Notice of Initial Delivery |
| Viva Entertainment, Inc. | 11/16/2006 | ACCIDENTAL HUSBAND | Philippines | Execution | Spec'd | 3/28/2016 | Def'd | 8 years from Notice of Initial Delivery |
| PRISVIDEO EDICOES VIDEOGRAFICAS, L | 8/11/2006 | ACCIDENTAL HUSBAND | Portugal | Execution | Spec'd | 3/28/2020 | Def'd | 12 years from Notice of Initial Delivery |
| NORDISK FILM AS | 4/27/2007 | ACCIDENTAL HUSBAND | Scandinavia | Execution | Spec'd | 3/28/2025 | Def'd | 15 years from Notice of Initial Delivery |
| Entermode Corp. | 10/30/2007 | ACCIDENTAL HUSBAND | South Korea | Execution | Spec'd | 3/28/2018 | Def'd | 10 years from Notice of Initial Delivery |
| STER KINEKOR ENTERTAINMENT, a divisi | 9/25/2006 | ACCIDENTAL HUSBAND | Southern Africa | Execution | Spec'd | 9/25/2016 | Def'd | 10 years from Notice of Initial Delivery |
| DARO FILM DISTRIBUTION | 9/29/2009 | ACCIDENTAL HUSBAND | Southern Africa | Execution | Spec'd | 3/8/2023 | Def'd | 10 years from Notice of Initial Delivery Availability |
| AURUM PRODUCCIONES S.A. | 12/19/2006 | ACCIDENTAL HUSBAND | Spain | Execution | Spec'd | 3/28/2030 | Def'd | 22 years from Complete Delivery |
| CMC Content Corporation | 3/1/2007 | ACCIDENTAL HUSBAND | Taiwan | Execution | Spec'd | 3/28/2020 | Def'd | 12 years from Notice of Initial Delivery |
| PRA Films | 1/26/2007 | ACCIDENTAL HUSBAND | Turkey | Execution | Spec'd | 3/28/2018 | Def'd | 10 years from Notice of Initial Delivery |
| All Interactive Distribution | 12/1/2009 | ADDICTED aka POSSESSION | Australia | Execution | Spec'd | 12/4/2019 | Def'd | 10 years from Notice of Initial Delivery |
| BELGA FILMS S.A. | 11/17/2005 | ADDICTED aka POSSESSION | Benelux | Execution | Spec'd | 11/18/2019 | Def'd | 12 years from Notice of Initial Delivery |
| SWEN INTERNATIONAL HOLDINGS, LLC. | 12/16/2009 | ADDICTED aka POSSESSION | Brazil | Execution | Spec'd | 12/16/2021 | Def'd | 12 years from Notice of Initial Delivery Availability |
| MOTION PICTURE DISTRIBUTION LP | 11/7/2006 | ADDICTED aka POSSESSION | Canada | Execution | Spec'd | 12/15/2027 | Estd | 20 years from Complete Delivery |
| Blue Sky Media/Modus Vivendi | 10/30/2006 | ADDICTED aka POSSESSION | Eastern Europe | Execution | Spec'd | 11/18/2022 | Def'd | 7 years from Notice of Initial Delivery |
| Elite Film AG | 4/29/2009 | ADDICTED aka POSSESSION | Germany | 3/19/2009 | Spec'd | 4/29/2024 | Def'd | 15 years from Notice of Initial Delivery |
| ProSiebenSat.1 Media AG | 12/28/2006 | ADDICTED aka POSSESSION | Germany | Execution | Spec'd | 5/3/2029 | Outside | 18 years from Pay TV Availability Date |
| VILLAGE ROADSHOW FILMS DISTRIBUTO | 2/8/2007 | ADDICTED aka POSSESSION | Greece | Execution | Spec'd | 11/16/2019 | Def'd | 12 years from Notice of Initial Delivery |
| PT PARKIT FILM | 9/27/2006 | ADDICTED aka POSSESSION | India | Execution | Spec'd | 11/16/2017 | Def'd | 10 years from Notice of Initial Delivery |
| PT Amero Mitra JI. K.H. | 9/27/2006 | ADDICTED aka POSSESSION | Indonesia | Execution | Spec'd | 11/16/2015 | Def'd | 8 years from Notice of Initial Delivery |
| UNITED KING VIDEO LIMITED | 9/29/2006 | ADDICTED aka POSSESSION | Israel | Execution | Spec'd | 11/16/2022 | Def'd | 15 years from Notice of Initial Delivery |
| GUSSI S.A de C.V. | 12/22/2006 | ADDICTED aka POSSESSION | Latin America | Execution | Spec'd | 11/16/2024 | Def'd | 17 years from Notice of Initial Delivery |
| PHARS FILM CO., LLC | 7/12/2006 | ADDICTED aka POSSESSION | Middle East | Execution | Spec'd | 11/16/2014 | Def'd | 6 years from Notice of Initial Delivery |
| Viva Entertainment, Inc. | 7/6/2007 | ADDICTED aka POSSESSION | Philippines | To Be Def'd | Estd | 11/15/2014 | Def'd | 7 years from Notice of Initial Delivery |
| PRISVIDEO EDICOES VIDEOGRAFICAS, L | 9/27/2006 | ADDICTED aka POSSESSION | Portugal | Execution | Spec'd | 11/16/2019 | Def'd | 12 years from Notice of Initial Delivery |
| NORDISK FILM AS | 11/19/2007 | ADDICTED aka POSSESSION | Scandinavia | Execution | Spec'd | 11/20/2022 | Def'd | the earlier of 15 years from First Theatrical Release in United States or 15 years from Notice of Initial Delivery |
| AURUM PRODUCCIONES S.A. | 11/20/2006 | ADDICTED aka POSSESSION | Spain | Execution | Spec'd | 5/7/2030 | Def'd | 22 years from Complete Delivery |
| PRA Films | 7/12/2006 | ADDICTED aka POSSESSION | Turkey | Execution | Spec'd | 11/16/2017 | Def'd | 10 years from Notice of Initial Delivery |
| Alliance Atlantis Releasing Trading as Mome | 11/17/2006 | ADDICTED aka POSSESSION | United Kingdom | Execution | Spec'd | 12/14/2025 | Def'd | 22 years from Complete Delivery |
| TWENTIETH CENTURY FOX | 10/8/2007 | ADDICTED aka POSSESSION | US | Execution | Spec'd | 3/9/2017 | Outside | 7 years from First Video Release |
| ROGUES PICTURES, A DIVISION OF FOCL | 9/13/2005 | BLOCK PARTY | US | Execution | Spec'd | 9/26/2030 | Def'd | 23 years from First Theatrical Release (exactly 22.5 years) |
| DIFFUSION S.A. | 5/13/2005 | CHUMSCRUBBER | Argentina, Chile, Paraguay, Uruguay | Execution | Spec'd | 9/26/2018 | Def'd | 12 years from Notice of Initial Delivery |
| SGL ENTERTAINMENT LTD. | 5/23/2005 | CHUMSCRUBBER | Asia | 10/1/2008 | Spec'd | 10/1/2027 | Def'd | 12 months from Pay TV Availability Date |
| DEEP BLUE | 11/9/2004 | CHUMSCRUBBER | Brazil | Execution | Spec'd | 9/26/2015 | Def'd | 10 years from Notice of Initial Delivery |
| TELEVISION, INC. | 11/3/2005 | CHUMSCRUBBER | Bulgaria | Execution | Spec'd | 11/10/2011 | Def'd | 6 years from Notice of Initial Delivery + 45 Days |
| Central Partnership | 12/2/2004 | CHUMSCRUBBER | CIS (Russia) | 9/30/2004 | Spec'd | 9/26/2017 | Def'd | 7 years from Notice of Initial Delivery |
| INVESTA COMMERCE AG | 5/25/2004 | CHUMSCRUBBER | Eastern Europe | Execution | Estd | 9/26/2018 | Def'd | 10 years from Notice of Initial Delivery |
| PEEKSHILL A.V.V. | 6/11/2004 | CHUMSCRUBBER | Eastern Europe | Execution | Estd | 9/26/2018 | Def'd | 13 years from Notice of Initial Delivery |
| METROPOLITAN FILM EXPORT | 11/10/2004 | CHUMSCRUBBER | France | Execution | Spec'd | 9/26/2020 | Def'd | 15 years from Notice of Initial Delivery |
| content and more Gmbh | 9/15/2004 | CHUMSCRUBBER | Germany | 6/15/2004 | Spec'd | 1/12/2018 | Def'd | 12 years from Technical Acceptance |
| Feelaway Limited | 5/17/2004 | CHUMSCRUBBER | Greece | Execution | Estd | 9/26/2015 | Def'd | 10 years from Notice of Initial Delivery |
| PEEKSHILL A.V.V. | 9/5/2004 | CHUMSCRUBBER | Hungary | Execution | Estd | 10/20/2019 | Def'd | 13 years from Notice of Initial Delivery + 45 days |
| P.T. WARNA PICTURE BOXINDO | 8/24/2004 | CHUMSCRUBBER | Indonesia | Execution | Spec'd | 9/26/2013 | Def'd | 8 years from Notice of Initial Delivery Availability |
| LEMO FILMS | 5/14/2004 | CHUMSCRUBBER | Israel | Execution | Spec'd | 9/26/2015 | Def'd | 10 years from Notice of Initial Delivery |
| ANDREA LEONE FILMS S.r.l. | 6/3/2004 | CHUMSCRUBBER | Italy | Execution | Spec'd | 1/1/2021 | Def'd | 15 years from Complete Delivery |
| Gaga Communications, Inc. | 10/15/2004 | CHUMSCRUBBER | Japan | 5/17/2004 | Spec'd | 9/26/2015 | Outside | the earlier of 10 years from Notice of Initial Delivery or 10 years from First Release in Territory |
| Eagle Films USA | 9/23/2004 | CHUMSCRUBBER | Middle East | Execution | Spec'd | 9/26/2015 | Def'd | 10 years from Notice of Initial Delivery |
| WILMOT CORPORATION A.V.V. | 7/30/2004 | CHUMSCRUBBER | Poland | Execution | Spec'd | 9/26/2017 | Def'd | 12 years from Notice of Initial Delivery |
| NEW LINEO CINEMAS | 6/14/2004 | CHUMSCRUBBER | Portugal | Execution | Spec'd | 9/26/2015 | Def'd | 10 years from Notice of Initial Delivery |
| TELEVISION, INC. | 6/13/2004 | CHUMSCRUBBER | Romania | Execution | Spec'd | 9/26/2013 | Def'd | 8 years from Notice of Initial Delivery |
| Scanbox Entertainment | 6/15/2004 | CHUMSCRUBBER | Scandinavia | Execution | Spec'd | 9/26/2017 | Def'd | 12 years from Notice of Initial Delivery |
| NU METRO FILM DISTRIBUTION | 9/28/2004 | CHUMSCRUBBER | Southern Africa | Execution | Spec'd | 1/1/2013 | Def'd | 8 years from Complete Delivery |
| Sogetasa - Sociedad General de Derechos | 8/11/2004 | CHUMSCRUBBER | Spain | Execution | Spec'd | 9/26/2035 | Def'd | 30 years from Notice of Initial Delivery |
| SIMETEL | 5/19/2004 | CHUMSCRUBBER | Turkey | Execution | Spec'd | 9/26/2015 | Def'd | 10 years from Notice of Initial Delivery |
| ICON FILM DISTRIBUTION | 4/28/2005 | CHUMSCRUBBER | United Kingdom | Execution | Spec'd | 6/8/2025 | Def'd | 18 years from First Release in Territory |
| GO FISH Pictures, a division of DREAMWOR | 12/17/2004 | CHUMSCRUBBER | US | 5/19/2004 | Spec'd | 9/26/2030 | Def'd | 25 years from Notice of Initial Delivery |

1 of 7

**Persik Productions, Inc**

**Contracted Sales - Expiration Dates**

| Distributor/Licensee Name | Execution Date | Property Name | License Territory | Term Starts | Est'd? | Term Ends | Status | Expiration Description |
|---|---|---|---|---|---|---|---|---|
| CAPTIVE ENTERTAINMENT | 8/8/2005 | CHUMSCRUBBER | Worldwide | | | 9/26/2007 | Outside | the later of 2 years from Availability Date or 8/17/2007 |
| AlfaFilmjord S.A. | 3/1/2004 | CRASH | Argentina, Chile, Paraguay, Uruguay | 3/1/2004 | Spec'd | 4/1/2017 | Def'd | 12 years from Notice of Initial Delivery |
| SGL ENTERTAINMENT LTD. | 10/26/2006 | CRASH | Asia | 2/1/2007 | Spec'd | 5/1/2008 | Def'd | 15 months from Pay TV Availability Date |
| DENDY ICON | 10/10/2004 | CRASH | Australia | 10/10/2004 | Spec'd | 4/17/2017 | Def'd | 12 years from Delivery and Technical Acceptance of Delivery Materials + 3 addl yrs if MG unrecouped |
| ACME UAB | 3/10/2006 | CRASH | Baltic States | Execution | Spec'd | 3/10/2013 | Def'd | 7 years from Notice of Initial Delivery |
| BELGA FILMS S.A. | 11/29/2004 | CRASH | Benelux | 11/29/2004 | Spec'd | 4/1/2017 | Def'd | 12 years from Notice of Initial Delivery |
| DELTA VIDEO SAC | 3/19/2004 | CRASH | Bolivia, Ecuador, Peru | 3/19/2004 | Spec'd | 4/1/2016 | Def'd | 10 years from Notice of Initial Delivery |
| Imagem Filmes Distribodora Ltda | 11/24/2003 | CRASH | Brazil | 11/24/2003 | Spec'd | 4/1/2019 | Def'd | 14 years from Notice of Initial Delivery |
| A. MEDIA | 1/5/2004 | CRASH | CIS (Russia) | 1/5/2004 | Spec'd | 4/1/2017 | Def'd | 13 years from Notice of Initial Delivery |
| Freeman Film Trade and Finance, Ltd. | 12/2/2003 | CRASH | Eastern Europe | 12/2/2003 | Spec'd | 4/1/2017 | Def'd | 12 years from Notice of Availability in any component of the Territory |
| METROPOLITAN FILM EXPORT | 10/19/2005 | CRASH | France | 5/5/2004 | Spec'd | 9/14/2023 | Def'd | the earlier of 18 years from First Release or 222 months from Initial |
| Telepool GmbH | 7/12/2005 | CRASH | Germany | 7/12/2005 | Spec'd | 7/14/2023 | Def'd | 18 years from Delivery and Technical Acceptance of Material + 6-month sell off period |
| Speritzos Films S.A. | 12/18/2003 | CRASH | Greece | 12/18/2003 | Spec'd | 4/1/2017 | Def'd | 12 years from Notice of Initial Delivery |
| EDKO FILMS LTD. | 5/9/2006 | CRASH | Hong Kong | Execution | Spec'd | 5/9/2013 | Def'd | 7 years from Notice of Initial Delivery |
| SANFilm Entertainment | 4/11/2004 | CRASH | Iceland | 4/11/2004 | Spec'd | 4/1/2014 | Def'd | 9 years from Notice of Initial Delivery |
| PT PARROT FILM | 6/9/2005 | CRASH | India | 5/14/2005 | Spec'd | 4/1/2017 | Def'd | 9 years from Notice of Availability |
| PT Amero Mitra Jl. K.H. | 2/19/2004 | CRASH | Indonesia | 2/19/2004 | Spec'd | 4/1/2014 | Def'd | 9 years from Notice of Initial Delivery |
| UNITED KING VIDEO LIMITED | 3/16/2004 | CRASH | Israel | 3/16/2004 | Spec'd | 4/1/2020 | Def'd | 15 years from Notice of Availability |
| Filmauro S.R.I. | 11/7/2004 | CRASH | Italy | 11/7/2004 | Spec'd | 11/11/2030 | Def'd | 25 years from First Release in Territory |
| STAR TV S.A. | 9/29/2004 | CRASH | Latin America | 9/29/2004 | Spec'd | 7/1/2016 | Def'd | 10 years from Notification of Transmission availability date |
| GUSSI S.A.de C.V. | 3/21/2004 | CRASH | Latin America | 3/21/2004 | Spec'd | 4/1/2016 | Def'd | 10 years from Notice of Availability |
| SURAYA FILEM DISTRIBUTION | 11/12/2003 | CRASH | Malaysia, Philippines | 11/12/2003 | Spec'd | 4/1/2012 | Def'd | 7 years from Notice of Availability |
| GULF FILM/ALMASSA | 11/12/2003 | CRASH | Middle East | 11/12/2003 | Spec'd | 4/1/2015 | Def'd | 10 years from Notice of Initial Delivery |
| GLMC MULTIMEDIA SA | 12/18/2003 | CRASH | Portugal | 12/18/2003 | Spec'd | 4/1/2012 | Def'd | 7 years from Notice of Initial Delivery |
| Scanbox Entertainment | 12/2/2003 | CRASH | Scandinavia | 12/2/2003 | Spec'd | 4/1/2015 | Def'd | 10 years from Notice of Initial Delivery |
| Golden Village Pictures Pty Ltd | 3/21/2004 | CRASH | Singapore | 3/21/2004 | Spec'd | 4/1/2015 | Def'd | 10 years from Notice of Initial Delivery |
| Tiger Pictures | 2/25/2005 | CRASH | South Korea | Execution | Est'd | 3/16/2018 | Def'd | 12 years from Notice of Initial Delivery |
| NU METRO FILM DISTRIBUTION | | CRASH | Southern Africa | 9/10/2004 | Spec'd | 4/1/2017 | Def'd | 12 years from Notice of Initial Delivery |
| MANGA FILMS S.L. | 2/11/2004 | CRASH | Spain | 6/27/2003 | Spec'd | 4/1/2019 | Def'd | 25 years from Notice of Initial Delivery |
| Infinity Int'l Co., LTD | 3/13/2006 | CRASH | Taiwan | 8/22/2003 | Spec'd | 4/1/2012 | Def'd | 7 years from Notice of Initial Delivery |
| BOXOFFICE ENTERTAINMENT CO., LTD | 11/17/2003 | CRASH | Thailand | 11/17/2003 | Spec'd | 4/1/2012 | Def'd | 7 years from Notice of Initial Delivery |
| PHA Films | 4/3/2004 | CRASH | Turkey | 4/3/2004 | Spec'd | 4/1/2015 | Def'd | 7 years from First Release in Territory |
| PATHE PRODUCTIONS LIMITED | 5/4/2004 | CRASH | United Kingdom | 5/4/2004 | Spec'd | 8/12/2023 | Def'd | 18 years from First Release in Territory |
| Lions Gate Films Inc | 3/8/2005 | CRASH | US | 10/8/2004 | Spec'd | 2/15/2030 | Def'd | 25 years from Complete Delivery |
| DEJ PRODUCTIONS, INC. | 12/1/2003 | CRASH | US | 12/1/2003 | Spec'd | 5/6/2030 | Outside | the earlier of 25 years from First Release in Territory or 9 months from Complete Delivery |
| Cinematografica Blancica | | CRASH | Venezuela | 3/4/2004 | Spec'd | 4/1/2012 | Def'd | 7 years from Notice of Initial Delivery |
| ATM FILM DIST. LTD | 5/13/2005 | CRASH | West Indies | 5/13/2005 | Spec'd | 4/1/2010 | Def'd | 5 years from Notice of Availability |
| CINESKYJETSTREAM PICTURES | 11/16/2005 | CRASH | Worldwide | 8/29/2005 | Spec'd | 4/1/2007 | Def'd | 2 years from Availability Date |
| CINESKYJETSTREAM PICTURES | 11/16/2005 | CRASH | Worldwide | 8/29/2005 | Spec'd | 9/3/2007 | Def'd | 2 years from Availability Date |
| RAYSON GLOBAL LTD | 1/13/2004 | CRASH | Argentina, Chile, Paraguay, Uruguay | 1/13/2004 | Spec'd | 9/17/2014 | Def'd | 10 years from Notice of Initial Delivery |
| SGL ENTERTAINMENT LTD. | 10/26/2006 | EMPLOYEE OF THE MONTH | Asia | 7/1/2006 | Spec'd | 10/1/2007 | Def'd | 15 months from Pay TV Availability Date |
| Visual Retsh | 3/15/2004 | EMPLOYEE OF THE MONTH | Australia | 3/15/2004 | Spec'd | 9/17/2011 | Def'd | 7 years from Notice of Availability |
| Red Puskar Enterprises | 4/28/2010 | EMPLOYEE OF THE MONTH | Australia | Execution | Spec'd | 4/28/2022 | Def'd | 12 years from Long Form Execution |
| BRIDGE RIGHTS B.V. | 6/9/2003 | EMPLOYEE OF THE MONTH | Benelux | 6/9/2003 | Spec'd | 9/17/2019 | Def'd | 15 years from Notice of Initial Delivery |
| ALPHA DISTRIBUCAO CINEMA VIDEO E. | 6/30/2003 | EMPLOYEE OF THE MONTH | Brazil | 6/30/2003 | Spec'd | 9/17/2015 | Def'd | 10 years from Notice of Availability |
| HELIOS ENTERAINMENT/21 ENTERTAINM | 3/19/2003 | EMPLOYEE OF THE MONTH | CIS (Russia) | 3/19/2003 | Spec'd | 9/17/2011 | Def'd | 7 years from Notice of Initial Delivery |
| ZODIAC A.V.V. | 7/29/2003 | EMPLOYEE OF THE MONTH | Eastern Europe | 5/20/2003 | Spec'd | 9/17/2016 | Def'd | 12 years from Notice of Initial Delivery |
| METROPOLITAN FILM EXPORT | 5/5/2004 | EMPLOYEE OF THE MONTH | France | 5/5/2004 | Spec'd | 7/14/2020 | Def'd | the earlier of 15 years from First Release in Territory or 186 months from Initial Delivery |
| Splendid Film GmbH | 7/15/2003 | EMPLOYEE OF THE MONTH | Germany | 7/15/2003 | Spec'd | 7/15/2030 | Est'd | 25 years from Technical Acceptance of the IM by Distrib |
| VILLAGE ROADSHOW FILMS DISTRIBUTO | 7/28/2003 | EMPLOYEE OF THE MONTH | Greece | 7/28/2003 | Spec'd | 9/17/2014 | Def'd | 10 years from Notice of Initial Delivery |
| PT Amero Mitra Jl. K.H. | 5/21/2003 | EMPLOYEE OF THE MONTH | Indonesia | 5/21/2003 | Spec'd | 4/25/2013 | Def'd | 9 years from Notice of Initial Delivery |
| UNITED KING VIDEO LIMITED | 7/30/2003 | EMPLOYEE OF THE MONTH | Israel | 6/6/2003 | Spec'd | 9/17/2019 | Def'd | 15 years from Notice of Availability |
| STAR TV S.A. | 3/16/2006 | EMPLOYEE OF THE MONTH | Latin America | Execution | Spec'd | 9/17/2019 | Outside | 15 years from Notice of Availability for Satellite Transmission |
| ALLIED PICTURES, LLP | 6/30/2003 | EMPLOYEE OF THE MONTH | Mexico | 6/30/2003 | Spec'd | 9/17/2011 | Def'd | 7 years from Notice of Initial Delivery |
| PHAIS FILM CO., LLC | 6/7/2003 | EMPLOYEE OF THE MONTH | Middle East | 6/7/2003 | Spec'd | 9/17/2011 | Def'd | 7 years from Notice of Initial Delivery |
| PRISIVIDEO EDICOES VIDEOGRAFICAS, L | 6/9/2003 | EMPLOYEE OF THE MONTH | Portugal | 6/9/2003 | Spec'd | 9/17/2011 | Def'd | 10 years from Notice of Initial Delivery |
| NORDISK FILM AS | 10/13/2003 | EMPLOYEE OF THE MONTH | Scandinavia | 10/13/2003 | Spec'd | 9/17/2011 | Def'd | 7 years from Notice of Availability |
| SHAW RENTERS (SINGAPORE) PTE LIMIT | 6/19/2003 | EMPLOYEE OF THE MONTH | Singapore | 6/19/2003 | Spec'd | 9/17/2011 | Def'd | 7 years from Notice of Availability |
| NU METRO FILM DISTRIBUTION | 6/12/2003 | EMPLOYEE OF THE MONTH | Southern Africa | 6/12/2003 | Spec'd | 9/17/2011 | Outside | 7 years from Notice of Availability |
| MANGA FILMS S.L. | 7/31/2003 | EMPLOYEE OF THE MONTH | Spain | 6/13/2003 | Spec'd | 9/2/2022 | Est'd | 17 years from Acceptance of Delivery |
| AVSAR FILM | 12/17/2003 | EMPLOYEE OF THE MONTH | Turkey | 12/17/2003 | Spec'd | 9/17/2014 | Def'd | 12 years from Notice of Availability |
| DEJ PRODUCTIONS, INC. | | EMPLOYEE OF THE MONTH | US | Execution | Spec'd | 1/4/2030 | Outside | the earlier of 25 years from First Release in Territory or 9 months from Complete Delivery |
| CINESKYJETSTREAM PICTURES | 8/15/2007 | EMPLOYEE OF THE MONTH | Worldwide | Execution | Spec'd | 9/11/2026 | Def'd | 2 years from Availability Date |
| SGL ENTERTAINMENT LTD. | 10/25/2006 | FIND ME GUILTY | Asia | 2/1/2007 | Spec'd | 5/1/2008 | Def'd | 15 months from Pay TV Availability Date |
| BELGA FILMS S.A. | 5/26/2005 | FIND ME GUILTY | Benelux | 5/26/2005 | Spec'd | 12/19/2017 | Def'd | 12 years from Notice of Initial Delivery |
| ALPHA DISTRIBUCAO CINEMA VIDEO E. | 11/24/2004 | FIND ME GUILTY | Brazil | 11/24/2004 | Spec'd | 12/19/2019 | Def'd | 15 years from Notice of Initial Delivery |
| MOTION PICTURE DISTRIBUTION LP | 3/26/2007 | FIND ME GUILTY | Canada | Execution | Spec'd | 4/6/2027 | Def'd | 20 years from Complete Delivery |
| HELIOS ENTERAINMENT/21 ENTERTAINM | | FIND ME GUILTY | CIS (Russia) | 5/15/2004 | Spec'd | 12/19/2015 | Def'd | 10 years from Notice of Initial Delivery |
| AQS A.S. | 11/23/2004 | FIND ME GUILTY | Eastern Europe | 5/21/2004 | Spec'd | 12/19/2020 | Def'd | the earlier of 12 years from Notice of Availability in any component of the Territory |
| METROPOLITAN FILM EXPORT | 5/5/2004 | FIND ME GUILTY | France | 5/5/2004 | Spec'd | 3/17/2024 | Outside | the earlier of 18 years from First Release in Territory or 222 months from Initial Delivery |
| Worldwide SPE Acquisitions Inc. | 12/6/2008 | FIND ME GUILTY | Germany | Execution | Spec'd | 12/23/2014 | Def'd | 7 years from First Video Release |
| ProSiebenSat.1 Media AG | 1/2/2007 | FIND ME GUILTY | Germany | 6/10/2005 | Spec'd | 9/17/2025 | Def'd | 18 years from Pay TV and FTV Availability Dates |
| VILLAGE ROADSHOW FILMS DISTRIBUTO | 3/15/2004 | FIND ME GUILTY | Greece | 3/10/2004 | Spec'd | 12/19/2014 | Def'd | 10 years from Notice of Initial Delivery |
| PT Amero Mitra Jl. K.H. | 3/15/2004 | FIND ME GUILTY | Indonesia | 3/15/2004 | Spec'd | 12/19/2013 | Def'd | 8 years from Notice of Initial Delivery |
| UNITED KING VIDEO LIMITED | 3/15/2004 | FIND ME GUILTY | Israel | 3/15/2004 | Spec'd | 12/19/2026 | Def'd | 15 years from Notice of Availability plus addtl 2 yrs if MG unrecouped |

**Persik Productions, Inc**

**Contracted Sales - Expiration Dates**

| Licensee Name | Execution Date | Property Name | Licensee Territories | Starts | Hs'sted | Ends | Left? | From |
|---|---|---|---|---|---|---|---|---|
| MEDUSA FILM S.p.A. | 10/8/2004 | FIND ME GUILTY | Italy | 10/8/2004 | Spec'd | 12/19/2034 | Defd | the earlier of 25 years from First Theatrical Release in Italy or 25 years from Notice of Initial Delivery plus 6 months |
| STAR TV S.A. | 9/25/2009 | FIND ME GUILTY | Latin America | Execution | Spec'd | 12/19/2018 | Outside | 13 years from Notice of Availability for Satellite Transmission but no sooner than 12/1/2009 |
| PHARS FILM CO., LLC | 5/4/2004 | FIND ME GUILTY | Middle East | 5/4/2004 | Spec'd | 8/9/2013 | Defd | 7 years from Notice of Initial Delivery |
| PRISVIDEO EDICOES VIDEOGRAFICAS, L | 5/15/2004 | FIND ME GUILTY | Portugal | 5/15/2004 | Spec'd | 12/19/2017 | Defd | 12 years from Notice of Initial Delivery |
| NORDISK FILM A/S | 3/1/2004 | FIND ME GUILTY | Scandinavia | 3/1/2004 | Spec'd | 12/19/2020 | Defd | 15 years from Notice of Initial Delivery |
| SHAW RENTERS (SINGAPORE) PTE LIMIT | 3/15/2004 | FIND ME GUILTY | Singapore | 3/15/2004 | Spec'd | 12/19/2012 | Defd | 7 years from Notice of Availability |
| NU METRO FILM DISTRIBUTION | 5/28/2004 | FIND ME GUILTY | Southern Africa | 5/28/2004 | Spec'd | 12/19/2012 | Defd | 7 years from Notice of Availability + 3 yrs if MG unrecouped |
| DeA PLANETA S.L. | 6/21/2004 | FIND ME GUILTY | Spain | 6/21/2004 | Spec'd | 12/19/2025 | Defd | 20 years from Notice of Initial Delivery |
| AVSAR FILM | 11/24/2004 | FIND ME GUILTY | Turkey | 11/24/2004 | Spec'd | 12/19/2013 | Defd | 12 years from Notice of Availability |
| ENTERTAINMENT IN MOTION | 8/1/2006 | FIND ME GUILTY | Worldwide | 6/16/2009 | Spec'd | 6/30/2009 | Spec'd | |
| Alfa/Ringford S.A. | 11/9/2006 | FIRST SNOW | Argentina, Chile, Paraguay, Uruguay | Execution | Spec'd | 11/9/2013 | Defd | 7 years from Notice of Initial Delivery |
| SGL ENTERTAINMENT LTD. | 10/26/2006 | FIRST SNOW | Asia | 4/1/2007 | Spec'd | 7/1/2008 | Outside | 15 months from Pay TV Availability Date |
| HORIZON ONE ENTERTAINMENT PTY LTD | 9/18/2008 | FIRST SNOW | Australia | Execution | Spec'd | 9/4/2029 | Defd | 12 years from Complete Delivery + 6 Month Non-Exclusive Sell Off Period |
| BELGA FILMS S.A. | 11/5/2004 | FIRST SNOW | Benelux | 11/5/2004 | Spec'd | 8/9/2018 | Defd | 14 years from Notice of Initial Delivery |
| CONQUEST FILMES | | FIRST SNOW | Brazil | Execution | Spec'd | 8/9/2020 | Defd | 14 years from Notice of Initial Delivery |
| MOTION PICTURE DISTRIBUTION LP | | FIRST SNOW | Canada | Execution | Spec'd | 4/6/2027 | Defd | 20 years from Complete Delivery |
| HELIOS ENTERAINMENT/21 ENTERTAINM | 5/15/2004 | FIRST SNOW | CIS (Russia) | 5/15/2004 | Spec'd | 8/9/2016 | Defd | 10 years from Notice of Initial Delivery |
| AOS A.S. | 5/21/2004 | FIRST SNOW | Eastern Europe | 5/21/2004 | Spec'd | 8/9/2021 | Defd | 15 years from Notice of Availability in any component of the Territory |
| Worldwide SPE Acquisitions Inc. | 12/8/2008 | FIRST SNOW | Germany | Execution | Spec'd | 6/4/2016 | Defd | 7 years from First Video Release |
| VILLAGE ROADSHOW FILMS DISTRIBUTO | 5/21/2004 | FIRST SNOW | Greece | 5/21/2004 | Spec'd | 8/9/2016 | Defd | 10 years from Notice of Availability plus addt 2 yrs if MG unrecouped |
| PT Amero Mitra JI. K.H. | 5/15/2004 | FIRST SNOW | Indonesia | 5/15/2004 | Spec'd | 8/9/2014 | Defd | 8 years from Notice of Initial Delivery plus 2 yrs if MG unrecouped |
| UNITED KING VIDEO LIMITED | 3/15/2004 | FIRST SNOW | Israel | 3/15/2004 | Spec'd | 8/9/2021 | Defd | 10 years from Notice of Availability plus addt 2 yrs if MG unrecouped |
| EAGLE PICTURES SPA | 4/2/2007 | FIRST SNOW | Italy | Execution | Spec'd | 1/22/2033 | Defd | the earlier of 25 years from First Theatrical Release or 6 months from Notice of Availability, to be fixed not prior to 4 wks before US Th rel; addtl 6 month sell-off for HV |
| STAR TV S.A. | 9/20/2006 | FIRST SNOW | Latin America | Execution | Spec'd | 6/11/2024 | Defd | 15 years from Notice of Availability for Satellite Transmission |
| PHARS FILM CO., LLC | 5/4/2004 | FIRST SNOW | Middle East | 5/4/2004 | Spec'd | 8/9/2013 | Defd | 7 years from Notice of Initial Delivery |
| PRISVIDEO EDICOES VIDEOGRAFICAS, L | 5/15/2004 | FIRST SNOW | Portugal | 5/15/2004 | Spec'd | 8/9/2016 | Defd | 12 years from Notice of Availability plus 6 smonth sell-off period |
| NORDISK FILM A/S | 1/10/2006 | FIRST SNOW | Scandinavia | Execution | Spec'd | 8/9/2021 | Defd | 15 years from Notice of Initial Delivery |
| SHAW RENTERS (SINGAPORE) PTE LIMIT | 3/15/2004 | FIRST SNOW | Singapore | 3/15/2004 | Spec'd | 8/9/2013 | Defd | 7 years from Notice of Initial Delivery |
| DARO FILM DISTRIBUTION | 9/29/2006 | FIRST SNOW | Southern Africa | 10/1/2006 | Spec'd | 9/30/2019 | Defd | 12 years from Notice of Availability |
| AVSAR FILM | 5/16/2004 | FIRST SNOW | Turkey | 5/16/2004 | Spec'd | 9/9/2016 | Defd | 12 years from Notice of Availability |
| CINESKY/JETSTREAM PICTURES | 6/20/2007 | FIRST SNOW | Worldwide | 6/20/2007 | Spec'd | 7/27/2009 | Defd | 2 years from Complete Delivery |
| BELGA FILMS S.A. | 7/25/2005 | GRAY MATTERS | Benelux | 7/25/2005 | Spec'd | 11/10/2018 | Defd | 12 years from Notice of Initial Delivery |
| MOTION PICTURE DISTRIBUTION LP | 3/1/2007 | GRAY MATTERS | Canada | Execution | Spec'd | 6/26/2027 | Defd | 20 years from Complete Delivery |
| Blue Sky Media/Medus Vivendi | | GRAY MATTERS | Eastern Europe | 5/19/2005 | Spec'd | 11/10/2021 | Defd | 15 years from Notice of Initial Delivery |
| Worldwide SPE Acquisitions Inc. | 12/8/2008 | GRAY MATTERS | Germany | Execution | Spec'd | 6/4/2016 | Defd | 7 years from First Video Release |
| VILLAGE ROADSHOW FILMS DISTRIBUTO | 11/7/2004 | GRAY MATTERS | Greece | 11/7/2004 | Spec'd | 11/10/2016 | Defd | 10 years from Notice of Initial Delivery + 2 additional yrs if MG unrecouped |
| PT PARKIT FILM | | GRAY MATTERS | India | Execution | Spec'd | 4/27/2017 | Defd | 10 years from Notice of Initial Delivery |
| QUALITY FILMS, S. DE R L DE C.V. | 5/29/2006 | GRAY MATTERS | Latin America | Execution | Spec'd | 11/10/2021 | Defd | 15 years from Notice of Initial Delivery |
| STAR TV S.A. | 1/12/2008 | GRAY MATTERS | Latin America | Execution | Spec'd | 1/22/2023 | Defd | 15 years from Notice of Initial Delivery |
| Viva Entertainment, Inc. | 1/19/2006 | GRAY MATTERS | Philippines | 11/8/2005 | Spec'd | 11/10/2013 | Defd | 7 years from Notice of Initial Delivery |
| PRISVIDEO EDICOES VIDEOGRAFICAS, L | 1/12/2007 | GRAY MATTERS | Portugal | Execution | Spec'd | 8/30/2016 | Defd | 7 years from Notice of Initial Delivery |
| NORDISK FILM A/S | 4/27/2007 | GRAY MATTERS | Scandinavia | Execution | Spec'd | 5/31/2022 | Defd | 15 years from Notice of Initial Delivery |
| MEGABOX | 1/25/2007 | GRAY MATTERS | South Korea | Execution | Spec'd | 12/4/2017 | Defd | 10 years from Notice of Initial Delivery |
| DARO FILM DISTRIBUTION | 9/29/2009 | GRAY MATTERS | Southern Africa | 10/1/2009 | Spec'd | 9/30/2019 | Defd | 10 years from Notice of Initial Delivery |
| AURUM PRODUCCIONES S.A | 9/21/2006 | GRAY MATTERS | Spain | Execution | Spec'd | 6/7/2034 | Defd | 27 years from Complete Delivery |
| PRA Films | 1/25/2007 | GRAY MATTERS | Turkey | Execution | Spec'd | 12/6/2016 | Defd | 10 years from Notice of Initial Delivery |
| Alliance Atlantis Releasing Trading as Mome | 5/29/2007 | GRAY MATTERS | United Kingdom | Execution | Spec'd | 5/12/2029 | Defd | 20 years from Complete Delivery |
| CINESKY/JETSTREAM PICTURES | 6/20/2007 | GRAY MATTERS | Worldwide | 6/20/2007 | Spec'd | 11/13/2010 | Defd | 2 years from Complete Delivery |
| RAYSON GLOBAL LTD | 11/24/2003 | HAVEN | Argentina, Chile, Paraguay, Uruguay | 11/24/2003 | Spec'd | 6/15/2016 | Defd | 10 years from Notice of Initial Delivery |
| SGL ENTERTAINMENT LTD. | 10/26/2006 | HAVEN | Asia | 9/1/2007 | Spec'd | 12/1/2008 | Defd | 15 months from Pay TV Availability Date |
| BELGA FILMS S.A. | 11/18/2003 | HAVEN | Benelux | 11/18/2003 | Spec'd | 6/15/2016 | Defd | 12 years from Notice of Initial Delivery |
| AIWASTAR LTD | 9/30/2005 | HAVEN | Bolivia, Colombia, Ecuador, Peru | Execution | Spec'd | 6/15/2013 | Defd | 7 years from Notice of Initial Delivery |
| ALPHA DISTRIBUICAO CINEMA VIDEO E, | 11/24/2003 | HAVEN | Brazil | 11/24/2003 | Spec'd | 6/15/2020 | Defd | 14 years from Notice of Initial Delivery |
| MOTION PICTURE DISTRIBUTION LP | 1/25/2007 | HAVEN | Canada | Execution | Spec'd | 6/15/2024 | Defd | 20 years from Complete Delivery |
| HELIOS ENTERAINMENT/21 ENTERTAINM | 12/5/2003 | HAVEN | CIS (Russia) | 12/5/2003 | Spec'd | 6/15/2016 | Defd | 10 years from Notice of Initial Delivery |
| Freeman Film Trade and Finance, Ltd. | 11/25/2003 | HAVEN | Eastern Europe | 11/25/2003 | Spec'd | 6/15/2016 | Outside | 15 years from Notice of Availability in any component of the Territory |
| AQS A.S. | 11/25/2003 | HAVEN | Eastern Europe | 11/25/2003 | Spec'd | 6/15/2021 | Defd | 15 years from Notice of Availability in any component of the Territory |
| METROPOLITAN FILM EXPORT | 11/30/2004 | HAVEN | France | 11/30/2004 | Spec'd | 9/30/2024 | Esrd | the earlier of 18 years from First Release in Territory or Initial Delivery |
| Worldwide SPE Acquisitions Inc. | 12/8/2008 | HAVEN | Germany | Execution | Spec'd | 4/23/2016 | Defd | 7 years from First Video Release |
| ProSiebenSat 1 Media AG | 1/25/2007 | HAVEN | Germany | 1/23/2010 | Outside | 1/23/2030 | Spec'd | |
| VILLAGE ROADSHOW FILMS DISTRIBUTO | 12/16/2003 | HAVEN | Greece | 12/16/2003 | Spec'd | 6/15/2016 | Defd | 10 years from Notice of Availability plus addt 2 yrs if MG unrecouped |
| UNITED KING VIDEO LIMITED | 12/5/2003 | HAVEN | Israel | 12/5/2003 | Spec'd | 6/15/2021 | Defd | 15 years from Notice of Availability plus addt 2 yrs if MG unrecouped |
| DNC S.p.A. | 10/12/2007 | HAVEN | Italy | Execution | Spec'd | 7/6/2017 | Defd | 7 years from Complete Delivery |
| Gaga Communications, Inc. | 9/20/2004 | HAVEN | Japan | 9/29/2004 | Spec'd | 9/5/2018 | Defd | 12 years from Initial Delivery |
| STAR TV S.A. | 1/28/2006 | HAVEN | Latin America | Execution | Spec'd | 6/15/2021 | Outside | 15 years from Notice of Availability for Satellite Transmission |
| GUSSI S.A.de C.V. | 11/23/2003 | HAVEN | Latin America | 11/23/2003 | Spec'd | 6/15/2023 | Defd | 17 years from Notice of Initial Delivery |
| PHARS FILM CO., LLC | 9/30/2003 | HAVEN | Middle East | 9/30/2003 | Spec'd | 6/15/2013 | Defd | 7 years from Notice of Initial Delivery |
| PIONEER FILM | 1/5/2004 | HAVEN | Philippines | 1/5/2004 | Spec'd | 6/15/2011 | Defd | 5 years from Notice of Initial Delivery |
| PRISVIDEO EDICOES VIDEOGRAFICAS, L | 12/2/2003 | HAVEN | Portugal | 12/2/2003 | Spec'd | 6/15/2016 | Defd | 10 years from Notice of Initial Delivery |
| NORDISK FILM A/S | 10/13/2003 | HAVEN | Scandinavia | 10/13/2003 | Spec'd | 6/15/2019 | Defd | 12 years from Notice of Initial Delivery |
| SHAW RENTERS (SINGAPORE) PTE LIMIT | 1/5/2004 | HAVEN | Singapore | 1/5/2004 | Spec'd | 6/15/2013 | Defd | 7 years from Notice of Initial Delivery |
| NU METRO FILM DISTRIBUTION | 5/20/2004 | HAVEN | Southern Africa | 5/20/2004 | Spec'd | 6/15/2013 | Defd | 7 years from Notice of Availability + 3 yrs if MG unrecouped |
| AURUM PRODUCCIONES S.A | 11/3/2007 | HAVEN | Spain | Execution | Spec'd | 9/13/2033 | Defd | 20 years from Complete Delivery |
| B.I.G. FILM | 9/15/2006 | HAVEN | Taiwan | Execution | Spec'd | 6/15/2016 | Defd | 7 years from Notice of Initial Delivery |
| AVSAR FILM | 11/24/2004 | HAVEN | Turkey | 11/24/2004 | Spec'd | 6/15/2016 | Defd | 12 years from Notice of Availability |
| Alliance Atlantis Releasing Trading as Momentum Pictures | | HAVEN | United Kingdom | Execution | Spec'd | 5/1/2029 | Defd | 22 years from Complete Delivery |

3 of 7

**Persik Productions, Inc**

**Contracted Sales - Expiration Dates**

| Licensee Name | Execution Date | Property Name | License Territories | Start Date | Est/Date | End Date | Est/Ca | From |
|---|---|---|---|---|---|---|---|---|
| SGL ENTERTAINMENT LTD. | 10/26/2006 | HOAX | Asia | 4/1/2008 | Spec'd | 7/1/2009 | Defd | 15 months from Pay TV Availability Date |
| ROADSHOW FILMS PTY LTD | 7/27/2006 | HOAX | Australia | Execution | Spec'd | 7/31/2024 | Defd | 18 years from Notice of Initial Delivery |
| BELGA FILMS S.A | 7/25/2005 | HOAX | Benelux | 7/25/2005 | Spec'd | 11/30/2018 | Defd | 12 years from Notice of Initial Delivery |
| ALPHA DISTRIBUCAO CINEMA VIDEO E | 5/16/2005 | HOAX | Brazil | 5/16/2005 | Spec'd | 12/1/2020 | Defd | 14 years from Notice of Availability |
| HELIOS ENTERAINMENT/21 ENTERTAINM | 5/15/2006 | HOAX | CIS (Russia) | 5/15/2005 | Spec'd | 11/30/2021 | Defd | 15 years from Notice of Initial Delivery |
| AQS A.S. | 8/25/2005 | HOAX | Eastern Europe | 7/7/2005 | Spec'd | 12/1/2021 | Defd | 15 years from Notice of Initial Delivery |
| Elite Film AG | 8/25/2009 | HOAX | Germany | 7/29/2009 | Spec'd | 8/25/2024 | Defd | 15 years from Notice of Initial Delivery |
| ProSiebenSat.1 Media AG | 8/25/2005 | HOAX | Germany | Execution | Spec'd | 2/15/2027 | Outside | 18 years from Pay TV Availability Date |
| VILLAGE ROADSHOW FILMS DISTRIBUTO | 9/2/2005 | HOAX | Greece | 5/15/2005 | Spec'd | 12/1/2021 | Defd | 15 years from Notice of Initial Delivery |
| PT PARKIT FILM | 5/15/2006 | HOAX | India | Execution | Spec'd | 11/30/2016 | Defd | 10 years from Notice of Initial Delivery |
| PT Amero Mitra JI. K.H. | 8/15/2006 | HOAX | Indonesia | 2/14/2005 | Spec'd | 11/30/2012 | Defd | 8 years from Notice of Initial Delivery Availability |
| UNITED KING VIDEO LIMITED | 5/15/2005 | HOAX | Israel | 5/15/2005 | Spec'd | 11/30/2021 | Defd | 15 years from Notice of Initial Delivery |
| EAGLE PICTURES SPA | 9/7/2004 | HOAX | Italy | 9/7/2004 | Spec'd | 10/20/2019 | Outside | the earlier of 23 years from First Theatrical Release or 6 months from Notice of Availability, to be rcvd not prior to 4 wks before US th rel.; addtl 6 month sell-off for HV. 15 years from Notice of Availability for |
| STAR TV S.A | 11/12/2008 | HOAX | Latin America | Execution | Spec'd | 12/1/2021 | Defd | Satellite Transmission |
| PHARS FILM CO., LLC | 4/25/2003 | HOAX | Middle East | 4/25/2005 | Spec'd | 12/1/2013 | Defd | 7 years from Notice of Initial Delivery |
| PRISVIDEO EDICOES VIDEOGRAFICAS, L | 8/22/2005 | HOAX | Portugal | 5/15/2005 | Spec'd | 12/1/2016 | Defd | 12 years from Notice of Initial Delivery + additional 6 mths sell-off period |
| NORDISK FILM A/S | 9/2/2005 | HOAX | Scandinavia | 5/15/2005 | Spec'd | 11/30/2015 | Defd | 12 years from Notice of Initial Delivery |
| DARO FILM DISTRIBUTION | 9/29/2009 | HOAX | Southern Africa | 10/1/2009 | Spec'd | 9/30/2019 | Defd |  |
| AURUM PRODUCCIONES S.A. | 9/14/2005 | HOAX | Spain | 9/14/2005 | Spec'd | 4/4/2022 | Defd | 15 years from Complete Delivery |
| AURUM PRODUCCIONES S.A. | 9/14/2005 | HOAX | United Kingdom | 9/14/2005 | Spec'd | 4/4/2022 | Defd | 15 years from Complete Delivery |
| WALT DISNEY COMPANY | 9/2/2006 | HOAX | US | 8/11/2008 | Spec'd | 8/11/2028 | Defd | 20 years from Long Form Execution |
| CINESKYJUETSTREAM PICTURES | 8/15/2007 | HOAX | Worldwide | Execution | Spec'd | 4/5/2009 | Outside | 2 years from Availability Date |
| SGL ENTERTAINMENT LTD. | 10/26/2006 | HOUSE OF D | Asia | 12/1/2006 | Spec'd | 3/1/2007 | Defd | 15 months from Pay TV Availability Date |
| BELGA FILMS S.A. | 5/20/2003 | HOUSE OF D | Benelux | 5/20/2003 | Spec'd | 9/1/2015 | Defd | 12 years from Notice of Initial Delivery |
| HELIOS ENTERAINMENT/21 ENTERTAINM | 5/19/2003 | HOUSE OF D | CIS (Russia) | 5/19/2003 | Spec'd | 9/1/2011 | Defd | 7 years from Notice of Initial Delivery |
| ZODIAC A.V.V. | 7/29/2003 | HOUSE OF D | Eastern Europe | 5/20/2003 | Spec'd | 9/1/2016 | Defd | 12 years from Notice of Initial Delivery |
| METROPOLITAN FILM EXPORT | 3/5/2004 | HOUSE OF D | France | 5/5/2004 | Spec'd | 6/2/2023 | Outside | the earlier of 18 years from First Release in Territory or 222 months from Inkial Delivery |
| Worldwide SPE Acquisitions Inc. | 1/28/2008 | HOUSE OF D | Germany | Execution | Spec'd | 4/9/2016 | Defd | 7 years from First Video Release |
| VILLAGE ROADSHOW FILMS DISTRIBUTO | 7/28/2003 | HOUSE OF D | Greece | 7/29/2003 | Spec'd | 9/1/2014 | Defd | 10 years from Notice of Initial Delivery |
| DELON INTERNATIONAL FILM LIMITED | 5/25/2003 | HOUSE OF D | Hong Kong | 3/25/2003 | Spec'd | 9/1/2012 | Defd | 8 years from Notice of Initial Delivery |
| UNITED KING VIDEO LIMITED | 6/6/2003 | HOUSE OF D | Israel | 6/6/2003 | Spec'd | 9/1/2016 | Defd | 12 years from Notice of Initial Delivery |
| Toshiba Entertainment, Inc. | 11/10/2003 | HOUSE OF D | Japan | 11/10/2003 | Spec'd | 9/1/2016 | Defd | 12 years from Notice of Initial Delivery |
| ALLIED PICTURES, LLP | 9/9/2003 | HOUSE OF D | Latin America | 6/3/2003 | Spec'd | 9/1/2024 | Defd | 20 years from Notice of Initial Delivery |
| PHARS FILM CO., LLC | 6/7/2003 | HOUSE OF D | Middle East | 6/7/2003 | Spec'd | 9/1/2011 | Defd | 7 years from Notice of Initial Delivery |
| PRISVIDEO EDICOES VIDEOGRAFICAS, L | 6/9/2003 | HOUSE OF D | Portugal | 6/9/2003 | Spec'd | 9/1/2013 | Defd | 10 years from Notice of Initial Delivery |
| NORDISK FILM A/S | 10/13/2003 | HOUSE OF D | Scandinavia | 13/13/2003 | Spec'd | 9/1/2016 | Defd | 13 years from Notice of Initial Delivery |
| SHAW RENTERS (SINGAPORE) PTE LIMIT | 6/19/2003 | HOUSE OF D | Singapore | 6/19/2003 | Spec'd | 2/6/2013 | Defd | 7 years from Notice of Initial Delivery |
| Korea Screen, Inc. | 5/18/2004 | HOUSE OF D | South Korea | 5/18/2004 | Spec'd | 9/1/2014 | Defd | 10 years from Notice of Initial Delivery |
| NU METRO FILM DISTRIBUTION | 6/12/2003 | HOUSE OF D | South  Africa | 6/12/2003 | Spec'd | 9/1/2011 | Defd | 7 years from Notice of Initial Delivery |
| BOXOFFICE ENTERTAINMENT CO., LTD | 11/12/2003 | HOUSE OF D | Thailand | 11/12/2003 | Spec'd | 9/1/2012 | Defd | 8 years from Notice of Initial Delivery |
| AVSAR FILM | 12/17/2003 | HOUSE OF D | Turkey | 12/17/2003 | Spec'd | 9/1/2015 | Defd | 12 years from Notice of Initial Delivery |
| Lions Gate Films Inc. | 8/1/2005 | HOUSE OF D | US | 4/12/2004 | Spec'd | 12/31/2006 | Defd | 15 years from Complete Delivery plus six (6) month sell-off period |
| CINESKYJUETSTREAM PICTURES | 8/15/2007 | HOUSE OF D | Worldwide | Execution | Spec'd | 9/10/2006 | Defd | 2 years from Availability Date |
| AlfaRinglo/d S.A. | 5/10/2005 | HOUSE OF D | Argentina, Chile, Paraguay, Uruguay | 5/16/2005 | Spec'd | 7/11/2013 | Defd | 7 years from Notice of Initial Delivery |
| SGL ENTERTAINMENT LTD. | 3/27/2008 | ILLUSIONIST, THE | Asia | 2/14/2006 | Spec'd | 5/17/2009 | Defd | 15 months from Pay TV Availability Date - License Start Date |
| ROADSHOW FILMS PTY LTD | 12/11/2006 | ILLUSIONIST, THE | Australia | 12/11/2006 | Spec'd | 7/11/2026 | Defd | 20 years from Notice of Initial Delivery |
| BELGA FILMS S.A. | 5/15/2005 | ILLUSIONIST, THE | Benelux | 5/15/2005 | Spec'd | 7/11/2018 | Defd | 12 years from Notice of Initial Delivery |
| CONQUEST FILMES | 5/15/2005 | ILLUSIONIST, THE | Brazil | Execution | Spec'd | 7/11/2020 | Defd | 14 years from Notice of Initial Delivery |
| MOTION PICTURE DISTRIBUTION LP | 10/31/2006 | ILLUSIONIST, THE | Canada | Execution | Spec'd | 10/31/2026 | Defd | 20 years from Complete Delivery |
| HELIOS ENTERAINMENT/21 ENTERTAINM | 5/15/2005 | ILLUSIONIST, THE | CIS (Russia) | 5/15/2005 | Spec'd | 7/11/2016 | Defd | 10 years from Notice of Initial Delivery |
| AQS A.S. | 2/14/2005 | ILLUSIONIST, THE | Eastern Europe | 2/14/2005 | Spec'd | 7/11/2021 | Defd | 15 years from Notice of Availability in any component of the Territory |
| METROPOLITAN FILM EXPORT | 10/26/2006 | ILLUSIONIST, THE | France | 2/15/2005 | Spec'd | 9/17/2025 | Defd | the earlier of 18 years from First Release in Territory or 222 months from Initial Delivery |
| Elite Film AG | 10/13/2008 | ILLUSIONIST, THE | Germany | 9/13/2008 | Spec'd | 10/14/2023 | Defd | 15 years from Notice of Initial Delivery |
| ProSiebenSat.1 Media AG | 6/13/2005 | ILLUSIONIST, THE | Germany | 6/10/2005 | Spec'd | 3/1/2027 | Outside | 18 years from Pay TV Availability Date |
| VILLAGE ROADSHOW FILMS DISTRIBUTO | 6/23/2005 | ILLUSIONIST, THE | Greece | 6/10/2005 | Spec'd | 7/11/2018 | Defd | 12 years from Notice of Availability plus addtl 3 months  MG unrecouped |
| PT Amero Mitra JI. K.H. | 2/11/2005 | ILLUSIONIST, THE | Indonesia | 2/11/2006 | Spec'd | 7/11/2014 | Defd | 8 years from Notice of Initial Delivery Availability |
| UNITED KING VIDEO LIMITED | 5/15/2005 | ILLUSIONIST, THE | Israel | 5/15/2005 | Spec'd | 7/11/2021 | Defd | 15 years from Notice of Availability plus addtl 2 yrs  MG unrecouped |
| EAGLE PICTURES SPA | 3/26/2007 | ILLUSIONIST, THE | Italy | Execution | Spec'd | 4/5/2030 | Outside | the earlier of 23 years from First Theatrical Release or 6 months from Notice of Availability, to be rcvd not prior  to 4 wks before US th rel.; addtl  6 month sell-off for HV. |
| Digital Site Corporation | 2/20/2007 | ILLUSIONIST, THE | Japan | Execution | Spec'd | 1/16/2018 | Defd | 12 years from Notice of Initial Delivery Availability with an Additional Three Years in the event that the Distributor has not recouped the Guarantee |
| STAR TV S.A. | 10/4/2006 | ILLUSIONIST, THE | Latin America | Execution | Spec'd | 7/11/2021 | Outside | 15 years from Notice of Availability for Satellite Transmission |
| QUALITY FILMS, S. DE R.L DE C.V. | 5/19/2006 | ILLUSIONIST, THE | Latin America | Execution | Spec'd | 7/11/2023 | Defd | 17 years from Notice of Initial Delivery |
| PHARS FILM CO., LLC | 12/8/2005 | ILLUSIONIST, THE | Middle East | 11/7/2005 | Spec'd | 7/11/2013 | Defd | 7 years from Notice of Initial Delivery |
| PRISVIDEO EDICOES VIDEOGRAFICAS, L | 6/28/2005 | ILLUSIONIST, THE | Portugal | 2/14/2005 | Spec'd | 7/11/2018 | Defd | 12 years from Notice of Availability + addtl 6 month sell-off period |
| NORDISK FILM A/S | 8/9/2005 | ILLUSIONIST, THE | Scandinavia | 4/27/2005 | Spec'd | 7/11/2021 | Defd | 15 years from Notice of Initial Delivery |
| Archer Entertainment Asia Pacific PTE LTD. | 10/6/2006 | ILLUSIONIST, THE | Singapore | 10/6/2006 | Spec'd | 7/11/2013 | Defd | 7 years from Notice of Initial Delivery |
| Korea Screen, Inc. | 1/10/2007 | ILLUSIONIST, THE | South Korea | Execution | Spec'd | 1/10/2017 | Defd | 10 years from Notice of Initial Delivery |
| DARO FILM DISTRIBUTION | 9/29/2009 | ILLUSIONIST, THE | Southern Africa | 10/1/2009 | Spec'd | 9/30/2019 | Defd |  |
| AURUM PRODUCCIONES S.A. | 11/7/2006 | ILLUSIONIST, THE | Spain | Execution | Spec'd | 11/4/2028 | Defd | 22 years from Complete Delivery |
| PRA Films | 3/27/2006 | ILLUSIONIST, THE | Turkey | Execution | Spec'd | 11/4/2026 | Defd | 22 years from Complete Delivery |
| Alliance Atlantis Releasing Trading as Momer | 1/20/2007 | ILLUSIONIST, THE | United Kingdom | Execution | Spec'd | 3/2/2029 | Defd | 22 years from Complete Delivery |
| CINESKYJUETSTREAM PICTURES | 1/24/2007 | ILLUSIONIST, THE | Worldwide | 1/24/2007 | Spec'd | 12/1/2008 | Outside | 2 years from Availability Date |
| DIFUSION S.A. | 5/19/2002 | In The Shadows | Argentina, Chile, Paraguay, Uruguay | Execution | Spec'd | 6/2/2008 | Defd | 6 years from Complete Delivery |
| Rod Puskar Enterprises | 12/15/2002 | In The Shadows | Australia | 4/28/2003 | Defd | 12/15/2006 | Outside | the earlier of 7 years from Notice of Initial Delivery or Contract Cancelled or End of Initial Term |

4 of 7

-154-

**Persik Productions, Inc**

**Contracted Sales - Expiration Dates**

| Sub-Licensee/Licensee Name | Execution Date | Real Sub Property Name | License Territories | Rts Start Date | Stat'n | Rts Ends | Cat 7 | Notes/Frozen |
|---|---|---|---|---|---|---|---|---|
| PASATIEMPO PICTURES INC. | 5/4/2001 | In The Shadows | Baltic States | 5/4/2001 | Def'd | 6/6/2011 | Outside | the earlier of End of Initial Term or 10 years from Notice of Initial Delivery |
| CNR Film & video | 3/5/2000 | In The Shadows | Benelux | 3/5/2000 | Def'd | 1/31/2016 | Outside | the earlier of End or Initial Term or 15 years from Notice of Initial Delivery |
| Rongoon Group, Ltd. | 3/19/2002 | In The Shadows | Brazil | Execution | Spec'd | 3/19/2012 | Def'd | 10 years from Long Form Execution |
| HELIOS ENTAINMENT/21 ENTERTAINM | 3/6/2000 | In The Shadows | CIS (Russia) | 3/6/2000 | Def'd | 1/23/2008 | Outside | the earlier of End of Initial Term or 7 years from Notice of Initial Delivery |
| INTERPLUS INTERNATIONAL | 2/23/2000 | In The Shadows | Eastern Europe | 2/23/2000 | Def'd | 3/9/2011 | Outside | the earlier of End of Initial Term or 10 years from Notice of Initial Delivery |
| Pyrine Films | 11/22/2002 | In The Shadows | Eastern Europe | 11/22/2002 | Def'd | 10/22/2014 | Def'd | 10 years from Notice of Initial Delivery |
| Double V | 1/13/2003 | In The Shadows | France | Execution | Spec'd | 3/11/2010 | Def'd | 7 years from Complete Delivery |
| Helas World Int'l | 3/5/2000 | In The Shadows | Greece | 3/5/2000 | Def'd | 12/19/2012 | Outside | the earlier of End or Initial Term or 12 years from Notice of Initial Delivery |
| Haskolabo | 3/5/2000 | In The Shadows | Iceland | Execution | Spec'd | 6/26/2008 | Outside | the earlier of End of Initial Term or 7 years from Notice of Initial Delivery |
| PT Amero Mitra Jt. K.H. | 4/11/2001 | In The Shadows | Indonesia | 4/11/2001 | Def'd | 6/24/2009 | Outside | the earlier of End of Initial Term or 7 years from Notice of Initial Delivery |
| Forum Films | 4/3/2001 | In The Shadows | Israel | 4/3/2001 | Def'd | 6/19/2012 | Outside | the earlier of End or Initial Term or 10 years from Notice of Initial Delivery |
| Creaton Entertainment | 5/30/2003 | In The Shadows | Italy | Execution | Spec'd | 7/29/2008 | Def'd | 5 years from Complete Delivery |
| Cine Video | 6/20/2002 | In The Shadows | Mexico | Execution | Spec'd | 6/20/2009 | Def'd | 7 years from Long Form Execution |
| GULF FILM/ALMASSA | 3/19/2002 | In The Shadows | Middle East | Execution | Spec'd | 8/19/2009 | Def'd | 7 years from Notice of Initial Delivery |
| Scanbox Entertainment | 4/12/2000 | In The Shadows | Scandinavia | Execution | Spec'd | 5/16/2013 | Def'd | the earlier of End or Initial Term or 12 years from Notice of Initial Delivery |
| NU METRO FILM DISTRIBUTION | 3/29/2001 | In The Shadows | Southern Africa | 3/29/2001 | Def'd | 6/3/2011 | Outside | the earlier of End of Initial Term or 10 years from Notice of Initial Delivery |
| Lions Gate Films Inc. | 3/11/2000 | In The Shadows | US | Execution | Spec'd | 11/15/2025 | Def'd | 25 years from Complete Delivery |
| SGL ENTERTAINMENT LTD. | 10/26/2006 | JUMPSHOT | Asia | 4/1/2007 | Spec'd | 7/1/2008 | Def'd | 15 months from Pay TV Availability Date |
| HORIZON ONE ENTERTAINMENT PTY LTD | 8/21/2008 | JUMPSHOT | Australia | Execution | Spec'd | 7/11/2020 | Def'd | 12 years from Complete Delivery + 6 Month Non-Exclusive Sell Off Period |
| BELGA FILMS S.A. | 5/15/2005 | JUMPSHOT | Benelux | 5/15/2005 | Spec'd | 6/16/2018 | Def'd | 12 years from Notice of Initial Delivery |
| CONQUEST FILMES | | JUMPSHOT | Brazil | Execution | Spec'd | 7/23/2020 | Def'd | 14 years from Notice of Initial Delivery |
| MOTION PICTURE DISTRIBUTION LP | | JUMPSHOT | Canada | Execution | Spec'd | 7/23/2027 | Def'd | 20 years from Complete Delivery |
| HELIOS ENTAINMENT/21 ENTERTAINM | 6/28/2005 | JUMPSHOT | CIS (Russia) | 5/15/2004 | Spec'd | 6/16/2016 | Def'd | 10 years from Notice of Initial Delivery |
| AQS A.S. | 4/12/2005 | JUMPSHOT | Eastern Europe | 5/21/2004 | Spec'd | 6/16/2021 | Def'd | 15 years from Notice of Availability in any component of the Territory |
| Worldwide SPE Acquisitions Inc. | 12/8/2008 | JUMPSHOT | Germany | 5/21/2004 | Spec'd | 6/16/2021 | Def'd | 12 years from First Video Release |
| ProSiebenSat.1 Media AG | 6/16/2005 | JUMPSHOT | Germany | 4/23/2010 | Spec'd | 4/22/2028 | Spec'd | |
| VILLAGE ROADSHOW FILMS DISTRIBUTO | 5/21/2004 | JUMPSHOT | Greece | 5/21/2004 | Spec'd | 6/16/2021 | Def'd | 15 years from Notice of Initial Delivery |
| PT PARKIT FILM | | JUMPSHOT | India | 11/4/2005 | Spec'd | 4/2/2017 | Def'd | 9 years from Notice of Initial Delivery |
| PT Amero Mitra Jt. K.H. | 5/15/2004 | JUMPSHOT | Indonesia | 5/15/2004 | Spec'd | 6/16/2014 | Def'd | 7 years from Notice of Initial Delivery |
| UNITED KING VIDEO LIMITED | 5/15/2004 | JUMPSHOT | Israel | 5/15/2004 | Spec'd | 6/16/2021 | Def'd | 15 years from Notice of Availability plus addt'l 2 yrs if NG unrecouped |
| PHARS FILM CO., LLC. | 5/4/2004 | JUMPSHOT | Middle East | 5/4/2004 | Spec'd | 6/16/2013 | Def'd | 7 years from Notice of Initial Delivery |
| PRISVIDEO EDICOES VIDEOGRAFICAS, LDA | | JUMPSHOT | Portugal | 5/15/2004 | Spec'd | 6/16/2018 | Def'd | 12 years from Notice of Initial Delivery + addt'l 6-month sell-off period |
| NORDISK FILM A/S | 3/1/2004 | JUMPSHOT | Scandinavia | 3/1/2004 | Spec'd | 6/16/2021 | Def'd | 15 years from Notice of Initial Delivery |
| SHAW RENTERS (SINGAPORE) PTE LIMIT | 3/15/2004 | JUMPSHOT | Singapore | 3/15/2004 | Spec'd | 6/16/2013 | Def'd | 7 years from Notice of Initial Delivery |
| DARO FILM DISTRIBUTION | 9/29/2009 | JUMPSHOT | Southern Africa | 10/1/2009 | Def'd | 9/30/2019 | Def'd | 10 years from Notice of Initial Delivery |
| AURUM PRODUCCIONES S.A. | 10/2/2006 | JUMPSHOT | Spain | Execution | Spec'd | 3/27/2034 | Def'd | 27 years from Complete Delivery |
| MOMENTUM FILM HOUSE LTD. | 5/17/2004 | JUMPSHOT | Turkey | 5/17/2004 | Spec'd | 6/16/2016 | Def'd | 10 years from Notice of Availability |
| CINESKY/JETSTREAM PICTURES | 6/20/2007 | JUMPSHOT | Worldwide | 6/20/2007 | Def'd | 12/14/2009 | Def'd | 2 years from Complete Delivery |
| SGL ENTERTAINMENT LTD. | 3/27/2008 | KICKIN' IT OLD SKOOL | Asia | 10/27/2004 | Def'd | 1/26/2010 | Def'd | 15 months from Pay TV Availability Date - license Start Date |
| HORIZON ONE ENTERTAINMENT PTY LTD | 9/18/2008 | KICKIN' IT OLD SKOOL | Australia | Execution | Spec'd | 10/21/2020 | Def'd | 12 years from Complete Delivery + 6 Month Non-Exclusive Sell Off Period |
| BELGA FILMS S.A. | 8/24/2006 | KICKIN' IT OLD SKOOL | Benelux | Execution | Spec'd | 6/16/2018 | Def'd | 12 years from Notice of Initial Delivery |
| MOTION PICTURE DISTRIBUTION LP | | KICKIN' IT OLD SKOOL | Canada | Execution | Spec'd | 4/27/2027 | Def'd | 20 years from Complete Delivery |
| Worldwide SPE Acquisitions Inc. | 12/8/2008 | KICKIN' IT OLD SKOOL | Germany | Execution | Spec'd | 7/9/2016 | Def'd | 8 years from First Video Release |
| PT Amero Mitra Jt. K.H. | 3/28/2007 | KICKIN' IT OLD SKOOL | Indonesia | Execution | Spec'd | 5/29/2015 | Def'd | 8 years from Notice of Initial Delivery Availability |
| UNITED KING VIDEO LIMITED | 4/14/2008 | KICKIN' IT OLD SKOOL | Israel | Execution | Spec'd | 10/24/2023 | Def'd | 15 years from Notice of Initial Delivery |
| STAR TV S.A. | 11/12/2008 | KICKIN' IT OLD SKOOL | Latin America | Execution | Spec'd | 6/11/2024 | Def'd | 15 years from Notice of Availability for Satellite Transmission |
| PHARS FILM CO., LLC. | 7/12/2006 | KICKIN' IT OLD SKOOL | Middle East | Execution | Spec'd | 5/21/2014 | Def'd | 7 years from Notice of Initial Delivery |
| PRISVIDEO EDICOES VIDEOGRAFICAS, LI | 8/9/2006 | KICKIN' IT OLD SKOOL | Portugal | Execution | Spec'd | 5/29/2019 | Def'd | 12 years from Notice of Initial Delivery + addtl 6 month sell-off period |
| NORDISK FILM A/S | 4/27/2007 | KICKIN' IT OLD SKOOL | Scandinavia | Execution | Spec'd | 5/29/2022 | Def'd | 15 years from Notice of Initial Delivery |
| DARO FILM DISTRIBUTION | 9/29/2009 | KICKIN' IT OLD SKOOL | Southern Africa | 10/1/2009 | Def'd | 9/30/2019 | Def'd | 10 years from Notice of Initial Delivery |
| PRA Films | 1/25/2007 | KICKIN' IT OLD SKOOL | Turkey | Execution | Spec'd | 5/29/2017 | Def'd | 10 years from Notice of Initial Delivery |
| Warner Home Video Inc. | 6/13/2006 | KICKIN' IT OLD SKOOL | US | 7/13/2006 | Spec'd | 1/16/2008 | Def'd | |
| Starz Entertainment, LLC | 11/21/2007 | KICKIN' IT OLD SKOOL | US | 2/29/2008 | Spec'd | 2/26/2010 | Spec'd | |
| TWENTIETH CENTURY FOX | 3/23/2006 | KICKIN' IT OLD SKOOL | US | Execution | Spec'd | 8/26/2014 | Outside | 15 years from First Video Release |
| CINESKY/JETSTREAM PICTURES | 6/20/2007 | KICKIN' IT OLD SKOOL | Worldwide | 6/20/2007 | Def'd | 5/30/2009 | Def'd | 2 years from Complete Delivery |
| All Interactive Distribution | 12/1/2009 | LONELY MAIDEN aka THE MAIDEN HEIST | Australia | Execution | Spec'd | 12/1/2019 | Def'd | 10 years from Notice of Initial Delivery Availability |
| E1 Films Canada Inc | 1/29/2008 | LONELY MAIDEN aka THE MAIDEN HEIST | Canada | Execution | Spec'd | 1/9/2029 | Def'd | 20 years from Complete Delivery |
| Freeman Film Trade and Finance, Ltd. | 2/19/2008 | LONELY MAIDEN aka THE MAIDEN HEIST | Eastern Europe | Execution | Spec'd | 11/4/2023 | Def'd | 15 years from Notice of Initial Delivery |
| Elle Film AG | 1/26/2010 | LONELY MAIDEN aka THE MAIDEN HEIST | Germany | Execution | Spec'd | 1/26/2025 | Def'd | 15 years from Notice of Initial Delivery Availability |
| New Films International | 3/7/2008 | LONELY MAIDEN aka THE MAIDEN HEIST | Greece | Execution | Spec'd | 11/4/2020 | Def'd | |
| UNITED KING VIDEO LIMITED | 4/14/2008 | LONELY MAIDEN aka THE MAIDEN HEIST | Israel | Execution | Spec'd | 11/4/2023 | Def'd | 15 years from Notice of Initial Delivery |
| SWEN INTERNATIONAL HOLDINGS, LLC | 12/16/2009 | LONELY MAIDEN aka THE MAIDEN HEIST | Latin America | Execution | Spec'd | 12/16/2021 | Def'd | 15 years from Notice of Initial Delivery |
| PHARS FILM CO., LLC | 11/12/2007 | LONELY MAIDEN aka THE MAIDEN HEIST | Middle East | Execution | Spec'd | 11/4/2015 | Def'd | 7 years from Notice of Initial Delivery |
| PRISVIDEO EDICOES VIDEOGRAFICAS, LI | | LONELY MAIDEN aka THE MAIDEN HEIST | Portugal | To Be Det'd | Est'd | 11/4/2023 | Def'd | 12 years of 15 years from First Theatrical Release in United States or 15 years from Notice of Initial Delivery |
| NORDISK FILM A/S | 11/19/2007 | LONELY MAIDEN aka THE MAIDEN HEIST | Scandinavia | Execution | Spec'd | 11/4/2023 | Def'd | 15 years from Notice of Initial Delivery |
| STER KINEKOR ENTERTAINMENT, a divisi | 9/25/2009 | LONELY MAIDEN aka THE MAIDEN HEIST | Southern Africa | Execution | Spec'd | 9/25/2016 | Def'd | 7 years from Notice of Initial Delivery |
| DARO FILM DISTRIBUTION | 9/29/2009 | LONELY MAIDEN aka THE MAIDEN HEIST | Southern Africa | Execution | Spec'd | 3/8/2020 | Def'd | 10 years from Notice of Initial Delivery Availability |
| SINETEL | 11/24/2008 | LONELY MAIDEN aka THE MAIDEN HEIST | Turkey | Execution | Est'd | 11/4/2018 | Def'd | 10 years from Notice of Initial Delivery |
| SOURCE INVESTMENTS B.V. | 11/12/2004 | LOVE SONG FOR BOBBY LONG | Benelux | Execution | Spec'd | 9/29/2016 | Def'd | 12 years from Notice of Initial Delivery |

5 of 7

**Persik Productions, Inc**

**Contracted Sales - Expiration Dates**

| Licensee Name | Execution Date | Property Name | License Territories | Start | Est. | End | Est. | From |
|---|---|---|---|---|---|---|---|---|
| Central Partnership | 8/4/2003 | LOVE SONG FOR BOBBY LONG | CIS (Russia) | 8/1/2003 | Spec'd | 9/26/2017 | Defd | 12 years from Notice of Initial Delivery |
| New Films International | 2/26/2004 | LOVE SONG FOR BOBBY LONG | Eastern Europe | Execution | Spec'd | 9/29/2014 | Defd | 10 years from Notice of Initial Delivery |
| SMD | 7/25/2003 | LOVE SONG FOR BOBBY LONG | France | Execution | Spec'd | 12/1/2006 | Outside | the earlier of 15 years from First Theatrical Release or six (6) months from Delivery & Acceptance |
| Tobis Film GmbH & Co. KG. | 3/10/2005 | LOVE SONG FOR BOBBY LONG | Germany | 3/10/2005 | Spec'd | 3/21/2023 | Defd | 18 years from Notice of Initial Delivery |
| VILLAGE ROADSHOW FILMS DISTRIBUTIO | 11/14/2003 | LOVE SONG FOR BOBBY LONG | Greece | Execution | Spec'd | 9/29/2014 | Defd | 10 years from Notice of Initial Delivery |
| PT. MULTIPLEX MEDIA | 2/28/2005 | LOVE SONG FOR BOBBY LONG | Indonesia | Execution | Spec'd | 9/29/2011 | Defd | 7 years from Notice of Initial Delivery |
| FIVE STARS | 8/26/2003 | LOVE SONG FOR BOBBY LONG | Israel | Execution | Spec'd | 9/29/2014 | Defd | 10 years from Notice of Initial Delivery |
| LUCKY RED S.R.L. | 2/27/2003 | LOVE SONG FOR BOBBY LONG | Italy | Execution | Spec'd | 9/4/2019 | Outside | 15 years from Notice of Initial Delivery |
| PHARS FILM CO., LLC | 11/22/2003 | LOVE SONG FOR BOBBY LONG | Middle East | Execution | Spec'd | 9/29/2014 | Defd | 10 years from Notice of Initial Delivery |
| PRISVIDEO EDICOES VIDEOGRAFICAS, L | 12/15/2003 | LOVE SONG FOR BOBBY LONG | Portugal | Execution | Spec'd | 9/29/2014 | Defd | 10 years from Notice of Initial Delivery |
| Scanbox Entertainment | 8/5/2003 | LOVE SONG FOR BOBBY LONG | Scandinavia | Execution | Spec'd | 9/29/2014 | Defd | 10 years from Notice of Initial Delivery |
| Rich Entertainment, Inc. | 11/3/2006 | LOVE SONG FOR BOBBY LONG | South Korea | Execution | Spec'd | 9/20/2014 | Defd | 7 years from Notice of Initial Delivery |
| BOXOFFICE ENTERTAINMENT CO., LTD | 11/24/2003 | LOVE SONG FOR BOBBY LONG | Thailand | 11/24/2003 | Spec'd | 9/29/2011 | Defd | 7 years from Notice of Initial Delivery |
| ENTERTAINMENT IN MOTION | 9/26/2003 | LOVE SONG FOR BOBBY LONG | Worldwide | Execution | Spec'd | 8/31/2006 | Spec'd | |
| ROADSHOW FILMS PTY LTD | 8/12/2009 | NOTHING BUT THE TRUTH | Australia | Execution | Spec'd | 8/31/2024 | Defd | 15 years from Complete Delivery |
| E1 Films Canada Inc. | 3/13/2008 | NOTHING BUT THE TRUTH | Canada | Execution | Spec'd | 12/16/2028 | Defd | 20 years from Complete Delivery |
| Freeman Film Trade and Finance, Ltd. | 2/19/2008 | NOTHING BUT THE TRUTH | Eastern Europe | Execution | Spec'd | 10/7/2023 | Defd | 15 years from Notice of Initial Delivery |
| CTV International | 10/15/2009 | NOTHING BUT THE TRUTH | Germany | Execution | Spec'd | 10/31/2021 | Defd | 12 years from Notice of Initial Delivery |
| Elite Film AG | 8/25/2009 | NOTHING BUT THE TRUTH | Germany | 7/29/2009 | Spec'd | 8/25/2024 | Defd | 15 years from Notice of Initial Delivery |
| ProSiebenSat.1 Media AG | 9/26/2008 | NOTHING BUT THE TRUTH | Germany | 6/17/2010 | Outside | 6/17/2025 | Outside | 15 years from Pay TV Availability Date |
| New Films International | 3/7/2008 | NOTHING BUT THE TRUTH | Greece | Execution | Spec'd | 11/4/2020 | Defd | 12 years from Notice of Initial Delivery |
| PT Amero Mitra JI K.H. | 11/28/2007 | NOTHING BUT THE TRUTH | Indonesia | Execution | Spec'd | 10/7/2018 | Defd | 10 years from Notice of Initial Delivery |
| UNITED KING VIDEO LIMITED | 4/14/2008 | NOTHING BUT THE TRUTH | Israel | Execution | Spec'd | 10/7/2023 | Defd | 15 years from Notice of Initial Delivery |
| SWEN INTERNATIONAL HOLDINGS, LLC | 12/16/2009 | NOTHING BUT THE TRUTH | Latin America | Execution | Spec'd | 12/16/2024 | Defd | 15 years from Notice of Initial Delivery |
| PHARS FILM CO., LLC | 11/12/2007 | NOTHING BUT THE TRUTH | Middle East | Execution | Spec'd | 12/16/2021 | Defd | 12 years from Notice of Initial Delivery |
| PIONEER FILM | 6/30/2009 | NOTHING BUT THE TRUTH | Philippines | 10/1/2009 | Spec'd | 6/16/2014 | Defd | 5 years from Notice of Initial Delivery |
| PRISVIDEO EDICOES VIDEOGRAFICAS, L | 1/7/2008 | NOTHING BUT THE TRUTH | Portugal | To Be Defd | Estd | 10/7/2023 | Defd | 15 years from Notice of Initial Delivery |
| NORDISK FILM A/S | 11/19/2007 | NOTHING BUT THE TRUTH | Scandinavia | Execution | Spec'd | 10/7/2023 | Defd | the earlier of 15 years from First Theatrical Release in United States or 15 years from Notice of Initial Delivery |
| STER KINEKOR ENTERTAINMENT, a divisi | 10/12/2009 | NOTHING BUT THE TRUTH | Southern Africa | Execution | Spec'd | 10/12/2016 | Defd | 7 years from Notice of Initial Delivery |
| SINETEL | 11/24/2008 | NOTHING BUT THE TRUTH | Turkey | Execution | Estd | 10/7/2018 | Defd | 10 years from Notice of Initial Delivery |
| Transmission Films Pty. Limited | 10/29/2008 | PAINTED VEIL | Australia | Execution | Spec'd | 3/27/2020 | Defd | 12 years from First Theatrical Release in Australia |
| BELGA FILMS S.A. | 7/27/2005 | PAINTED VEIL | Benelux | 5/15/2005 | Spec'd | 11/18/2014 | Defd | 10 years from Notice of Initial Delivery |
| HE.IOS ENTERTAINMENT/21 ENTERTAINM | 5/15/2005 | PAINTED VEIL | CIS (Russia) | 11/1/2003 | Spec'd | 11/19/2016 | Defd | 12 years from Notice of Initial Delivery |
| WILMOT CORPORATION A.V.V. | 11/1/2003 | PAINTED VEIL | Eastern Europe | 11/1/2003 | Spec'd | 11/17/2018 | Defd | 12 years from Notice of Initial Delivery |
| Elite Film AG | 12/11/2008 | PAINTED VEIL | Germany | 11/18/2008 | Spec'd | 12/11/2023 | Defd | 15 years from Notice of Initial Delivery |
| ProSiebenSat.1 Media AG | 8/15/2006 | PAINTED VEIL | Germany | Execution | Spec'd | 1/15/2027 | Defd | 18 years from Pay TV Availability Date |
| UNITED KING VIDEO LIMITED | 6/9/2005 | PAINTED VEIL | Israel | Execution | Spec'd | 11/15/2021 | Defd | 12 years from Notice of Initial Delivery |
| EAGLE PICTURES SPA | 10/17/2005 | PAINTED VEIL | Italy | Execution | Spec'd | 2/23/2030 | Outside | the earlier of 23 years from First Theatrical Release or 6 months from Notice of Availability, to be revd not prior to 4 wks before US Th rel.; addtl 6 month sell-off for HV. |
| GUSSI S.A.de C.V. | 1/1/2004 | PAINTED VEIL | Latin America | Execution | Spec'd | 3/9/2027 | Defd | 20 years from Complete Delivery |
| ITALIA FILM | 11/1/2003 | PAINTED VEIL | Middle East | Execution | Spec'd | 11/17/2013 | Defd | 7 years from Notice of Initial Delivery |
| PRISVIDEO EDICOES VIDEOGRAFICAS, L | 8/30/2005 | PAINTED VEIL | Portugal | Execution | Spec'd | 11/18/2018 | Defd | 12 years from Notice of Initial Delivery |
| NORDISK FILM A/S | 3/1/2004 | PAINTED VEIL | Scandinavia | Execution | Spec'd | 11/15/2023 | Defd | 17 years from Notice of Initial Delivery |
| SHAW RENTERS (SINGAPORE) PTE LIMI | 11/1/2003 | PAINTED VEIL | Singapore | Execution | Spec'd | 11/18/2013 | Defd | 7 years from Notice of Initial Delivery |
| DARO FILM DISTRIBUTION | 9/29/2009 | PAINTED VEIL | Southern Africa | 10/1/2009 | Defd | 9/30/2016 | Defd | |
| AURUM PRODUCCIONES S.A. | 11/1/2005 | PAINTED VEIL | Spain | Execution | Spec'd | 3/9/2027 | Defd | 20 years from Complete Delivery |
| PRA Films | 11/4/2005 | PAINTED VEIL | Turkey | Execution | Spec'd | 11/15/2016 | Defd | 10 years from Notice of Initial Delivery |
| AURUM PRODUCCIONES S.A. | 11/1/2005 | PAINTED VEIL | United Kingdom | Execution | Spec'd | 3/9/2027 | Defd | 20 years from Complete Delivery |
| CINESKY/FISTREAM PICTURES | 8/15/2007 | PAINTED VEIL | Worldwide | Execution | Spec'd | 9/1/2009 | Outside | 2 years from Availability Date |
| New Films International | 6/19/2008 | Perfect Holiday | Greece | Execution | Spec'd | 6/19/2020 | Defd | 12 years from Notice of Initial Delivery |
| PHARS FILM CO., LLC | 11/19/2007 | Perfect Holiday | Middle East | Execution | Spec'd | 6/4/2015 | Defd | 7 years from Notice of Initial Delivery |
| PRISVIDEO EDICOES VIDEOGRAFICAS, L | 6/13/2008 | Perfect Holiday | Portugal | Execution | Spec'd | 6/13/2023 | Defd | 15 years from Notice of Initial Delivery |
| DARO FILM DISTRIBUTION | 9/29/2009 | Perfect Holiday | Southern Africa | 10/1/2009 | Defd | 9/30/2019 | Defd | |
| SINETEL | 11/24/2008 | Perfect Holiday | Turkey | Execution | Estd | 11/24/2018 | Defd | 10 years from Notice of Initial Delivery |
| ROADSHOW FILMS PTY LTD | 7/27/2009 | REAL MEN CRY aka WHAT DOESN'T KILL YOU | Australia | Execution | Spec'd | 7/31/2024 | Defd | 15 years from Complete Delivery |
| E1 Films Canada Inc. | 3/20/2008 | REAL MEN CRY aka WHAT DOESN'T KILL YOU | Canada | Execution | Spec'd | 1/29/2029 | Defd | 20 years from Complete Delivery |
| Elite Film AG | 8/25/2009 | REAL MEN CRY aka WHAT DOESN'T KILL YOU | Germany | 7/29/2009 | Spec'd | 8/25/2024 | Defd | 15 years from Notice of Initial Delivery |
| New Films International | 3/7/2008 | REAL MEN CRY aka WHAT DOESN'T KILL YOU | Greece | Execution | Spec'd | 11/4/2020 | Defd | 12 years from Notice of Initial Delivery |
| UNITED KING VIDEO LIMITED | 4/14/2008 | REAL MEN CRY aka WHAT DOESN'T KILL YOU | Israel | Execution | Spec'd | 11/14/2023 | Defd | 15 years from Notice of Initial Delivery |
| SWEN INTERNATIONAL HOLDINGS, LLC | 12/16/2009 | REAL MEN CRY aka WHAT DOESN'T KILL YOU | Latin America | Execution | Spec'd | 12/16/2024 | Defd | 15 years from Notice of Initial Delivery |
| PHARS FILM CO., LLC | 11/12/2007 | REAL MEN CRY aka WHAT DOESN'T KILL YOU | Middle East | Execution | Spec'd | 11/4/2015 | Defd | 7 years from Notice of Initial Delivery |
| PRISVIDEO EDICOES VIDEOGRAFICAS, L | 1/7/2008 | REAL MEN CRY aka WHAT DOESN'T KILL YOU | Portugal | To Be Defd | Estd | 1/14/2023 | Defd | 15 years from Notice of Initial Delivery |
| Sandrew Metronome International AB | 12/10/2009 | REAL MEN CRY aka WHAT DOESN'T KILL YOU | Scandinavia | Execution | Spec'd | 12/10/2024 | Defd | 15 years from Notice of Initial Delivery |
| STER KINEKOR ENTERTAINMENT, a divisi | 10/12/2009 | REAL MEN CRY aka WHAT DOESN'T KILL YOU | Southern Africa | Execution | Spec'd | 10/12/2016 | Defd | 7 years from Notice of Initial Delivery |
| New Films International | 3/7/2008 | REAL MEN CRY aka WHAT DOESN'T KILL YOU | Turkey | Execution | Spec'd | 11/4/2020 | Defd | 12 years from Notice of Initial Delivery |
| SSL ENTERTAINMENT LTD | 3/21/2005 | Resurrecting The Champ | Asia | 2/24/2009 | Spec'd | 5/23/2010 | Defd | 15 months from Pay TV Availability Date - License Start Date |
| ROADSHOW FILMS PTY LTD | 7/27/2009 | Resurrecting The Champ | Australia | Execution | Spec'd | 7/31/2024 | Defd | 15 years from Complete Delivery |
| BELGA FILMS S.A. | 8/24/2008 | Resurrecting The Champ | Benelux | Execution | Spec'd | 3/21/2018 | Defd | 12 years from Notice of Initial Delivery |
| KSA Entertainment Limited | 2/11/2005 | Resurrecting The Champ | Brazil | Execution | Spec'd | 5/21/2021 | Defd | 14 years from Notice of Initial Delivery |
| MOTION PICTURE DISTRIBUTION LP | 3/9/2007 | Resurrecting The Champ | Canada | Execution | Spec'd | 6/29/2027 | Defd | 20 years from Complete Delivery |
| Blue Sky Media/Modus Vivendi | 2/19/2005 | Resurrecting The Champ | Eastern Europe | Execution | Spec'd | 5/21/2022 | Defd | 15 years from Notice of Initial Delivery |

6 of 7

**Persik Productions, Inc**

**Contracted Sales - Expiration Dates**

| Licensee Name | Execution Date | Property Name | License Territories | Start(s) | Spec'd 2 | Ends | Est'd 2 | Expiration ... From |
|---|---|---|---|---|---|---|---|---|
| METROPOLITAN FILM EXPORT | 10/27/2006 | Resurrecting The Champ | France | Execution | Spec'd | 2/1/2026 | Def'd | the earlier of 18 years from First Release in Territory or 222 months from Initial Delivery |
| ProSiebenSat.1 Media AG | 7/1/2007 | Resurrecting The Champ | Germany | Execution | Spec'd | 4/23/2024 | Def'd | 15 years from Pay TV Availability Date |
| Elite Film AG | 8/25/2006 | Resurrecting The Champ | Germany | 7/29/2009 | Spec'd | 8/25/2024 | Def'd | 15 years from Notice of Initial Delivery |
| VILLAGE ROADSHOW FILMS DISTRIBUTO | 7/25/2006 | Resurrecting The Champ | Greece | Execution | Spec'd | 5/21/2022 | Def'd | 15 years from Notice of Initial Delivery |
| PT Amero Mitra JI. K.H. | 8/21/2006 | Resurrecting The Champ | Indonesia | Execution | Spec'd | 5/21/2015 | Def'd | 8 years from Notice of Initial Delivery Availability |
| UNITED KING VIDEO LIMITED | 7/27/2006 | Resurrecting The Champ | Israel | Execution | Spec'd | 5/21/2022 | Def'd | 15 years from Notice of Initial Delivery |
| PHARS FILM CO., LLC | 5/23/2006 | Resurrecting The Champ | Middle East | Execution | Spec'd | 5/21/2014 | Def'd | 7 years from Notice of Initial Delivery |
| PRISVIDEO EDICOES VIDEOGRAFICAS, LI | 2/13/2006 | Resurrecting The Champ | Portugal | Execution | Spec'd | 5/21/2019 | Def'd | 12 years from Notice of Initial Delivery + 6 mths selloff period |
| NORDISK FILM AS | 4/27/2007 | Resurrecting The Champ | Scandinavia | Execution | Spec'd | 5/21/2022 | Def'd | 15 years from Notice of Initial Delivery |
| DARO FILM DISTRIBUTION | 9/29/2006 | Resurrecting The Champ | South Africa | Execution | Spec'd | 9/30/2019 | Def'd | |
| AURUM PRODUCCIONES S.A. | 9/14/2006 | Resurrecting The Champ | Spain | Execution | Spec'd | 12/30/2029 | Def'd | 22 years from Complete Delivery |
| Alliance Atlantis Releasing Trading as Momer | 7/12/2006 | Resurrecting The Champ | United Kingdom | Execution | Spec'd | 12/30/2029 | Def'd | 22 years from Complete Delivery |
| ENTERTAINMENT IN MOTION | 3/3/2007 | Resurrecting The Champ | Worldwide | 3/14/2007 | Spec'd | 3/31/2010 | Spec'd | |
| SGL ENTERTAINMENT LTD. | 3/27/2008 | SHORTCUT TO HAPPINESS | Asia | 1/17/2009 | Def'd | 4/12/2010 | Def'd | 15 months from Pay TV Availability Date - License Start Date |
| New Site Distribuidora de Filmes Ltda. | 7/25/2007 | SHORTCUT TO HAPPINESS | Brazil | Execution | Spec'd | 7/25/2021 | Def'd | 14 years from Notice of Initial Delivery |
| HELIOS ENTERAINMENT/21 ENTERTAINM | 7/25/2007 | SHORTCUT TO HAPPINESS | CIS (Russia) | To Be Def'd | Est'd | 7/25/2014 | Def'd | 7 years from Notice of Initial Delivery |
| INTERPLUS DISTRIBUTION | 7/18/2008 | SHORTCUT TO HAPPINESS | Eastern Europe | Execution | Spec'd | 7/18/2018 | Def'd | 10 years from Notice of Initial Delivery |
| MEDIAPRO DISTRIBUTION | 9/29/2008 | SHORTCUT TO HAPPINESS | Eastern Europe - | Execution | Spec'd | 9/29/2018 | Def'd | 10 years from Notice of Initial Delivery |
| Worldwide SPE Acquisitions Inc | 12/8/2008 | SHORTCUT TO HAPPINESS | Germany | Execution | Spec'd | 5/7/2015 | Def'd | 7 years from First Video Release |
| Establissement Les Films Du Chamois (ELF) | 9/27/2007 | SHORTCUT TO HAPPINESS | Greece | Execution | Spec'd | 9/14/2019 | Def'd | 10 years from Notice of Initial Delivery |
| Formula Bollywood Pvt Ltd | 17/10/2008 | SHORTCUT TO HAPPINESS | India | Execution | Spec'd | 1/10/2016 | Def'd | 8 years from Notice of Initial Delivery |
| ECS FILM DISTRIBUTION | 4/17/2008 | SHORTCUT TO HAPPINESS | Middle East | Execution | Spec'd | 5/7/2018 | Def'd | 10 years from Notice of Initial Delivery |
| Viva Entertainment, Inc. | 9/19/2006 | SHORTCUT TO HAPPINESS | Philippines | 11/16/2005 | Spec'd | 11/16/2012 | Def'd | 7 years from Notice of Initial Delivery |
| PRISVIDEO EDICOES VIDEOGRAFICAS, LI | 8/13/2008 | SHORTCUT TO HAPPINESS | Portugal | Execution | Spec'd | 8/13/2023 | Def'd | 15 years from Notice of Initial Delivery |
| Korea Screen, Inc | 9/4/2008 | SHORTCUT TO HAPPINESS | South Korea | Execution | Spec'd | 9/4/2018 | Def'd | 10 years from Notice of Initial Delivery |
| DARO FILM DISTRIBUTION | 9/29/2009 | SHORTCUT TO HAPPINESS | Southern Africa | 10/1/2009 | Def'd | 9/30/2019 | Def'd | |
| CINESKY/JETSTREAM PICTURES | 6/20/2007 | SHORTCUT TO HAPPINESS | Worldwide | 6/20/2007 | Def'd | 6/23/2009 | Def'd | 2 years from Complete Delivery |
| All Interactive Distribution | 12/1/2009 | THE SOPHOMORE aka ASSASSINATION OF A HIGH SCHOOL PRESIDENT | Australia | Execution | Spec'd | 12/1/2019 | Def'd | 10 years from Notice of Initial Delivery Availability |
| SWEN INTERNATIONAL HOLDINGS, LLC. | 8/22/2007 | THE SOPHOMORE aka ASSASSINATION OF A HIGH SCHOOL PRESIDENT | Brazil | To Be Def'd | Est'd | 6/13/2020 | Def'd | 12 years from Notice of Initial Delivery |
| E1 Films Canada Inc | 1/23/2008 | THE SOPHOMORE aka ASSASSINATION OF A HIGH SCHOOL PRESIDENT | Canada | Execution | Spec'd | 1/15/2028 | Def'd | 20 years from Complete Delivery |
| AOS A.S. | 12/13/2007 | THE SOPHOMORE aka ASSASSINATION OF A HIGH SCHOOL PRESIDENT | Eastern Europe | Execution | Spec'd | 6/13/2024 | Def'd | 16 years from Notice of Initial Delivery |
| Capelight Pictures | 7/22/2009 | THE SOPHOMORE aka ASSASSINATION OF A HIGH SCHOOL PRESIDENT | Germany | 5/13/2009 | Spec'd | 5/13/2024 | Spec'd | |
| ProSiebenSat.1 Media AG | 7/13/2007 | THE SOPHOMORE aka ASSASSINATION OF A HIGH SCHOOL PRESIDENT | Germany | Execution | Est'd | 7/7/2025 | Outside | 15 years from Pay TV Availability Date |
| VILLAGE ROADSHOW FILMS DISTRIBUTO | 10/1/2007 | THE SOPHOMORE aka ASSASSINATION OF A HIGH SCHOOL PRESIDENT | Greece | Execution | Spec'd | 6/13/2020 | Def'd | 12 years from Notice of Initial Delivery |
| Formula Bollywood Pvt Ltd | 12/11/2008 | THE SOPHOMORE aka ASSASSINATION OF A HIGH SCHOOL PRESIDENT | India | Execution | Spec'd | 12/11/2016 | Def'd | 8 years from Notice of Initial Delivery |
| UNITED KING VIDEO LIMITED | 1/4/2008 | THE SOPHOMORE aka ASSASSINATION OF A HIGH SCHOOL PRESIDENT | Israel | Execution | Spec'd | 6/13/2023 | Def'd | 15 years from Notice of Initial Delivery |
| PHARS FILM CO., LLC | 7/24/2007 | THE SOPHOMORE aka ASSASSINATION OF A HIGH SCHOOL PRESIDENT | Middle East | To Be Def'd | Est'd | 6/13/2015 | Def'd | 7 years from Notice of Initial Delivery |
| PRISVIDEO EDICOES VIDEOGRAFICAS, LI | 8/27/2007 | THE SOPHOMORE aka ASSASSINATION OF A HIGH SCHOOL PRESIDENT | Portugal | To Be Def'd | Est'd | 6/13/2020 | Def'd | 12 years from Notice of Initial Delivery |
| NORDISK FILM A/S | 11/19/2007 | THE SOPHOMORE aka ASSASSINATION OF A HIGH SCHOOL PRESIDENT | Scandinavia | Execution | Spec'd | 6/13/2024 | Def'd | the earlier of 15 years from First Theatrical Release in United States or 15 years from Notice of Initial Delivery |
| PRA Films | 8/3/2007 | THE SOPHOMORE aka ASSASSINATION OF A HIGH SCHOOL PRESIDENT | Turkey | To Be Def'd | Est'd | 6/13/2018 | Def'd | 10 years from Notice of Initial Delivery |
| SGL ENTERTAINMENT LTD. | 10/26/2006 | THUMBSUCKER | Asia | 12/1/2006 | Spec'd | 3/1/2008 | Def'd | 15 months from Pay TV Availability Date |
| BELGA FILMS S.A. | 6/4/2003 | THUMBSUCKER | Benelux | 5/29/2003 | Spec'd | 9/22/2017 | Def'd | 14 years from Notice of Initial Delivery |
| HELIOS ENTERAINMENT/21 ENTERTAINM | 5/19/2003 | THUMBSUCKER | CIS (Russia) | 5/19/2003 | Spec'd | 9/22/2012 | Def'd | 7 years from Notice of Initial Delivery |
| New Films International | 7/7/2003 | THUMBSUCKER | Eastern Europe | 7/7/2003 | Spec'd | 9/22/2015 | Def'd | 10 years from Notice of Initial Delivery |
| Splendid Film GmbH | 8/6/2003 | THUMBSUCKER | Germany | Execution | Spec'd | 2/24/2031 | Def'd | 25 years from Technical Acceptance of the IM by Distrib |
| PT Amero Mitra Jl. K.H. | 5/21/2003 | THUMBSUCKER | Indonesia | 5/21/2003 | Spec'd | 9/22/2013 | Def'd | 8 years from Notice of Initial Delivery Availability |
| NORDISK FILM A/S | 10/13/2003 | THUMBSUCKER | Scandinavia | 10/13/2003 | Spec'd | 9/22/2019 | Def'd | 14 years from Notice of Initial Delivery |
| SHAW RENTERS (SINGAPORE) PTE LIMIT | 6/19/2003 | THUMBSUCKER | Singapore | 6/19/2003 | Spec'd | 9/17/2012 | Def'd | 7 years from Notice of Initial Delivery |
| SONY PICTURES CLASSICS, INC. | 3/6/2005 | THUMBSUCKER | US - Other Countries | 19/8/2004 | Spec'd | 9/22/2017 | Def'd | 25 years from Complete Delivery |
| SGL ENTERTAINMENT LTD | 3/27/2008 | WHERE THE RED FERN GROWS | Asia | 4/1/2009 | Def'd | 7/1/2010 | Def'd | 15 months from Pay TV Availability Date - License Start Date |
| ROADSHOW FILMS PTY LTD | 8/12/2009 | WHERE THE RED FERN GROWS | Australia | Execution | Def'd | 7/31/2024 | Def'd | 15 years from Complete Delivery |
| Blue Sky Media/Modus Vivendi | 11/3/2009 | WHERE THE RED FERN GROWS | Eastern Europe | Execution | Def'd | 8/14/2023 | Def'd | 13 years from Notice of Initial Delivery |
| PHARS FILM CO., LLC | 11/12/2008 | WHERE THE RED FERN GROWS | Middle East | Execution | Def'd | 11/24/2018 | Def'd | 10 years from Notice of Initial Delivery |
| DARO FILM DISTRIBUTION | 9/29/2009 | WHERE THE RED FERN GROWS | Southern Africa | 10/1/2009 | Def'd | 9/30/2019 | Def'd | |
| Warner Home Video Inc. | 9/13/2006 | WHERE THE RED FERN GROWS | US | 7/31/2006 | Spec'd | 7/31/2007 | Spec'd | |
| Starz Entertainment, LLC | 6/12/2009 | WHERE THE RED FERN GROWS | US | 10/1/2009 | Spec'd | 9/30/2011 | Spec'd | |
| Buena Vista Home Entertainment, Inc. | 5/13/2004 | WHERE THE RED FERN GROWS | US | 5/13/2004 | Spec'd | 12/21/2015 | Outside | 15 years from First Video Release |
| CINESKY/JETSTREAM PICTURES | 6/20/2007 | WHERE THE RED FERN GROWS | Worldwide | 6/20/2007 | Def'd | 10/8/2010 | Def'd | 2 years from Complete Delivery |

7 of 7

# EXHIBIT "4"

**PBUH PRODUCTIONS UNSECURED CLAIMS ANALYSIS AS OF JANUARY 1, 2011**

| Creditor | Claim No. | Amount of Claim | Description of Claim | Contingent/unliquidated/disputed | Amount of Claim |
|---|---|---|---|---|---|
| Alliance Atlantis Releasing Ltd (Momentum Pictures) | 18-1 | 3,096,509.00 | Judgement & contract claim (per PDC) | unliquidated / disputed | 10,156,779.45 |
| Alliance Films, Inc. (MFD) | 19-1 | 1,416,250.00 | Subject of litigation | unliquidated / disputed | 10,156,779.45 |
| Apsley Pictures GmbH&Co Film und KG | 16-1 | | | | 13,447,580.00 |
| Aurum Producciones S.A. | 19-1 | 2,483,565.28 | Settlement Agreement | Disputed | 10,156,779.45 |
| Aurum International | (7)- | 163,244.97 | N/A | Disputed | N/A |
| Bank Leumi | | | | contingent | 13,014,239.88 |
| Basanfilm Filmworks, Inc | | | Estimated participation | unliquidated | 173,060.00 |
| Barker Court Reporters | | | | | 173,060.00 |
| Bassline, Inc. | | | | | $0.00 |
| Baste & Titus | | | | | $0.00 |
| Careere | | | Services for protection against internet piracy | Disputed | $0.00 |
| Cathy Schulman, et al | | | Subject to litigation | unliquidated / disputed | 13,165.68 |
| Contagious Entertainment | 16-1 | 9,012,788.00 | Subject to ratification/litigation claim | unliquidated / disputed | $0.00 |
| Corporation Service Company | | | | | $0.00 |
| D.R. Reiffe & Associates | | | | | $0.00 |
| Daniel Keston | | | | | $0.00 |
| Directors Guild of America, Inc. | 34 | 1,679,691.00 | Litigation claims | unliquidated / disputed | 184,524.54 |
| Directors Guild of America - Producer Pension and Health | 13-1 | TBD | N/A | | N/A |
| Ex Films Canada, Inc. | 14-1 | 2,070,058.00 | Litigation claims | | $0.00 |
| F.A.W. Pictures Inc. | | | | | $0.00 |
| Equity Pictures Medien&Co KGII | | | Arbitration award | | 153,669.00 |
| Equity Pictures Medien&Co KGII | | | Matador LLC Guarantee | contingent / disputed | 15,170,330.00 |
| | | | Hostage LLC Guarantee | contingent / disputed | 15,470,330.00 |
| | | | Charronobus Guarantee | contingent / disputed | 14,185,000.00 |
| Fleetwood Limousine, Ltd | | | | | $0.00 |
| Franchise Tax Board | 1 | 358.00 | N/A | | N/A |
| Georgia & Associates | | | | | $0.00 |
| Grosvenor Park Investments, LLC | | | | | $0.00 |
| Harrelson Corp | 8 | 1,724,945.40 | N/A | Disputed | $0.00 |
| Horizons Corp | 10 | 1,724,945.40 | N/A | Disputed | 1,660,000.00 |
| Holland & Knight LLP | | | | Disputed | $0.00 |
| Insurance Co of Canada | | | | Disputed | $10,306.00 |
| Jacobson Russell, et al. | 32 | 283,391.45 | Litigation claims | unliquidated / disputed | $0.00 |
| James Pablo | 11 | 3,464,170.00 | Litigation claims | Disputed | 13,464,170.00 |

1 of 3

PERRIN PRODUCTIONS
UNSECURED CLAIMS ANALYSIS
AS OF JANUARY 31, 2011

| Creditor | Claim No. | Amount of Claim | Description of Claim | Contingent/Unliquidated/Disputed | Amount of Claim |
|---|---|---|---|---|---|
| Jason Byers | | | | | |
| Katy Canfield | | | | unliquidated | $0.00 |
| Lenen Works, Inc. | | | Estimated participation | $25,000.00 | $25,000.00 |
| Leica Sullivan et al LLP | | | | $0.00 | $0.00 |
| Martin Korneman | | | Litigation claims | unliquidated / disputed | $50,000.00 |
| Matt Dillon | 18 | 375,000.00 | N/A | not reported | N/A |
| MNP Zwerth Kaiez F?HY?CO | 26-1 | 2,098,374.48 | N/A | $3,174,071.00 | $3,174,071.00 |
| Michael Lerider Treating Inc. | | | Estimated participation | unliquidated / disputed | N/A |
| Motion Picture Pension & Health Plans | 32-1 | 3,746,179.00 | N/A | $190,000.00 | $190,000.00 |
| Natel Law Group | | | Debtor's litigation counsel | N/A | N/A |
| Nixon Peabody, LLP | 8 | 13,366.56 | Legal fees | Disputed | $145,909.99 |
| NTN, Inc./Edward Norton | | | Estimated participation | Unliquidated | $113,366.56 |
| O'Melveny & Myers, LLP | 11 | 344,093.01 | | $0.00 | $520,000.00 |
| Palatine Hills/Paul Carnalli | | | Estimated participation | no amount claims or comments | $0.00 |
| Paul Haggis, et al | 2 | 500,000.00 | N/A | Unliquidated/disputed | $16,987,067.00 |
| Paul Haggis, Inc. | 9 | 500,000.00 | N/A | N/A | N/A |
| Paul Haggis, Inc. | 4 | 6,500,000.00 | N/A | N/A | N/A |
| Paul Haggis, Inc. Klumba, Inc./Bobby Moresco | 10 | 6,500,000.00 | N/A | unliquidated / disputed | N/A |
| Producer Fees LLP | | | | | $0.00 |

| Creditor | Claim No. | Amount of Claim | Description of Claim | Contingent/Unliquidated/Disputed | Amount of Claim |
|---|---|---|---|---|---|
| Paxan, Inc. | 3 | N/A | N/A | N/A | N/A |
| Paxar, Inc. | 21 | 370,000.00 | N/A | No claim submitted | N/A |
| Rogue Pictures/Focus Features LLC | | | Accounting fees | | $4,350.00 |
| Saffer & Flint Accountancy Corp. | | | Accounting fees | | $4,350.00 |
| Screen Actors Guild, Inc | 37-1 | 4,317,461.00 | Subject of litigation | unliquidated / disputed | $4,317,638.64 |
| Screen Actors Guild Producer Pension & Health Plans | 34-1 | TBD | N/A | Disputed | N/A |
| Spillane Shaeffer et al | | | | | $0.00 |
| Star Insurance Company | 6 | 100,000.00 | Arbitrator fees | $0.00 | $4,575.00 |
| Steven Strick | | | Arbitrator fees | | $0.00 |
| The Peacock Group | | | | | $0.00 |
| Thomson CompuMark | | | Invoice No.02003493 | 193,341.00 | $0.00 |
| Union Bank of California, NA | | | Invoice No.00480/N / Contract No.2590169 | $18,076.00 / 194,408.00 | |
| | | | Union Total | 177,886.00 | |

PERISH PRODUCTIONS
UNSECURED CLAIMS ANALYSIS
AS OF JANUARY 31, 2011

| Creditor | Proof of Claim No. | Amount of Claim | Description of Claim | Schedule F (not on 3/30/10) Contingent / unliquidated / disputed | Amount of Claim |
|---|---|---|---|---|---|
| United Talent Agency | 25-1 | 246,015.31 | | Disputed | $318,878.66 |
| Warner Brothers Entertainment, Inc. | | - | | | $0.00 |
| Warner Independent Pictures, Inc. | | - | | | $0.00 |
| Warner Specialty Films, Inc. | | - | | | $0.00 |
| Writers Guild of America | 38-1 | 1,564,871.00 | Litigation claim | unliquidated / disputed | $353,642.79 |
| Writers Guild Industry Health Fund & Producer-Writers Guild of America Pension Plan | 35-1 | TBD | N/A | unliquidated / disputed | N/A |
| Winstead Sechrest & Minick P.C. | | - | | | |
| Wireless PF Acquisitions, Inc. | | | | Disputed | $0.00 |
| XL Reinsurance America Inc. | 5 | 100,000.00 | N/A | Disputed | $0.00 |
| Yari Film Group Releasing LLC (filed by Ch. 7 Trustee) | 31 | 20,918,000.00 | N/A | | N/A |
| Zclew | | - | | | $0.00 |
| Pilot Boy | | 2,760,363.67 | | | |
| Curlis | | | | | N/A |
| **TOTAL** | | **29,765,716.96** | | | **$36,593,816.17** |

# EXHIBIT "5"

**CHART I**

**ESTIMATED LIQUIDATION VALUE OF THE DEBTOR'S
ASSETS ASSUMING A LIQUIDATION UNDER CHAPTER 7**
**(February 1, 2011)**

| Assets | Fair Market Value (Est.) | Note | Liquidation Value |
|---|---|---|---|
| Cash | $25,000 | 1 | $25,000 |
| Accounts Receivable, Refunds, Deposits and Other Assets | 0 | 2 | 0 |
| Subsidiary Interests | $1,388,725 | 3 | $483,959 |
| Motion Picture Development Rights | 0 | 4 | 0 |
| Avoidance Action Claims | 0 | 5 | 0 |
| Causes of Action | 0 | 6 | 0 |
| **TOTAL EST. LIQUIDATION VALUE OF ASSETS:** | | | $518,959 |

-1-

MAINDOCS-#158523-v1-PErsikChartswNotes-1stAmndDS.DOC

**CHART II**

**ESTIMATED ADMINISTRATIVE AND PRIORITY
EXPENSES IN CHAPTER 7 LIQUIDATION**

| Expense | Note | Approx. Amount |
|---|---|---|
| Chapter 7 Trustee's Fees | 7 | $29,198 |
| Chapter 7 Trustee's Attorneys' Fees and Other Professional Fees | 8 | 100,000 |
| Cost of Services Necessary to Liquidate Assets During Chapter 7 | 9 | 0 |
| Chapter 11 Professional Fees (unpaid) | 10 | $459,901 |
| United States Trustee Fees | 11 | 975 |
| Allowed Priority Tax Claims | 12 | 0 |
| **TOTAL:** | | $590,074 |

-2-

MAINDOCS-#158523-v1-PErrakCharts wNotes-1stAmndDS.DOC

**CHART III**

**ESTIMATED DISTRIBUTION TO GENERAL
UNSECURED CREDITORS IN CHAPTER 7 LIQUIDATION**

Proceeds from Liquidation of Assets
    (Chart I)                                                $518,959

Less Proceeds Necessary to Satisfy Administrative and Priority Expenses
    (Chart II)

                                                 $590,074
Allowed Secured Claims (Note 13)                               0

        **TOTAL AVAILABLE FOR DISTRIBUTION TO HOLDERS
        OF ALLOWED GENERAL UNSECURED CLAIMS**        (\$71,115)

        **ESTIMATED AMOUNT OF ALLOWED GENERAL**     $40,000,000 -
        **UNSECURED CLAIMS IN CHAPTER 7 (Note 14)**     $45,000.000

        **ESTIMATED PERCENTAGE RECOVERY BY HOLDERS
        OF ALLOWED GENERAL UNSECURED CLAIMS IN
        CHAPTER 7**                                    **0%**

MAINDOCS-#138523-v1-PErsikChartswNotes-1stAmndDS.DOC

## NOTES TO LIQUIDATION ANALYSIS

Note 1:

Cash -- Consists of cash as of February 1, 2011, and is treated as 100% recoverable on that date.

Note 2:

Accounts Receivable, Refunds, Deposits and Other Assets -- The Debtor has no accounts receivable, rights to refunds or return of deposits, prepaid expenses, furniture or fixtures, machinery or equipment, inventory, or other assets, except as set forth to the contrary in Chart I of this Liquidation Analysis.

Note 3:

Subsidiary Interests -- The Subsidiary Interests constitute the Debtor's equity interests in the Subsidiaries. The value of the Subsidiary Interests listed in the chart attached hereto is based upon the projected Subsidiary Distributions that Subsidiaries will pay to the Debtor in a Chapter 7 liquidation of the Debtor. It should be recalled that the Debtor generally is not entitled to receive a Subsidiary Distribution from a Subsidiary unless and until the Subsidiary pays in full its obligations, both secured and unsecured, to its creditors.

The chart attached hereto sets forth the estimated value of each Subsidiary Interest in a Chapter 7 liquidation of the Debtor. The estimated liquidation value of each Subsidiary Interest is based upon the Debtor's projection of each Subsidiary's net cash flow (the Subsidiary's projected cash receipts less projected cash disbursements) in a Chapter 7 liquidation of the Debtor based, in part, upon the following assumptions:

1.    Subsidiary Assets (projected cash receipts):

    a.    Cash -- recoverable at 100%.

    b.    Accounts Receivable -- collections are discounted by 20% to address projected deterioration in value of receivables resulting from discontinuation of business relations and other effects of liquidation, such as potential assertion by Subsidiary account debtors of setoffs and other defenses to payment and potential attempts by account debtors to avoid paying in full obligations to a Chapter 7 trustee acting on behalf of the Debtor.

-4-

MAINDOCS-#158523-v1-PErsikChartswNotes-1stAmndDS.DOC

    c.      Projected valuations of unsold international territories -- discounted by 50% to account for the deterioration in value resulting from the liquidation.

    d.      Reversionary values -- discounted by 50% to account for the deterioration in value resulting from the liquidation.

2.    <u>Subsidiary Liabilities (projected cash disbursements)</u>:

    a.      Secured production loans — paid in full.

    b.      Secured obligations owed to the Guilds -- paid in a priority position by each Subsidiary at the lesser of (i) the full amount of the secured obligation that the Subsidiary owes to the Guilds, or (ii) the balance of the asset value of the Subsidiary (i.e., the value of the Guilds' collateral) after payment of the senior secured production loans. The Debtor projects that only approximately $1,452,700 of such secured claims would be payable to the Guilds based on the liquidation value of the Guilds' collateral.

    c.      Unsecured obligations owed to the Guilds -- paid <u>pari passu</u> with all other unsecured obligations of the Subsidiary only to the extent that such Subsidiary has value to pay such unsecured claims after payment of secured production loans and secured obligations owed to the Guilds.

    d.      Sales commissions — calculated at an effective rate of 15% for the sale of unsold international territories, servicing of existing contracts, negotiating and drafting of contracts, billings and collections, etc.

    e.      Profit Participation Claims -- where value is available, a Subsidiary must pay in full any third-party profit participation obligations of the Subsidiary before Subsidiary Distributions can be paid by such Subsidiary.

3.    <u>Net Equity (projected Subsidiary Distributions)</u>:

    a.      A Subsidiary can make Subsidiary Distributions to the Debtor only to the extent that projected cash receipts of the Subsidiary exceed projected cash disbursements of the Subsidiary.

    b.      Assets of certain Subsidiaries are cross-collateralized with the assets of other Subsidiaries to secure the repayment of certain secured production loans. The value of assets of certain Subsidiaries has been offset to satisfy the obligations of cross-collateralized Subsidiaries with negative asset value.

    c.      Values are limited to the Debtor's interest in each Subsidiary.

MAINDOCS-#158523-v1-PErsikChartswNotes-1stAmndDS.DOC

Persik Productions Inc.
Net Asset Valuation
As of February 15, 2011

# Note 3 to Liquidation Analysis

| | Accidental Haircut | Addicted | Block Party | ChannelChaser | Crash | Employee of The Month LLC | First Me Guilty | First Snow | Gray Matters | Pawas | Hindu | House of 9 LLC | Illusionist |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | | | | | |
| Cash | 742 | 170 | 295 | 427 | | 766 | 267 | 430 | | | 95 | 625 | 450 |
| Collection Account - Apollo | | | | | 70 | | | | | | | | |
| Collection Account - BVP | | | | | 272,282 | | | | | | | | |
| Accounts Receivable | 4,052,443 | 1,866,396 | | | 574,532 | 2,396 | 25,000 | 593,295 | 25,000 | 1,096,780 | 226,923 | 25,000 | 386 |
| Allowance for Doubtful Accounts | (120,612) | (76,896) | | 2,500 | 26,518 | | (35,000) | (549,245) | (25,000) | (80,000) | | 25,000 | |
| Value of Unpaid Territories | 77,500 | 192,500 | | | | 129,500 | 111,250 | 131,239 | 222,750 | 35,250 | 68,750 | 60,000 | 25,000 / 100,000 |
| Forecasted Royalties | | | 100,000 | | 600,000 | | | | | | | | (57) |
| Reduction in value of Receivables by 30% 30% | (784,366) | (333,909) | | | (5,864) | (698) | (635,629) | (8,835) | (111,675) | (209,756) | (45,385) | (30,000) | (17,135) |
| Reduction in value of Unsold Territories by 50% 50% | (38,750) | (96,250) | | (1,240) | | (64,250) | | (65,520) | | (17,625) | (34,375) | | |
| Accounts Receivable - Tax Credit | 1,592,437 | | | | | | | | | | | | |
| **TOTAL ASSETS** | 4,780,355 | 1,352,520 | 100,295 | 1,677 | 1,668,450 | 67,432 | 15,892 | 113,213 | 111,894 | 835,126 | 215,898 | 30,925 | 118,211 |
| **TOTAL POST PETITION RESIDUALS ON RECEIVABLES AND UNEARNED** | 148,644 | 44,055 | | 141 | 754 | 7,133 | 2,633 | 13,287 | 4,833 | 11,247 | 3,709 | 3,782 | 651 |
| | | | | | | | | | | | | | |
| **SECURED PRODUCTION LOANS** | | | | | | | | | | | | | |
| Secured Production Loans | 2,000,000 | | | | | | | | | | | | |
| Secured Tax Credit Financing | 1,500,000 | | | | | | | | | | | | |
| **TOTAL SECURED PRODUCTION LOANS** | 4,500,000 | | | | | | | | | | | | |
| **NET VALUE AFTER SECURED DEBT** | 102,780 | 1,347,415 | 100,295 | 1,537 | 1,667,677 | 80,293 | 92,260 | 199,946 | 108,687 | 843,181 | 207,290 | 27,093 | 117,515 |
| **TOTAL PRE-PETITION SECURED RESIDUALS** | 556,972 | 67,711 | 100,285 | 32,090 | 246,811 | 33,788 | 311,287 | 212,299 | 24,148 | 1,024,285 | 117,527 | 117,527 | 727,484 |
| **NET VALUE AFTER SECURED RESIDUALS** | (456,932) | 1,279,704 | 100,285 | (69,534) | 1,420,866 | 26,505 | (285,527) | (102,332) | 82,809 | 840,181 | (117,024) | (84,664) | (609,906) |
| **TOTAL PRE-PETITION UNSECURED RESIDUALS** | 103,391 | | | 142,316 | 184,417 | 55,606 | | 265,613 | 56,334 | 190,071 | 772,199 | 180,961 | |
| | | | | | | | | | | | | | |
| **OTHER UNSECURED LIABILITIES** | | | | | | | | | | | | | |
| Accounts Payable | 54,415 | 2,800 | 291,273 | 7,474 | 244,814 | 395 | 7,900 | 19,100 | 2,910 | 24,198 | 7,222 | | 15,781 |
| Sales Commission Payable | 578,945 | 369,100 | | 1,344 | 728 | 16,083 | 10,876 | 54,075 | 19,833 | 89,922 | | 5,125 | 29,373 |
| Sales Commission on Unsold and Forecasted Royalties 25% | 9,688 | 24,250 | 25,000 | 313 | 100,050 | 723 | 13,906 | 23,808 | 27,965 | 4,906 | 8,594 | 7,500 | 1 |
| Collection costs on Receivables 5% | 155,872 | 64,730 | | | 1,314 | | | 3,350 | | 41,871 | 9,077 | | 2,600,000 |
| Participations Payable | | | 2,135,584 | | 1,500,000 | | | | | | | 18,734 | |
| Residuals Payable A/M thru SAG | | | | 23,508 | | | 44,586 | | | | 93,408 | 18,879 | |
| Residuals Payable A/M thru YDRFD | | | | 450 | | | 5,199 | | | | 26,371 | 1,200 | |
| Residuals Payable - A/M from receivables | | | 1,140,722 | | | | | | | | 400 | | |
| Production Loans - Investory / German Funds | | | | 1,469,002 | | | 1,489,002 | 1,014,352 | 276,214 | | | | |
| Contingent Obligation - E1 | | | | | | | | | | | | | |
| **TOTAL OTHER UNSECURED LIABILITIES** | 799,021 | 467,747 | 3,594,793 | 1,487,568 | 7,912,453 | 18,547 | 1,551,019 | 1,113,343 | 328,632 | 159,249 | 154,072 | 45,199 | 2,645,147 |
| **TOTAL UNSECURED LIABILITIES** | 799,021 | 534,333 | 3,594,793 | 1,483,208 | 5,072,910 | 72,245 | 1,551,911 | 1,313,693 | 336,460 | 359,471 | 328,148 | 235,148 | 2,645,147 |
| **NET EQUITY** | (1,255,744) | 665,371 | (3,493,907) | (1,232,731) | (6,818,934) | (45,741) | (1,814,146) | (1,418,137) | (302,277) | (1,740,398) | (211,924) | (311,024) | (3,435,536) |
| **PERSIK'S OWNERSHIP INTERESTS** | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| **PERSIK'S EQUITY** | (1,256,744) | 665,371 | (3,493,907) | (1,232,731) | (1,389,463) | (45,741) | (1,814,146) | (1,418,137) | (302,277) | 465,301 | (1,740,398) | (155,512) | (3,435,536) |
| **Reversionary Value** | 100,000 | 300,000 | 100,000 | 100,000 | 200,000 | 100,000 | 100,000 | 150,000 | 150,000 | 190,000 | 200,000 | 50,000 | 450,000 |
| **Reduction in Reversionary Value** 50% | 100,000 | 150,000 | 50,000 | 50,000 | 100,000 | 50,000 | 100,000 | 90,000 | 10,000 | 90,000 | 100,000 | 25,000 | 200,000 |
| **Persik's Equity plus reversionary value, if greater than zero** | 0 | 848,371 | 0 | 0 | 4,209 | 0 | 0 | 0 | 0 | 535,301 | 0 | 0 | 0 |
| Less: Gu8d obligation on reversionary values | | | | | | | | | | | | | |
| Less: Reserve for Litigation costs | | | | | | | | | | | | | |
| **NET ASSET VALUE** | 0 | 848,371 | 0 | 0 | | 4,209 | 0 | 0 | 0 | 0 | | | |
| | Copyright owned by German Fund | | | | | Copyright owned by German Fund | | Copyright owned by German Fund | Copyright owned by German Fund | | | Copyright owned by German Fund | Copyright owned by German Fund |

See Accompanying Footnotes

Panda Productions, Inc.
Net Asset Valuation
As of February 15, 2011

## Note 3 to Liquidation Analysis

| ASSETS | In the Shadows | Judgment Cash Money | Kaye/K Old Bank/Stock | Lonely Maiden | for Bobby Long | 21 | 2 | 1453 | NDTT | One Truth Later | Painted Veil | Perfect Holiday | Real Men Cry | Resurrecting The Champ | Shortcut To Happiness | Happiness | Suono |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash | | 1,359 | | | | 21 | 2 | 1,453 | | 20 | 501 | | 39 | 84 | 782 | 84 | |
| Collection Account - Apollo | | | | | | | | | | | | | | | | | |
| Collection Account - BYP | | | | | | | | | | | | | | | | | |
| Accounts Receivable | | 125,034 | 76,500 | 225,000 | | | 1,250,705 | 574,700 | | | | 916,997 | 160,000 | | 297,000 | 756,318 | |
| Allowance for Doubtful Accounts | | (60,034) | (25,000) | | | | | | | | | | (122,000) | | (25,000) | (950,818) | |
| Value of Unpaid Receivables | 125,500 | 207,500 | 307,500 | 146,290 | 83,750 | | 477,500 | 2,790,000 | | 129,750 | 343,750 | 722,500 | 183,750 | | 245,500 | 450,000 | |
| Forecasted Royalties | | | | | | | | | | | | | | | | | |
| Reduction in value of Receivables by 10% | | (11,450) | (12,500) | (45,000) | | | (252,141) | (114,940) | | | | (183,399) | (13,500) | | (54,400) | (41,200) | |
| Reduction in value of unpaid Receivables by 50% | (62,750) | (103,750) | (153,750) | (171,125) | (41,875) | | (238,750) | (1,393,500) | | (64,875) | (174,375) | (361,250) | (91,875) | | (122,500) | (209,000) | |
| Accounts Receivable - Tax Credit | | | | | | | | | | | | | | | | | |
| **TOTAL ASSETS** | 62,750 | 150,709 | 146,370 | 563,269 | 41,898 | 21 | 1,239,314 | 1,873,713 | | 61,893 | 173,178 | 1,094,864 | 149,239 | 84 | 340,492 | 392,814 | 84 |
| **TOTAL POST PETITION RESIDUAL COLLECTABLES AND UNRESIDS** | 146,023 | 7,937 | 73,352 | 4,646 | 37,631 | | 34,780 | 2,170 | | 2,176 | 7,338 | 38,492 | 4,537 | | 15,881 | 66,710 | |
| SECURED PRODUCTION LOANS | | | | | | | | | | | | | | | | | |
| Secured Production Loans | | | | | | | | 2,313,588 | | | | | | | | 830,737 | |
| Secured Tax Credit Financing | | | 1,496,177 | | | | | | | | | | | | | | |
| **TOTAL SECURED PRODUCTION LOANS** | | | 1,496,177 | | | | | 2,313,588 | | | | | | | | 830,737 | |
| NET VALUE AFTER SECURED DEBT | 62,750 | 2,687 | 107,254 | (5,014,090) | 37,246 | | 1,141,143 | (534,784) | | 99,714 | 104,138 | 1,038,992 | 142,333 | | 324,692 | (534,193) | |
| **TOTAL PRE-PETITION SECURED RESIDUALS** | 208,287 | | 9,783 | 73,422 | 129,245 | | | 146,240 | | | 3,115 | 34,578 | 166,856 | | 32,033 | 186,109 | |
| NET VALUE AFTER SECURED RESIDUALS | 62,750 | 285,980 | 107,254 | (1,067,543) | (34,174) | | 1,013,411 | (534,784) | | (84,324) | 105,023 | 1,204,412 | (44,246) | | 295,849 | (994,274) | |
| TOTAL PRE-PETITION UNSECURED RESIDUALS | 204,370 | 72,442 | 14,216 | 129,214 | 20,077 | | | 406,191 | | | 3,416 | 3,415 | 174,535 | | 11,792 | | |
| OTHER UNSECURED LIABILITIES | | | | | | | | | | | | | | | | | |
| Accounts Payable | 16,636 | 18,454 | 237,747 | 3,022 | 15,623 | | | 5,600 | | 4,500 | 15,640 | 2,200 | | 4,256 | 19,335 | |
| Sales Commission Payable | 4,997 | 38,438 | 94,550 | 10,469 | 311,100 | | | 15,235 | | 133,338 | 10,200 | | 63,146 | 415,863 | |
| Sales Commission on Unsold and Forecasted Royalties | 15,618 | 25,558 | 82,231 | | 59,881 | | | 15,489 | | 43,594 | 90,313 | 22,969 | | 30,679 | 96,250 | |
| Collection Loan on Receivable | | 2,540 | 5,000 | | 53,028 | | | | | 38,680 | 2,720 | | 10,606 | 8,250 | |
| Participants Payable | | | | | | | | | | | | | | | | |
| Residuals Payable AFM thru IR2I | 28,338 | | | | | | | | | | | | | | | |
| Residuals Payable AFM thru H2010 | 4,551 | | | | | | | | | | | | | | | |
| Residuals Payable - AFM from receivables | 17,500 | | | | | | | | | | | | | | | |
| Production Loans - Treasury / German Funds | 900,840 | 1,329,406 | 822,106 | | | | | | | | | | | | | |
| Contingent Obligation - EII | | | | | | | | | | | | | | | | |
| **TOTAL OTHER UNSECURED LIABILITIES** | 1,004,430 | 1,289,738 | 1,240,526 | 13,491 | 141,056 | | 391,113 | | 21,899 | 332,334 | 132,689 | | 101,851 | 943,316 | |
| **TOTAL UNSECURED LIABILITIES** | 15,668 | 1,289,663 | 1,471,218 | 1,394,378 | 152,708 | 12,481 | 461,234 | 341,153 | | 21,099 | 429,284 | 91,599 | 332,334 | 33,699 | 101,851 | 943,316 | |
| NET EQUITY | 47,063 | (1,482,460) | (1,364,186) | (2,462,216) | (180,879) | | 151,681 | (888,969) | | (114,787) | 102,715 | 347,066 | (236,771) | | 170,225 | (1,607,588) | |
| PERSON'S OWNERSHIP INTERESTS | 100% | 100% | 100% | 100% | 100% | 100% | 30% | 100% | | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| PERSON'S EQUITY | 47,063 | (1,482,460) | (1,364,186) | (2,462,216) | (180,879) | | 151,681 | (266,961) | | (116,787) | 103,715 | 387,960 | (236,771) | | 170,225 | (1,607,588) | 0 |
| Reduction to Anniversary Value | | 100,000 | 100,000 | 100,000 | 100,000 | | 100,000 | 200,000 | | 200,000 | 100,000 | 200,000 | 200,000 | | 100,000 | 100,000 | |
| Less: Reserve for Litigation Costs | 0 | 50,000 | 50,000 | 100,000 | 50,000 | | 100,000 | 0 | | 100,000 | 60,000 | 100,000 | 100,000 | | 75,000 | 100,000 | 0 |
| **NET ASSET VALUE** | 47,063 | 0 | 0 | (685,542) | 0 | 0 | 291,681 | 0 | | 0 | 163,715 | 487,880 | 0 | 0 | 245,225 | (45,371) | 0 |

Copyright
owned by
German Fund

See Accompanying Footnotes

2 of 3

# Note 3 to Liquidation Analysis

Peak Productions, Inc.
Net Asset Valuation
As of February 15, 2011

| | Incremental | W7WD'g | Consequential |
|---|---|---|---|
| **ASSETS** | | | |
| Cash | | | 9,960 |
| Collection Account - Apollo | | | 276,293 |
| Collection Account - SYP | | | 974,532 |
| Accounts Receivable | | 19,100 | 12,127,982 |
| Allowance for Doubtful Accounts | 20,000 | | (1,979,929) |
| Value of Unsold Territories | | 217,500 | 8,105,000 |
| Forecasted Royalties | | | 600,000 |
| Reduction in value of Receivables by 35% | | (2,020) | (2,102,767) |
| Receivables reduced to Unsold Territories by 50% | (15,000) | (108,375) | (4,003,320) |
| Accounts Receivable - Tax Credit | | | 1,592,437 |
| **TOTAL ASSETS** | 11,000 | 116,855 | 19,904,142 ... 727,576 |
| | | | |
| **SECURED PRODUCTION LOANS** | | | |
| Secured Production Loans | | | 7,848,903 |
| Secured Tax Credit Financing | | | 1,500,000 |
| **TOTAL SECURED PRODUCTION LOANS** | | | 9,348,903 |
| | | | |
| **NET VALUE AFTER SECURED DEBT** | 15,920 | 111,314 | 9,661,040 |
| **TOTAL PRE-PETITION SECURED RESIDUALS** | 86,498 | 7,074 | 4,300,414 |
| **NET VALUE AFTER SECURED RESIDUALS** | (61,578) | 104,275 | 1,371,247 |
| **TOTAL PRE-PETITION UNSECURED RESIDUALS** | 109,453 | | 3,116,131 |
| | | | |
| **OTHER UNSECURED LIABILITIES** | | | |
| Accounts Payable | 2,100 | | 1,016,317 |
| Sales Commission Payable | | | 2,272,516 |
| Sales Commission on Unsold and Forecasted Royalties | 3,750 | 5,015 | 1,162,583 |
| Collective note on Receivables | | 27,188 | 430,593 |
| Participation Payable | | 404 | 12,451,569 |
| Residuals Payable A/M thru 9/08 | | | 205,328 |
| Residuals Payable A/M thru 12/2010 | | | 46,773 |
| Residuals Payable - A/M term receivables | | | 17,900 |
| Production Loans - Inventory / German Funds | | | 7,633,443 |
| Contingent Obligation - E1 | | | 2,070,086 |
| **TOTAL OTHER UNSECURED LIABILITIES** | 8,450 | 32,607 | 27,337,415 |
| | | | |
| **TOTAL UNSECURED LIABILITIES** | 112,882 | 32,821 | 30,407,744 |
| | | | |
| **NET EQUITY** | (186,419) | 71,899 | (39,376,337) |
| | | | |
| PERSIK'S OWNERSHIP INTERESTS | 100% | 33% | |
| | | | |
| **PERSIK EQUITY** | (186,419) | 23,644 | (34,993,458) |
| | | | |
| Reversionary Value | 100,000 | 49,000 | 3,140,000 |
| | | | |
| Reduction in Reversionary Value | 39,000 | 25,000 | 1,670,000 |
| | | | |
| Persik's Equity plus reversionary value, if greater than zero | 0 | 43,266 | 1,832,428 |
| | | | |
| Less: Build obligation on reversionary value | | | (848,000) |
| Less: Reserve for Litigation Costs | | | (240,000) |
| **NET ASSET VALUE** | | | 481,838 |

See Accompanying Footnotes

Note 4:

Motion Picture Development Rights -- The Debtor's Motion Picture Development Rights relate to scripts for motion pictures potentially to be developed by the Debtor, and any rights to recoup development costs with respect to such scripts. The Debtor attributes no value to such scripts and related rights.


Note 5:

Avoidance Action Claims -- The Debtor has not completed an evaluation of potential Avoidance Action Claims, and, accordingly, by the Disclosure Statement, the Debtor assumes, conservatively, that there will be no Net Recoveries from the prosecution of Avoidance Actions. Pursuant to the Plan, any Net Recoveries from the prosecution of Avoidance Actions will be paid to the Plan Fund and will increase the recoveries by holders of Allowed General Unsecured Claims. The Debtor believes the value of Avoidance Action Claims may be less in a Chapter 7 than in the Case because, in a Chapter 7, a trustee may not have funding sufficient to prosecute Avoidance Action Claims, and, therefore, may not be inclined to prosecute aggressively Avoidance Action Claims.


Note 6:

Causes of Action -- The Debtor has not completed an evaluation of potential Causes of Action, and, accordingly, by the Disclosure Statement, the Debtor assumes, conservatively, that there will be no Net Recoveries from the prosecution of Causes of Action. In the event that there are Net Recoveries pursuant to Causes of Action (including, without limitation, from the prosecution of any Yari Causes of Action), recoveries by holders of Allowed General Unsecured Claims may increase in accordance with the terms of the Plan. The Debtor believes that the value of Causes of Action may be less in a Chapter 7 than in the Case because, in a Chapter 7, a trustee may not have funding sufficient to prosecute Causes of Action, and, therefore, may not be inclined to prosecute aggressively Causes of Action.


Note 7:

Chapter 7 Trustee's Fees -- The Debtor estimates that a Chapter 7 trustee will distribute to Creditors approximately $518,959. Pursuant to section 326(b) of the Bankruptcy Code, a Chapter 7 trustee would be entitled to a fee equal to the following:  25% of the first $5,000 distributed to Creditors; 10% of any amount in excess of $5,000, but not in excess of $50,000, distributed to Creditors; 5% on any amount in excess of $50,000, but not in excess of $1.0 million, distributed to Creditors; and reasonable compensation not to exceed 3% of monies distributed to Creditors in excess of $1.0 million. The Debtor estimates, therefore, that the Chapter 7 trustee would be entitled to a fee of approximately $29,198.

-7-

MAINDOCS-#158523-v1-PErsikChartswNotes-1stAmndDS.DOC

Note 8:

Chapter 7 Trustee's Attorneys' Fees and Other Professional Fees -- The Debtor believes that the Chapter 7 trustee would need to retain counsel and accountants to assist him to liquidate the Debtor's assets and to administer the Debtor's Chapter 7 case. The Debtor estimates that the fees and costs incurred by such Professionals would be approximately $100,000.

Note 9:

Costs of Services Necessary to Liquidate Assets During Chapter 7 -- The Debtor believes that, in any Chapter 7 proceeding, the Chapter 7 trustee would be required to employ, on behalf of the Subsidiaries, sales agents and other services to assist in the liquidation of the Subsidiaries' assets. The cost of such services has been deducted from the proceeds projected to be received from the liquidation of the Subsidiaries' assets (i.e., the value for the Subsidiary Interests stated in Note 3 is a "net" value). The Debtor believes that there may be no need for the Chapter 7 trustee to employ any bookkeepers, technicians or other persons to assist the Chapter 7 trustee in the liquidation of the Debtor's other assets or to assist the trustee to administer the Debtor's Chapter 7 case. The Debtor projects, therefore, that there will no direct costs incurred by the Debtor for personnel or services to assist the Chapter 7 trustee to liquidate the Debtor's assets during Chapter 7.

Note 10:

Chapter 11 Professional Fees -- This amount is calculated as follows: the unpaid fees and costs of Winthrop Couchot Professional Corporation in the amount of approximately $258,901 as of January 31, 2011; and the unpaid fees and costs of the Committee's counsel, Pachulski, Stang, Ziehl & Jones, LLP, in the amount of approximately $201,000 as of January 31, 2011.

Note 11:

United States Trustee's Fees -- This amount is as of January 31, 2011.

Note 12:

Allowed Priority Tax Claims -- While approximately $71,573 in Priority Tax Claims have been asserted in the Case, the Debtor disputes such Priority Tax Claims, and believes that such Priority Tax Claims will not be allowed in the Case.

-8-

MAINDOCS-#158523-v1-PErsikChartswNotes-1stAmndDS.DOC

Note 13:

Allowed Secured Claims -- The Debtor projects that the Allowed Secured Claim of Bank Leumi will be paid in full in the ordinary course of the Subsidiaries' business operations, and that the Chapter 7 trustee would not be required to make any payments to Bank Leumi. While the Guilds have substantial secured claims against the Subsidiaries, the Guilds have direct Secured Claims against the Debtor only in connection with the Debtor's obtaining Subsidiary Distributions from the Debtor's Subsidiary, Illusionist Distribution, LLC ("Illusionist Distribution"). The Debtor projects that, in a Chapter 7 liquidation, Illusionist Distribution would make no distributions to the Debtor, and, accordingly, that the Guilds would have no material Secured Claim against the Debtor in a Chapter 7 liquidation.

Note 14:

Estimated Amount of General Unsecured Claims Allowed in Chapter 7 -- Based upon the Debtor's preliminary review of the Proofs of Claim filed in the Case, and the information contained in the Bankruptcy Schedules, the Debtor estimates that in excess of $70.0 million in General Unsecured Claims have been asserted against the Debtor. The Debtor disputes a substantial amount of such General Unsecured Claims. By the Disclosure Statement, the Debtor projects that General Unsecured Claims in the range of approximately $30.0 million to $40.0 million will be allowed in the Case. However, the Debtor believes that there would be a significant increase in General Unsecured Claims allowed in a Chapter 7 liquidation. In a Chapter 7 liquidation, the Chapter 7 trustee would have no knowledge of the Claims asserted against the Debtor, and, without the assistance of the Debtor's management, may not be in a position to evaluate effectively and, if appropriate, to object to Claims. Moreover, it is possible that, in a Chapter 7 liquidation, the Chapter 7 trustee may not be inclined to prosecute aggressively Causes of Action, and, as a result, there could be an increase in Allowed Claims because, by not pursuing aggressively Causes of Action against the holders of Disputed Claims (e.g., setoff claims), Disputed Claims could be allowed in a Chapter 7 that otherwise would not be allowed in the Case. Based upon the foregoing, the Debtor projects that approximately $40.0 million to $45.0 million in General Unsecured Claims would be allowed in a Chapter 7 liquidation.

MAINDOCS-#158523-v1-PErsikCharts w Notes-1stAmndDS.DOC

Persik Productions, Inc.
Footnotes to Liquidation Valuation
As of February 15, 2011

(1)  All Footnotes accompanying the Net Asset Valuation also apply to the Liquidation Valuation.

(2)  The Secured Production Loan on Lonely Maiden is cross-collateralized with NBTT and Real Men Cry. Therefore, the Liquidation Valuation is impacted by the valuation of Lonely Maiden.  This impact is limited to the value provided by NBTT and Real Men Cry

(3)  The Secured Production Loan on Sophomore is cross-collateralized with Addicted.  Therefore, the Liquidation Valuation is impacted by the valuation of Sophomore.  This impact is limited to the value provided by Addicted.

(4)  The following adjustments have been used for liquidation purposes:Collections have been reduced by 20% for liquidation purposes:

  (a)  Receivables has been reduced by 20%

  (b) Value of Unsold Territories and Forecasted Royalties have been reduced by 50%

  (c) Sales Commissions have been adjusted to a 25% across all titles to compensate for insolvent titles.

  (d) Collection costs have been estimated at 5% of net receivables

  (e) Reversionary values have been reduced by 50%

  (f) Residuals and receivables, unsolds, forecasted royalties and reversionary values have been reduced, accordingly.

(5)  It is assumed that the German Funds do not cancel the sale contracts on the titles owned by German Funds.

1

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

2

### PROOF OF SERVICE OF DOCUMENT

3

4

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 660 Newport Center Drive, 4th Fl., Newport Beach, CA 92660.

5

A true and correct copy of the foregoing document described as: **SECOND AMENDED DISCLOSURE STATEMENT TO ACCOMPANY DEBTOR'S SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

6

7

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On March 11, 2011, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

8

9

10

☒  Service information continued on attached page

11

II. **SERVED BY U.S. MAIL OR OVERNIGHT MAIL** (indicate method for each person or entity served):
On March 11, 2011 I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

12

13

14

Office of the U.S. Trustee
Russell Clementson, Esq.
725 S. Figueroa St., 26th Fl.
Los Angeles, CA 90017

15

16

17

☐  Service information continued on attached page

18

III. **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on March 11, 2011 I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

19

20

21

Honorable Barry Russell
USBC – Los Angeles Division
Roybal Federal Building
255 E. Temple St., Suite 1660
Los Angeles, CA 90012-3332

22

23

24

☐  Service information continued on attached page

25

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

26

27

| March 11, 2011 | Susan Connor | /s/ Susan Connor |
| --- | --- | --- |
| _Date_ | _Type Name_ | _Signature_ |

28

MAINDOCS-#158405-v5-PersikFirstAmndDisclosureStatement.DOC

**NEF SERVICE LIST**

- David E Ahdoot    dahdoot@bushgottlieb.com, tjimines@bushgottlieb.com
- Michael F Chekian    mike@cheklaw.com, msalanick@cheklaw.com
- Russell Clementson    russell.clementson@usdoj.gov
- Alicia Clough    alicia.clough@kayescholer.com
- Jeremy Faith    jfaith@goodmanfaith.com
- David Guess    dguess@ktbslaw.com
- Alan S Gutman    alangutman@gutmanlaw.com
- Garrick A Hollander    ghollander@winthropcouchot.com, sconnor@winthropcouchot.com;pj@winthropcouchot.com
- Lance N Jurich    ljurich@loeb.com, kpresson@loeb.com
- Joseph A Kohanski    jkohanski@bushquinonez.com, tjimines@bushgottlieb.com
- Robert E Opera    ropera@winthropcouchot.com, sconnor@winthropcouchot.com;pj@winthropcouchot.com
- Malhar S Pagay    mpagay@pszjlaw.com, mpagay@pszjlaw.com
- Jeremy V Richards    jrichards@pszjlaw.com, bdassa@pszjlaw.com
- Yonaton M Rosenzweig    yoni.rosenzweig@kattenlaw.com
- James R Selth    jim@wsrlaw.net, charles@wsrlaw.net
- Jonathon Shenson    jshenson@ktbslaw.com
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
- Pamela Kohlman Webster    pwebster@buchalter.com
- Eric D Winston    ericwinston@quinnemanuel.com
- Marc J Winthrop    mwinthrop@winthropcouchot.com, pj@winthropcouchot.com
- Melvin Yee    myee@bushgottlieb.com, tjimines@bushgottlieb.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28